**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**EAGLE'S NEST CONDOMINIUM**
**ASSOCIATION, INC., A/K/A**
**EAGLE NEST CONDOMINIUM ASSOC.**

**V.** **C.A.NO: 04-436ML**

**NEW LONDON COUNTY MUTUAL**
**INSURANCE COMPANY, NLC INSURANCE**
**COMPANIES, INC., DOES I THROUGH V**
**AND NLC INSURANCE COMPANIES,**
**ALIAS JOHN DOE COMPANY**

**DEFENDANTS, NEW LONDON COUNTY MUTUAL INSURANCE COMPANY AND NLC INSURANCE COMPANIES, INC.'S MOTION FOR SUMMARY JUDGMENT**

Now come the Defendants, The New London County Mutual Insurance Company and NLC Insurance Companies, Inc. (hereinafter "NLC"), and hereby moves this Honorable Court for Summary Judgment in the above-captioned matter. Defendant further relies on its reasons set forth in its Memorandum of Law appended hereto.

Respectfully submitted,
Defendant, "NLC"
By its attorneys,

Ronald Langlois, # 2891
Smith & Brink, P.C.
One State Street, Suite 400
Providence, RI 02908
Tel: (401) 351-9970
Fax: (401) 274-6218

# CERTIFICATION

To: Steven Orabone, Esq.
20 Ridgevale Court
Cranston, RI 02921

I hereby certify that I hand delivered a true copy of the within to the above listed attorney(s) on the 31 day of January, 2006.

Dana Palangio

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., A/K/A EAGLE NEST CONDOMINIUM ASSOC.**

**V.** **C.A.NO: 04-436ML**

**NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY**

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### I. Introduction

This is a declaratory judgment action to determine whether the defendant (hereinafter "NLC") should provide insurance coverage for the reported failure of defectively constructed floor trusses at the Eagle's Nest Condominium complex. The complex consists of 120 condominium units contained in approximately 48 buildings, of which there are several different styles. Construction on the condominiums commenced prior to 1983 and proceeded in phases over several years. Some of the individuals associated with the problematic units are original owners since 1983. In other effected units there have been multiple owners.

### II. Insurance

NLC insured Eagle's Nest Condominium Association pursuant to a commercial policy commencing on or about December 20, 2000 and continuing through December 22, 2004, with separate consecutive policy periods. Eagle's Nest did not notify NLC of any problems until March 15, 2004.

### III. Loss

On June 28, 2002, Joan Zeller, an association member who lived at 15C Eagles Run, reported to Eagle's Nest's property manager that approximately one week earlier, she had run into another unit owner who reported that their dining room ceiling was sagging. Ms. Zeller wrote:

> "This came as no surprise as my living and dining room floors have been sinking for over a decade. Every time I hear a loud cracking noise I break out in a cold sweat. My first concern of course is the correction of the

> structural stress before we have a catastrophe...The gentleman from your staff thought he'd have an answer by this coming Monday, July 1, 2002, after researching the blue prints from town hall to determined (sic) where the center beam was." (Exhibit A - Zeller Letter 6/28/02)

Shortly thereafter, Eagle's Nest retained an engineer to assess the problem in building 15. It was reported that there was a five (5) inch deflection in unit 15A. The engineer subsequently inspected condominium units in other buildings and found deflections of various degrees ranging from an inch and a half, to three inches (Exhibit J – Bogle Report) He has since testified that the problem was due to the quality of materials used in making the trusses, which existed from the day they were installed some nineteen to twenty years earlier.

Through counsel, Eagle's Nest immediately began exploring its legal options. However, Eagle's Nest did not notify NLC of any problems and continued to renew its policies.

By February 10, 2003, Eagle's Nest had consulted with Sydney Smith, its insurance agent, who had nearly forty years of insurance experience. He reviewed the engineering report and determined that NLC's policy did not provide coverage for the loss.

