**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., A/K/A EAGLE NEST CONDOMINIUM ASSOC.**

**V.** **C.A.NO: 04-436ML**

**NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY**

# CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS

## I. Background

### A. History of Eagle's Nest Condominium Association

1. The Eagles Nest Condominium Association (herein after Eagles Nest) consists of approximately 120 condominium units.

2. The 120 Condominium units are divided up among 48 buildings.

3. There are approximately four (4) styles of buildings

4. The buildings were constructed in various phases.

5. The earlier condominium buildings were constructed in 1983.

### B. Problem With Trusses

6. On June 28, 2002, Joan Zeller, an association member who lived at 15C Eagles Run, reported to Barbara Perrino, Eagle's Nest's property manager that approximately one week earlier, she had run into another unit owner who reported that their dining room ceiling was sagging. Ms. Zeller wrote:

> "This came as no surprise as my living and dining room floors have been sinking for over a decade. Every time I hear a loud cracking noise I break out in a cold sweat. My first concern of course is the correction of the structural stress before we have a catastrophe…The gentleman from your staff thought he'd have an answer by this coming Monday, July 1, 2002,

after researching the blue prints from town hall to determined (sic) where the center beam was." (Exhibit A- Zeller June 28, 2002 letter)

7. Independent of the letter, Joan Zeller told Barbara Perrino, (Property Manager) that the "problem" existed for over a decade. (Exhibit B - Deposition of Barbara Perrino, P. 29)

8. Joan Zeller has lived in her unit since 1983.

9. Barbara Perrino, Eagle's Nest's property manager, wrote in her June 2002 report: A structural problem in building 15 is under review with Geisser Engineering. This appears to be a serious problems and we will forward information as soon as possible. This quadplex apparently was the first quadplex constructed during development. Indications are that there is insufficient central beam support as floors are bowing. All other quadplexes don't appear to have problems but these are also being reviewed by Geisser. (Exhibit C - June 2002 Report)

10. In June 2002 Eagle's Nest knew "Indications are there is insufficient central beam support as floors are bowing". (Deposition of Ms. Broussard, P. 26)

11. On February 21, 2003, the Eagle's Nest Condominium Association's property manager reported, "At this time, the structural problems are considered a design flaw and the Association's insurance policy does not cover the expenses for structural design flaws. However, there may be other issues involved here which is why a truss expert has been engaged. Be assured that we have been proactively working with Attorney Frank Lombardi to pursue whatever legal means possible to alleviate the financial impact this will have on the Association." (Exhibit D- 2/21/03 Report)

12. On December 9, 2003, the owner of Unit 3C reported at the annual unit owners' meeting, "two years ago she reported a deflection in her basement. Nothing was done so her husband braced it. Called for an inspection by an engineer, but has not happened". (Exhibit E – 12/9/03 Executive Minutes)

C. <u>Eagle's Nest Investigation</u>

13. Geisser Engineering was retained by the Eagle's Nest Condominium Association to inspect the units. (Plaintiff's Response to Admissions)

14. Hardpine, Inc. inspected the trusses on behalf of the Eagle's Nest Condominium Association. (Plaintiff's Response to Admissions)

15. Hardpine, Inc. reported that based on field observations and structural calculations, the above mentioned trusses do not meet the minimum design criteria or codes and might collapse under normal loads. (Plaintiff's Response to Admissions)

16. Hardpine took field measurements of certain trusses, recorded the chord and web layout of the trusses, and recorded lumber grades of the truss parts. Hardpine reported that it found number 2 southern yellow pine had been used for the top and bottom chords of the trusses and that number 3 southern yellow pine had been used for the webs of the trusses. Hardpine also reported that it found certain items missing from the truss installation, that certain trusses had metal plates improperly pressed in certain chords, that they found holes cut in certain chords, they found that certain trusses had failed and that in a number of areas trusses were not properly spaced and clipped at partitions. Hardpine used their field measurements and performed a structural analysis (a mathematical evaluation) to calculate the ability of the structure as constructed to support live and dead loads. Based on these facts and grounds, they concluded that the trusses do not meet minimum design criteria or codes and might collapse under normal loads, and that immediate repair or replacement was strongly recommended. They concluded, further, that had these trusses been spaced 12 inches on center they would have passed the code requirements. (Plaintiff's Answers to Interrogatories No. 4.)

