UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., ALSO KNOWN AS EAGLE NEST CONDOMINIUM ASSOC<br><br>Plaintiff,<br><br>vs.<br><br>NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V, AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY<br><br>Defendants | Civil Action, File No.: 04-436ML |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

**BASIC FACTUAL OVERVIEW:**

Eagles Nest Condominiums is a residential condominium complex located in Warwick Rhode Island. The complex consists of 120 dwelling units spread out among 48 distinct, multi-faimily buildings that are physically separated from one another. Some of the buildings contain 4 units per building (the condominium complex refers to the 4-unit buildings as "quadplexes"). Each of the quadplex buildings consists of 2 individual dwelling units on the ground floor, plus 2 additional dwelling units on the second story. The remaining buildings in the complex contain only 2 units per building (the condominium complex refers to the 2-unit

buildings as "duplexes"). In June of 2002, the owners of units 15A and 15C (who shared a ceiling and floor in one of the quadplex buildings) experienced a problem in which the floor of the upper unit (the opposite side of which was the ceiling of the lower unit) experienced a marked depression. The upper unit complained of this to the property manager.

The property manager hired an engineer to investigate the problem. The engineer first examined units 15A and 15C on July 17, 2002, but at that time the floor's truss system was hidden below 15C's floor and above 15A's ceiling. The engineer returned on July 25, 2005 after the floor trusses were exposed, and discovered that the truss floor had structurally failed. The engineer has concluded that the floor trusses were too widely spaced for trusses constructed of the lumber grades used in these trusses. He has concluded that these trusses could support the building's dead load weight without the floor's structurally failing and that they could support some live load weight (in addition to the dead load) without failing, but not as much additional live load as the applicable building code requires. He has concluded that the floor truss failure was caused in part by the weight of people and property on these trusses, and that the floors structurally failed after construction was complete. The engineer has concluded that all of the structurally failed floors need to be repaired.

Eagle's Nest has brought this breach of contract action against Defendants, The New London County Mutual Insurance Company and NLC Insurance Companies, Inc. (hereinafter referred to as "NLC") for payment for this loss. The loss is covered under NLC's insurance policy in effect at the time the loss manifested.

**PLAINTIFF'S ARGUMENTS:**

## (A) NO APPLICABLE STATUTE OF LIMITATIONS BARS EAGLE'S NEST'S ACTION

### (1) A Ten-Year Statute of Limitations Applies to Eagle's Nest's Loss

Eagle's Nest Condominium Association filed this breach of contract action against NLC on June 30, 2004 for NLC's failure to pay for the Loss Eagle's Nest has suffered as a result of the collapse of Eagle's Nest's floors. Eagle's Nest has demanded payment from NLC for Eagle's Nest's covered loss. NLC argues that Eagle's Nest's loss occurred on June 28, 2002, and is, therefore, barred by a contractual two-year statute of limitations. For reasons discussed later in this memorandum, NLC is incorrect in its assertion that Eagle's Nest has failed to file this lawsuit within 2 years of the date of loss. However, the Court does not need to address that argument because a ten-year statute of limitations applies to Eagle's Nest's action against NLC.

Eagle's Nest has certainly filed its action within 10 years of its loss.

Attached Exhibit 1 contains copies of the pertinent portions of NLC's insurance policy. In arguing for a two-year limitation, NLC appears to be citing the language from page 1 of 2 on attached form CP 00 90 07 88. For easy reference, I have affixed a yellow tab with the label "1A" on that page. NLC appears to rely on the following language from that page:

**"COMMERICAL PROPERTY CONDITIONS**

* * * * * *

**D. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

* * * * * *

2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred."

This portion of the insurance policy, however, is modified by a later endorsement in the same policy (this modifying endorsement is contained in the attached form numbered and labeled as "CP 01 29 06 95" and is located on pages 1 of 3 and 3 of 3 of that endorsement). For easy reference, I have affixed a yellow tab with the label "1B1" on that page 1 of 3 of that

endorsement and I have affixed a yellow tab with the label "1B3" on page 1 of 3 of that endorsement. The relevant portions of the modifying language in the attached policy (found on page 1 of 3 and page 3 of 3 of the Rhode Island Changes form) are as follows:

**"THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**RHODE ISLAND CHANGES**

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

* * * * * *

G. The **Legal Action Against Us** Commercial Property Condition is replaced by the following:

**LEGAL ACTION AGAINST US**

1. No one may bring a legal action against us under this Coverage Part unless there has been full compliance with all of the terms of this Coverage Part.

2. Subject to Paragraph 1. above, any action on this policy for the recovery of any claim for direct loss or damage by fire and lightning must be brought within 2 years after the date on which such direct loss or damage occurred.

Eagle's Nest has made a claim for a loss arising from a collapsed floor resulting from the weight of dead load and live

load on the floor trusses. This claim in no way arises from fire or from lightning, thus under the above-noted endorsement, a two-year limitation cannot apply to it. This is a breach of contract action. An action based on a contract theory is governed by the 10 year statute of limitations set out in R.I.G.L §9-1-3(a) (see Boghossian v. Ferland Corp., 600 A.2d 288 (R.I 1991).

The plain language of this endorsement changes the policy language on which NLC seeks to rely. Rhode Island's Supreme Court has noted, "When presented with a preprinted-form policy with various endorsements attached thereto, we read the two components together, with the terms of the preprinted form remaining intact **except to the extent they are altered by the endorsements.**" Textron, Inc. v. Liberty Mutual Insurance Co., 639 A.2d 1358, 1362 (R.I 1994) (emphasis added). Immediately following this quote, in Textron, Inc. v. Liberty Mutual, the Court went on to note as follows:

> In so doing, we give the language in both the form policy and the endorsements its plain, ordinary, and usual meaning. Malo v. Aetna Casualty and Surety Co., 459 A.2d 954, 956 (R.I. 1983); Bush v. Nationwide Mutual Insurance Co., 448 A.2d 782, 784 (R.I. 1982). If the terms are clear and unambiguous, we must enforce the policy as written and refrain from engaging in any judicial modification of the

policy terms. Amica Mutual Insurance Co. v. Streicker, 583 A.2d 550, 551 (R.I. 1990); Malo, 459 A.2d at 956).

Textron, Inc., 698 A.2d at 1362-1363.

The two-year limitation language on which NLC relies comes under the headings "**COMMERICAL PROPERTY CONDITIONS**" and "**LEGAL ACTION AGAINST US**". The endorsement upon which Eagle's Nest relies is prefaced by the statement "The **Legal Action Against Us** Commercial Property Condition is replaced by the following:" (emphasis added). There can be no doubt that this endorsement changes the preprinted form to limit the application of the 2 year limitation period to just fire and lightning claims.

Here, there is no need to utilize principles of contract interpretation in order to find that a 2-year limitation period does not apply to Eagle's Nest's claim.

