UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., ALSO KNOWN AS EAGLE NEST CONDOMINIUM ASSOC

Plaintiff,

vs.

NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V, AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY

Defendants

Civil Action, File No.: 04-436ML

**PLAINTIFF, EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., ALSO KNOWN AS EAGLE NEST CONDOMINIUM ASSOC,'S**

**CONCISE STATEMENT OF DISPUTED AND UNDISPUTED MATERIAL FACTS**

Disputed Facts:

6. Eagle's Nest disputes that part of the purported fact that alleges it was reported to Barbara Perrino on June 28, 2002. Eagle's Nest acknowledges that the letter is dated June 28, 2002 and that it received the letter, but there is a question as to the date it was actually received. Marilyn Broussard (Eagle's Nest President at the time of the letter) noted that with the mail she could have gotten the letter at the beginning of July (See Plaintiff's

Memorandum Exhibit 8, Excerpts from the Marilyn Broussard deposition excerpts, page 17, lines 13-15)

32. Eagle's Nest does not dispute the minutes, except to note that the portion designated in brackets as [counsel for Eagle's Nest] refers to attorney Frank Lombardi, who is specifically named on Exhibit G, and not in any way to attorney Steven H. Orabone.

37. Eagle's Nest does not dispute that it repaired trusses in 14 condominium units, and that it did so before Mr. Aube sent his March 15, 2004 letter to NLC (through Shailer and Greene) notifying them of Eagle's Nest's loss.

Eagle's Nest disputes the allegation that it replaced any trusses in any condominium unit. In repairing the trusses, no truss was replaced. In fact no part of the truss was removed in any of the truss repairs. In support of this, Eagle's Nest refers to Plaintiff's Memorandum Exhibit 5, The Steven Bogle Affidavit, and to Plaintiff's Memorandum Exhibit 6, the Dennis Higgins Affidavit.

In addition, while Eagles Nest disputes the allegation that it repaired the units in 14 units in question before NLC was notified of the loss, in that Eagle's Nest contends (for the reasons stated in Section (B)(1) of

Eagle's Nest's memorandum) that its notice to Sidney Smith, Jr. served as notice to NLC.

38. Eagle's Nest disputes this allegation. (See Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

41. Eagle's Nest disputes that this portion of the insurance policy is pertinent, as Eagle's Nest's loss is not a fire or lightning claim.

47. Eagle's Nest does not dispute that Sidney Smith, was not a licensed agent of NLC, but Mr. Smith noted as to Eagle's Nest's insurance policy with NLC that he and Affiliated split the commission 50/50 (See Plaintiff's Memorandum Exhibit 9, Excerpts from the Sidney Smith Jr. Deposition Transcript, page 28, lines 19-23).

Mr. Smith noted, further, regarding his agency status and his share of the commission "But to the services I provided, I was known as what was called the controlling agent, since I originally had that business. And Affiliated would have been known as the placing -- the placement agency, since they had the contract with the carrier. So the reason for the 50/50 split is that communication goes through both agencies (See Plaintiff's

Memorandum Exhibit 9, Excerpts from the Sidney Smith Jr. Deposition Transcript, page 45, lines 3-10).

**<u>Additional Undisputed Facts that Both Support Eagle's Nest's Motion for Summary Judgment and Preclude NLC's Motion for Summary Judgment</u>:**

(1) At the time of Eagle's Nest's loss, and at the time Eagle's Nest filed the within lawsuit, The **Legal Action Against Us** Commercial Property Condition of NLC's policy, which previously provided as follows:

**"COMMERICAL PROPERTY CONDITIONS**

* * * * * *

**D. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

* * * * * *

2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred."

had already, as of the time of Eagle's Nest's loss, and as of the time Eagle's Nest filed this lawsuit against NLC, been replaced by the following endorsement in the NLC policy:

**"THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**RHODE ISLAND CHANGES**

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

* * * * * *

G. The **Legal Action Against Us** Commercial Property Condition is replaced by the following:

**LEGAL ACTION AGAINST US**

1. No one may bring a legal action against us under this Coverage Part unless there has been full compliance with all of the terms of this Coverage Part.

