UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., A/K/A EAGLE NEST CONDOMINIUM ASSOC.**

**Vs.** **C.A. NO. 04-436ML**

**NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY**

COPY

**DEPOSITION OF MARILYN FRANCES BROUSSARD**, taken on behalf of the Defendants, on December 20, 2005, at the law offices of Smith & Brink, P.C., One State Street, Suite 400, Providence, Rhode Island, before Susan J. LeBlanc-Rockcliffe, RPR, convening at 8:54 a.m.

**APPEARANCES:**

**STEVEN H. ORABONE, ESQUIRE**
Counsel for the Plaintiffs

**SMITH & BRINK, PC**
BY: Ronald Langlois, Esquire
Counsel for the Defendants

Plaintiff's Exhibit 8

REPORTING ASSOCIATES
Suite 617 - 10 Dorrance Street
Providence, Rhode Island 02903

A Yes.
Q -- prior to that time? This document is dated June 28th, 2002?
A Uh-huh (affirmative).
Q Is that a yes?
A Yes.
Q And was that at or about the time that you received the document?
A Yes.
Q June of 2002?
A (The deponent nodded in the affirmative.)
Q Is that correct?
A Yeah. Well, with the mail I could have gotten it at the beginning of July, I don't know, but around that time.
Q And do you recall -- what do you recall happening after you received this letter dated June 28, 2002?
A I talked to Barbara, said we had a problem.
Q Did you call Barbara or --
A I can't be sure of that. We would have talked it out and --
Q Tell me everything you recall about that first conversation.
A I don't really recall the conversation. I just know we would have talked to find out what was

going to be done about it because generally if there's a problem that's raised in a manner like that, I didn't get many letters. But if something was raised like that that could have been a significant problem, we would have addressed it at the next Board meeting. And Barbara probably would have had someone go in and do something about it beforehand just to assess the situation because she had maintenance people that worked for her. So I can't swear to it, but I'm sure someone came in to look, to assess the situation.

Q Did you ever speak to Mrs. Zeller about her problem?

A I do not believe so.

Q Do you know Mr. Jackvony? There's two Mr. Jackvonys?

A Yes. A member of your profession.

Q One is and one is not.

A No. We met with both of them.

Q Is that around the time of Ms. Zeller's letter?

A It was ongoing for months, as I recall.

Q What do you recall about meeting with the Jackvonys?

A First of all, when this first happened and we discussed it at the Board meeting, we were treating

it as an isolated incident, something that had just occurred in this unit. And we, we were new at it, so we were determining -- first of all, both of the people affected by it were little old ladies.

Q Who were they?

A Mrs. Jackvony and -- I can't remember the other lady's name. It's probably in the minutes somewhere. They -- so we knew that they were going to be displaced, so what we had Barbara do was investigate -- we were thinking we could put them up in like little day suites or something so they could stay there. And we were investigating what we would do with their furniture, how we would do things. Then Mr. Jackvony started calling Barbara.

Q Which Jackvony was this? Was it the lawyer?

A Bernard. And he was making demands of us. First of all, he was trying to, I think the first thing was he was trying to coincide his mother having hip surgery and then going into an assisted living facility and wanted us to pay for it. Then there was a question of her going into the like day suite place, Days Inn or something, and then he felt that she was too fragile to do that. Then she was going to go to his sister's house, and he wanted us to pay the sister to have the mother there, which we

thought was unreasonable. He wanted us to replace the carpet, give her all new drapes, to the point where when all of this was finally settled, which was, I think about, probably about six months later, because, see, she was supposed to be done first, and the other side was done first because he wouldn't come to an agreement. We had him before the Board. He was, he was really unreasonable. But it was the first one that we were dealing with. We were treating it as an isolated incident. We were trying to be fair to everybody involved. And as people got wind of, you know, there was a problem in one unit, then they started -- the people walk and they start talking, and the people were upset with us, so, as if we had caused the problem. But, anyway, before we did anything to his unit, we had a photographer go in and take pictures of everything so he couldn't then say blame us for that. It was too bad. It was embarrassing, I thought, for him. You know?

Q Did you ever visit the Jackvony unit?

A No.

Q Did you ever visit the Zeller unit?

A No, I didn't, no.

MR. LANGLOIS: Could I mark this as