UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM :
ASSOCIATION, INC., A/K/A EAGLE : C.A. NO.: 04-436ML
NEST CONDOMINIUM ASSOCIATION :
vs. :
NEW LONDON COUNTY MUTUAL :
INSURANCE COMPANY, NLC :
INSURANCE COMPANIES, ET AL. : September 29, 2005

CERTIFIED COPY

DEPOSITION OF JOAN ZELLER, a nonparty witness taken on behalf of the Defendants, pursuant to the Rhode Island Rules of Civil Procedure, on Thursday, September 29, 2005 at the offices of Smith & Brink, One State Street, Providence, Rhode Island, before Kathryn R. Orofino Little, Certified Shorthand Reporter and Notary Public, convening at 10:00 a.m.

APPEARANCES:

BY: STEVEN ORABONE, ESQ.
Counsel for Plaintiffs.

Smith & Brink
BY: RONALD LANGLOIS, ESQ.
Counsel for Plaintiff

Plaintiff's Exhibit 13

REPORTING ASSOCIATES
Shorthand Reporters
10 Dorrance Street, Suite 617
Providence, Rhode Island 02903
(401) 351-1660

Q. And what is that document?

A. That is a letter I wrote to Perrino & Associates, who was the management firm for Eagle's Nest on June 28th, to notify her that I had a serious collapse of the floor, or sinking of the floor.

Q. Now, this letter is dated June 28th, 2002; is that correct?

A. Correct.

Q. Is that at or about the time you prepared this letter?

A. Yes.

Q. And in the letter, you indicate that the problem had been going on for over a decade; is that correct?

A. The floor was spongy for over a decade. When you walked across it, the -- you would feel -- you would -- you didn't have this solid feeling. It was spongy. But this letter was after I heard loud cracking noises, and like -- "cracking" is probably the wrong word. You know, when a sound is muffled, it's -- I can't duplicate the sound, but I could hear a thumping sound.

And the -- my -- my dining room table

was at a slant. And then when I walked across the floor, it was (indicating) -- and it got worse over the next couple of days or next couple of weeks. And I put a pen on the dining room table and it would roll off. And I got nervous. I knew something was wrong.

Q. Okay. Okay. Now, in your letter -- this letter is dated June 28th, 2002, correct?

A. Uh-huh.

Q. And I apologize. Is that a yes?

A. Yes, it is. Sorry.

Q. You indicated that about a week ago, you spoke with Mr. Jackvony; is that correct?

A. That's correct.

Q. So this would bring us back to June 21st?

A. Approximately, uh-huh.

Q. And at that point, he was concerned about his mother's dining room ceiling, correct?

A. Correct.

Q. Do you remember that meeting?

A. Yes. It was just a brushing -- a meeting on the sidewalk leading to his mother's door.

Q. Okay.

A. And I just said, "Hello." And he said, "I understand --" I don't know exactly how this

does that refresh your recollection of the sequence of events?

A. You know, I may have very well ran into Al, and then because of his comments, felt validated.

Q. Okay.

A. And gone right upstairs, or within reason, that day or the next day, and called Perrino, because up until that point, I was afraid somebody would think I was nuts.

Q. But it was pretty noticeable to you that the floor was way off?

A. Yeah, but he validated it.

Q. Okay. Okay. What did Perrino say to you -- I mean, I apologize. How do you have him listed in your book, the gentleman that came out on the 24th?

A. "Brett."

Q. "Brett"?

A. Right, yeah.

Q. And do you know his last name?

A. No, I don't.

Q. Is it Hiltz?

A. Oh, thank you.

Q. So when he came out on June 24th, what did