**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., A/K/A EAGLE NEST CONDOMINIUM ASSOC.**

**V.** **C.A.NO: 04-436ML**

**NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY**

# DEFENDANT'S OPPOSITION MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## BACKGROUND

As previously noted, the Eagle's Nest Condominium complex consists of 120 dwelling units divided among 48 distinct multifamily buildings that are physically separated from one another. There are six different styles of buildings: Jefferson, Georgian, Madison, Presidential, Elmhurst, and Garrison. Some of the buildings contain four units per building, and some two. Due to the size of the complex, the buildings were constructed in phases over several years.

The item in question, floor trusses, is not susceptible to visible inspection. They are enclosed between the floor of the top unit and the ceiling of the bottom unit. The only way to discern whether there is a problem with the unit is to remove the ceiling.

Since there are several styles of units, constructed at different times, there is no way to know, without ripping down the ceilings, whether the floor trusses in Unit A are the same as the trusses in Unit B. Likewise, it is unknown whether the trusses in one unit were installed in the same manner as the trusses in another unit. One cannot infer

therefore that a problem with a truss in one unit means that there are problems with trusses in other units.

This is confirmed by the fact that many units have no reported deflections[1] more than 20 years after construction,[2] while other units reported acceptable deflection limits as established by the plaintiff's engineer.[3] (Exhibit "J" – Bogle Report)

According to the plaintiff's engineering report of January 27, 2003, they used "an inch and one half deflection as indicative that a truss posed a problem and needed to be reinforced".[4] As evidence that these units are structurally sound, the plaintiff's engineer wrote with respect to Unit 37B, "based on the most recent measurements taken in the above referenced unit there is currently no need to perform any structural modifications to the floor system. Although we cannot guarantee the floor system in this particular unit, will continue to operate satisfactorily, the relatively small amount of deflection recently measured indicates that the floor system is working quite well and shows no sign of needing any structural repairs in the short term future". (Exhibit "L" - October 7, 2004 Bogle Letter) Relatedly, there was a five eighths inch deflection in one of the units that had been repaired, which the plaintiff's engineer deemed to be structurally sound. (Exhibit "M" - January 2, 2004 Bogle Letter)

The Readings

There are several variables which compromise the reliability of the readings:

---

[1] A "deflection reading" indicates the amount of sag in a structure.

[2] Units with no deflection: 3A, 3C, 5A, 5B, 5C, 5D, 9A, 9B, 15D, 17C, 17D, 20D, 22C, 22D, 26B, 24C, 34D, 38C, 38D, 39C, 39D, 40C, 40D

[3] Units with acceptable deflection: 1B, 2A, 2B, 3B, 4A, 4B, 6A, 6B, 7A, 9C, 9D, 10A, 10B, 11A, 11B, 12A, 12B, 16A, 16B, 18A, 19B, 20C, 21A, 21B, 25B, 26A, 27A, 27B, 28A, 28B, 29A, 29B, 29C, 29D, 30A, 30B, 31A, 31B, 32B, 33A, 33B, 35A, 35B, 36A, 36B, 37B, 37C, 37D, 41A, 41B, 42B, 43A, 43B, 44A, 44B, 46A, 46B, 46C, 47A, and 47B

[4] In addition to the previously referenced units, according to the plaintiff's report, the following units did not need to be reinenforced: 1A, 24B, 38A, 38B, 45B, and 46D.

a) The person taking the readings. The deflection readings were not performed by an engineer, but rather by the property manager's maintenance person;

b) The methodology for taking measurements.

c) Allowances. The plaintiff's engineer admitted that in construction, things are frequently built crooked. Accordingly, there is a tolerance to be employed when assessing the readings.

