UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., ALSO KNOWN AS EAGLE NEST CONDOMINIUM ASSOC<br><br>Plaintiff,<br><br>vs.<br><br>NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V, AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY<br><br>Defendants | Civil Action, File No.: 04-436ML |

**PLAINTIFF'S COMBINED MEMORANDUM IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION TO STRIKE AFFIDAVITS, IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, IN SUPPORT OF MOTION OF PLAINTIFF FOR LEAVE TO SUPPLEMENT EXHIBITS AND IN SUPPORT OF CONDITIONAL MOTION FOR LEAVE TO STAY RULING AND PERMIT FILING RULE 26 STATEMENT OUT OF TIME AND/OR TO PERMIT FURTHER DISCOVERY**

---

**PRELIMINARY STATEMENT:**

In the interest of economy, Eagle's Nest submits this combined memorandum in support of 4 matters: (1) Eagle's Nest's objection to NLC's motion to strike the affidavits of Steven Bogle and of Richard Aube; (2) Eagle's Nest's reply to NLC's objection to Eagle's Nest's motion for summary judgment; (3) Eagle's Nest's Motion for leave to supplement it's Exhibits; and (4) Eagle's Nest's conditional motion for leave to file a rule 26

disclosure statement out of time and/or to permit further discovery.

**PLAINTIFF'S ARGUMENTS:**

**(A) RICHARD AUBE'S AFFIDAVIT IS OFFERED MERELY FOR FACTS, NOT FOR OPINIONS**

Mr. Aube's affidavit does identify him as a public insurance adjuster, and does note that he reviewed the Eagle's Nest policy and concluded that policy covered the Eagle's Nest's loss. These matters are not in the affidavit to qualify Mr. Aube as an expert nor to submit an expert opinion from him. They are merely included to identify Mr. Aube and to establish the context of how he came to notify NLC of Eagle's Nest's loss. Given this, it is inappropriate to strike Mr. Aube's affidavit. It is not an expert opinion affidavit. It is a factual statement. At most, one might argue that the Court should strike from the affidavit such parts as the Court construes as expert opinion. In light of the fact that Eagle's Nest offered such evidence only to for the above-noted purposes, even striking such portions of Mr. Aube's affidavit is inappropriate in this case.

**(B) EAGLE'S NEST MADE AEQUATE DISCLOSURES TO NLC CONCERNING EXPERT WITNESS STEVEN BOGLE**

**(1) The Initial Disclosure was Made Even Before the Court's Conference**

NLC incorrectly asserts that Eagle's Nest has never complied with the requirements for expert witness disclosure. Enclosed with this Memorandum as Exhibit 1 is a second affidavit from Steven Bogle. Attached to Mr. Bogle's Affidavit are 39 reports. By the time this Court held its December 7, 2004 pretrial conference, Mr. Aube had already, on behalf of Eagle's Nest, provided the vast majority of Mr. Bogle's expert reports to NLC. Of the reports that Mr. Aube provided, the overwhelming majority of those reports are dated, typewritten and signed. Those reports contain Mr. Bogle's expert opinions, describe the details of his investigations, state the matters on which he based his opinions, are dated (with the exception of 1) and (except for the handwritten one and the coversheets) are signed by Mr. Bogle. While they were never formally designated as a Rule 26 disclosure statement, they are providing the same essential information.

Eagle's Nest has complied with the spirit of Rule 26. Given this, a Rule 26 disclosure would have served no purpose. In fact, it would have run contrary to one of the rule's purposes, which is "to eliminate the paper work involved in requesting such information, and the rule should be applied in a manner to achieve those objectives." See Advisory Committee's comments to Rule 26's 1993 Amendments Subdivision (a).

What is more, if anybody has been non-compliant with rule 26(a)(2), it is NLC. Their engineer examined Eagle's Nest's

floors almost exactly 2 years ago, and Eagle's Nest has yet to receive any written information from NLC with regard to that engineer's opinions.

Should the Court, however, decide, despite this, that Eagle's Nest should file a formally designated Rule 26 disclosure statement, Eagle's Nest requests that, rather than dismissing Plaintiff's case, the Court stay it's ruling on the parties' respective summary judgment motions and on Defendant's motions to strike the affidavits of Mr. Aube and Mr. Bogle and grant Eagle's Nest a reasonable extension of time to file such a disclosure statement.

**(2) Plaintiff has Disclosed Further Information Concerning Expert Witness Bogle's Testimony as the Case has Developed**

Even if the Bogle reports Eagle's Nest provided to NLC prior to the Court's pretrial were somehow to be viewed as deficient, any such deficiencies were filled by the materials and information provided through the following items:

-Eagle's Nest's responses to NLC's requests for Admissions (enclosed Exhibit 7);

-Eagle's Nest's First response to NLC's Production Request (see Enclosed Exhibit 5, which contains the response without it's approximately 748 pages of accompanying documents);

Eagle's Nest's Supplemental Response to NLC's Production Request (see enclosed Exhibit 6, which contains the response without it's approximately 278 pages of accompanying additional documents);

-Eagle's Nest's Interrogatory Answers (enclosed Exhibit 8);

-The additional information and documents produced at the various witness depositions (including Mr. Bogle, who produced his entire file at his deposition).