With respect to placing NLC on notice, Eagle's Nest's insurance agent testified:

> "I don't know if I would have used the term, pluses and minuses. But you can put a carrier on notice of a potential claim and the carrier has the right to investigate to determine a lot of the facts about the situation and then look at their policy to determine if they feel that there's coverage, that's not a position that I would be in. However, being a knowledgeable insurance person...I would recognize that this type of situation could be a very serious underwriting consideration of not only NLC, but any other carrier looking at the acceptability of the risk." (Deposition of Sidney Smith, P. 57, L22-P. 58, L9)

Mr. Smith was further asked:

Q. Did you discuss... [with Eagle's Nest's property manager] any potential pitfalls of putting NLC on notice of this loss?

A. I don't recall that specifically. But if by pitfalls you mean what could be some of the consequences of doing it, of putting NLC on notice, I can clearly understand why an insurance company would not want to stay on the risk or a new carrier to go on the risk. There's a lot of coverages under this type of policy besides collapse. But this could have an impact on the general liability.

(Deposition of Sidney Smith, P. 58, L10-20)

Despite the insurance agent's position, Eagle's Nest's property manager recommended submitting the claim to its insurance carrier [NLC] and obtaining a denial letter. The Eagle's Nest Association rejected the advice and did not notify NLC of the problem. (Exhibit B, P. 47, L21-25) Eagle's Nest then repaired four units without giving NLC the opportunity to inspect the conditions, verify their measurements or assess the cost. (Exhibit J – Bogle Report)

In May of 2003, the Eagle's Nest Condominium Association discussed "insurance lawsuit updates" with their counsel. After discussing "insurance lawsuit updates" with their attorney, but prior to providing NLC with any notice, they repaired an additional eight units. (Exhibit J – Bogle Report)

On or about March 15, 2004, twenty-one months after Eagle's Nest was undisputedly aware of a problem, thirteen months after they had consulted with their insurance agent, and ten months after they discussed "insurance lawsuit updates" with their attorney, Eagle's Nest notified NLC of the problem. (Exhibit H – Aube Letter 3/15/04) By then, fourteen units had been repaired without NLC having had the opportunity to assess the claim. (Exhibit J – Bogle Report)

One hundred and seven (107) days later, Eagle's Nest filed a lawsuit against NLC in the Kent County Superior Court. However, Eagle's Nest did not serve NLC with the complaint, nor did they provide NLC with a copy of the lawsuit.

On August 12, 2004, NLC, through its counsel, requested Eagle's Nest to produce various documents relating to the history of the property, the problem and various association meetings. (Exhibit K – Request 8/12/04) Eagle's Nest did not respond to this request.

On September 27, 2004, Eagle's Nest served the insurance commissioner with the complaint. Subsequently, the matter was removed to Federal Court.

On January 14, 2005, following the Court's mandatory conference, NLC served Eagle's Nest interrogatories and request for production of documents. Eagle's Nest responded to the discovery requests on or about August 1, 2005, thirty-seven months after the loss occurred. It is at this point in time that NLC learned for the first time about the June 28, 2002 Zeller letter. Additionally, the plaintiff provided the following response to Interrogatory 17:

17. For each unit you claim had defective trusses, please identify:

a. the unit number;
b. the unit owner;
c. the date the owner purchased the unit;
d. the date the problem was reported;
e. who determined the problem;

f. how the problem was determined;
g. what the problem was;
h. all repairs performed;
i. who performed the repair work;
j. the cost.

*Plaintiff objects to answering this interrogatory as posed. Plaintiff has not kept a separate record that summarizes the requested information. Said information is irrelevant, and the question is not reasonably calculated to lead to the discovery of admissible evidence. What is more, it would be unduly burdensome, unduly expensive, and unduly oppressive to require Eagle's Nest Condominium Association, Inc. to attempt to answer this interrogatory as posed. Plaintiff could attempt to answer this interrogatory by reviewing the documents Plaintiffs produced in response to Defendant's production request. Defendant's however, are equally capable of doing so. Since it is Defendant's that seek such information, it should be Defendant's burden to do so. Without waiving this objection, Plaintiff incorporates as its answer to this interrogatory the various documents Plaintiffs have produced in response to Defendant's production requests. Plaintiff answers, further, that in approximately August of 2002, Steven Bogle orally informed the board of the problems with the trusses. Mr. Bogle followed this up in November 2002 with a written report of the truss problems. As further answer to this interrogatory, see Plaintiff's answer to interrogatory 4, which is incorporated by reference.*

While there are a multitude of reasons why Eagle's Nest is not entitled to coverage, there are four (4) coverage issues which are ripe for summary judgment determination.