17. Steven Bogle of Geisser Engineering testified that the problem predated his arrival to the location. (Deposition of Steven Bogle, P. 20)

18. Steven Bogle of Geisser Engineering testified that the problem in Unit 15 was visibly noticeable and "you didn't have to be an engineer to figure it out". (Deposition of Steven Bogle, P. 20)

19. Steven Bogle of Geisser Engineering stated that he agreed with Hardpine's report which states: Based on field observations and structural calculations, the above mentioned trusses do not meet the minimum design criteria or codes and might collapse under normal loads. (Deposition of Steven Bogle, P. 57)

20. Steven Bogle of Geisser Engineering testified that the materials used in the trusses were of insufficient quality when they were originally constructed. (Deposition of Steven Bogle, P. 59)

21. Steven Bogle of Geisser Engineering testified that the trusses could not meet normal load requirements. (Deposition of Steven Bogle, P. 59)

22. Steven Bogle of Geisser Engineering testified that the problem with the trusses existed from the day they were installed nineteen or twenty years earlier. (Deposition of Steven Bogle, P. 59-60)

23. Steven Bogle of Geisser Engineering testified that those problems were causing the deflection under normal loads. (Deposition of Steven Bogle , P. 60)

24. Steven Bogle of Geisser Engineering testified that it was not excessive load that was causing the problem; the trusses could not hold the regular loads. (Deposition of Steven Bogle , P. 68)

25. The plaintiff's expert, Steven Bogle of Geisser Engineering testified, without qualification, that the materials used in the trusses when they were originally constructed were of insufficient quality which was what was causing the problem in all of the units. (Deposition of Steven Bogle , P. 59)

26. The building code states in pertinent part:

> **301.1 Design**. Buildings and structures, and all parts thereof, shall be constructed to support safely all loads, including dead loads.
> **301.2 Climatic and geographic design criteria.** Buildings shall be constructed in accordance with the provisions of this code using the design criteria set forth in Tables 301.2a and 301.2b.
> **301.3 Dead load.** The actual weights of materials and construction shall be used for determining dead load with consideration for the dead load of fixed service equipment.
> **301.4 Live load**. The minimum uniformly distributed live load shall be as provided in Table 301.4.
> **301.6 Deflection**. The allowable deflection of any structural member under the live load listed in Sections 301.4 and 301.5 shall not exceed the values in Table 301.6. (Exhibit F – Building Codes)

27. Steve Bogle of Geisser Engineering testified that the trusses were not capable of meeting those requirements from the day they were installed. (Deposition of Steven Bogle , P. 68)

28. The applicable building codes set the standard for what weight a truss should support. (Deposition of Steven Bogle, P. 65, L20)

29. The trusses are installed to meet building code requirements. (Deposition of Steven Bogle , P. 67, L4-P.68, L9)

30. The building code requirements anticipate that there will be people, refrigerators, and stoves on top of the truss – these are "normal loads". (Deposition of Steven Bogle , P. 68, L10)

D. <u>Notice of the Loss</u>

32. The November 18, 2002, Eagle's Nest Condominium Association's board meeting minutes state:

> "Building 15: First regarding legal avenues the board may pursue regarding the structural issues, there seems to be some confusion as to the limitations imposed by law. The question is- can action be taken from date of discovery or date of completion? Do we have a case or don't we? Can we go ahead and pursue legal action against the appropriate parties? Do we have a case or not? It was requested of [counsel for Eagle's Nest]

to provide specifics and outline chances of success. The board is eager to move on the issue." (Exhibit G – 11/18/02 Executive Minutes)

33. On March 22, 2003, Barbara Perrino reported, "the Board of Directors, through Attorney Lombardi, is actively pursing legal recovery against all parties responsible for this situation". (Memo from Barbara Perrino to Unit owners/Eagle's Nest Condominium Association, March 22, 2003, Special Assessment)

34. On May 15, 2003, Eagle's Nest's Condominium Association's executive board discussed, "insurance lawsuit updates with attorney". (Executive Board Minutes May 15, 2003)