If this Court were somehow to find that this endorsement does not clearly alter the preprinted form policy by applying the 2-year limitation period only to fire and lightning claims, then the language is at least ambiguous. It is interesting that NLC itself initially indicated in a March 22, 2004 letter to Eagle's Nest that "In Rhode Island, the Statute of Limitations for this loss is ten (10) years." In that same letter, NLC referred to Eagle's Nest's loss date as being November 29, 2002. (See Attachment 1 to Memorandum Exhibit 2, the Roberta McMahon

Affidavit). Later, on May 28, 2004, NLC's adjuster (James A. Heaney) sent Eagle's Nest a letter claiming that "the statute of limitations for your claim is twenty-four months fromm the date of loss". (See Attachment 2 to Memorandum Exhibit 2, the Roberta McMahon Affidavit). From these letters, it appears that even NLC had trouble making up its mind concerning interpretation of its own policy. That alone would support a finding of ambiguity. It does not matter that NLC finally decided to contend that a 2-year limitation period applied. The Rhode Island Supreme Court has noted that "When determining coverage, "[w]e look not at what the insurer may have intended the policy to cover or exclude, but rather what an ordinary reader of the policy would have understood the policy's terms to mean if he or she had read them." Sanzi v. Shetty, M.D. et al., 864 A.2d 614, 620-621, (R.I. 2005), (citing American Commerce Insurance Co. v. Porto, 811 A.2d 1185, 1192 (R.I.2002).

At the very least, there is ambiguity here because of the policy language. This ambiguity must be resolved in Eagle's Nest's favor. "If, after the policy is read in its entirety, the terms are found to be ambiguous or capable of more than one reasonable meaning, the policy will be strictly construed in favor of the insured and against the insurer." Aetna Casualty & Surety Co. v. Sullivan, 633 A.2d 684, 686 (R.I. 1993).

**(2) Even If a 2-year Limitation Applied here, Eagle's Nest, filed this action within 2 years of the date of Loss**

Notwithstanding the 2 above-noted letters (in which NLC and its adjuster describe the date of Eagle's Nest's loss as being November 29, 2002) NLC now argues that Eagle's Nest's loss occurred on June 28, 2002, and is, therefore, thus barred by a 2-year statute of limitations. As noted above, the 2-year limitation period in the NLC policy only applies to losses arising from fire or lightning. Even if the 2-year limitation somehow did apply to Eagle's Nest's loss, however, it would be incorrect to conclude that Eagle's Nest's loss occurred any earlier than July 17, 2002 (and more accurately should be viewed as occurring July 25, 2002 for the reasons discussed below in Section (C)(2) of this memorandum).

The facts relevant to the dates issue in the remainder of this Section (A)(2) of this memorandum are the same as the facts relevant to the dates issue discussed in Section (C) of this memorandum, below. Here in Section (A)(2) of this memorandum, the date of Eagle's Nest's loss is at best a minor issue (since Eagle's Nest has clearly filed its action within the 10 year statute of limitations that obviously applies to this claim). In the interest of brevity, therefore, Eagle's Nest presents its arguments concerning the correct date of loss below in Section

(C) of this memorandum. Those arguments are presented in complete detail below in Section (C) of this memorandum. Eagle's Nest incorporates those detailed arguments by reference here into Section (A)(2), in the event that this Court feels that a 2 year statute of limitations applies to this claim.

Here in Section (A)(2), Eagle's Nest adds the argument that the confusion NLC introduced into this issue by its above-noted letters of March 22, 2004 and May 28, 2004 would also estop NLC from relying on a 2-year limitation period even if it does apply and even if the date of loss were viewed as being June 28, 2002.

## (B) PLAINTIFF'S NOTICE OF ITS CLAIM PROVIDED TO NLC WAS SUFFICIENT AND REASONABLE AND DOES NOT ACT TO BAR PLAINTIFF'S CLAIM

### (1) Barbara Perrino's Notice to Sidney Smith, Jr. Constitutes Sufficient Notice to NLC

In Plaintiff's Memorandum Exhibit 3, (the Barbara Perrino Affidavit), Ms. Perrino notes the following:

> (1) During the entire time that I was property manager for Eagles Nest Condominiums, Sidney Smith, Jr. was the insurance agent with whom I dealt.
>
> (2) Whenever I notified an insurance company of an Eagle's Nest Condominium Association loss, I went through Sidney Smith, Jr. This was my normal, usual, and

> customary practice for notifying an Eagle's Nest Condominium Association insurance carrier of a loss. I never notified an insurance company of an Eagle's Nest Condominium Association loss by directly contacting an insurance carrier.

With regard to notifying insurance carriers by notifying insurance agents, the Rhode Island Supreme Court has noted:

> The requirement in Pickering that an insurer show prejudice before it can rely on noncompliance with the notice provisions was prompted by an expressed recognition that today's insurance contract is furnished to an insured on a take-it-or-leave-it basis. Moreover, there is an implicit realization on our part that in this day and age attempts to comply with notice provisions are sometimes carried on in a very informal way which frequently consists of no more than a telephone call by an insured to the seller of the policy who then, because of his desire to serve his customer, takes over from there.

Donahue v. Hartford Fire Insurance Company, 295 A.2d 693, 694 (R.I. 1972).

Eagle's Nest's situation sounds quite like the situation described by the Rhode Island Supreme Court in Donahue, supra. It appears, therefore, that our Rhode Island Supreme Court recognizes the route Eagle's Nest took regarding notice to Sidney

Smith, Jr. as a valid means of attempting to comply with the insurance company's notice provision. Given that, it would be inappropriate to find that Eagle's Nest was not prompt in giving notice of its claim to NLC.

(2) **Even if Eagle's Nest's Notice to Sidney Smith, Jr. was not Sufficient, NLC's Summary Judgment Motion Must Still Fail, for NLC has not Proved that it was Prejudiced by Eagle's Nest's Notice**

In its memorandum, NLC alleges that Eagle's Nest failed to provide NLC with prompt notice of Eagle's Nest's loss, and that this has prejudiced NLC. NLC's memorandum, however, cites no affidavit or deposition testimony by some qualified individual to support this argument. Thus, NLC has not met its burden of proving prejudice. "An insured should not be barred from recovering the benefits for which he or she has paid because of a breach of the policy's notice provision when there is no showing by the insurance carrier that it was prejudiced by the breach. *Pickering v. American Employers Insurance Co.*, 109 R.I. 143, 160, 282 A.2d 584, 593 (R.I. 1971). The burden of showing prejudice is on the insurance carrier. Id." Pennsylvania General Insurance Company v. Becton 475 A.2d 1032, 1035 (R.I. 1984) (citing Pickering v. American Employers Insurance Co., 282 A.2d 584, 593 (R.I. 1971).