2. Subject to Paragraph 1. above, any action on this policy for the recovery of any claim for direct loss or damage by fire and lightning must be brought within 2 years after the date on which such direct loss or damage occurred.

(2) On March 22, 2004 NLC sent Eagle's Nest a letter stating that "In Rhode Island, the Statute of Limitations for this loss is ten (10) years" and referring to the date of

Eagle's Nest's loss as being November 29, 2002. (see Attachment 1 to Plaintiff's Memorandum Exhibit 2, the Roberta McMahon Affidavit).

(3) Eagle's Nest Condominium Association's file for Unit 3C, contains no document concerning any report of a deflection in the basement of that unit, and that the file for Unit 3C contains no document concerning any call for an inspection by an engineer. (Plaintiff's Memorandum Exhibit 2, the Roberta McMahon Affidavit).

(4) On May 28, 2004, NLC's adjuster (James A. Heaney) sent Eagle's Nest a letter claiming that "the statute of limitations for your claim is twenty-four months from the date of loss". (See attachment 2 to Plaintiff's Memorandum Exhibit 2, the Roberta McMahon Affidavit).

(5) During the entire time that Barbara Perrino was property manager for Eagles Nest Condominiums, Sidney Smith, Jr. was the insurance agent with whom she dealt. (see Plaintiff's Memorandum Exhibit 3, the Barbara Perrino Affidavit)

(6) Sidney Smith, JR. was the insurance agent for Eagle's Nest for a 9-10 year period. (See Plaintiff's Memorandum

Exhibit 12, Excerpts from the Barbara Perrino Deposition Transcript, page 34 line 21 through page 35 line 10)

(7) Whenever Barbara Perrino notified an insurance company of an Eagle's Nest Condominium Association loss, she went through Sidney Smith, Jr. This was Barbara Perrino's normal, usual, and customary practice for notifying an Eagle's Nest Condominium Association insurance carrier of a loss. Barbara Perrino never notified an insurance company of an Eagle's Nest Condominium Association loss by directly contacting an insurance carrier. (see Plaintiff's Memorandum Exhibit 3, the Barbara Perrino Affidavit)

(8) Barbara Perrino knew to contact Sidney Smith, Jr. because he was the insurance agent. Barbara Perrino had other occasions in the past to contact Mr. Smith on claims; this was Ms. Perrino's normal procedure; it was based on her experience since approximately 1978 in the property management field; it was what she ordinarily did when she had a claim. (See Plaintiff's Memorandum Exhibit 12, Excerpts from the Barbara Perrino Deposition Transcript, page 74 line 8 through line 21).

(9) Sidney Smith, Jr. advised Barbara Perrino that because Eagle's Nest's floor truss problem was a structural issue it would not be a covered loss (See Plaintiff's Memorandum

Exhibit 12, Excerpts from the Barbara Perrino Deposition Transcript, page 37 line 13 through line 16)

(10) Barbara Perrino had conversations with Sidney Smith, Jr. more than once because the expenses continued to increase. And Ms. Perrino wanted to make sure that she understood what the position was regarding coverage. (See Plaintiff's Memorandum Exhibit 12, Excerpts from the Barbara Perrino Deposition Transcript, page 38, lines 13 through 17)

(11) Barbara Perrino relied on Sidney Smith, Jr.'s advice and understanding of insurance policies. (See Plaintiff's Memorandum Exhibit 12, Excerpts from the Barbara Perrino Deposition Transcript, page 39 line 20 through line 22)

(12) On or about January 30, 2003, Perrino Associates, at a time when it was serving as the property management company for Eagle's Nest Condominiums, received a Notice of Violation from the Warwick Building Department concerning the floor truss problem at Eagle's Nest Condominiums. A true and exact copy of the Notice of Violation is attached to Barbara Perrino's affidavit and labeled as Exhibit 1. (see Attachment 1 to Plaintiff's Memorandum Exhibit 3, the Barbara Perrino Affidavit).