Mr. Bogle testified:

***Q. How do you take the measurements?***

***A. At that time they were less sophisticated. They were, Brett was using his level and just measuring.***

(Exhibit "N" – Deposition of Steve Bogle, P. 69, L25- P. 70, L2)

***

***Q. And some of them, and the measurements were, the early measurements were imprecise?***

***A. I would say they may not have been the most accurate. It probably would have been better to run a string even with a laser, setting it up a, on an even, you know, some of the floors were uneven, so you wouldn't get proper measurements that way. I think the best way would be run a dry line that's at a fixed height above the floor and then measure along that. And we should be able to get a much better, more accurate readings. But the original measurements were taken using the level off the ceiling.***

***Q. And you don't know what Brett's background is?***

***A. Not really, no.***

*Q. You don't know whether he's an engineer or –*

*A. I know he's not an engineer. I know that.*

*Q. He's a handyman?*

*A. That's the best I know him is a handyman.*

(Exhibit "N" - Deposition of Steven Bogle, P. 70, L17- P. 71, L9)

According to Exhibit D of Mr. Bogle's deposition:

a) Sixteen (16) units were repaired prior to NLC receiving notice of this claim;

b) Four units during NLC's policy period, after NLC received notice; and

c) approximately four to five units were repaired after NLC's policies had expired.

It is now 43 months since Mrs. Zeller wrote her letter, and fifteen months since NLC did not renew the policy, and no action has been taken with respect to approximately 96 units. No unit has ever sustained an "actual collapse". Nor has any unit sustained direct physical loss or damage as a result of a collapse. The action taken to reinforce certain trusses were precautionary measures, undertaken to respond to a perceived condition which "might" cause a condition at some undefined point in the future.

It is important to note that no ceiling has ever fallen down at the complex. No one at the complex vacated their premises except when repairs were being performed.

In NLC's Interrogatory 17, the plaintiff was in essence asked to set forth the elements they needed to prove to establish their claim.

17. For each unit you claim had defective trusses, please identify:

a. the unit number;

b. the unit owner;

c. the date the owner purchased the unit;

d. the date the problem was reported;

e. who determined the problem;

f. how the problem was determined;

g. what the problem was;

h. all repairs performed;

i. who performed the repair work;

j. the cost.

*Plaintiff objects to answering this interrogatory as posed. Plaintiff has not kept a separate record that summarizes the requested information. Said information is irrelevant, and the question is not reasonably calculated to lead to the discovery of admissible evidence. What is more, it would be unduly burdensome, unduly expensive, and unduly oppressive to require Eagle's Nest Condominium Association, Inc. to attempt to answer this interrogatory as posed. Plaintiff could attempt to answer this interrogatory by reviewing the documents Plaintiffs produced in response to Defendant's production request. Defendant's however, are equally capable of doing so. Since it is Defendant's that seek such information, it should be Defendant's burden to do so. Without waiving this objection, Plaintiff incorporates as its answer to this interrogatory the various documents Plaintiffs have produced in response to Defendant's production requests. Plaintiff answers, further, that in approximately August of 2002, Steven Bogle*

*orally informed the board of the problems with the trusses. Mr. Bogle followed this up in November 2002 with a written report of the truss problems. As further answer to this interrogatory, see Plaintiff's answer to interrogatory 4, which is incorporated by reference.*

To date, the plaintiff has not provided the aforementioned information. Nor have they set forth their proof in their motion for summary judgment.

**ARGUMENT**

Plaintiff's Burden of Proof

Here, the policy "does not provide coverage for collapse unless the collapse result[s] from or more of the … enumerated causes". State Farm Fire & Cas. Co. v. Shady Grove Baptist Church, 838 So. 2d 1039, 1043-1044 (Ala. 2002). It is not [NLC's] position … that the collapse was excluded from coverage; rather, [NLC] asserts that the collapse was not covered under the policy. Therefore, this is not a case in which [Eagle's Nest] has to prove that a collapse, as defined within the policy, has occurred and [NLC] then has to prove that a certain exclusion within the policy removed the collapse from the scope of its coverage.(Citations Omitted) Rather, in resisting [NLC's] motion for [summary] judgment …, [Eagle's Nest] must … [submit] substantial evidence showing that the collapse fit[s] within the definition of that term in the policy and that it was covered under the policy by virtue of its being caused by at least one of the …enumerated causes provided in the policy." Id.

The plaintiff, Eagle's Nest, bears the burden of demonstrating "that the damages… sustained were within the coverage and not encompassed by the exclusions of liability set forth in the contract…entered into with the Defendant." Napoletano v.

Standard Fire Insurance Company, 102 R.I. 604, 607-608 (1967). This requires the plaintiff to prove, for each unit, a "collapse" and damage[5], caused by a "covered peril", during an NLC policy period, and not prior or subsequent thereto.