**(3) Mr. Bogle's Affidavit Opinion is the Same Substance as the Opinions Contained in his Prior Reports. His Affidavit Merely Reinforces the Opinion Mr. Bogle has Disclosed from the Beginning. NLC has not been Surprised**

Through this process, NLC received, prior to the close of discovery, all but 4 of Mr. Bogle's reports. Three of the unreceived reports are fairly recent. They are brief and deal only with be before and after inspections of 3 units that were fairly recently repaired.

NLC alleges that it is surprised by the opinion contained in Mr. Bogle's February 24, 2006 Affidavit concerning the weight of people and property (also known as live load) and its causal relationship to the structural failure of Eagle's Nest floor trusses. NLC, however, simply cannot validly claim surprise,

given the substantive information Eagle's Nest previously provided to it on this issue. Neither can NLC validly claim that it has been prejudiced by this Affidavit.

First, Mr. Bogle's earliest signed report (the August 16, 2002, one, which is attached to enclosed Exhibit 1-2) noted that the "trusses were not designed to properly support the superimposed dead and live load for the 26' foot span." It has been clear from the start, therefore, that Mr. Bogle's opinion is that the live load (that is the weight of people and property) played a part in causing the truss failure, and that the dead load did not cause it alone.

Second, on April 5, 2005, Eagle's filed a Response to NLC's Request for Admissions (Attached Exhibit 7). Request #9 and Eagle's Nest's response were as follows:

> Request 9: The sole and proximate cause of the truss failure at the Eagle's Nest Condominiums was due to the use of defective materials.
>
> Response 9: Denied. Plaintiff's loss in this action was caused by collapses that occurred in various buildings and/or in parts of various buildings in plaintiff's condominium complex, which collapses occurred after construction, remodeling, or renovation was complete, and which were caused in part by the weight of people and/or

personal property even though the use of defective methods in construction contributed to the collapse.

After Eagle's Nest filed this response, Eagle's Nest's attorney and NLC's attorney met for lunch to discuss this case. The 2 parties' attorneys first agreed to a meeting in February of 2005 (see attached Exhibit 11), but din not actually meet over lunch until May of 2005. At that meeting, Eagle's Nest's attorney disclosed to NLC's attorney that it was Mr. Bogle's opinion that the dead load alone was not enough to cause the Eagle's Nest floor trusses to structurally fail (and that live load, therefore, must have played a part in the structural failure of the floor trusses).

As noted in the attached affidavit of Mr. Medeiros, HardPine analyzed Eagle's Nest's trusses and found that "the above mentioned trusses do not meet the minimum design criteria or codes and might collapse under normal loads." (see Attachment A, page 2 to enclosed Exhibit 2; emphasis in the original). Granted, this report says "might" collapse. The same report also notes, however, that the trusses failed to sustain the minimum loads stipulated by code, it is clear that the type of "collapse" the report notes might happen is a complete descent to the floor below. As noted, in Eagle's Nest's earlier memorandum, however, that is not what Eagle's Nest is required to prove in order to

establish as collapse as that term applies to Eagle's Nest's claim under the NLC insurance policy.

To establish a collapse, Eagle's Nest has to prove only that the structural integrity of the building (or any part of it) has been substantially impaired. Since the floor trusses have structurally failed, it is clear that a part of the building (the floor) has been substantially impaired, and that a collapse has, therefore, occurred.

The HardPine report comprising Attachment A bears out another point. It is certainly implicit in the term "normal load" when used in a report concerning residential floors that the weight of people and property is included. Mr. Bogle agrees with the HardPine findings and, as noted above, stated in his August 16, 2002 report that the "trusses were not designed to properly support the superimposed dead and live load for the 26' foot span." (see attachment 1-2 to enclosed Exhibit 1). This evidence alone is sufficient to prove that the weight of people and property, in part, caused a collapse of the floors that is covered by the NLC insurance policy. Thus, even if the Court were to grant NLC's motion to strike Mr. Bogle's Affidavit, it would be inappropriate to grant NLC's motion for summary judgment and appropriate to grant Eagle's Nest's motion for summary judgment.

As noted above, the Bogle Affidavit does fortify Mr. Bogle's opinions concerning the weight of people and property being a partial cause of the floors' structurally failing (and, therefore, substantially impairing a part of the building). Thus Eagle's Nest's case is stronger if NLC's motion to strike Mr. Bogle's Affidavit is denied, and Mr. Bogle's Affidavit and the opinions expressed therein are allowed to stand. There are additional reasons for denying NLC's motion to strike Mr. Bogle's affidavit, noted as follows.

At Mr. Bogle's deposition, NLC's attorney tried to elicit a statement from Mr. Bogle to the effect that an Eagle's Nest truss was incapable of holding even dead load alone. The question and answer were as follows:

Q: And, to your observation, was the truss in unit 15 incapable of holding even dead load? You can't --?