**A. <u>THE PLAINTIFF FAILED TO FILE ITS COMPLAINT WITHIN THE POLICY'S TWO YEAR SUIT PROVISION</u>**

The policy in issue provides in pertinent part:

*Legal Action against us*

*No one may bring a legal action against us under this coverage part unless:*

***

*2. The action is brought within two years after the date on which a direct physical loss or damage occurred.*

Rhode Island has long adhered to the validity of limitation periods in insurance contracts. <u>DiIorio v. Abington Mutual Fire Insurance Co</u>., 121 R.I. 689, 694; 402 A.2d 745, 747 (1979); <u>Hay, et al v. Pawtucket Mutual Ins. Co</u>, 824 A.2d 458, 460 (R.I. 2003). Indeed the specific two year provision in issue was held valid in the matter of <u>Maywood Corporation and Admiral Condominium Association v. NLC Insurance Company</u>, 754 A.2d 109 (R.I. 2000).

The limitation period in an insurance contract runs from the date of the loss. DiIorio v. Abington Mutual Fire Insurance Co., 121 R.I. 689, 695; 402 A.2d 745, 748 (1979); Hay, et al v. Pawtucket Mutual Ins. Co, 824 A.2d 458, 460 (R.I. 2003). When, as here, the facts relevant to the issue of statute of limitations are not in dispute, resolution of the question, becomes a matter of law and summary judgment is appropriate. Id.

In the instant matter, it is uncontroverted that prior to June 28, 2002, the plaintiff was aware there were substantial structural problems with the trusses. On that date Ms. Zeller wrote to Eagle's Nest property manager:

> "About a week ago I had the occasion to catch up with Al Jackvony, son of Mrs. Jackvony in 15A.
>
> ***
>
> At the time he expressed concern about his mother's dining room ceiling and the fact it was sagging. This came as no surprise as my living and dining room floors have been sinking for over a decade. Now there is perceivable lean to all my furniture and you can feel the floor sloping as you walk across it. It was frightening to learn it had sagged enough to caused (sic) Mrs. Jackvony's ceiling to sag too. Every time I hear a loud cracking noise I break out in a cold sweat...My first concern of course is the correction of the structural stress before we have a catastrophe but just as important is the time frame in which this will be done.
>
> ***
>
> Needless to say, I would like to see this thing resolved ASAP and look forward to hearing the planned solution and time-frame for action to be taken, as soon as possible. The gentleman from your staff thought he'd have an answer by this coming Monday, July 1, 2002, after researching the blue prints from town hall to determine where the center beam was. (Exhibit A – Zeller Letter 6/28/02)

Ms. Zeller's description of the defect is "sufficiently significant to alert [the plaintiff] to the possibility of a defect". See, Lee v. Morin, 469 A.2d 358, 360 (R.I. 1983)

In Lee v. Morin, supra, the Rhode Island Supreme Court held that with respect to improvements to real property, the statute of limitations begins to run when the evidence of injury to property, is sufficiently significant to alert the injured party to the possibility of a defect. Id. See, Lally v. Allstate Ins. Co., 724 F. Supp. 760, 761-63 (S.D. Cal. 1989) aff'd 930 F. 2d 28 (9th Cir. 1991) (reasonable person on notice of loss when damage is reasonably observable not after geologist report identifying cause).

Consistent with Ms. Zeller's observation that the structural problem had existed for a substantial period of time prior to June 2002, the owner of unit 3C reported at the

owners' meeting of December 9, 2003 that, " two years ago she reported a deflection in her basement. Nothing was done so her husband braced it. Called for an inspection by an engineer, but has not happened". (Exhibit E- 12/9/03 Executive Minutes)

Ms. Broussard, a former president of Eagle's Nest Condominium Association, testified that Eagle's Nest knew in June 2002 that "indications are there is insufficient central beam support as floors are bowing." (Deposition of Ms. Broussard, P. 26)

In her June 2002 report, Barbara Perrino, Eagle's Nest's property manager, wrote:

> A structural problem in building 15 is under review with Geisser Engineering. This appears to be a serious problem and we will forward information as soon as possible. This quadplex apparently was the first quadplex constructed during development. Indications are that there is insufficient central beam support as floors are bowing. (Exhibit C – Perrino Report 6/2002)