35. On or about March 15, 2004, Eagle's Nest Condominium Association, through its loss consultant adjuster, Richard Aube, notified NLC's insurance agent that "Eagle's Nest Condominium Association has damage to property as a result of a collapse". (Exhibit H - 3/15/04 Aube Letter)

36. On June 30, 2004[1], Eagle's Nest Condominium Association's adjuster wrote to James Hainey at RJ Marguetta adjustment, NLC's independent adjuster, stating:

> "Please be advised that on this date, and pursuant to the terms of the Commercial Policy Conditions, the insured, Eagle Nest Condominium Association has filed a legal action against New London County Mutual Insurance Company for damages sustained to property as a result of collapse.
>
> Our records indicate... that the date of loss is July 2002 and not the referenced date of loss of 11/29/02 as it appears in you letter of 5/28/04 to the insured and thus the two year anniversary is approaching." (Exhibit I – 6/30/04 Letter)

37. Prior to notifying NLC of this claim, "Eagle's Nest" repaired and or replaced the trusses in approximately 14 condominium units.

38. NLC did not have an opportunity to inspect, evaluate or appraise the alleged damage and/or repairs performed by "Eagle's Nest" in approximately 14 condominium units.

E. Insurance

39. NLC insured the Eagle's Nest Condominium Association's property pursuant to a commercial package policy, policy no. ORC34922-1, commencing on or about December 20, 2000 and continuing through December 22, 2004.

---

[1] Eagle's Nest Condominium Association filed an action against "NLC' in the Kent county Superior Court on June 30, 2004.

40. The pertinent portion of the insurance policies provide:

***CONDOMINIUM ASSOCIATION COVERAGE FORM***

*A. COVERAGE*

*We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.*

*D. ADDITIONAL COVERAGE - COLLAPSE*

*The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in D.1. through D.5. below.*

*1. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following:*
   *a. The "specified causes of loss" or breakage of building glass, all only as insured against in this Coverage Part;*
   *b. Hidden decay;*
   *c. Hidden insect or vermin damage;*
   *d. Weight of people or personal property;*
   *e. Weight of rain that collects on a roof;*
   *f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in D.1.a. through D.1.e., we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.*

*4. Collapse does not include settling, cracking, shrinkage, bulging or expansion*

41. ***COMMERCIAL PROPERTY CONDITIONS***

*H. POLICY PERIOD, COVERAGE TERRITORY*

*Under this Coverage Part:*

*1. We cover loss or damage commencing:*

*a. During the policy period shown in the Declarations*

***COMMERCIAL PROPERTY CONDITIONS***

***D. LEGAL ACTION AGAINST US***

*No one may bring a legal action against us under this coverage part unless:*

***

*2. The action is brought within two years after the date on which a direct physical loss or damage occurred.*

42. DUTIES IN THE EVENT OF LOSS OR DAMAGE

a. You must see that the following are done in the event of loss or damage to covered property:

(2) Give us prompt notice of the loss or damage, include a description of the property involved;

(3) As soon as possible, give us a description of how and where the loss or damage occurred.

F. <u>Sidney Smith</u>

43. Sydney Smith was Eagles Nest's Insurance Agent.

44. Sydney Smith has approximately forty (40) years of experience in the insurance industry.

45. On February 10, 2003, Eagle's Nest's insurance agent, Sidney Smith, "is citing a design flaw (as reiterated by Geisser) and therefore will not cover costs of repair". (2/10/03 Executive Minutes)

46. Sydney Smith told Eagles Nest that based on the engineering report the "collapse" would not generally be covered under NLC's policies. (Deposition of Sidney Smith, P. 13)

47. Sydney Smith was not an agent of NLC (Deposition of Sidney Smith, P.50, L5)

Defendant/Plaintiff in Counterclaim,
By its attorneys,

Ronald Langlois, Esq. #2891
Smith & Brink, P.C.
One State Street, Suite 400
Providence, RI 02908
Tel: (401) 351-9970
Fax: (401) 274-6218

**CERTIFICATION**

I hereby certify that I hand delivered a true copy of the within to **Steven Orabone,** Esquire, 20 Ridgevale Court, Cranston, RI 02921 on the 31 day of January, 2006.

Dana Palangio