Even if NLC had cited an affidavit or deposition testimony from a qualified individual on the issue of prejudice, the weight of the evidence in this case would still be against a finding of prejudice.

NLC concedes that Eagle's Nest repaired only 14 units before NLC got involved in this loss. NLC further acknowledges that the Eagle's Nest condominium complex consists of 120 units. It is interesting to note that even though NLC alleges prejudice, when given the opportunity to inspect the Eagle's Nest units, they only did so on 2 occasions. Even more telling evidence on this issue of non-prejudice are the statements in Plaintiff's Memorandum 4, the Richard Aube affidavit. In that Affidavit, Mr. Aube notes the following:

(1) I am a public insurance adjuster licensed as such by the State of Rhode Island.

(2) I have 26 years of professional experience in the field of insurance claims;

(3) My work as an insurance adjuster regularly requires that I read and interpret insurance policies.

(4) In the latter part of February, 2004 the Eagles Nest Condominium Association Board of Directors informed me of the problem Eagles Nest Condominiums was experiencing with their floor trusses, and asked me to read their New London County Mutual Insurance Company (hereinafter referred to as "NLC") commercial package insurance policy.

(5) After considering the facts and documents provided to me concerning the Eagle's Nests floor truss problem and after reviewing the NLC policy, I concluded that the NLC policy provides coverage for Eagle's Nest's loss arising from the floor truss problem.

(6) In March of 2004, James Heaney of R.J. Margetta Adjustment contacted me concerning the Eagle's Nest loss, and we agreed to a March 25, 2004 appointment for him to inspect Eagle's Nest condominiums on behalf of NLC. Mr. Heaney conducted this inspection in my presence. He inspected one unit (#24A) that day. At that time, I provided certain materials to NLC (through Mr. Heaney) in support of Eagle's Nest's loss.

(7) On April 5, 2004, I forwarded a package of additional materials to NLC (through Mr. Heaney) concerning Eagle's Nest's loss. I accompanied that package with a letter to Mr. Heaney in which I outlined Eagle's Nest's claim. A true and exact copy of that letter is attached as Exhibit 1.

(8) On April 20, 2004, in order to keep NLC up to date concerning our progress on the repairs, I sent Mr. Heaney a letter notifying him, per our previous conversations, that Unit 7B had been completed (and I accompanied that letter with a copy of Eagle's Nest's Engineer's floor truss repair certification). A true and exact copy of that letter and its attachment are attached hereto as Exhibit 2;

(9) Mr. Heaney again came to Eagles Nest to conduct an inspection in May of 2004. On this occasion, David Grandpre (an engineer acting on NLC's behalf) and Mr. Heaney inspected 2 additional condominium units. This was the only time Mr. Grandpre came to Eagle's Nest to inspect any of the condominium units.

(10) On May 19, 2004, in order to keep NLC up to date concerning our progress on the repairs, I sent Mr. Heaney a letter notifying him that repairs to Unit 17A (one of the Unit that Mr. Heaney and Mr. Grandpre had inspected) would be continuing, and noting that should they require additional access to that unit to please contact me immediately. A true and exact copy of that letter is attached hereto as Exhibit 3;

(11) After the inspection that Mr. Grandpre performed (in May 2004), while Mr. Grandpre was still at Eagle's Nest Condominiums, Mr. Grandpre verbally indicated to me that he would probably concur with Eagle's Nest's engineer. He indicated that this was because they were both looking at the same thing. This is noted in my letter of June 3, 2004 to James Heaney. With that June 3, 2004 letter to Mr. Heaney, I forward a further package of materials to NLC (through Mr. Heaney) concerning Eagle's Nest's loss. A true and exact copy of that letter is attached hereto as Exhibit 4.

(12) Eagles Nest Condominium Complex consists of 120 units distributed over 48 detached and separate buildings. In all, Eagles Nest will be performing 106 repairs. The reason there will not be 120 repairs is because each quadplex repair applies to 2 units.

(13) To the present NLC's engineer has inspected 2 units, and NLC's adjuster has inspected 3 units (2 of which are the same ones NLC's engineer inspected).

(14) On July 1, 2004 I faxed a letter to Mr. Heaney, advising him that work had begun on another of the Eagle's Nest condominium units, that 3 broken trusses were found, and asking if he would like to view the trusses prior to repair

and installation of the ceiling. A true and exact copy of that letter is attached as Exhibit 5. In response to this letter, Mr. Heaney contacted me and informed me that he was not coming out to see every unit.

(15) On approximately August 12, 2004 NLC, through their attorney sent me a letter requesting materials from Eagle's Nest. At the time NLC made this request, I had already forwarded to NLC (through Mr. Heaney) a large amount of documentation relating to Eagle's Nest's claim. These included copies of the following significant items:

(a) The contents of the file of Eagle's Nest's structural engineer (Steven Bogle, P.E. of Geisser Engineering Corporation);

(b) A table itemizing the structural repair expense for each repaired unit for 2002 and 2003

(c) Check vouchers related to the repairs;

(d) Repair contracts;

(e) Correspondence with the repair contractor

(f) The condominium association's management company's work orders related to floor truss repairs

(g) Checks paid for expenses related to the units' repairs

(h) Invoices related to the repairs;

(i) Invoices from Eagle's Nest's structural engineer;

(j) Photographs related to the loss;

(k) The Warwick Building Inspector's Notice of Violation;

(16) In September 2004, I informed NLC's attorney that Eagle's Nest was attempting to assemble the materials NLC's Attorney

requested, but that due to limited resources it may take some time to gather those materials. NLC's attorney acknowledged this in a letter to me dated September 15, 2004. Attached Exhibit 6 is a true and exact copy of that letter.

The facts that Eagle's Nest has provided NLC with its expert's report, that NLC's expert indicated he would probably agree with Eagle's Nest's expert, and that there are only a limited number of styles of Eagle's Nest units are especially relevant in light of A & W Artesian Well Co. v. Aetna Casualty and Surety Co. In that matter, the Rhode Island Supreme Court noted: "Finally in evaluating the effect of the delay, the court found evidence that Aetna had been afforded an opportunity to conduct a meaningful investigation. He discussed the evidence establishing that Aetna had received a report and had been given an opportunity to examine an identical piece of equipment." A & W Artesian Well Co. v. Aetna Casualty and Surety Co., 463 A.2d 1381, 1383 (R.I. 1983).

In the instant case, the Court has even further evidence to support a finding that NLC has not been prejudiced. This is found in the following noted excerpts from Steven Bogle's deposition testimony and from his attached affidavit, and from Dennis Higgin's attached affidavit. Mr. Bogle is Eagle's Nest's engineer. Mr. Higgins is the individual in charge of performing the actual repairs for the 14 units repaired before NLC got

involved in this matter. Following are the relevant excerpts from Mr. Bogle's deposition on this issue:

Q: Did you recommend that certain repairs be done?