(13) Barbara Perrino's work as Eagle's Nest Condominium Association's property manager ended when she resigned effective approximately February 29, 2004. (see Plaintiff's Memorandum Exhibit 3, the Barbara Perrino Affidavit)

(14) After Barbara Perrino's resignation date, whenever she received mail concerning Eagles Nest Condominium Association, she forwarded that mail to Roberta McMahon, Eagles Nest Condominium Association's president. (see Plaintiff's Memorandum Exhibit 3, the Barbara Perrino Affidavit)

(15) Richard Aube is a public insurance adjuster licensed as such by the State of Rhode Island. (see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(16) Richard Aube has 26 years of professional experience in the field of insurance claims. (see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(17) Richard Aube's work as an insurance adjuster regularly requires that he read and interpret insurance policies. (see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(18) In the latter part of February, 2004 the Eagles Nest Condominium Association Board of Directors informed Richard Aube of the problem Eagles Nest Condominiums was experiencing with their floor trusses, and asked him to read their New London County Mutual Insurance Company (hereinafter referred to as "NLC") commercial package insurance policy. (see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(19) Richard Aube, after considering the facts and documents provided to him concerning the Eagle's Nests floor truss problem and after reviewing the NLC policy, concluded that the NLC policy provides coverage for Eagle's Nest's loss arising from the floor truss problem. (see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(20) In March of 2004, James Heaney of R.J. Margetta Adjustment contacted Richard Aube concerning the Eagle's Nest loss, and they agreed to a March 25, 2004 appointment for Mr. Heaney to inspect Eagle's Nest condominiums on behalf of NLC. Mr. Heaney conducted this inspection in Mr. Aube's presence. Mr. Heaney inspected one unit (#24A) that day. At that time, Mr. Aube provided certain materials to NLC (through Mr. Heaney) in support of Eagle's Nest's loss.

(see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(21) On April 5, 2004, Richard Aube forwarded a package of additional materials to NLC (through Mr. Heaney) concerning Eagle's Nest's loss. Mr. Aube accompanied that package with a letter to Mr. Heaney in which Mr. Aube outlined Eagle's Nest's claim. A true and exact copy of that letter is attached as Exhibit 1 to Mr. Aube's Affidavit. (see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(22) On April 20, 2004, in order to keep NLC up to date concerning Eagle's Nest's progress on the repairs, Richard Aube sent Mr. Heaney a letter notifying him, per their previous conversations, that Unit 7B had been completed (and Mr. Aube accompanied that letter with a copy of Eagle's Nest's Engineer's floor truss repair certification). A true and exact copy of that letter and its attachment are attached to Richard Aube's Affidavit as Exhibit 2. (see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(23) Mr. Heaney again came to Eagles Nest to conduct an inspection in May of 2004. On this occasion, David Grandpre (an engineer acting on NLC's behalf) and Mr.

Heaney inspected 2 additional condominium units. This was the only time Mr. Grandpre came to Eagle's Nest to inspect any of the condominium units. (see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(24) On May 19, 2004, in order to keep NLC up to date concerning Eagle's Nest's progress on the repairs, Richard Aube sent Mr. Heaney a letter notifying him that repairs to Unit 17A (one of the Units that Mr. Heaney and Mr. Grandpre had inspected) would be continuing, and noting that should they require additional access to that unit to please contact Mr. Aube immediately. A true and exact copy of that letter is attached to Mr. Aube's Affidavit as Exhibit 3. (see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(25) After the inspection that Mr. Grandpre performed (in May 2004), while Mr. Grandpre was still at Eagle's Nest Condominiums, Mr. Grandpre verbally indicated to Richard Aube that Mr. Grandpre would probably concur with Eagle's Nest's engineer. Mr. Grandpre indicated that this was because Mr. Grandpre and Eagle's Nest's engineer were both looking at the same thing. This is noted in Richard Aube's letter of June 3, 2004 to James Heaney. With that June 3, 2004 letter to Mr. Heaney, Mr. Aube forwarded a