As can be seen in the plaintiff's answer to interrogatory 17 and the absence of any evidence submitted to the court thereafter, the plaintiff has not come forward with the requisite degree of proof to demonstrate a "collapse", due to "the weight of persons or property", during NLC's policy period, which caused damage.

For reasons more fully set forth in its memorandum of law in support of NLC's Motion for Summary Judgment, (P. 11-13) Eagle's Nest cannot sustain this burden. Additionally the plaintiff cannot produce competent admissible evidence on the issue of causation as can be seen in NLC's motion to strike the affidavit of Steven Bogle.

The testimony of Mr. Smith, Eagle's Nest's own insurance agent, supports NLC's position. Mr. Smith, who has forty years of experience in the insurance industry,[6]

[5] It is not readily apparent that the Eagle's Nest Condominium Association, Inc. is the appropriate party to be seeking damages. The expenses associated with reinforcing the trusses were levied upon the individual owners in the form of a special assessment. Many of these unit owners have since moved and are no longer members of the Association.

[6] After graduating from college, Mr. Smith entered a training program at Travelers Insurance Company where he became an underwriter, dealing with the acceptability or non-acceptability of a risk. He has taken courses in charter property and casualty underwriting and has a designation as an associate in risk management. This is a professional designation that addresses legal issues of transfer of legal liability or risk. He had continuing education to maintain his producer's license, which includes fifteen credits an hour. He attended many seminars on insurance and CPCU meetings. He was employed by Travelers for 12 ½ years, where he also worked as a commercial lines underwriter. While at Travelers, he was an assistant manager in commercial lines for the underwriting of major accounts and major agencies. He was also involved in managing the commercial lines department and training the underwriters staff. After leaving Travelers he became a manager at Frank B. Hall, an international insurance brokerage firm.. At Frank B. Hall, he was responsible for administration of commercial and personal lines and training. In that position, he was involved with questions regarding interpretations of insurance policies. While at Frank B. Hall, he wrote insurance and was the only producer of certain bank industries such as National Bank, Citizens Financial and Old Stone. In that position, he assessed potential risks an entity may have and the types of policies that would cover those risks He subsequently worked for an entity called Davis, Bateman & Nugent which dealt with commercial accounts where he assumed the post of vice president of marketing. When he left this entity in 1995, he was vice president of financial institutions and vice president of the company. In 1995, he opened his own insurance agency, Smith, Mack & Associates, Inc., where he writes commercial accounts and accounts for condominiums. (Ex "O" – Deposition of Sidney Smith P. 60- P. 72)

testified that he, was presented with the engineering report in this matter relative to the defectively constructed trusses. He testified, "if the engineering report was correct, my feeling was generally you would not find that kind of coverage under a policy such as NLC's, which is a first party property policy". (Exhibit "O" – Deposition of Sidney Smith, P. 74)

Mr. Smith testified as follows:

A. ...If the engineering report was correct, that the lumber was wrong, the wrong type lumber, then either the contractor used the wrong lumber. That should have been in the architect's specifications, in which case the contractor may have been liable.

***

***If a third-party, some third-party building supply dealer built the trusses, then you would have to look to whoever built the trusses to see who gave the –that builder the specifications that would have included the size, the dimensions, the type of lumber, and everything else.***

***So my recommendation was since the trusses were failing and the engineer report said, because of the type of lumber – and I'm not positive it was the word type, but it was the grade, the type, the size, something with that lumber was wrong. But if that's the case, then that's where she should have been looking for coverage.***

(Exhibit "O" – Deposition of Sidney Smith, P. 20, L1-25)

The Plaintiff's Reliance on *Campbell, et al. v. Norfolk & Dedham Mutual Fire Insurance Company*, is Misplaced

The plaintiff's reliance on Campbell, et al. v. Norfolk & Dedham Mutual Fire Insurance Company, 682 A.2d 933 (R.I. 1996) is misplaced. There, the Rhode Island Supreme Court interpreted the meaning of the provision, "Collapse. We insure for direct

physical loss to covered property involving collapse of a building or any part of a building collapse". This clause is substantively different from the collapse provision in Eagle's Nest's policy. The insurer in Norfolk & Dedham, also denied the claim on the basis of an exclusion which is not in issue in this matter. Finally, the cases are factually distinguishable which render the application of Norfolk & Dedham to this matter inappropriate.