A: Hard for me to say that, no.

(Bogle Deposition Transcript page 84, lines 11-13).

Clearly, Mr. Bogle disagreed with NLC's attorney's statement. This can only mean, therefore, that Mr. Bogle was of the opinion that the weight of dead load alone was not enough to cause the truss to fail, and that live load (the weight of people and property) had to be a cause, in part, of the truss failure.

Two questions and answers then immediately occurred at this deposition as follows:

Q: So you don't know one way or the other?

A: No. I would have to, actually, I would have to ask HardPine to run an analysis strictly on dead load to determine that for sure.

Q: You'd have to do a more detailed analysis?

A: A proper analysis would have to be done.

(Bogle Deposition Transcript page 84, lines 14-19).

This did not in any way amount to a retraction of Mr. Bogle's opinion on caûse. Mr. Bogle simply was indicating that in order for him to be sure of that the dead alone did not cause the structural failure he'd have to run more analysis. In order to testify as to the weight of people and property in part being a cause of the floor truss failure, however, Mr. Bogle is not required to testify with absolute certainty. He only has to testify that it is more probable that not. In testifying at his deposition, Mr. Bogle disagreed with the proposition that the truss was incapable of holding dead load alone. It was clear from this testimony that Mr. Bogle was of the opinion that the weight of people and property was a cause in part of the structural failure of the floor trusses.

Unfortunately, Mr. Bogle could not immediately run the analysis that would allow him to know for sure that the truss was capable of holding the dead load by itself without failing (and thus to know for certain that the weight of people and property, in part, caused the structural failure of the floor. This is because Mr. Bogle needed the weight (in pounds per square foot) of the gypcrete floor underlayment before he could have the analysis run. Concerning this, Mr. Bogle notes the following at numbered paragraphs 33-37 of his Affidavit (enclosed Exhibit 1):

(33) The gypcrete floor underlayment in the Eagle's Nest properties is located above the floor trusses. In performing repairs on the Eagle's Nest floor trusses, the truss are exposed from the bottom floor. This exposing of the trusses does not provide access to the gypcrete floor underlayment. The gypcrete floor underlayment lies beneath the finished 2nd floor of the condominium unit. Thus, it is not accessible from the 2nd floor either, unless the finished floor material is removed.

(34) Eagle's Nest provided me with a number of specimens of gypcrete floor underlayment material from Quadplex Unit 17D on December 30, 2005. Those specimens were collected December 29, 2005 by Dennis Higgins of ACC Contractors. Prior to December 29, 2005, I did not

have access to a specimen of gypcrete floor underlayment from an Eagle's Nest condominium unit. The gypcrete floor underlayment from Unit 17D was available at the time the specimens were collected because the Unit was under renovation, and its floors had been removed.

(35) Once I had the gypcrete samples from Unit 17D, and once I was able to cut them into a regular geometric shape, I was able to determine from the specimens that the gypcrete floor underlayment weighed 5 pounds per square foot.

(36) I did not immediately cut the gypcrete floor underlayment specimens upon receiving them. Eagle's Nest's attorney instructed me not to do so until he received consent from NLC's attorney to do so.

(37) After being informed that NLC's attorney consented to cutting the specimens, I went forward and began the cutting and weighing procedure, following a January 20, 2006 meeting at my office between attorney Orabone, NLC's attorney (Mr. Langlois) and me.

In numbered paragraphs 2-4 of her attached affidavit (enclosed Exhibit 4), Roberta McMahon notes the following concerning the gypcrete:

(2) The gypcrete floor underlayment in the Eagle's Nest properties is located above the floor trusses. In repairing the Eagle's Nest floor trusses, the trusses were exposed from the living area below the floor containing the truss, but this did not provide access to the gypcrete floor underlayment (which lies beneath the finished floor material of the floor above the truss). The gypcrete floor underlayment is not accessible from the living area above a truss unless the finished floor material in the living area above the truss is removed.

(3) Around December 29, 2003, I learned, by chance, that Quadplex Unit 17D was under renovation, that those renovations involved removal of the finished floor material of the floor above the truss, and that the gypcrete floor underlayment in Unit 17D was available for inspection. I promptly notified Eagle's Nest's attorney of these facts, and we made arrangements for Dennis Higgins of ACC Contractors to remove a number of gypcrete floor underlayment specimens from Quadplex Unit 17D. Mr. Higgins removed those specimens from Quadplex Unit 17D on December 29, 2005 in my presence.

(4) Immediately upon removing those specimens of gypcrete floor underlayment, Dennis Higgins, in my presence, sealed the specimens in bags, placed the bags in an envelope, sealed and labeled the envelope, and gave it to me. That sealed envelope remained continuously in my care and custody until I delivered the sealed envelope containing the gypcrete floor underlayment to Steven A. Bogle, P.E., on December 30, 2005. Those

specimens remained unaltered, and in the same condition, while they were in my care and custody.