The November 18, 2002, Eagle's Nest Condominium Association's board meeting minutes state:

> "Building 15: First regarding legal avenues the board may pursue regarding the structural issues, there seems to be some confusion as to the limitations imposed by law. The question is- can action be taken from date of discovery or date of completion? Do we have a case or don't we? Can we go ahead and pursue legal action against the appropriate parties? Do we have a case or not? It was requested of [counsel for Eagle's Nest] to provide specifics and outline chances of success. The board is eager to move on the issue." (Exhibit G – 11/18/02 Executive Minutes)

On June 30, 2004[1], Eagle's Nest Condominium Association's adjuster wrote to James Hainey at RJ Marguetta Adjustment, NLC's independent adjuster, stating:

> "Please be advised that on this date, and pursuant to the terms of the Commercial Policy Conditions, the insured, Eagle Nest Condominium Association has filed a legal action against New London County Mutual Insurance Company for damages sustained to property as a result of collapse.
>
> Our records indicate... that the date of loss is July 2002 and not the referenced date of loss of 11/29/02 as it appears in you letter of 5/28/04 to the insured an thus the two year anniversary is approaching." (Exhibit I – 6/30/04 Letter)

[1] Eagle's Nest Condominium Association filed an action against "NLC' in the Kent County Superior Court on June 30, 2004.

This correspondence from Eagle's Nest's insurance adjuster demonstrates that "the plaintiff was not lulled by the insurer into a reasonable belief that [her] claim would be settled without suit, but instead felt compelled to bring suit against the insurer to enforce [her] claim" DiIorio v. Abington Mutual Fire Insurance Co., 121 R.I. 689, 695; 402 A.2d 745 (1979).

Ms. Zeller's correspondence of June 28, 2002 conclusively establishes that at a minimum, the loss occurred at least one week before June 28, 2002. Thus, the filing of the Complaint on June 30, 2004 was, as a matter of law, not within the two year suit provision.

## B. THE PLAINTIFF'S DELIBERATE FAILURE TO PROVIDE NLC WITH PROMPT NOTICE PRECLUDES COVERAGE

Like all liability policies, NLC's policies required Eagle's Nest to provide them with prompt notice of the loss.

The pertinent portion of the insurance policies provides:

DUTIES IN THE EVENT OF LOSS OR DAMAGE

a. You must see that the following are done in the event of loss or damage to covered property:

(2) Give us prompt notice of the loss or damage, include a description of the property involved;

(3) As soon as possible, give us a description of how and where the loss or damage occurred.

The purpose of a policy provision requiring the insured to give the company prompt notice… of a claim is to give the insurer an opportunity to make a timely and adequate investigation of all the circumstances. An adequate investigation often cannot be made where notice is long delayed because of the possible removal or lapse of memory on the part of witnesses, the loss of opportunity for examination of the physical surroundings…Such a requirement [for timely notice] tends to protect the insurer against… invalid claims made in good faith. 8 Appleman, Insurance Law and Practice § 4734 (2nd Ed); 13 G. Couch, Cyclopedia of Insurance Law §49.39-49.48 (2nd Ed).

Stated more succinctly, the notification serves to facilitate the timely investigation of claims by bringing an event to the attention of an insurer that allows an inquiry "before the scent of factual investigation grows cold". Textron, Inc. v. Liberty Mutual Ins. Co., 639 A.2d 1358, 1364 (R.I. 1994)

"In determining whether notice was given within a reasonable time, the following circumstances, among others, have been considered to be relevant: the length of delay in giving the notice, the reasons for the delay, and the probable effect of the delay on the insurer." 8 Appleman, Insurance Law and Practice, § 4734 at 29. Consideration of the effect of the delayed notice involves the extent of any prejudice suffered by an insurer

given it was not notified of a loss or claim within a reasonable time. Pickering v. American Employers Ins. Co., 109 R.I. 143, 158 (1971).

The uncontroverted chronology of events conclusively demonstrates that Eagle's Nest made a conscious decision not to promptly notify NLC, thus depriving NLC of the opportunity to examine critical evidence.