A: Yeah, that's, basically, that what this describes, a reinforcing scheme for the trusses.

Q: Can we open this up?

A: Sure. Relatively simple. It's using plywood.

Q: For the record, sir, describe what Exhibit N is.

A: That's an elevation view of a floor truss and a cross-section of the same truss with showing the application of plywood on either side of it to be, to reinforce the truss because of the damages.

Q: Okay. And what was the solution?

A: The solution is to apply three-quarter inch plywood on either side that is glued and screwed to the existing truss.

(See Plaintiff's Memorandum Exhibit 10, Excerpts from the Steven Bogle Deposition Transcript, page 35, line 10, through line 23)

In Plaintiff's Memorandum Exhibit 5 (the Steven Bogle Affidavit) Steven Bogle notes, at numbered paragraphs (18) and (19), of his affidavit as follows:

(18) The repairs I designed and specified for the Eagle's Nest floor trusses required no removal of truss materials.

(19) I have reviewed the repair work performed on the floor trusses in each unit that has had the repairs I specified performed, and I have confirmed, in each case, that the repairs were completed in compliance with my specifications. Such compliance has included the fact that no truss material was removed.

In his attached Plaintiff's Memorandum Exhibit 6 (the Dennis Higgins Affidavit) Dennis Higgins notes, at numbered paragraphs (5) and (6), as follows:

(5) For each Eagles Nest Condominium Unit on which ACC Contractors, Inc. has performed floor truss repairs, ACC Contractors, Inc. has photographed the floor trusses before the repairs and after the repairs. This includes, but is not limited to, each Eagles Nest Condominium Unit that was repaired before May 21, 2004.

(6) In performing its repairs, ACC Contractors, Inc. did not remove any part of the floor truss systems in any of the condominium units for which ACC Contractors, Inc. has repaired the floor truss system.

Thus, with regard to the 14 units repaired before NLC's involvement in the matter, the repair consisted of a relatively simple matter of gluing and screwing plywood to the trusses, the trusses were photographed before they were

repaired, they were photographed after they were repaired, and the repair required no removal of the truss material.

Two additional relevant factors bear on the issue of any prejudice allegation. One is the fact that Eagle's Nest was subject to the dictates of the City of Warwick Building Inspector which issued the Violation Notice which is Exhibit 1 to Plaintiff's Memorandum Exhibit 3, The Barbara Perrino Affidavit. The second factor is that NLC wants its insureds to mitigate their damages by taking reasonable steps to protect the insured property.

NLC's Diane Landock was questioned on the mitigation of damages issue at her deposition as follows:

Q: Number 4, take all reasonable steps to protect the covered property from further damage. Isn't that what you basically refer to as mitigation of damages?

A: Yes.

Q: That's something the insurance company benefits from, correct?

A: As does the insured.

Q: Everybody benefits because it reduces the loss?

A: Correct.

Q: So certainly that's something that NLC wants its insureds to do with any loss?

A: Yes.

(See Plaintiff's Memorandum Exhibit 11, Excerpts from the Diane Landock Deposition Transcript, page 31, line 24 through page 32, line 14). When Eagle's Nest repaired the first 14 units (indeed, each time it has repaired a unit) NLC has benefited, Eagle's Nest was taking reasonable steps to protect the covered property from further damage.

**(3) Eagle's Nest's Notice to NLC was Reasonable in Light of the Particular Circumstances of this Case**

Even if NLC were somehow to present facts in support of its allegation that it has been prejudiced in this matter, that alone would not be sufficient to support a finding that Eagle's Nest's notice to NLC was untimely. "[I]n this state and generally elsewhere the condition of timely notice is satisfied if the insured acts diligently and with reasonable dispatch in the light of all the circumstances and facts of the particular case." Cinq-Mars v. Travelers Insurance Company, 218, A.2d 467, 471-472 (R.I. 1966) (citing Sherwood Ice Co. v. United States Casualty Co., 40 R.I. 268, 100 A. 572, and 8 Appleman Insurance Law & Practice, §4734, p. 22).

A number of the particular circumstances and facts in Eagle's Nest's case support a finding that Eagle's Nest's acted reasonably and that their notice to NLC was timely under these circumstances and facts.

First, they notified their insurance agent of the loss on multiple occasions, but he incorrectly advised them that the NLC policy did not cover this claim. Barbara Perrino testified at her deposition on this issue as follows:

Q: Do you know for how long a time Mr. Smith had been the insurance agent for Eagle's Nest?

A: He was the insurance agent for Eagle's Nest beginning with my management through Phoenix Property Management through the first bid process on insurance that I had done for them. And he continued from that point forward.

Q: So for, you told me, but I forget the exact time. In 1994 or so?

A: Yes. '94, '95

Q: So to the best of your recollection, Mr. Smith had been the insurance agent for Eagle's Nest that whole nine-, ten-year period?

A: Yes.

(See Plaintiff's Memorandum Exhibit 12, Excerpts from the Barbara Perrino Deposition Transcript, page 34 line 21 through page 35 line 10).

Q: What do you recall about your discussions with Mr. Smith regarding whether this loss was covered?

A: He advised that because it was a structural issue, it would not be a covered loss.

(See Plaintiff's Memorandum Exhibit 12, Excerpts from the Barbara Perrino Deposition Transcript, page 37 line 13 through line 16).

Q: You were relying on [Sidney Smith, Jr.'s] advice and understanding of insurance policies.

A: Yes.

(See Plaintiff's Memorandum Exhibit 12, Excerpts from the Barbara Perrino Deposition Transcript, page 39 line 20 through line 22).

Q: All right. Then how did you know to contact Sid Smith? How did you make that decision?

A: 'Cause he's the insurance agent.

Q: Had you had other occasions in the past to contact Sid Smith on claims?

A: Yes.

Q: Was that your normal procedure?

A: Yes.

Q: And based on your experience in the property management field since approximately 1978, --

A: Yes.

Q: -- is that what is ordinarily done when you have a claim?

A: Yes.

(See Plaintiff's Memorandum Exhibit 12, Excerpts from the Barbara Perrino Deposition Transcript, page 74 line 8 through line 21).