further package of materials to NLC (through Mr. Heaney) concerning Eagle's Nest's loss. A true and exact copy of that letter is attached to Richard Aube's Affidavit as Exhibit 4. (see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(26) Eagles Nest Condominium Complex consists of 120 units distributed over 48 detached and separate buildings. In all, Eagles Nest will be performing 106 repairs. The reason there will not be 120 repairs is because each quadplex repair applies to 2 units. (see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(27) To the present NLC's engineer has inspected 2 units, and NLC's adjuster has inspected 3 units (2 of which are the same ones NLC's engineer inspected) . (see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(28) On July 1, 2004 Richard Aube faxed a letter to Mr. Heaney, advising him that work had begun on another of the Eagle's Nest condominium units, that 3 broken trusses were found, and asking if he would like to view the trusses prior to repair and installation of the ceiling. A true and exact copy of that letter is attached to Richard Aube's Affidavit as Exhibit 5. In response to this letter, Mr. Heaney contacted Richard Aube and informed Mr. Aube that

Mr. Heaney was not coming out to see every unit. (see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(29) On approximately August 12, 2004 NLC, through their attorney sent Richard Aube a letter requesting materials from Eagle's Nest. At the time NLC made this request, Richard Aube had already forwarded to NLC (through Mr. Heaney) a large amount of documentation relating to Eagle's Nest's claim. These included copies of the following significant items:

(a) The contents of the file of Eagle's Nest's structural engineer (Steven Bogle, P.E. of Geisser Engineering Corporation);

(b) A table itemizing the structural repair expense for each repaired unit for 2002 and 2003

(c) Check vouchers related to the repairs;

(d) Repair contracts;

(e) Correspondence with the repair contractor

(f) The condominium association's management company's work orders related to floor truss repairs

(g) Checks paid for expenses related to the units' repairs

(h) Invoices related to the repairs;

(i) Invoices from Eagle's Nest's structural engineer;

(j) Photographs related to the loss;

(k) The Warwick Building Inspector's Notice of Violation;

(see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(30) In September 2004, Richard Aube informed NLC's attorney that Eagle's Nest was attempting to assemble the materials NLC's Attorney requested, but that due to limited resources it may take some time to gather those materials. NLC's attorney acknowledged this in a letter to Richard Aube dated September 15, 2004. Exhibit 6 attached to Richard Aube's affidavit is a true and exact copy of that letter. (see Plaintiff's Memorandum Exhibit 4, the Richard Aube Affidavit)

(31) Eagle's Nest's Engineer (Steven Bogle, P.E. of Geisser Engineering Corporation designed a solution for repair of the Eagle's Nest Floor trusses which is to apply three-quarter inch plywood on either side that is glued and screwed to the existing truss. (See Plaintiff's Memorandum Exhibit 10, Excerpts from the Steven Bogle Deposition Transcript, page 35, lines 10-23).

(32) Steven Bogle's first visit to Eagles Nest Condominiums occurred on July 17, 2002. (see Plaintiff's Memorandum Exhibit 5, the Steven Bogle Affidavit)

(33) After July 17, 2002 Steven Bogle examined various units concerning the floors in them at the Eagle's Nest Condominium Association. In addition, Steven Bogle has had the opportunity to examine many of the underlying truss systems that comprise certain of those floors. (see Plaintiff's Memorandum Exhibit 5, the Steven Bogle Affidavit)

(34) Steven Bogle was first able to examine the floor trusses in detail the week following Mr. Bogle's July 17, 2002 initial visit to Eagle's Nest. By this visit, the ceiling to the Jackvony unit was removed, and Mr. Bogle was called in to inspect it. During that visit, Mr. Bogle saw that two trusses side by side were broken, they had literally snapped. (See Plaintiff's Memorandum Exhibit 10, Excerpts from the Steven Bogle deposition transcript, page 26, lines 3 through 9 and page 36, lines 15-21)

(35) The term "dead load" means the weight of a condominium unit's fixed structure. (see Plaintiff's Memorandum Exhibit 5, the Steven Bogle Affidavit)

(36) The term "live load" means the weight of people and property in a condominium unit. (see Plaintiff's Memorandum Exhibit 5, the Steven Bogle Affidavit)