There, the insured's had a homeowner's policy for a single-family dwelling. A nineteen-foot section of the thirty-two foot foundation wall to their home "collapsed and crumbled into rubble in the basement". As a result of the collapse, the floors of the home became unleveled and continued to shift and the home was rendered "uninhabitable". The insurer denied the claim "on the basis of the exclusion for loss caused by earth movement or ground water." An engineer retained by the insured reported "that water had no part in the collapse", but was due to "hidden decay". The policy provided in pertinent part:

> Collapse. We insure for direct physical loss to covered property **involving collapse** of a building or any part of a building caused only by one or more of the following:
>
> b. hidden decay
>
> Loss to ..., foundation, *** is not included under items b, c, d, e, and f unless the loss is a direct result of the collapse of a building.
>
> Collapse does not include settling, cracking, shrinking, bulging or expansion. (Emphasis Supplied) Id. at 935.

The insured asserted that this provision was ambiguous because it covers collapse of a building or any part of a building that is due to hidden decay, but it then excludes

coverage for loss to the homeowner's foundation except when the loss is caused by the collapse of a building. The Supreme Court defined the issue to be:

> [W]hether it is reasonable for the purchaser of an insurance contract to believe that the collapse of a nineteen-foot section of thirty-two foot basement wall that eventually renders his home uninhabitable constitutes a "collapse of a building". Id. at 936.

The Court observed:

> In construing insurance clauses similar to the one here, many courts have found that the use of the word collapse in an insurance policy does not require the total destruction of a building because to require a party to await complete destruction before losses will be covered frustrates an insured's understanding of the insurance agreement and subverts his or her duty to mitigate damages and to avoid economic waste. (Citations omitted). Id. at 936.
>
> * * *
>
> In effect, to require that any loss to a foundation be recoverable only if it results from the complete collapse of a building would render illusory as applied to the foundation the earlier policy provision purporting to insure against the risk of 'collapse of a building or any part of a building.' Id.

The court vacated the summary judgment finding in favor of the insurer and remanded the matter to the superior court for further proceedings consistent with its holdings, presumably to determine the cause of the collapse.

While the reasoning underlying the court's decision is not readily apparent, the Rhode Island Supreme Court implied that you do not need a "total collapse". However, the decision does not provide any guidance as to what constitutes a "collapse" short of a total failure which is not the case here. "The fact remains that determining whether a

collapse has occurred rests largely on the degree of damage."[7] (Couch On Insurance 2d, 48:178 at 185) See, Dreiblatt, et al. v. St. Paul Fire & Marine Insurance Company, 264 F.3d 126 (1st Cir. 2001).

Regardless, Norfolk & Dedham, is not applicable to the instant matter, because the court addressed an insurance policy covering "risks of direct physical loss **involving collapse** of a building or any part of a building. The NLC's policy provision is substantively different, it provides in pertinent part:

*We will pay for direct physical loss or damage to covered property, caused by collapse...*

The Court in Hilton Head Resort Four Seasons Ctr. Horizontal Prop. Regime Council of Co-Owners, Inc. v. General Star Indemnity Co., 357 F.Supp. 2d 885 (D.S.C. 2005) analyzed the distinction between these two clauses. The court noted that there is "markedly different" language in the two policies. "The distinction is not a different interpretation of the word "collapse;" rather, it is the scope of coverage outlined in the policies themselves. A policy covering "risks of direct physical loss involving collapse," as the court noted, "appears to cover even the threat of loss from collapse." Here, however, [the insurer], General Star's policy provides coverage for "direct physical loss or damage to Covered Property caused by collapse of a building or any part of a building". **This policy language requires not just a threat of collapse and not just collapse itself, but actual loss or damage caused by a collapse.**"(Emphasis Supplied) Id. at 888.

[7] Even if one was to accept collapse to mean the threat of imminent collapse, it should be noted that no action has been taken with respect to approximately 96 units. Furthermore, the plaintiff has come forth with no admissible evidence identifying what units were in imminent danger of collapsing. Nor has it produced any evidence of damage caused by a collapse.