The day after Eagle's Nest collected the gypcrete specimens, Eagle's Nest's attorney informed NLC's attorney (via E-mail and letter) of that fact and the fact that Mr. Bogle wanted to cut the gypcrete into regular shape so that Mr. Bogle could determine how much it weighed per square foot. The attorneys agreed, and the letter confirmed, that Mr. Bogle would hold off a reasonable time to allow NLC's expert to examine the specimens should NLC's attorney so desire. (See Enclosed Exhibit 10).

NLC's attorney never did have NLC's expert examine the gypcrete specimens. Instead, the attorneys agreed to meet at Mr. Bogle's office on January 20, 2006 so that NLC's attorney could be present when the gypcrete specimen was cut. (See enclosed Exhibit 9). At that meeting, with Mr. Bogle present, Eagle's Nest's attorney explained to NLC's attorney that the purpose in weighing the gypcrete was to determine how much it added to the dead load on the Eagle's Nest floor trusses, and to use that data to establish that even with that extra weight from gypcrete accounted for in the dead load, the dead load alone was not enough to cause the floor trusses to structurally fail.

**(C) <u>EVEN IF THE COURT WERE TO FIND PLAINTIFF'S INFORMATION DISCLOSURES CONCERNING EXPERT WITNESS BOGLE TO BE DEFICIENT, IT IS INAPPROPRIATE TO SANCTION PLAINTIFF UNDER THE CIRCUMSTANCES OF THIS CASE</u>**

**(1) <u>Any deficiency is Insubstantial and has been Entirely Without Prejudice to Defendant</u>**

As noted above, the Affidavit opinions are the same in substance are consistent his prior reports, with the Eagle's Nests Admissions Response, with Eagle's Nest's interrogatory answers and with Mr. Bogle's prior deposition testimony. The essence of the opinion is that these trusses have structurally failed because their defective design could not support the dead and live loads superimposed on them on them, and thus the live loads played some part in causing the floors to structurally fail. This is all that the NLC insurance policy requires in order for Eagle's Nest's loss to be covered.

In spite of having severely limited resources to prosecute this matter, Eagle's Nest has worked long, hard, and in good faith to satisfy the substance of the disclosure rules. This must be apparent from the materials Eagle's Nest has enclosed as Exhibits with this memorandum (those Exhibits are listed and described in the enclosed "Plaintiff's Further List of Exhibits", and are attached thereto).

Even if the Court finds that Eagle's Nest has inadequately informed NLC concerning Mr. Bogle's opinion concerning the weight of people and property (live load) being the cause of the structural failure of the Eagle's Nest Floors, Eagle's Nest has not in any way acted with willfulness or in bad faith.

In these circumstances no sanction is appropriate. "As the moving party, defendant bears the burden to show valid grounds for striking the designation of the expert witness." Marek v. Moore 171 F.R.D. 298, 302 (D.Kan.,1997). NLC has not met that burden. "[T]he Court is not aware of, any bright line rule that every opinion by an expert must be preliminarily stated in the report, or forever be precluded." App. 24. This Court is similarly unaware of such a rule. *Cf. Weinstein's Federal Evidence* § 403.02[4][a] (2d ed. 2005) ("Some members of the bar would have preferred to add surprise to Rule 403, but the Advisory Committee rejected this suggestion. The modern shift in attitude does not require the recognition of surprise, standing alone, as a ground for exclusion.") (internal citation omitted). Hill v. Reederei F. Laeisz G.M.B.H., Rostock 435 F.3d 404, *423 (C.A.3 (Pa.),2006).

For the reasons noted above, it is not valid for NLC to claim that they have been caught by surprise by Mr. Bogle's opinion concerning the weight of people and property being the cause in part of the structural failure of the floors.

If, however, the Court disagrees, and finds that NLC has been surprised, then NLC is still not entitled to have the affidavits of Mr. Aube and Mr. Bogle stricken. The appropriate action in such a case is for the Court to stay its decisions on the parties' respective summary judgment motions, to allow plaintiff's Affidavits and to permit the parties a reasonable period to conduct further discovery. "Where surprise has occurred, the appropriate action remains within the trial court's discretion, informed by the following factors: "(1) the prejudice or surprise in fact to the opposing party, (2) the ability of the party to cure the prejudice, (3) the extent of disruption of the orderly and efficient trial of the case, and (4) the bad faith or willfulness of the non-compliance." *Hurley v. Atlantic City Police Dept.*, 174 F.3d 95, 113 (3d Cir.1999) (citations and quotations omitted). Hill v. Reederei F. Laeisz G.M.B.H., Rostock 435 F.3d 404, *423 (C.A.3 (Pa.),2006).

Eagle's Nest wishes to reiterate that it is not conceding prejudice, surprise, or that any sanction is appropriate. Eagle's Nest does, however, wish to point out that, striking the Affidavits of Mr. Aube and Mr. Bogle is especially inappropriate as a sanction. This case has not even been assigned for trial. there is ample time before trial to conduct further reasonable discovery if the Court feels that NLC has been surprised. At the conclusion of Mr. Bogle's deposition, NLC's attorney actually noted the possibility that he might further depose Mr. Bogle,

noting "Steve, you didn't speak - and we're going to stop right here and we'll suspend for now." (Bogle Deposition Transcript, enclosed Exhibit 2, page 110, lines 17-19).