In June of 2002, Eagle's Nest knew that they had a substantial structural problem. By July 2002, they had an engineering report and an attorney. [2] By February 10, 2003, they consulted with their insurance agent, who had more than forty years of experience. More importantly, as of February 10, 2003, they rejected their property manager's recommendation to submit the claim to the carrier to obtain a denial letter. Eagle's Nest then waited an additional thirteen months to put NLC on notice of the claim. During that thirteen month period of time, Eagle's Nest repaired thirteen units, depriving NLC of the ability to verify the conditions and assess the repairs. This late notice deprived NLC critical evidence in determining whether the loss commenced during its policy periods.

It must be remembered that in June of 2002, NLC had only insured the property for eighteen months. We know that Ms. Zeller stated that the problem had existed for ten years. We also know the owners of Unit 3C stated that they had reported the problem two years earlier. They have since moved to Florida.

The plaintiff's expert states that the defect causing the problem existed from the date of construction, some eighteen to nineteen years earlier. The plaintiff's expert testified that the condition had existed for a while, but he could not estimate as to how long.

According to the reports made by the plaintiffs, the units that were repaired before NLC was put on notice, had the most significant problems. Units such as 15A and 15B had five inches of deflection; Units 22A and 22B had three inches deflection; Units 40A and 40B had two inches of deflection. (Exhibit J – Bogle Report) An examination of the condition in these units would have revealed the best evidence as to how long the problem existed. All of these units were repaired before NLC had notice of the claim. Some of the owners of the effected units, (3C) have since moved. Even for the witnesses who are still available it would be unreasonable to expect them to fully recall events which occurred years before.

There is nothing to suggest that plaintiff's engineer or anyone else had any interest in determining when the damage occurred when they did the initial inspection. See. Carl v. Oregon Auto. Ins. Company/North Pac. Ins. Co., 141 Ore. App.515 (1996) (insured failed to give timely notice where it removed evidence without regard for when loss occurred even though it took photos).

---

[2] The plaintiff is unable to locate minutes from the July 2002 executive board meeting where the issues were no doubt discussed.

The plaintiff's failure to provide timely notice was compounded by its lack of cooperation after notice was given. On August 12, 2004, Eagle's Nest was asked to provide a series of documents so that NLC could investigate this loss. (Exhibit K – 8/12/04 Request) The documents requested in this letter were not produced until August 1, 2005, when the plaintiff responded to NLC's discovery requests.

The Rhode Island Supreme Court has held that sufficient prejudice is shown when an insurer is denied the opportunity to investigate the cause and nature of the claim or occurrence while the facts are still fresh in the minds of the parties and while the physical evidence is still fresh. Textron, Inc. v. Liberty Mut. Ins. Co., 639 A.2d 1358 (R.I. 1994); Avco Corp. v. Aetna Cas. & Sur. Co., et al, 679 A.2d 323, 329 (R.I.1996); Eastern Products Corp. v. Cont'l Cas. Co., 58 Mass. App. Ct. 16 (Mass. 2003). This is precisely what has occurred in this matter.

The Rhode Island Supreme Court has consistently held that the issue of prejudice is not a mechanical rule to apply without analysis of the underlying facts. Textron, Inc., supra,; Avco Corp., supra,; Donahugh v. Hartford Ins. Co., 110 R.I. 603, 605, 295 A.2d 693, 694 (1972). In Avco, the Rhode Island Supreme Court stated, "Avco is presumed to have more sophistication in managing its affairs than the average consumer and thus should be able to recognize and adhere to notice provisions in contracts of insurance that require it to contact its carrier 'as soon as practicable' in the event of an occurrence." Id.

Here, the evidence conclusively demonstrates that Eagle's Nest had the sophistication to understand the importance of providing notice. After June of 2002, they had retained an engineer and were aware of the circumstances surrounding the problem. They had an attorney exploring the possibility of legal action. They had their insurance agent, who had at least forty years of experience, review the report. They did not follow their property manager's suggestion to submit the claim and obtain a denial letter.

The plaintiff's deliberate delay in notifying NLC should not inure to their benefit where critical evidence has been lost. The plaintiff's 21 month delay in notifying NLC during which time they lost critical evidence, precludes coverage as a matter of law.