At her deposition, Barbara Perrino noted that she had conversations with Sidney Smith, Jr. more than once, "Because the expenses continued to increase. And I wanted to make sure that I understood what the position was regarding coverage." (See Plaintiff's Memorandum Exhibit 12, Excerpts from the Barbara Perrino Deposition Transcript, page 38, lines 13 through 17)

Unfortunately for Eagle's Nest, Mr. Smith left Eagle's Nest misinformed as to the correct state of their coverage under the NLC policy. Ignorance of coverage, however, is one of the factors the Rhode Island Supreme Court listed in Cinq-Mars, supra, as relevant in deciding whether an insured's notice to the carrier was timely. The Cinq-Mars decision notes "[I]n determining "reasonableness," ignorance of coverage as well as diligence in ascertaining whether it exists are both relevant

circumstances." Cinq-Mars v. Travelers Insurance Company, 218, A.2d 467, 472 (R.I. 1966) (citing Howell v Frost, 98 Ohio App. 127, 128 N.E.2d 189; National Surety Corp. v. Wells, 287 F.2d 102; Scott v. Inter-Insurance Exchange of The Motor Club, 352 Ill. 572, 186 N.E. 176; 8 Applemen, supra, § 4745, p. 87).

There are additional facts and circumstances in connection with this loss that help to establish that Eagle's Nest acted reasonably in the notice that it gave to NLC. There are the facts that this was a matter that was new to Eagle's Nest, that they thought this was an isolated incident confined to building 15, and that posed significant problems due to the age and vigor of some of the unit owners affected, the novelty of the problem, the logistics of dealing with the complications the problem posed for the unit owners and the board, and the unit owners reactions to the problem. Marilyn Broussard was Eagle's Nest's President at the time the matter first emerged. The following excerpt from her deposition should give the Court some idea of the facts and circumstances Eagle's Nest faced:

Q: What do you recall about meeting with the Jackvony's?

A: First of all, when this happened and we discussed it at the Board meeting, we were treating it as an isolated incident, something that had just occurred in this unit. And we, we were new at it, so we were determining -- first of all, both of the people affected by it were little old ladies.

Q: Who were they?

A: Mrs. Jackvony and -- I can't remember the other lady's name. It's probably in the minutes somewhere. They -- so we knew that they were going to be displaced, so what we had Barbara do was investigate -- we were thinking we could put them up in a little like day suites or something so they could stay there. And we were investigating what we would do with their furniture, how we would do things. Then Mr. Jackvony started calling Barbara.

Q: Which Jackvony was this? Was it the lawyer?

A: Bernard. And he was making demands of us. First of all, he was trying to, I think the first thing was he was trying to coincide his mother having hip surgery and then going into an assisted living facility and wanted us to pay for it. Then she was going into the like day suite place, Days Inn or something, and then he felt that she was too fragile to do that. Then she was going to go to his sister's house, and he wanted us to pay the sister to have the mother there, which we thought was unreasonable. He wanted us to replace the carpet, give her all new drapes, to the point where when all of this was finally settled, which was, I think about, probably six months later, because, see she was supposed to be done first, and the other side was done first because he wouldn't come to an agreement. We had him before the Board.

> He was, he was really unreasonable. But it was the first one that we were dealing with. We were treating it as an isolated incident. We were trying to be fair to everybody involved. And as people got wind of, you know -- the people walk and they start talking, and the people were upset with us, so, as if we had caused the problem. But, anyway, before we did anything to his unit, we had a photographer go in and take pictures of everything so he couldn't then say blame us for that. It was too bad.

(See Plaintiff's Memorandum Exhibit 8, Excerpts from the Marilyn Broussard Deposition Transcript, page 18, line 22 through page 20, line 19).

Finally, on the issue of reasonableness, Eagle's Nest notes that it has been more than reasonable in providing NLC with information and documentation related to this loss.

Almost immediately after reviewing Eagle's Nest's NLC insurance policy, Richard Aube notified NLC of the loss. Mr. Aube then promptly commenced with documenting the claim for NLC. Mr. Aube details these efforts in the paragraphs of his attached affidavit (Plaintiff's Memorandum Exhibit 4), which are detailed, above, in Section (B)(2) of this memorandum.

After Mr. Aube had provided the above-noted documentation to NLC, NLC's attorney requested further materials from Eagle's Nest. In response, Mr. Aube contacted NLC's attorney and advised

that Eagle's Nest was attempting to assemble the requested materials, but that due to limited resources it might take some time to gather the materials. NLC's attorney acknowledged this in a September 15, 2004 letter (a copy of which is attachment 6 to Plaintiff's Memorandum Exhibit 4, The Richard Aube Affidavit).

In its memorandum in support of its motion for summary judgment, NLC alleges that Eagle's Nest never responded to NLC's Attorney's request for materials. For a number of reasons, this is incorrect. First, by the time NLC's attorney made the request, Eagle's Nest had already provided NLC with a great quantity of the requested materials (as noted in the above-quoted excerpts from Mr. Aube's affidavit. Second, Eagle's Nest (through its attorney) has provided NLC additional materials through multiple filed responses to NLC's request for production of documents (which includes the request NLC's attorney sent to Eagle's Nest), and by producing materials in connection with witness depositions.

In the responses to NLC's production request alone, Eagle's Nest has produced over 984 pages of materials. The itemized descriptions Eagle's Nest provided to NLC to accompany the documents produced by Eagle's Nest's attorney comprise an additional 52 pages. The sheer volume of materials produced made such detailed description necessary in order for counsel accurately to keep track of what was produced.

It is also unreasonable for NLC to complain about having not received the response until August 1, 2005 to its request for production of documents. To get to the point of being able to segregate and produce the 984 pages of materials produced, Eagle's Nest first had to sort through literally boxes of material. This includes, but is not limited to, the many storage boxes of materials Barbara Perrino turned over to Eagle's Nest when she resigned in February 2004. Then Eagle's Nest's attorney had to review the documents provided to Eagle's Nest's Attorney by Eagle's Nest to determine whether and how it was responsive to NLC's request, to determine whether all or any portion of the document was privileged, and, if so, to redact the privileged material. Then Eagle's Nest's attorney had to assemble the materials in a form responsive to NLC's request, and provide the itemized description of the materials being requested. In addition, as part of this process, Eagle's Nest's attorney had to engage in multiple meetings with Eagle's Nest to discuss the request and to assist in attempting to ascertain what documents were responsive thereto. Finally, it is unreasonable for NLC to complain about the pace at which materials were produced when they joined with Eagle's Nest in making joint motions for extension of time to conduct discovery.

Finally, on the reasonableness issue, Eagle's Nest points out that NLC's allegation in footnote 2 on page 8 of NLC's memorandum in support of its motion for summary judgment that the

plaintiff is unable to locate minutes from the July 2002 executive board meeting is incorrect. In numbered paragraphs 3-7 of Plantiff's Memorandum Exhibit 7, The Marilyn Broussard Affidavit, Ms. Broussard notes the following on this matter:

(3) The Eagle's Nest Condominium Association Executive Board did not hold a meeting during the month of July 2002.

(4) At its meeting held June 25, 2002 the Eagle's Nest Condominium Association Executive Board decided to hold its next meeting on August 14, 2002.

(5) Exhibit 1 attached hereto is a true and exact copy of the Eagle's Nest Condominium Association Executive Board's minutes from its meeting conducted June 25, 2002.