(37) The amount of weight comprising the dead load on the Eagle's Nest Condominium floors was not sufficient weight, by itself, to cause the floors to structurally fail. (see Plaintiff's Memorandum Exhibit 5, the Steven Bogle Affidavit)

(38) The floors at Eagle's Nest Condominium were constructed with sufficient strength to support the dead load plus the addition of some live load added onto the floors without the floors structurally failing. (see Plaintiff's Memorandum Exhibit 5, the Steven Bogle Affidavit)

(39) The 28 foot 4 inch span trusses at Eagle's Nest, were constructed capable of safely supporting 9 pounds per square foot of live load, in addition to the dead load. (see Plaintiff's Memorandum Exhibit 5, the Steven Bogle Affidavit)

(40) The 26 foot span trusses at Eagle's Nest, were constructed capable of safely supporting 14 pounds per square foot of live load, in addition to the dead load. (see Plaintiff's Memorandum Exhibit 5, the Steven Bogle Affidavit)

(41) When sufficient live loads were added to the dead loads on the trusses comprising the floors of the various condominium units at Eagle's Nest such that the floor's weight bearing capacity as constructed was exceeded, the trusses of such floors became overstressed and physically damaged, as a result of which the floors structurally failed, thereby substantially impairing their structural integrity. (see Plaintiff's Memorandum Exhibit 5, the Steven Bogle Affidavit)

(42) The structural failure of the Eagle's Nest floors and the resulting substantial impairment in the structural integrity of the floors was caused in part by the weight of people and property (the live load) on the floors. (see Plaintiff's Memorandum Exhibit 5, the Steven Bogle Affidavit)

(43) The structural failure of the Eagle's Nest floors occurred after construction was complete. (see Plaintiff's Memorandum Exhibit 5, the Steven Bogle Affidavit)

(44) The repairs Steven Bogle designed and specified for the Eagle's Nest floor trusses required no removal of truss materials. (see Plaintiff's Memorandum Exhibit 5, the Steven Bogle Affidavit)

(45) Steven Bogle has reviewed the repair work performed on the floor trusses in each unit that has had the repairs he specified performed, and Mr. Bogle has confirmed, in each case, that the repairs were completed in compliance with his specifications. Such compliance has included the fact that no truss material was removed. (see Plaintiff's Memorandum Exhibit 5, the Steven Bogle Affidavit)

(46) The only bracing added in the basement of Unit 3C after the building containing Unit 3C was constructed consisted of two (2) wooden posts. These two (2) wooden posts were installed to support a built up wooden header at the basement stairs in Unit 3C. There is no evidence of any additional support having been added to any of the floor trusses in the basement of Unit 3C after the building containing Unit 3C was constructed. (see Plaintiff's Memorandum Exhibit 5, the Steven Bogle Affidavit)

(47) With regard to all repairs performed by ACC Contractors, Inc. on the Eagles Nest Condominiums, Dennis Higgins has been, and remains, the individual in charge of performing ACC Contractors, Inc.'s work to repair the floors of Eagle's Nest Condominiums in accordance with the drawings and specifications developed by Geisser Engineering

Corporation for said repairs. (see Plaintiff's Memorandum Exhibit 6, the Dennis Higgins Affidavit)

(48) For each Eagles Nest Condominium Unit on which ACC Contractors, Inc. has performed floor truss repairs, ACC Contractors, Inc. has photographed the floor trusses before the repairs and after the repairs. This includes, but is not limited to, each Eagles Nest Condominium Unit that was repaired before May 21, 2004. (see Plaintiff's Memorandum Exhibit 6, the Dennis Higgins Affidavit)

(49) In performing its repairs, ACC Contractors, Inc. did not remove any part of the floor truss systems in any of the condominium units for which ACC Contractors, Inc. has repaired the floor truss system. (see Plaintiff's Memorandum Exhibit 6, the Dennis Higgins Affidavit)

(50) Both the insured and the insurer benefit when an insured mitigates its damages. (See Plaintiff's Memorandum Exhibit 11, Excerpts from the Diane Landock Transcript, page 31, line 24, through page 32, line 14)

(51) NLC wants its insureds to mitigate their damages (See Plaintiff's Memorandum Exhibit 11, Excerpts from the Diane Landock Deposition Transcript, page 31, line 24, through page 32, line 14)

(52) Marilyn Broussard was Eagle's Nest Condominium Association president from approximately 2001 through 2003.