In Hilton Head, the insured had two mansard roofs which suffered damage which was reportedly in imminent danger of collapse although had not physically fallen off the buildings or been replaced. It was undisputed that none of the roofs suffered "an actual collapse" or direct physical loss or damage as a result of a collapse. Rather, the insured had roofs with deteriorated wood that was "in imminent danger of collapse". The insured relied upon a previous South Carolina case, Ocean Winds Council of Co-Owners, Inc. v. Auto-Owner Ins. Co., 350 S.C. 268, 565 S.E.2d 306, which interpreted the same policy provision that was at issue in Norfolk & Dedham, supra. As in Norfolk & Dedham, supra the Court in Ocean Winds held:

> To construe the phrase "risks of direct physical loss involving collapse" as requiring actual collapse is too narrow an interpretation. This phrase is more expansive than the word collapse and appears to cover even the threat or loss from collapse. We find a requirement of imminent collapse is the most reasonable construction of the policy language covering risks of direct physical loss involving collapse. We define imminent collapse to mean collapse is likely to happen without delay...Ocean Winds Council of Co-Owners, Inc. v. Auto-Owner Ins. Co., 350 S.C. 268, 565 S.E.2d 306 at 308 (2002).

The Federal District Court in Hilton Head, held that the reasoning in Ocean Winds, was not applicable because of the different wording in the policies. In ruling for the insurer, the court held:

> It is undisputed that none of the [roofs] or any part of them, suffered an actual collapse during the applicable policy period, or indeed have collapsed to this date. Moreover, the Plaintiff has demonstrated nothing to indicate any direct physical loss or damage as a direct result of a collapse of the mansard roofs. At most, the Plaintiff has mansard roofs with deteriorated wood, in "imminent danger of collapse" for over three years, which have not caused any direct loss or damage to any covered property. General Star [the insurer] had no duty under the insurance contract to provide coverage. Id. at 888.

Ignoring for the moment the fact that the plaintiff has not shown via admissible evidence that the problem is due to a covered peril, the plaintiff has not even shown that there is a collapse. Not one ceiling has fallen down in the complex. Hardpine, Inc. inspected the trusses on behalf of the Eagle's Nest Condominium Association and reported that based on field observations and structural calculations, the ...trusses do not meet the minimum design criteria or codes and might collapse under normal loads. (Plaintiff's Response to Admissions) Due to the nature of the complex, we do not even know which units have trusses of that configuration.[8]

Factually, this matter is closely analogous to the situation presented in Dreiblatt, et al. v. St. Paul Fire & Marine Insurance Company, 264 F.3d 126 (1st Cir. 2001). There, the insured, a condominium complex, noticed problems with its roofs after a snowstorm. The condominium buildings had flat roofs constructed of wood trusses supported by wood and metal webs covered with plywood sheathing and a rubber membrane. The ceiling of the top unit in each apartment building was made of plaster attached directly to the roof structure.

Following the snowstorm, a unit owner discovered that his living room ceiling was hanging down a couple of inches. The ceiling was repaired and St. Paul paid for the damage. The Condominium Association subsequently hired an engineer who determined that several of the metal trusses failed and severely corroded and that the problem extended to roof supports in many of the other units. The building inspector determined that at least some parts of the roof systems had rusted and deteriorated, and issued a

---

[8] For similar reasons, Monroe Guarantee Insurance Co. v. Legworks Corp., 829 N.E.2d 968 (In. 2005), is not applicable. The collapse provision in Monroe, is the same as the one in Norfolk. Similarly, in Monroe, supra, a four by eight section of ceiling panel crashed to the floor due to their own weight, which is not the situation presented herein. Id. at 328. Therefore, for reasons presented above, Monroe, is not applicable in this matter.

citation warning the owners that the ceilings needed to be repaired. There, as here, the Association conducted "deflection readings" of all of the units. It was determined that a number of the deflection readings exceeded that allowable under the Massachusetts Building Code but none of the measurements showed deflection of greater than one inch. Based on these reflection readings, the Condominium Association's expert testified that there had been a complete collapse of the plywood deck resulting from the snowstorm. The insurer's engineering firm was of the opinion that there had been differing amounts of corrosion within the roof and some deflection of the roof system but due to load redistribution and the associated deflections, it did not "collapse".