## (D) MR. BOGLE'S OPINIONS SATISFY THE EVIDENTIARY REQUIREMENTS NECESSARY TO THE INTRODUCTION OF EXPERT TESTIMONY

### (1) Mr. Bogle's Opinion is Reasonably Founded on Proper, Reliable Data

The reports attached to Mr. Bogle's enclosed affidavit (1-1 through 1-39) describe chronologically and in detail the manner in which he went about formulating his opinions and the data and information upon which he based his opinions. The following table summarizes the foundations for Mr. Bogle's opinions, as detailed in the indicated reports. The particular units to which the foundational basis applies is indicated in the individual reports:

| Exhibit Label | Date | Foundations |
|---|---|---|
| 1-2 | August 16, 2002 | ▪ His ceiling deflection measurements, his truss measurements, his truss inspections, |
| 1-4 | Sept. 16, 2002 | ▪ His observation of multiple broken trusses, his ceiling deflection measurements, his truss measurements, his ceiling |

| | | |
|---|---|---|
| | | condition observations |
| 1-5 | Nov. 29, 2002 | ▪ His ceiling deflection measurements, his observations of broken chords of trusses, information provided by Eagle's Nest's maintenance man, |
| 1-6 | Dec. 16, 2002 | ▪ His inspection of reinforcing work results, photos, |
| 1-7 | Dec. 16, 2002 | ▪ His inspection of reinforcing work results, photos |
| 1-8 | Dec. 16, 2002 | ▪ His inspection of reinforcing work results, photos concerning Unit 15A |
| 1-9 | Dec. 16, 2002 | ▪ His observation of acute truss damage, photos |
| 1-10 | Jan. 27, 2003 | ▪ His truss measurements, His ceiling deflection measurements, His knowledge concerning the maximum allowable live load deflections as compared to the actual deflections found, his observations of broken trusses, his observation that certain of the units |
| 1-11 | Feb. 24, 2003 | ▪ His observation of the effect of reinforcing the trusses |
| 1-13 | April 28, 2003 | ▪ His observations of the |

| | | |
|---|---|---|
| | | completed reinforcing work, his observation of the field modification, photos |
| 1-14 | June 6, 2003 | ▪ His floor deflection measurements |
| 1-16 | June 6, 2003 | ▪ His observation of broken trusses, photos |
| 1-17 | June 27, 2003 | ▪ His observation of exposed trusses before and after reinforcing work, photos |
| 1-18 | July 2, 2003 | ▪ His observation of exposed trusses before and after reinforcing work, photos |
| 1-19 | July 2, 2003 | ▪ His on site review of a proposed wall modification |
| 1-20 | July 25, 2003 | ▪ His review of existing conditions, his measurements of deflections |
| 1-21 | August 25, 2003 | ▪ His observation of exposed trusses before and after reinforcing work, photos |
| 1-22 | Sept. 3, 2003 | ▪ His observation of exposed trusses before and after reinforcing work, photos |
| 1-23 | Nov. 3, 2003 | ▪ His deflection measurements, his observations of ceiling and wall conditions, his observations concerning the |

| | | |
|---|---|---|
| | | comparative deflection measurements of the same units over time, His observation of floors for movement, |
| 1-24 | Nov. 20, 2003 | ▪ His observation of exposed trusses before and after reinforcing work |
| 1-25 | Nov. 20, 2003 | ▪ His observation of exposed trusses before and after reinforcing work, photos |
| 1-26 | Jan. 2, 2004 | ▪ His observations and deflection measurements of repaired unit and comparison to prior measurements |
| 1-27 | April 5, 2004 | ▪ His observation of exposed trusses before and after reinforcing work, photos |
| 1-28 | April 5, 2004 | ▪ His observation of exposed trusses before and after reinforcing work, photos |
| 1-29 | April 15, 2004 | ▪ The results of his inspections to that date |
| 1-30 | Oct. 7, 2004 | ▪ His review of the floor reinforcing system, the most recent measurements taken |
| 1-31 | March 17, 2005 | ▪ His review of truss supports adjacent to a basement stairway, His observation of |

| | | |
|---|---|---|
| | | unit's existing conditions, his representative's observations of truss condition |
| 1-32 | June 21, 2005 | ▪ His observation of exposed trusses before and after reinforcing work, photos |
| 1-33 | August 3, 2005 | ▪ His observation of exposed trusses before and after reinforcing work, photos |
| 1-34 | October 17, 2005 | ▪ His observation of exposed trusses before and after reinforcing work, photos |
| 1-35 | November 7, 2005 | ▪ His observation of exposed trusses before and after reinforcing work, photos |
| 1-36 | February 2, 2006 | ▪ His observation of exposed trusses before and after reinforcing work, photos |
| 1-37 | February 10, 2006 | ▪ His observation of exposed trusses before and after reinforcing work, photos |
| 1-38 | February 21, 2006 | ▪ His observation of exposed trusses before and after reinforcing work, photos |
| 1-39 | February 24, 2006 | ▪ HardPine's 3 truss analyses |

Certain excerpts from Mr. Bogle's deposition provide further information to this Court concerning the foundations on which Mr. Bogle based his expert opinions. They are noted as follows.