## C. THE PLAINTIFF BEARS THE BURDEN OF PROVING THAT THE COLLAPSE OCCURRED DURING NLC'S POLICY PERIOD

The NLC policy only covers:

*Loss or damage commencing:*

*a. During the policy period shown in the Declarations*

As a matter of law, the insured seeking to establish coverage bears the burden of proving a prima facia case, including but not limited to the existence and validity of a policy, the loss as within the policy coverage, and the insurer's refusal to make payments as required by the terms of the policy. General Accident Ins. Co. v. American Nat'l Fireproofing, 716 A.2d 751, 757 (R.I. 1998). Consistent with this burden, it is Eagle's

Nest's responsibility to demonstrate that the loss occurred during NLC's policy period, and not prior thereto. Davidson v. United Fire & Casualty Co., 576 So. 2d. 586, 590 (La. 1991).

In Davidson, the court, consistent with Rhode Island law relative to the burden of proof, held, "the burden is on the insured to prove that the collapse occurred during a particular carrier's policy period". Id. at 590. There, the insured's home sustained a "collapse" due to termite infestation which occurred over a number of years. The insured testified that she was unaware of property damage prior to one of the policy periods. Two experts testified that there was no way to determine when the damage occurred or over how long a period of time it occurred. Id. The Court, finding for the insurers, held that the fact that a disputed issue was difficult to prove did not lessen the insured's burden in this regard. Id.

Here, we know from the plaintiff's expert, that the cause of the problem existed since the condominiums were constructed some eighteen to nineteen years earlier. We also know that at least two unit owners reported that the problem had been in existence for a substantial period of time prior to June 2002. Consistent therewith, the plaintiff's engineer testified that the problem predated his inspection but was unable to testify for how long. More importantly, the plaintiff's expert does not state, to a reasonable degree of certainty that the problem only came into existence after December 20, 2000, the date NLC began insuring the property. In addition, Ms. Perrino testified that she was aware that the trusses were defective in design from the date of construction of the units. She also testified that it was her understanding that the trusses began sagging over a period of years. (Exhibit B – Deposition of Barbara Perrino, P. 53, L17-22)

The uncontroverted evidence demonstrates that Eagle's Nest cannot meet its burden of demonstrating that this loss commenced during NLC's policy period and not prior thereto. Therefore, NLC is entitled to summary judgment.

## D. THE POLICY DOES NOT PROVIDE COVERAGE FOR TRUSSES THAT WERE DEFECTIVELY CONSTRUCTED

The condominium association coverage form provides in pertinent part:

*A. COVERAGE*

*We will pay for direct physical loss of or damage to Covered Property caused by or resulting from any Covered Cause of Loss.*

*D. ADDITIONAL COVERAGE-COLLAPSE*

*The term Covered Cause of Loss includes the Additional Coverage-Collapse as described and limited in D.1 through D.5 below.*

1. *We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following:*

***

d. *Weight of people or personal property;*

***

f. *Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in D.1 through D.1e., we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.*

Pursuant to this provision "collapse is not a peril but rather a result of other perils" the policy provide[s] collapse coverage only if the cause or causes of the collapse were among those listed. Paula B. Tarr et al., Insurance Coverage for Collapse Claims: Evolving Standards and Legal Theories, 34 Tort & Ins. L.J. 57, 59 (1999):

Thus, it is not enough for the plaintiff to assert that a collapse occurred. The plaintiff bears the burden of demonstrating "that the damages… sustained were within the coverage and not encompassed by the exclusions of liability set forth in the contract…entered into with the Defendant." Napolentano v. Standard Fire Insurance Company, 102 R.I. 604, 607-608 (1967). In the instant matter it requires the plaintiff to prove that the loss or damage was caused by a covered peril.

To sustain its burden, the plaintiff must produce competent evidence that the collapse can be attributed to one of the enumerated causes eliciting coverage. Bohanan v. Farmer's Ins. Of Columbus, Inc., No. 03-CAE12066, 2004 Ohio App. LEXIS at *P29; Fernandes v. Allstate Ins. Co., 305 A.2d 1065 (2003); State Farm Fire and Casualty Co. v. Shady Grove Baptist Church, 838 So.2d 1039, 1043 (Ala. 2002). The law is clear that the causal connection between an event and an incident must be established by competent proof and cannot be based upon conjecture or speculation. Hernandez v. Fernandez, 697 A.2d 1101, 1103 (R.I. 1997) quoting Fondedile, S.A. v. C.E. Maguire, Inc., 610 A.2d 87, 95 (R.I. 1992). "Speculation cannot fill the void left by a lack of proof." Moore v. Chesapeake & O.R. Company, 340 U.S. 573, 577 (1951).