(6) Page 2 of attached Exhibit 1 (the minutes from the Eagle's Nest Condominium Association Executive Board's June 25, 2002 meeting) documents the Eagle's Nest Condominium Association Executive Board's decision to conduct the board's next meeting on August 14, 2002.

(7) The Eagle's Nest Condominium Association Executive Board's next meeting following its June 25, 2002 meeting was actually conducted on August 13, 2002

Both the June 2002 minutes and the August 2002 minutes mention in Ms. Broussard's affidavit have been produced to NLC.

**(C) <u>EAGLE'S NEST'S LOSS MANIFESTED DURING THE PERIOD OF NLC'S COVERAGE, AND NLC IS, THEREFORE, RESPONSIBLE FOR PAYMENT FOR EAGLE'S NEST'S LOSS</u>**

**(1) The Relevant Question in Determining Whether Eagle's Nest's Has Suffered a Compensable Loss is When Did the Loss Manifest**

Steve Bogle, in numbered paragraphs 15-17 of his attached affidavit, sums up the damage process affecting the Eagle's Nest floors as follows:

(15) It is my opinion, to a reasonable degree of professional certainty that when sufficient live loads were added to the dead loads on the trusses comprising the floors of the various condominium units such that the floor's weight bearing capacity as constructed was exceeded, the trusses of such floors became overstressed and physically damaged, as a result of which the floors structurally failed, thereby substantially impairing their structural integrity.

(16) It is my opinion, to a reasonable degree of professional certainty that the structural failure of the Eagle's Nest floors and the resulting substantial impairment in the structural integrity of the floors was caused in part by the weight of people and property (the live load) on the floors.

(17) It is my opinion, to a reasonable degree of professional certainty, that the structural failure of the Eagle's Nest floors occurred after construction was complete.

It is uncontested that Joan Zeller of Unit 15(C) wrote a letter dated June 28, 2002 to the property manager (and sent a copy to the condo association president) complaining of a sinking floor in her unit. Given that fact, however, one would expect

that some time would likely elapse as the letter passed through the mail.

In her deposition testimony, Ms. Zeller made it clear that the sinking of her floors was a recent problem. She gave the following pertinent testimony:

Q: Now, this letter is dated June 28th, 2002; is that correct?

A: Correct.

Q: Is that a or about the time you prepared this letter?

A: Yes.

Q: And in the letter, you indicate that the problem had been going on for over a decade; is that correct?

A: The floor was spongy for over a decade. When you walked across it, the -- you would feel -- you would -- you didn't have this solid feeling. It was spongy. But this letter was after I heard loud cracking noises, and like -- "cracking" is probably the wrong word. You know, when sound is muffled, it's -- I can't duplicate the sound, but I could hear a thumping sound. And the -- my dining room table was at a slant. And then when I walked across the floor, it was (indicating) -- and it got worse over the next couple of weeks. And I put a pen on the dining room table and it

would roll off. And I got nervous. I knew something was wrong.

(See Plaintiff's Memorandum Exhibit 13, Excerpts from the Joan Zeller Deposition Transcript, page 11 Line 7 through page 12, line 6)

Mr. Jackavony's testimony comports with Ms. Zeller's testimony of becoming conscious of the floor (which for Mr. Jackvony's unit would be the ceiling) sinking around June of 2002. At his deposition, Mr. Jackvony was asked "had the condition been existing for a period of time as of June 2002," and he responded, "Not a long period of time." (See Plaintiff's Memorandum Exhibit 14, Excerpts from the Al Jackvony Deposition Transcript, page 7 lines 3-5). What is more, the Zeller and Jackavony testimonies reinforce the point that this floor problem was a hidden, progressive condition that calls for application of the manifestation rule.

From the above-noted testimony and affidavit, it's clear that the floor truss failure lay hidden and progressed over time, unbeknown to Eagle's Nest. "[I]n first party progressive loss cases, when, as in the present case, the loss occurs over several policy periods and is not discovered until several years after it commences, the manifestation rule applies." Prudential-LMI Commercial Insurance v. Superior Court, 798 P.2d 1230, 1246 (Cal 1990).

While Prudential-LMI Commercial Insurance v. Superior Court, supra, is a California case, it is noteworthy that the Court in that case cites a case from the United States District Court for the District of Rhode Island to support the position that an "insurer on risk at time defect is discovered is responsible for loss", see Prudential-LMI Commercial Insurance v. Superior Court, supra at 1243, (wherein they cite Bartholomew v. Ins. Co. of North America (D.C.R.I., 1980) 502 F.Supp. 246, affd. sub nom. Bartholomew v. Appalachian Ins. Co., supra, 655 F.2d 27).

Indeed, Rhode Island does recognize a manifestation rule in insurance coverage (although it appears thus far that it has only done so in the context of liability insurance cases). Rhode Island's Supreme Court recently reaffirmed the concept in liability insurance cases when they held that "Property damage triggers coverage under this type of comprehensive general-liability-insurance policy when the damage (1) manifests itself, (2) is discovered or, (3) in the exercise of reasonable diligence is discoverable." Textron, Inc. v. Aetna Casualty and Surety Compnay et al., 754 A.2d 742, 746 (R.I. 2000) (citing CPC International, Inc. v. Northbrook Excess & Surplus Insurance Co., 668 A.2d 647, 649 (R.I. 1995)).

The Court in Prudential-LMI Commercial Insurance v. Superior Court offered sound reasoning and sound policy reasons in favor of following the manifestation rule in first party property

coverage cases (like Eagle's Nest's loss). That Court noted the following:

> [T]he manifestation rule in the first party context "promotes certainty in the insurance industry and allows insurers to gauge premiums with greater accuracy. Presumably this should reduce costs for consumers because insurers will be able to set aside proper reserves for well-defined coverages and avoid increasing such reserves to cover potential financial losses caused by uncertainty in the definition of coverage"

Prudential-LMI Commercial Insurance v. Superior Court, supra, at 1246, (quoting Home Ins. Co. v. Landmark Ins. Co. (1988) 205 Cal. App. 3d 1388, at pp. 1395-1396, 253 Cal. Rptr. 277).

Those policy reasons are equally applicable here, and should be followed.

**(2) Eagle's Nest's Loss Manifested (and therefore Occurred) During NLC's Coverage Period**

NLC's insurance policy covered the Eagle's Nest property for the period December 20, 2000 through December 22, 2004. NLC is liable for Eagle's Nest's loss as long as it manifested anytime during this 4-year period.

NLC, in its summary judgment motion memorandum points out a statement from the February 9, 2003 condominium association

meeting minutes attributed to Unit 3C's owner. The statement indicates "3C states that 2 years ago she reported a deflection in her basement. Nothing was done so her husband braced it. Called for an inspection by an engineer, but has not happened." Even if it were true that Unit 3C complained to the property manager of a basement deflection 2 years before the meeting date, working backwards 2 years from the date of the February 9, 2003 meeting still would put the complaint date well within the time of NLC's coverage.