(53) When Eagle's Nest learned of the floor truss problem in building 15, they thought it was an isolated incident. At that time, they were new at handling the matter. Two of the people living in building 15 were "little old ladies." The Eagle's Nest executive board conducted investigations as to where these little old ladies would stay and what would be done with their furniture when they were displaced during the repairs of their units. When the other Eagle's Nest Unit owners got wind of the floor truss problem, they were upset with the executive board. (See Plaintiff's Memorandum Exhibit 8, Excerpts from the Marilyn Broussard Deposition Transcript, page 18, line 22 through page 20, line 19)

(54) The Eagle's Nest Condominium Association Executive Board did not hold a meeting during the month of July 2002. (See Plaintiff's Memorandum Exhibit 7, The Marilyn Broussard Affidavit)

(55) At its meeting held June 25, 2002 the Eagle's Nest Condominium Association Executive Board decided to hold its next meeting on August 14, 2002. (See Plaintiff's Memorandum Exhibit 7, The Marilyn Broussard Affidavit)

(56) Page 2 of the minutes from the Eagle's Nest Condominium Association Executive Board's June 25, 2002 meeting (which is attachment 1 to the Marilyn Broussard Affidavit) documents the Eagle's Nest Condominium Association Executive Board's decision to conduct the board's next meeting on August 14, 2002. (See Plaintiff's Memorandum Exhibit 7, The Marilyn Broussard Affidavit)

(57) The Eagle's Nest Condominium Association Executive Board's next meeting following its June 25, 2002 meeting was actually conducted on August 13, 2002. (See Plaintiff's Memorandum Exhibit 7, The Marilyn Broussard Affidavit)

(58) Attachment 2 to the Marilyn Broussard Affidavit is a true and exact copy of the Eagle's Nest Condominium Association Executive Board's minutes from its meeting conducted August 13, 2002. (See Plaintiff's Memorandum Exhibit 7, The Marilyn Broussard Affidavit)

(59) The floor in Joan Zeller's unit (Unit 15(C)) was spongy for over a decade. It didn't have a solid feeling. The floor in Joan Zeller's unit was not sinking for over a decade. After Ms. Zeller heard a muffled thumping sound, her floor got worse over the next couple of weeks. (See Plaintiff's Memorandum Exhibit 13, Excerpts from the Joan

Zeller Deposition Transcript, page 11, line 7 through page 12, line 6)

(60) Up until approximately June 21, 2002, Joan Zeller was afraid somebody would think she was nuts if she mentioned the sponginess of her floors. (See Plaintiff's Memorandum Exhibit 13, Excerpts from the Joan Zeller Deposition Transcript, page 39, lines 9-10).

(61) The sinking ceiling condition in Mr. Jackvony's unit (Unit 15(A)) had not existed for a long period of time as of June 2002. (See Plaintiff's Memorandum Exhibit 14, Excerpts from the Al Jackvony Deposition Transcript, page 7, lines 3-5)

Dated: February 28, 2006

Plaintiff,
Eagle's Nest Condominium
Association, Inc., also known as
Eagle Nest Condominium Assoc,
By its Attorney,

Steven H. Orabone, Esq. (#3205)
20 Ridgevale Court
Cranston, RI 02921
Telephone: (401) 944-5777
FAX: (401) 942-1936
E-mail: stevenorabone@cox.net

**CERTIFICATION**

I, the undersigned, hereby certify that I hand-delivered a copy of the within Plaintiff, Eagle's Nest Condominium Association, Inc., also known as Eagle Nest Condominium Assoc,'s Statement of Disputed and Undisputed Material Facts, on February 28, 2006 to Ronald Langlois, Esq., Smith & Brink, P.C., One State Street, Suite 400, Providence, RI 02908.