St. Paul's policy covered against the risk of direct physical loss or damage involving collapse of a building or any part of the building due to causes including the weight of ice and snow or sleet. There as here, the policy did not define collapse but noted "collapse does not include settling, cracking, bulging, shrinking or expansion. The policy also denied coverage for loss caused or made worse by wear and tear or deterioration, mold, wet or dry rock, rust or corrosion. St. Paul denied the claim reasoning that there was no collapse and litigation ensued.

The Court held that a collapse has three elements: suddenness, a perceptible change in appearance, and completeness. Applying this standard, the District Court found that the problems with the roof and ceiling did not constitute a collapse. The District Court further held that the roof still performed its basic functions:

> [A collapse] must result in some significant primary … element of the structure becoming disengaged or falling down so that it no longer is performing its characteristic function in the building. The requirements of a "collapse" cannot be satisfied by mere 'flaking' or "bending," nor may it be satisfied by compression, shifting, sagging, or

> 'deflection' of a few inches. **The breakdown of subsidiary elements such as several metal webs is not in itself sufficient to constitute a collapse.** (Emphasis Supplied) Id. at 129.

The insured appealed this decision to the First Circuit arguing that a "loss of structural integrity coupled with some movement or alteration of the appearance of a portion of the building could indeed be collapse. It further argued that under this revised definition, they introduced sufficient facts to survive summary judgment: (i) that structural elements within the...roof failed and in some instances became detached; (ii) that ceilings sagged perceptibly; (iii) that there were measurable deflection readings; and (iv) that there was "ponding" on roof surfaces. Id. at 130.

The First Circuit rejected this argument, noting that other than one roof, there was no evidence that the ceilings sagged perceptibly to the naked eye. Additionally, the Court noted, "although the roof deflection was measurable using a specialized apparatus called a "story pole," and was significant enough in some cases to violate the Massachusetts building code, the insured had not suggested that a deflection of less than one inch can be perceived without engineering knowledge and equipment. The Court held that as a matter of law, a deflection of less than one inch is insufficient to create a noticeably altered physical appearance in the building. The policy's exclusion of settling, cracking, bulging, shrinking or expansion from the definition of a collapse further supports the determination that de minimus deflection does not meet the legal definition of collapse. Id. at 131.

The First Circuit Court of Appeals held that:

> Appellants [the insureds] have not introduced sufficient evidence to satisfy that aspect of the definition with which they agree, nor have they placed any material facts at issue sufficiently require a trial. Id. at 131.

Eagle's Nest has come forth with even less evidence than the insured in Dreiblatt, accordingly, NLC is, as a matter of law, entitled to summary judgment.

Known Loss/Loss in Progress

A related coverage defense is the loss-in-progress doctrine. The loss-in-progress doctrine simply states that where damage has begun to occur at the time the policy is purchased, no part of the loss may be insured against. Summers v. Harris, 573 F.2d 869 (5th Cir. 1978).

The First Circuit has held that where defects against which the plaintiffs brought insurance were "fully known" to the plaintiffs before the policies in question took effect, there can be no coverage. Bartholemew v. App. Ins. Co., 655 F.2d 27 (1st Cir. 1981)

Ms. Zeller's letter stating that, "my living and dining room floor has been sinking for over a decade", coupled with the fact that the problem with the trusses existed from the day they were constructed creates a material issue of fact on this issue.

Miscellaneous

The Defendant further submits that the plaintiff's motion for summary judgment fails and that judgment should enter for NLC due to the plaintiff's failure to file its complaint within the policy's two year suit provision, late notice and its failure to prove that this loss occurred during the appropriate policy for reasons set forth in its memorandum in support of its motion for summary judgment.

## CONCLUSION

For the reasons set forth herein, defendant NLC respectfully requests that this Court grant it's Motion for Summary Judgment, and enter judgment in favor of NLC and against plaintiff, Eagle's Nest Condominium Association, Inc.

Defendant, NLC
By its attorneys,

Ronald Langlois, Esq. #2891
Smith & Brink, P.C.
One State Street, Suite 400
Providence, RI 02908
Tel: (401) 351-9970
Fax: (401) 274-6218

## CERTIFICATION

I hereby certify that I hand delivered a true copy of the within to **Steven Orabone,** Esquire, 20 Ridgevale Court, Cranston, RI 02921 on the 17 day of March, 2006.

Dana Palangio