Concerning his analysis, Mr. Bogle noted:

> "We ran an analysis on the span of the structure to determine maximum moment. And then we determined how much of a section modules we needed to develop. He noted further, "And using that information, we used another piece of software called ShapeBuilder where we can generate a wooden structure in the computer. And by applying the plywood to it, we were able to develop the strength that we needed to perform an appropriate repair."

(Bogle Deposition Transcript, Enclosed Exhibit 2, page 36, lines 1-11).

Mr. Bogle's deposition also establishes that his opinions are based in part on his knowledge of the truss spacing, measurements, and characteristics. Concerning these bases, Mr. Bogle's deposition testimony reveals the following:

"A truss is a member of a collection of structural members put together with plates and in some cases pins to create a long-span structural member" (Bogle Deposition Transcript, enclosed Exhibit 2, page 37, lines 8-11). Mr. Bogle measured the Eagle's Nest Trusses when they were first exposed in July 2002 so that he

could perform an analysis (Bogle Deposition Transcript, enclosed Exhibit 2, page 30, lines 20-21). In answer to the question of what the spacing of the trusses on center were, Mr. Bogle noted "[T]hey were two foot on center. I did take a measurement 'cause I needed to figure out what kind of a load each truss had to carry." (Bogle Deposition Transcript, enclosed Exhibit 2, page 37, lines 20-22). Another basis for Mr. Bogle's expert opinion is his knowledge of the relationship between the lumbar grade used in the Eagle's Nest trusses and the truss spacing. Concerning this, Mr. Bogle noted the following in his deposition:

Q: So the problem with the trusses was the - specifically, what was the problem with the trusses, in your opinion?

A: Well, as he [Mr. Alawa of HardPine] states [in the first HardPine analysis], the spacing, based on the construction of the trusses, the spacing should have been closer.

Q: Less than twenty-four?

A: Typically. Typically, yeah. Typically for trusses like that aren't done at twelve inches on center. You could go to twenty-four inches on center and build them to that, to meet that requirement. So the next statement or the next problem would be the fact that they used a lower grade lumber to construct the trusses for the spacing that they were constructed at.

(Bogle Deposition Transcript, enclosed Exhibit 2, page 58, lines 6-20)

Further basis for Mr. Bogle's expert opinions consists of the field data Mr. Bogle collected with Mr. Alawa (a member of HardPine's staff). Mr. Bogle describes that data in paragraph 8 of his Affidavit (enclosed Exhibit 1).

**(2) HardPine's Truss Analysis (as Information Reasonably Relied on by Structural Engineers as a Basis for their Opinions) is Admissible Through Mr. Bogle's Expert Opinion**

In addition to the above noted field data, the entire HardPine computer generated analyses are part of the basis for Mr. Bogle's expert opinions. In numbered paragraphs 10 through 22 of his enclosed Affidavit (enclosed Exhibit 1), Mr. Bogle notes the following explanation of why structural engineers reasonably and regularly rely on such analysis as a basis for their expert opinions:

> (10) In order to obtain analysis of the weight bearing abilities of a wooden floor truss, structural engineers always rely on analysis performed by use of truss design software. This has been so in the structural engineering field for 15 years.
>
> (11) In my work as a structural engineer I commonly am called upon to form opinions concerning the structural soundness of truss floors. In formulating such

opinions, I regularly rely upon analysis of the weight bearing abilities of the floor trusses that has been supplied by another party (such as HardPine) through use of truss design software such as the MiTek 2020 software program. It is a common practice for structural engineers to do so.

(12) Analysis of the weight bearing abilities of wooden floor trusses is always done by use of truss design software. This has been so in my field for 15 years.

(13) The type of software used in the engineered wood products industry for analysis of the weight bearing abilities of wooden floor trusses is known as proprietary software. Such software must be leased from the company that develops it.

(14) Through my work as a structural engineer, I have become familiar with the nature of the proprietary software used to analyze wooden floor trusses and I am familiar with the MiTek 2020 software program.

(15) The Truss Plate Institute (hereinafter referred to as "TPI") is composed of a group of engineers who set the guidelines for the wooden truss industry. All building codes require use of the TPI guidelines. The Wood Truss Council of America (hereinafter referred to as "WTCA") is composed of a group of wood truss manufacturers.

(16) TPI and WTCA combined develop the methodologies that are required to be used in any wood truss analysis and design software. These are the accepted and required guidelines in the industry.

(17) Before a proprietary software product designed for use in wood truss analysis and design can be released for use in the market, TPI and code officials first verify that the software validly utilizes the methodologies required by WTCA and TPI to be used in wood truss analysis and design.