"When, as here, the issue of causation is presented in a context which is not a matter of common knowledge, such a reasonable probability can only be proven by the testimony of a competent expert witness." Money et al. v. Manville Corp. Asbestos Disease Compensation Trust Fund, et al., 596 A.2d 1372, 1377 (Del. 1991); W. Keeton Prosser & Keeton on the Law of Torts, 269 (5th Ed. 1984). Neely v. St. Paul Fire and

Marine Ins. Co., 584 F.2d 341 (9th Cir. 1978) (affirming grant of summary judgment where plaintiff's affidavits did not provide sufficient evidence from which to infer that one explanation of the cause of injury was more likely true than another). See, Goffredo v. Mercedes-Benz Truck Company, 520 N.E. 2d 1315, 1319 (Mass. 1988) ("Without the testimony of an expert as to the amount of force necessary to cause the door to open, the evidence was insufficient to establish that the design of the door was defective.")

The plaintiff has not identified an expert to state to a reasonable degree of engineering certainty that the problem was caused by "weight of person or property". Indeed, the plaintiff's engineer states that the problems were due to defective materials and methods used in construction.

Hardpine, Inc. inspected the trusses on behalf of the Eagle's Nest Condominium Association and reported that based on field observations and structural calculations, the …trusses do not meet the minimum design criteria or codes and might collapse under normal loads. (Plaintiff's Response to Admissions)

Steven Bogle of Geisser Engineering testified that the materials used in the trusses were of insufficient quality when they were originally constructed. (Deposition of Steven Bogle, P. 59) He further testified that excessive loads were not causing the problem, the trusses could not hold the regular loads. (Deposition of Steven Bogle, P. 68)

By law, the applicable building codes set the standard for what weight a truss should support. The building code requirements anticipate that there will be people, refrigerators, and stoves on top of the truss – these are "normal loads". The trusses at Eagle's Nest were not capable of meeting these requirements from the day they were installed. (Deposition of Steven Bogle, P. 68, L16-L22)

Given the opinion of the plaintiff's engineer, the plaintiff's insurance agent is correct, there is no insurance coverage for those units which may have sustained a collapse.

In examining the pertinent policy provisions, the Court must be mindful that a policy of insurance is a contract between the insurer and the insured and should be construed in the same way. See, Amica Mut. Ins. Co. v. Streicker, 583 A. 2d 550, 551 (RI 1990). The Court should not try to stretch its imagination in order to read ambiguity into a policy where none is present; rather, effect should be given to the plain, ordinary meaning of the language employed. Mullins v. Federal Dairy Co., 568 A.2d 759, 762 (RI 1990).

Consistent with these principles: "The Court should not construe policy language to achieve an absurd result inconsistent with what the ordinary reader and purchaser would have understood the language to mean". Textron, Inc. v. Century Indem. Co., C.A. 87-3497; 2005 R.I. Super. LEXIS 113.

It would be an "absurd result" to conclude that the cause of the problem is a "covered peril," where the plaintiff's engineer states it was due to defective methods and materials in the construction of the building.

CONCLUSION

For the reasons set forth herein, defendant NLC respectfully requests that this Court grant its Motion for Summary Judgment, and enter judgment in favor of NLC and against plaintiff, Eagle's Nest Condominium Association, Inc.

Defendant, NLC
By its attorneys,

R. Langlois
Ronald Langlois, Esq. #2891
Smith & Brink, P.C.
One State Street, Suite 400
Providence, RI 02908
Tel: (401) 351-9970
Fax: (401) 274-6218

**CERTIFICATION**

I hereby certify that I hand delivered a true copy of the within to **Steven Orabone,** Esquire, 20 Ridgevale Court, Cranston, RI 02921 on the 31 day of January, 2006.

Dana Palangio