It is worth mentioning, however, a number of facts that point away from unit 3C as evidence of manifestation of the loss that is the subject of Eagle's Nest's action against NLC. First is the statement from numbered paragraph 2 of Plaintiff's Memorandum Exhibit 2, the Roberta MacMahon Affidavit, in which Ms. McMahon states the following:

(2) I have now made a thorough review of Eagle's Nest Condominium Association's file for Unit 3C, and state that it contains no document concerning any report of a deflection in the basement of that unit, and that the file for Unit 3C contains no document concerning any call for an inspection by an engineer.

Second is the following statement (from numbered paragraph 21 of Steven Bogle's affidavit):

(21) It is my opinion, to a reasonable degree of professional certainty that the only bracing added in the basement of Unit 3C after the building containing Unit 3C was constructed consisted of two (2) wooden posts, and it is my opinion to a reasonable degree of professional certainty that these two (2) wooden posts were installed to support a built up wooden header at the basement stairs in Unit 3C. It is my opinion, to a reasonable degree of professional certainty that there is no evidence of any additional support having been added to any of the floor trusses in the basement of Unit 3C after the building containing Unit 3C was constructed.

As noted in Section A of this memorandum, NLC appears to argue that Eagle's Nest discovered the floor truss problem June 28, 2002. If that were true, it would have no bearing on the question of NLC's liability for Eagle's Nest's claim. We have shown in Section (A) of Eagle's Nest's memorandum that a 10 year statute of limitations applies to this breach of contract claim. We have shown here in Section (C) of this memorandum that in claims of this type the date of loss is the date that the damage manifests. Clearly, if the damage manifested on June 28, 2002 this loss still came during the period of NLC's coverage under the policy.

In this case, however, the great weight of the evidence points to July 25, 2002 as the discovery (or manifestation) date, and therefore as the loss date.

Joan Zeller did not act to bring the problem in her floor to the condominium association's attention until she wrote her June 28, 2002 letter. Ms. Zeller confirms this fact in her deposition, when she notes "[U]p until that point, I was afraid somebody would think I was nuts." (See Plaintiff's Memorandum Exhibit 13, Excerpts from the Joan Zeller Deposition Transcript, page 39, lines 9-10). The day to which Ms. Zeller refers in this quote is approximately June 21, 2002, when she learned of the problem in the Jackvony ceiling below her.

In response to the Zeller/Jackvony problem, Barbara Perrino retained Steven Bogle (the engineer). He inspected the Zeller and Jackvony units the first time on July 17, 2002, but the condition remained hidden beneath Zeller's floor and above Jackvony's ceiling. Steven Bogle was first able to examine the floor trusses in detail the week following Mr. Bogle's July 17, 2002 initial visit to Eagle's Nest. By this visit, the ceiling to the Jackvony unit was removed, and Mr. Bogle was called in to inspect it. (See Plaintiff's Memorandum Exhibit 10, Excerpts from the Steven Bogle deposition transcript, page 26, lines 3 through 9). During that visit, Mr. Bogle saw that two trusses side by side were broken, they had literally snapped. (See

Plaintiff's Memorandum Exhibit 10, Excerpts from the Steven Bogle deposition transcript, page 36, lines 15-21). This puts the manifestation date at July 25, 2002.

## (D) NLC'S INSURANCE POLICY COVERS EAGLE'S NEST'S LOSS

### (1) The Weight of People and Property has in Part Caused the Eagle's Nest Floors to Collapse, Bringing this Loss Within the Coverage of NLC's Insurance Policy

In numbered paragraphs 13 through 17 of Plaintiff's Memorandum Exhibit 5, the Steve Bogle Affidavit, Mr. Bogle notes:

(13) It is my opinion, to a reasonable degree of professional certainty, that the floors at Eagle's Nest Condominium were constructed with sufficient strength to support the dead load plus the addition of some live load added onto the floors without the floors structurally failing. The specific amounts of such added live load the floors were constructed capable of handling without structural failure is detailed in my letter attached hereto as Exhibit 2 and in the 4 pages of documents which follow Exhibit 2 (the 4 pages of documents following attached Exhibit 2 comprise attached Exhibit 3).

(14) It is my opinion, to a reasonable degree of professional certainty that the Eagle's Nest floor trusses were constructed by defective methods such that the floors did

not meet minimum design criteria that establish the amount of live load the floors are required to be able to handle

(15) It is my opinion, to a reasonable degree of professional certainty that when sufficient live loads were added to the dead loads on the trusses comprising the floors of the various condominium units such that the floor's weight bearing capacity as constructed was exceeded, the trusses of such floors became overstressed and physically damaged, as a result of which the floors structurally failed, thereby substantially impairing their structural integrity.

(16) It is my opinion, to a reasonable degree of professional certainty that the structural failure of the Eagle's Nest floors and the resulting substantial impairment in the structural integrity of the floors was caused in part by the weight of people and property (the live load) on the floors.

(17) It is my opinion, to a reasonable degree of professional certainty, that the structural failure of the Eagle's Nest floors occurred after construction was complete.

Indeed, as noted above, when Mr. Bogle examined the trusses in the Jackvony ceiling during Mr. Bogle's second visit he observed that 2 of the trusses side by side had snapped. (See Plaintiff's Memorandum Exhibit 10, Excerpts from the Steven Bogle deposition transcript, page 36, lines 15-21)

The portions of NLC's insurance policy pertinent to this evidence are located at page 6 of 7 of CP 10 20 06 95, contained in Plaintiff's Memorandum Exhibit 1. The policy language provides as follows:

**D. ADDITIONAL COVERAGE - COLLAPSE**

The term Covered Cause of Loss includes the Additional Coverage - Collapse as described and limited in **D.1.** through **D.5.** below.

**1.** We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following:

**a.** The "specified causes of loss" or breakage of building glass, all only as insured against in this Coverage Part;

**b.** Hidden decay;

**c.** Hidden insect or vermin damage;

**d.** Weight of people or personal property;

**e.** Weight of rain that collects on a roof;

**f.** Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during

the course of the construction, remodeling, or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in D.1.a. through D.1.e., we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

Reading this language in conjunction with the above-noted evidence, Eagle's Nest's loss is clearly covered by section **D.1.f.** of the additional coverage - collapse section. This evidence establishes that the collapse occurred after construction was complete, is caused in part by the cause of loss listed in **D.1.d.** (weight of people or personal property), even though defective construction methods contributed to the collapse.