(18) Truss design and analysis software analyzes wood trusses using the same mathematical formulas and engineering formulas that structural engineers would use to analyze the wood truss if the structural engineer performed the calculations by hand. Those formulas are universally accepted in engineering. Thus, the results the software yields from its analysis of the wood trusses can be tested by a structural engineer doing the calculations by hand.

(19) The software is so much faster than hand calculations that it is much more practical, effective, and economical to use the software to analyze the weight bearing abilities of the wood trusses rather than to perform the calculations by hand.

(20) The specific proprietary software HardPine used to analyze the Eagle's Nest wooden floor trusses for me is known as MiTek 2020 software.

(21) MiTek is recognized in the engineered wood products industry as the leading supplier of wood truss design and analysis software in the United States.

(22) A standard procedure in all proprietary software, to guard against error, is to build into the software an error checking routine to monitor error rates and to lock up the program if the rate is too high.

At Mr. Bogle's deposition, NLC's attorney inquired whether the HardPine analysis was beyond Mr. Bogle's expertise. Mr. Bogle noted the following

> I wouldn't say beyond my expertise, but I thought it was better to use somebody that was more versed and also had the software to analyze. The specialized software makes life a lot easier. For an engineer to just model a truss takes much more time, and it costs more money. I thought it would be much quicker, and to me it turned out to be much quicker. He's able to, he has software specific to this particular structural element. And that's what we did or I did.

(Bogle Deposition Transcript, enclosed Exhibit 2, page 55, lines 1 through 12).

Fed.R.Evid. 703 provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

Given this, Mr. Bogle is permitted to testify based on the HardPine analyses even without the HardPine analyses being

admissible in evidence. NLC is free to argue against the weight of the HardPine analysis, but cannot object to its admissibility. An expert is not always required to personally perceive the subject of his analysis. Fact that expert for plaintiff landowner in CERCLA cost recovery action relied on data obtained by hydrologists hired by plaintiff, and that expert visited site only once, went only to weight, not admissibility, of expert's testimony. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, §§ 101 et seq., 42 U.S.C.A. §§ 9601 et seq. Fed R Evid Rule 703 . NutraSweet Co. v. X-L Engineering Co., 227 F.3d 776 (7th Cir. 2000).

**(3) Even if the Court were to Rule that Mr. Bogle may not Reasonably Rely on the HardPine Analysis, the HardPine Analysis is Admissible Evidence on its Own**

Even if the Court were to rule that it is not reasonable for Mr. Bogle to rely upon the HardPine analyses as a basis for Mr. Bogle's expert opinions, the HardPine analysis should still be admitted as evidence in support of Eagle's Nest's claim. Domingos Medeiros, in his enclosed Affidavit (enclosed Exhibit 3). Lays out the methodology and reliability of the HardPine analyses in precise detail. In summary, that Affidavit establishes the following: that HardPine's analyses are based on field data collected by Mr. Alawa and Mr. Bogle; that for the past 15 years, such analyses has always been done by truss design

software; that the software uses the same accepted and mandated mathematical formulas engineers would use to perform the calculations by hand; that the results can, therefore, by independently tested; that it is more practical, effective, and economical to use the software than to do the calculations by hand; that HardPine's analysis was run on software from the recognized industry leading supplier of such software (MiTek); that the software has built in safeguards against error; that MiTek trained HardPine's software operators in the software's proper use; and that the software can not even be released for use in the market until code officials and officials form the Truss Plate Institute (TPI) first verify that the software validly utilizes the methodologies required by TPI and the Wood Truss Council of America to be used in wood truss analysis and design.

**(E) EAGLE'S NEST IS NOT REQUIRED TO PROVE THE EXACT DATES OF THAT EACH INDIVIDUAL FLOOR FAILED**

NLC points to Eagle's Nest's answer to NLC's interrogatory number 17 as a reason for dismissing Eagle's Nest's case. This is, however, inappropriate. In making this argument, NLC is completely ignoring the manifestation rule. Eagle's Nest arguments on that issue are stated in detail in Eagle's Nest's original Memorandum. For reference, Eagle's Nest briefly restates the pertinent points here. The manifestation rule,

provides that "Property damage triggers coverage under this type of comprehensive general-liability-insurance policy when the damage (1) manifests itself, (2) is discovered or, (3) in the exercise of reasonable diligence is discoverable." Textron, Inc. v. Aetna Casualty and Surety Compnay et al., 754 A.2d 742, 746 (R.I. 2000) (citing CPC International, Inc. v. Northbrook Excess & Surplus Insurance Co., 668 A.2d 647, 649 (R.I. 1995)).

The date of loss for all these Units, therefore, is the manifestation date. As noted in Eagle's Nest's original Memorandum, the earliest manifestation date is July 25, 2002. At the latest, the manifestation date is February 25, 2003, when Eagle's Nest received the first HardPine analysis, which indicated that the trusses had the wrong lumber grade for the truss spacing, and therefore would structurally fail under normal loads.