**(2) For a Collapse Loss to be Covered Under the NLC Policy Requires only that the Structural Integrity of the Building (or any Part of it) be Substantially Impaired. It Does Not Require the Building's Total Destruction**

In Rhode Island, a collapse claim does not require total destruction of a building. Rhode Island's Supreme Court has noted the following:

> In construing insurance clauses similar to the one here, many courts have found that use of the word "collapse" in an insurance policy does not require the total destruction of a building because to require a party to await complete destruction before losses will be covered frustrates an insured's understanding of the insurance agreement and subverts his or her duty to mitigate damages and to avoid economic waste.

Campbell v. Norfolk & Dedham Mutual Fire Insurance Company, 682 A.2d 933, 936 (R.I. 1996) (citing Ercolani v. Excelsior Insurance Co., 830 F.2d 31, 34 (3rd Cir. 1987); Fidelity and Casualty Co. of New York v. Mitchell, 503 So.2d 870, 871 (Ala.Civ.App.1987); Whispering Creek Condominium Association v. Alaska National Insurance Co., 774 P.2d 176, 180 (Alaska 1989); Beach v. Middlesex Mutual Assurance Co., 205 Conn. 246, 252-53, 532 A.2d 1297, 1300-01 (1987); Auto Owners Insurance Co. v. Allen, 362 So.2d 176, 177-78 (Fla.Dist.Ct.App. 1978); Nationwide Mutual Fire Insurance Co. v. Tomlin, 1818 Ga.App. 413, 415-16, 352 S.E.2d 612, 615 (1986); Government Employees Insurance Co. v. DeJames, 256 Md. 717, 724, 261 A.2d 747, 751 (1970); Guyther v. Nationwide Mutual Fire Insurance Co., 109 N.C.App. 506, 511-14, 428 S.E.2d 238, 241-42(1993); and What Constitutes "Collapse" of a Building Within Coverage of Property Insurance Policy, 71 A.L.R. 3rd 1072 (1976).

This extensive citation from the Rhode Island Supreme Court in Norfolk, supra, illustrates that a multitude of jurisdictions (besides Rhode Island) adhere to the rule that a collapse does not require a building to be reduced to a pile of rubble.

Also of assistance is a recent Indiana case (which therefore could not be cited in Norfolk, supra). In the Indiana case, the Court noted that "[T]he broader and so-called modern definition, which is followed by a majority of jurisdictions* defines "collapse" as a "substantial impairment of the structural integrity of the building or any part of a building." Monroe Guaranty Insurance Company v. Magwerks Corporation, 829 N.E.2d 968, 972-973 (Ind. 2005) (citing 43 Am.Jur.2d § 1282) (emphasis added). They went on later in this case to note "[N]either party challenges the Court of Appeals' adoption of the modern view of collapse coverage. We agree with this view as well." Monroe Guaranty Insurance Company v. Magwerks Corporation, supra, at 973.

I have placed the * symbol in the first above quote from Monroe Guaranty Insurance Company v. Magwerks Corporation, supra, to denote the location of the following footnote from that case. This footnote serves as a good summary of the modern view. It provides as follows:

> *See, e.g., Ercolani v. Excelsior Ins. Co.*, 830 F.2d 31, 34 (3rd Cir.1987) (predicting that New Jersey would follow

other states in holding that collapse requires only "serious impairment of structural integrity"). *See also Sherman v. Safeco Ins. Co. of America, Inc.*, 716 P.2d 475, 476 (Colo.Ct.App.1986) (holding that cracked masonry work, sagging roof, falling bricks, and bowed walls constituted collapse as a matter of law); *Beach v. Middlesex Mut. Assur. Co.*, 205 Conn. 246, 532 A.2d 1297, 1299-1300 (1987) (noting dictionary definition of collapse as "a breakdown in vital energy, strength, or stamina" and "sudden loss of accustomed abilities," Court held that collapse coverage did not include settling or cracking unless substantial impairment of structural integrity of building ensued); *Island Breakers v. Highlands Underwriters Ins. Co.*, 665 So.2d 1084, 1085-86 (Fla.Dist.Ct.App.1995) (Cope, J., concurring) (collapse coverage applies if there is a "substantial impairment of the structural integrity" of part of the building); *Nationwide Mut. Fire Ins. Co. v. Tomlin*, 181 Ga.App. 413, 352 S.E.2d 612, 615 (1986) (holding that collapse includes any "reasonably detectable serious impairment of structural integrity" because such a definition "more realistically reflects the purposes of the policy"); *Gov't Employees Ins. Co. v. DeJames*, 256 Md. 717, 261 A.2d 747, 750 (1970) (holding collapse is ambiguous because verb has restrictive meaning and noun has more liberal meaning, including "breakdown in strength," and thus resolving ambiguity in

> favor of insured to include any serious impairment of structural integrity); *United Nuclear Corp. v. Allendale Mut. Ins. Co.,* 103 N.M. 480, 709 P.2d 649, 652 (1985) (holding that settling that impairs the structural integrity of the building constitutes collapse); *Royal Indem. Co. v. Grunberg,* 155 A.D.2d 187, 189, 553 N.Y.S.2d 527 (1990) (agreeing with "numerical majority of American jurisdictions [that] a substantial impairment of the structural integrity of a building is said to be a collapse" because to require the building to fall down would be "unreasonable" in light of an insured's duty to protect property from further damage); *Thomasson v. Grain Dealers Mut. Ins. Co.,* 103 N.C.App. 475, 405 S.E.2d 808, 809 (1991) (holding that the word collapse is ambiguous because to "require that the house fall in completely" would render the coverage illusory).

Monroe Guar. Ins. Co. v. Magwerks Corp. 829 N.E.2d 968, 973 (Ind.2005).

**(E) SUMMARY**

On each above-discussed issues, it is clear, upon reviewing all the undisputed, material evidence, that it is Eagle's Nest, not NLC, who is entitled to judgment in its favor as a matter of law. Eagle's Nest requests, therefore, that the Court enter summary judgment in favor of Eagle's Nest against NLC on the

issue of liability. Should the Court be unwilling to grant Eagle's Nest's motion for summary judgment, Eagle's Nest moves that the Court deny NLC's motion for summary judgment. For, in that case, at the very least, there are genuine issues of material fact that must be resolved by the jury.

Dated: February 28, 2006

Respectfully submitted, Plaintiff,
Eagle's Nest Condominium
Association, Inc., also known as
Eagle Nest Condominium Assoc,
By its Attorney,

Steven H. Orabone, Esq. (#3205)
20 Ridgevale Court
Cranston, RI 02921
Telephone: (401) 944-5777
FAX: (401) 942-1936
E-mail: stevenorabone@cox.net

**CERTIFICATION**

I, the undersigned, hereby certify that I hand-delivered a copy of the within Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and in support of Plaintiff's Motion for Summary Judgment, on February 28, 2006 to Ronald Langlois, Esq., Smith & Brink, P.C., One State Street, Suite 400, Providence, RI 02908.