Even if the Court decides that the law requires Eagle's Nest to provide a unique manifestation date for each individual unit by establishing the date that a broken truss was discovered and/or the date that sufficient deflection was discovered, that information is described in the various expert reports prepared by Mr. Bogle and supplied to NLC, and in various other documents supplied to NLC, and is summarized in the two enclosed tables of deflection results (enclosed Exhibits 12 and 13) which Eagle's

Nest also supplied to NLC in responses to NLC's request for production.

Exhibit 12 is a table containing the deflection measurement results for each individual unit for the years 2003, 2004, and 2005. Exhibit 13 is a similar table. It describes the deflection as of February 27, 2004, provides additional information in the form of comments indicating such things as the inspection date, where cracks were noted, reinspection date and (where applicable) results, and repaired units and their repair dates up to that point. In answering interrogatory 17, Eagle's Nest incorporated by reference all the documents it has produced in response to NLC's discovery requests that contain this type of information (including these tables).

Given that the NLC policy covers a continuous 4-year period, it is immaterial if Eagle's Nest cannot establish the manifestation date with exact precision. It is enough to establish that the loss manifested during the 4 years of NLC's coverage, and certainly the above noted materials do establish this.

Eagle's Nest also notes that even if the Court finds that the above-noted evidence does not prove the date of loss, dismissal of Eagle's Nest's claim is too severe a sanction. Dismissal of Eagle's Nest's claim on such a basis is an especially inappropriate sanction in light of Eagle's Nest's

clearly good faith efforts to comply with NLC's discovery request and in light of the fact that it is obvious that, at the very least, a large number of the Unit's floors structurally failed and were repaired during the NLC coverage period.

Thus, if the court finds that Eagle's Nest has not adequately established the dates of loss for any of the units, then Eagle's Nest requests the Court stay its ruling on NLC's motion for summary judgment and grant Eagle's Nest a reasonable period of time to compile a more responsive answer to NLC's interrogatory 17.

**(F) THE PUBLIC POLICY UNDERLYING THE MODERN, BROAD VIEW OF COLLAPSE COVERAGE APPLIES HERE, AND JUSTIFIES FOLLOWING THE MODERN, LIBERAL VIEW IN THIS CASE**

Eagle's Nest's arguments concerning collapse coverage are stated at length and detail in Eagle's Nest's original Memorandum. To those arguments, Eagle's Nest does add that NLC's apparent effort to distinguish the Rhode Island case of Norfolk & Dedham and the Indiana case of Monroe Guar. Ins. Co. v. Mawerks Corp. is inappropriate. Adopting such a distinction would ignore probably the most compelling reasons for following the modern, broad view. Those reasons are safety and mitigation of damages.

In fact the Monroe case notes some of the public policy justifications in its citation, which notes in pertinent part as follows:

> *Nationwide Mut. Fire Ins. Co. v. Tomlin,* 181 Ga.App. 413, 352 S.E.2d 612, 615 (1986) (holding that collapse includes any "reasonably detectable serious impairment of structural integrity" because such a definition "more realistically reflects the purposes of the policy"); *Royal Indem. Co. v. Grunberg,* 155 A.D.2d 187, 189, 553 N.Y.S.2d 527 (1990) (agreeing with "numerical majority of American jurisdictions [that] a substantial impairment of the structural integrity of a building is said to be a collapse" because to require the building to fall down would be "unreasonable" in light of an insured's duty to protect property from further damage)

Monroe Guar. Ins. Co. v. Magwerks Corp. 829 N.E.2d 968, 973 (Ind.2005).

One must assume that if protecting the property from further damage justifies the modern view of collapse then protecting people from harm is even greater justification. If the Court were to follow NLC's suggestion of seeking to limit Norfolk and Dedham so as not to apply to this case, it would thwart the public policy behind the rule.

## (G) EAGLE'S NEST CONDOMINIUM ASSOCIATION IS THE PROPER PLAINTIFF IN THIS CASE

NLC argues in a footnote to its most recent Memorandum that the individual unit owners (and not the condominium association) should be the plaintiffs in this case. This argument is incorrect. It ignores the fact that the condominium association is the named insured on the insurance policy under which this claim is brought. A condominium association which is a signatory to a contract is a proper party to a suit for damages based on that contract. Andrikopoulos v. Broadmoor Management Co., Inc. App., 670 P.2d 435.

Dated: March 29, 2006

Respectfully submitted, Plaintiff,
Eagle's Nest Condominium
Association, Inc., also known as
Eagle Nest Condominium Assoc,
By its Attorney,

Steven H. Orabone, Esq. (#3205)
20 Ridgevale Court
Cranston, RI 02921
Telephone: (401) 944-5777
FAX: (401) 942-1936
E-mail: stevenorabone@cox.net

**CERTIFICATION**

I, the undersigned, hereby certify that I hand-delivered a copy of the within Plaintiff's Memorandum on March 29, 2006 to Ronald Langlois,

Esq., Smith & Brink, P.C., One State Street, Suite 400, Providence, RI 02908.