UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM
ASSOCIATION, INC., A/K/A
EAGLE NEST CONDOMINIUM ASSOC.

V. C.A.NO: 04-436ML

NEW LONDON COUNTY MUTUAL
INSURANCE COMPANY, NLC INSURANCE
COMPANIES, INC., DOES I THROUGH V
AND NLC INSURANCE COMPANIES,
ALIAS JOHN DOE COMPANY

# DEFENDANT, NEW LONDON COUNTY MUTUAL INSURANCE COMPANY'S MOTION IN LIMINE TO STRIKE PLAINTIFFS' PROPOSED EXPERTS' TESTIMONY

Now comes the Defendant, New London County Mutual Insurance Company (hereinafter "NLC") and respectfully requests that this Court preclude the plaintiff's expert witnesses, Dr. Aiman Alawa (hereinafter "Alawa") and Steve Bogle (hereinafter "Bogle") from testifying. The Plaintiff has identified Bogle and Alawa as experts they intend to call regarding the effect of live loads on the floor trusses at the Eagle's Nest Condominium Association. Bogle conducted no independent analysis relative to the effect of live load on the trusses. His opinions are based primarily on the analysis performed by Alawa. Hence, if Alawa's analysis is incorrect and not admissible, Bogle's opinion is likewise incorrect and not admissible.

NLC respectfully submits that the experts should not be allowed to testify because their opinions do not withstand the analysis imposed by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed 2d 469 (1993), and its progeny. In support of this motion the Defendant states that:

- Alawa's opinions are based on a computer design program (MiTek) not appropriate for assessing a failed truss.
- There is no way to independently verify the data the Plaintiff's expert used in his computer analysis.
- Alawa has admitted that no one, other than himself, can verify his results.
- Bogle has testified that Alawa's Rule 26 Report is inaccurate and unreliable.
- Neither expert attempted to validate the results of the analysis by testing it in the field according to building code requirements.
- No one verified the Plaintiff's expert analysis through actual load testing.
- Although requested, the Plaintiff's experts have not produced any materials relative to how the MiTek program operates.
- Although requested, the Plaintiff's experts have produced no information regarding how MiTek recommends the analysis to be used.
- Although requested, the Plaintiff's experts have produced no literature or programming materials indicating that the MiTek program is appropriate for failure analysis.
- Although requested, the Plaintiff's experts have identified no authoritative articles, treatises or publications recognized within the industry, demonstrating that the MiTek program is appropriate for truss failure analysis.
- The Plaintiff's expert has admitted that there is no literature which discusses the use of the MiTek program for failure analysis.

- Although requested, the Plaintiff's experts have produced no peer review literature or product software which discusses the use of the MiTek program for failure analysis.

- Alawa is not certified by MiTek for use of its program nor did he receive any formal training on how to properly operate the MiTek program.

- Both Bogle and Alawa have admitted that by law, Alawa cannot attest to the validity of the MiTek analysis because he is not a registered professional engineer.

- Alawa concedes that he is not a professional engineer and that by law he cannot certify the MiTek analysis, and represent its accuracy to a building inspector.

- No one tested the wood used to fabricate the Eagle's Nest trusses to determine its actual strength capabilities.

- No one tested the moisture content of the trusses, which can affect the strength qualities of the lumber.

- No one knows what the strength capabilities of the truss connector plates were at Eagle's Nest Condominium Complex.

- No one measured the actual live loads in any of the units at the Eagle's Nest Condominium Complex.

- No one conducted any test to determine what the dead load deflection was in any of the Eagle's Nest units

- Both Alawa and Bogle admit that the deflection readings which were conducted at Eagle's Nest were unreliable

In support of its motion, the Defendant relies upon its memorandum of law attached hereto.

Defendant, NLC
By its attorneys,

*/s/ Ronald Langlois*
Ronald Langlois, Esq. #2891
Smith & Brink, P.C.
One State Street, Suite 400
Providence, RI 02908
Tel: (401) 351-9970
Fax: (401) 274-6218

## CERTIFICATION

I hereby certify that I hand delivered a true copy of the within to **Steven Orabone,** Esquire, 20 Ridgevale Court, Cranston, RI 02921 on the 7th day of November, 2006.

*/s/ Ronald Langlois*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., A/K/A EAGLE NEST CONDOMINIUM ASSOC.**

**V.** **C.A.NO: 04-436ML**

**NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY**

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION IN LIMINE TO STRIKE PLAINTIFF'S EXPERTS' TESTIMONY

### BACKGROUND

This matter involves the alleged failure of defectively constructed floor trusses at the Eagle's Nest Condominium Complex. The Eagle's Nest Condominium complex consists of 120 dwelling units divided among 48 distinct multifamily buildings that are physically separated from one another. There are six different styles of buildings: Jefferson, Georgian, Madison, Presidential, Elmhurst, and Garrison. Some of the buildings contain four units per building (quadplexes), and some two units per building (duplexes). The quadplexes consist of two individual dwelling units on the ground floor, plus two additional dwelling units on the second story.[1] Construction of the trusses commenced in 1983 and continued in phases over the next several years.

The item in question, floor trusses, is not susceptible to visible inspection. They are enclosed between the floor of the top unit and the ceiling of the bottom unit. The only way to discern the truss construction is to remove the ceiling.

[1] Plaintiff's counsel represents, and it will be accepted as accurate for purposes of this motion that due to the configuration of the condominium complexes, there are only a possible 106 units which could be affected by the floor trusses. To date approximately 30 have been repaired.

Since there are several styles of units, constructed at different times, there is no way to know, without removing the ceilings, whether the floor trusses in Unit A are the same as the trusses in Unit B. Likewise, it is unknown whether the trusses in one unit were installed in the same manner as the trusses in another unit. One cannot infer therefore, that a condition with the trusses in one unit means that the same conditions exist in the trusses in other units.

This is confirmed by the fact that many units have no reported deflections more than 20 years after construction, while other units reported acceptable deflection limits, as established by the plaintiff's engineer. (Exhibit "A", Steven Bogle Report)

Initially, Steven Bogle (hereinafter "Bogle") believed that the trusses may have been constructed on site as opposed to being prefabricated. He observed "a variety in the actual construction of trusses [within] the same exact floor system, which made [him] think there was a lack of quality control". (Exhibit "B", Bogle Deposition 7/6/06, P.155, L3-15) Bogle measured a fairly significant difference in the depth of trusses right next to one another. "In some cases, one truss would have a single bottom chord, two web members, and a single top chord, next one to it would have an additional bottom chord plate added, and then the rest of it looking like the other trusses." (Exhibit "B", P.155, L16-25)

Consistent with Bogle's belief that the trusses were not prefabricated is the absence of sealed design drawings.

When a truss manufacturer prepares a truss design, they are required to submit design drawings. (Exhibit "B", P.113, L11) In this particular case, no one has located any design drawings for the trusses. (Exhibit "B", P.113, L15 - P.114, L3). Hence, there

is no documented evidence depicting how the trusses in each unit were constructed. Bogle did not observe any evidence which would reveal the identity of a manufacturer. (Exhibit "B", P.92, L.15-16)

Aiman Alawa's (hereinafter "Alawa") analysis is premised on the fact that there is uniformity in all of the trusses that were constructed.

**Wood**

Wood is assigned a strength rating based upon its species and grade. On June 27, 2006, Bogle reported, "that inferior grade lumber was used in construction of the trusses, given the depths, spans, lengths and use of trusses". With respect to the trusses Bogle inspected, he stated, "I did not write down or record for the record what the grade of level was". He further testified:

Q. And in terms of economics, Southern Yellow Pine #2 would be more expensive than Sothern Yellow Pine # 3?

A. Yes.

Q. So, a less than scrupulous truss manufacturer could be using Southern Yellow Pine #3 to save money?

A. Yes.

Q. That's a possibility?

A. Unfortunately, it's a strong possibility.

Q. And we don't know that as we sit here today?

A. As far as the grading, right. I mean, if we had somebody from the Southern Pine inspection bureau come out and look at the trusses, he might say I would never grade this a number two. I don't know.

(Exhibit "B", P.112, L20 – P.113, L10)

Q. So you can run a test on the specific wood to determine whether or not-what the strength capabilities of that wood is, correct?

A. Correct.

Q. Because the actual strength capabilities may be different than the assigned average values, correct?

A. Correct.

Q. In this particular case, no one tested the actual wood to determine what the strength capabilities were correct?

A. Correct.

Q. Without knowing the actual strength capabilities of the wood, you can't actually predict how much load it can carry, correct?

A. Yes. I guess you would say its estimated based on the tabular, not the actual of what's been done.

Q. You would agree with that, in a failure analysis as opposed to a design analysis, in a failure analysis you don't know what the actual strength of the wood is; you cannot accurately state how much load that wood can carry, correct?

A. I would agree with that, yes.

(Exhibit "B", P.132, L6 - P.133, L4)

In all of his calculations, Alawa assumed that the bottom and top chords of the trusses were constructed of Southern Yellow Pine #2.

**Moisture Content**

The plaintiffs do not know what the actual moisture content of the woods in the trusses at Eagle's Nest, which could also affect the strength capability of the lumber. (Exhibit "B", P.133, L5-10)

**Truss Depth**

Alawa's analysis assumed 18"depths and 24" truss depths depending on the length of the truss. (Exhibit "C", Dr. Alawa Deposition 7/7/06, P.149). Thus his analysis

would not be applicable to trusses which had different depths as observed by Bogle. (Exhibit "B", P.149)

**Hole Cuts**

Bogle determined that the plumbers had cut through the Eagle's Nest trusses and destroyed the structural integrity of the trusses which could contribute to the deflection problem. This problem was perceived in all of the units with upstairs bathrooms. (Exhibit "D", Bogle Deposition 9/16/05, P.78, L1 - P.80, L6). In one particular instance Bogle reported that [they] "discovered a truss with a significant portion of its top chord removed by a hole saw used to install a plumbing drain line. This damage weakened the truss considerably causing the truss to deflect which in turn affected the walls and doorways above. (Exhibit "B", P.184)

**Truss Plate Connectors**

The identity of manufacturer and strength of the various truss connector plates are unknown in the various trusses. (Exhibit "B", P.115, L18-21) Alawa's analysis does not consider the strength of the truss connector plates. (Exhibit "C", Vol. II, P.84, L9 – P. 85, L14)

**Miscellaneous Factors**

- No one measured the actual live loads in any of the units at the Eagle's Nest Condominium Complex. (Exhibit "B", P.87, L3-15; P.90, L17-22)

- No one conducted any test to determine what the dead load deflection was in any of the Eagle's Nest units. (Exhibit "B", P.90, L17-22)

- Both Alawa and Bogle admit that the deflection readings which were conducted at Eagle's Nest were unreliable. (Exhibit "B", P.158, L13-21)

**ALAWA DID NOT APPLY SCIENTIFICALLY VALID PRINCIPLES AND METHODOLOGY OF THIS CASE.**

Alawa used a MiTek software program to conduct his analysis. (Exhibit "C", P.6 L4-6) MiTek engineering software is design software used primarily in new construction. It was developed "to permit fabricators to do their own engineering related work for their building designs". See, MiTek Holdings Inc. v. Arce Eng'g Co., Inc., 89 F.3d 1548, 1551 (11th Cir. 1996) The program is not suited for a thorough analysis of actual field conditions in a failure analysis such as those presented in this matter. (Exhibit "E", Report of Michael Grafe)

During the course of the MiTek analysis, various drop down screens appear which allow the user to input information and/or adopt a default setting suggested by MiTek. (Exhibit "C", P.95, L23-25)

Critical to the reliability of the MiTek analysis is the extent to which the information inputted into the program corresponds to the actual conditions which exist at Eagle's Nest. As Alawa states, "computers are not intelligent entities. If you put garbage in, you get garbage out". (Exhibit "C", P.107, L14-16) "If you have the wrong person you produce wrong analysis and wrong designs, and if you put in wrong data you get erroneous results." (Exhibit "C" P.107, L20-24)

Thus, "if [Alawa] assumed certain parameters for his computerized finite element analysis, and those parameters were later proven to be incorrect, then the conclusion reached by the computer model would also be incorrect." Coffey v. Dowley Mfg., Inc., 187 F.Supp. 2d 958, 974; 2002 U.S. Dist. LEXIS 6898.

**Absence of Verification**

Although requested, the plaintiff's expert never produced the MiTek software program, allegedly because it was a, "proprietary program" (Exhibit "C", P.88, L12-14). Accordingly, we are not able to verify what data and information Alawa used to perform his analysis.

Alawa was asked:

Q. [W]hen we don't know what the MiTek program says, we don't know whether you are using a default analyses; is that correct?

A. It is correct, yes.

Q. So we can't verify your results, can we?

A. You cannot, I can. (Exhibit "C", P.125, L12-17)

Alawa further testified:

Q. You never tested anything in this particular case, correct?

A. Correct.

Q. So we cannot verify your analysis, correct?

A. You cannot.

(Exhibit "C", P.151, L17-21)

Verification is extremely important because Alawa's Rule 26 report was deemed unreliable by the plaintiff's other expert, Bogle. (Exhibit "B", P.190, L3-22) Alawa admittedly made mistakes in his Rule 26 report.

For example, Alawa did not include the actual weight of the trusses, the weight of the fixtures, or the weight of the carpet in his analysis. His analysis also did not factor in all of the partitions. His report fails to include the weight of the ceiling and mechanical

elements.[2] In performing his analysis, Alawa also did not input the strength capabilities of the truss plate connectors that were actually at Eagle's Nest.[3] (Exhibit "B" P.143, L16-P.147, L21) Coincidentally, all of these omissions are to the plaintiff's benefit. (Exhibit "C", P.128, L11- P.134, L4) His analysis is contrary to the R.I. building code which provides in pertinent part:

> The structural analysis shall be based on actual material properties and other as-built conditions that affect stability or load-bearing capacity, and shall be conducted in accordance with the applicable design standard.

**Creep**

Likewise, he did not consider the issue of "creep". Creep has been defined as, "a property of wood that causes trusses under a sustained long-term (dead load) to deflect more and more with time. This can increase the calculated immediate dead load deflection one-and-one half to two times." (Exhibit "F", Mitek Literature) With respect to Creep, MiTek's literature states, "regardless of what the codes say, most people regard large levels of deflection (usually referred to as sag in this context) as a sign of structural deficiency." According to MiTeck's literature its program has an adjustment factor to account for creep. (Exhibit "F") In the instant matter, the trusses in question were more than twenty years old and subject to creep.

**Finite Element Analysis**

The MiTek program is premised upon finite element analysis "Finite element analysis is a purely analytical technique and does not involve any physical testing". Coffey v. Dowley Mfg., Inc., 187 F.Supp. 2d 958, aff'd 89 Fed. Appx. 927, 930 (6th Cir.

---

[2] His analysis included the weight of the ceiling, but the table prepared in his report does not reference that fact.

[3] Alawa professes that it was not necessary to do this because the truss plates did not fail. However, in his 2003 report, he noticed that the truss plates were pulling apart at the joints.

2003). In Coffey the Court precluded the Plaintiff's expert, a professor of mechanical engineering, from testifying regarding the amount of torque required to fracture steel stud bolts. Although the expert was an "experienced mechanical engineer and a professor of engineering", the Court held, "An individual is not an expert in the abstract; expertise can only be judged within the context of a given case". Id at 975.

As in the instant case, the precluded expert used finite analysis to reach his conclusions. There, the proposed expert testified that "testing is often not utilized after conducting a finite element analysis. Id. at 976. The Court noted:

> Although (the proposed expert) undertook to validate his hypothesis by using finite element analysis, he did not utilize actual testing to verify the computerized predictions in a real world setting. When an exemplar [tool] was readily available, failure to physically test [tool] renders [the experts allocations of the principles and methods of the facts of the actual accident unreliable. 89 FedApp. 927, 932.

The Court further held:

> Bare finite element analysis, even assuming that it was based on correct assumptions and was an appropriate form of finite element analysis, was not appropriate validation in this context. [The Defendant's expert] demonstrated that [the Plaintiff's experts] hypothesis could be physically tested and verified in the laboratory. [The Plaintiff's expert] may very well be an expert in the abstract, but in this case he apparently settled for a convenient form of validation. However, Daubert and Rule 702, while not requiring absolute certainty or even a correct result, do require a more demanding approach to scientific evidence. Id. at 978.

The court further noted, this type of technique was not generally accepted:

> [The Defendants' expert's] testimony regarding the propriety of the use of a finite element analysis indicates, at the very least that [the Plaintiff's expert's] approach in this case is not generally accepted since finite element analysis is not often used when actual physical testing is an option. While [the Plaintiff's expert's] second finite element analysis was undertaken using accepted engineering procedures, its very use constitutes an unreliable method-the wrong tool for the wrong job. Id at 976.

"The failure of ...experts to test their hypothesis in a timely and reliable manner...renders their testimony...inadmissible under Daubert and Federal Rules of Evidence (702 and 104)." See, Pride v. BIC Corp., 54 F.Supp. 2d 757 (E.D. Tenn. 1998) aff'd 218 F.3d 566, 578 (6th Cir. 2000).

In the instant matter, as in Coffey, it is undisputed that Alawa's analysis was incorrect which rendered his report unreliable.

Concomitantly the plaintiff's experts never load tested the trusses either before or after the repairs to determine their actual capabilities and verify the MiTek analysis.[4]

"Load testing is the engineering procedure of placing weights upon a structure and studying in minute detail the behavior of the structure." Dr. Mete Sozen, the chairman of the American Concrete Institute, [has] testified that: "If there is controversy... then typically the test is used on the assumption that one test is worth a thousand opinions." He also stated that the load test is "the final arbiter, the final step in any dispute about safety or serviceability of a structure." Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 693 (3d Cir. 1993)

Bogle agrees with this position. He was asked:

Q. If we sent you back tomorrow to do an actual analysis, on the capabilities of the floor truss, what would you do today that you haven't done in the past?

Witness: If we wanted to do an in-place analysis?

Langlois: Yes. A proper scientific analysis that can be tested and verified, what would you do.

---

[4] The Rhode Island Building Code provides:1604.6 In-situ load tests. The building official is authorized to require an engineering analysis or a load test, or both, of any construction whenever there is reason to question the safety of the construction for the intended occupancy. Engineering analysis and load tests shall be conducted in accordance with Section 1710.

A. I would want a unit -- I would probably choose a unit that has an upstairs/downstairs, two different units above one another and want them both cleared out, and I would want the ceiling removed from the lower unit, and then I would establish a datum or existing condition of the deflection of the trusses, and then I would want to perform—I would do a load test where you actually load the trusses systematically approaching the prescribed live load of the building code and taking measurements throughout.

Q. And that wasn't done -- that hasn't been done yet, correct?

A. That's never been done.

Q. That would give you an actual reading?

A. Correct.

(Exhibit "B", P.162, L11 - P.163, L10)

**Argument**

**THE PLAINTIFF'S EXPERT'S OPINION FAILS TO SATISFY THE RELIABILITY CRITERIA SET FORTH IN DAUBERT.**

The aforementioned evidence demonstrates that the plaintiffs' experts' opinions can not satisfy the standard for admissibility of expert testimony. Rule 702 of the Federal Rules of Evidence permits the admission of expert or opinion testimony.

> **Rule 702. Testimony by Experts**
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion…, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The preliminary question of whether an expert witness is qualified is a matter for determination by the judge. The United States Supreme in Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786,125 L. Ed. 2d 469 (1993) (Daubert I) obligates the trial judge to serve as "gatekeeper".

"[T]he rules of evidence... do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597, 113 S. Ct. at 2799, 125 L Ed. 2d at 485. The Court must determine that "reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 593-4, 113 S. Ct. at 2796, 125 L.Ed.2d at 482. The language of the Daubert opinion speaks to scientific evidence because that is the evidence that was in question in that case but the rule applies to all experts. Kumho Tire Company, Ltd v. Carmichael, 526 U.S. 137,147-48; 119 S. Ct. 1167, 1174; 143 L. Ed.2d 238,250-51 (1999).

**The Burden of Proof is with the Proffering Party**

The proffering party must prove the reliability and relevance of the expert scientific testimony by a preponderance of the evidence. Daubert, 509 US at 592 n. 10, 113 S. Ct. at 2796 n.10, 125 L.Ed. 2d at 482. Notwithstanding the expert's qualifications, his broad assertion as to the reliability of his conclusion is insufficient. "[An] expert cannot establish that a fact is generally accepted merely by saying so". Grimes v. Hoffmann-LaRoche, Inc., 907 F.Supp. 33, 38 (D.N.H. 1995).

***Daubert* and its Progeny Have Suggested Guidance on Assessing Reliability**

While not a "definitive checklist or test" Daubert, 509 US at 593, sets out factors which "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."

Kumho Tire Company, Ltd v. Carmichael, 526 US 137,119 S. Ct 1167,143 L.Ed 2d 238.

These factors are:

1) Whether a "theory or technique. . . can be (and has been) tested";

2) Whether it "has been subjected to peer review and publication";

3) Whether, in respect to a particular technique, there is a high "known or potential rate of error" and Whether there are "standards controlling the technique's operation"; and

4) Whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." 509 U.S. at 592-594.

**Testing**

"Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified . . . . The statements constituting a scientific explanation must be capable of empirical test." 509 U.S. at 593.

Here, Alawa never tested his hypothesis, which is perhaps the most important Daubert factor. 509 U.S. at 593 ("a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested."); St. Laurent v. Mesto Minerals Indus., 2005 DNH 130 (D.N.H. 2005).

It is undisputed that the strength of the trusses could have been verified through load testing. Alawa's failure to test his hypotheses in a reliable manner or to validate his hypotheses by reference to generally accepted scientific principles as applied to the facts of this case renders his testimony inadmissible under Daubert and Federal Rules of Evidence 702 and 104. Am. Family Ins. Group v. JVC Ams. Corp., 2001 U.S. Dist.

LEXIS 8001 (D. Minn. 2001); See, Dr. Jeffrey Morehouse v. Louisville Matter Group, 2004 U.S. Dist. LEXIS 21766 (June 28, 2004) (held motion to exclude expert opinion and summary judgment granted where plaintiff's engineering expert did not reliably test his hypothesis regarding the amount of stress needed to cause a ladder to bend and fall); Oglesby v. General Motors Corp., 190 F.3d 244 (4th Cir. 1999) (plaintiff's engineering expert precluded from testifying regarding stresses necessary to break a plastic part…he did not know "the amount of the particular stress, and the stress resistance of the part at various temperatures"); Muller v. Synthes Corp., 2001 U.S. Dist. LEXIS 6305 (expert who used "elementary general computations" to determine the maximum stress an object can withstand, precluded from testifying regarding the stress failure of a medical implant).

**Standard Controlling The Techniques Of Operation**

"Daubert directs courts to consider 'the existence and maintenance of standards controlling the technique's operation.'" 509 U.S. at 594. "[T]he requirements of documentation and peer review of examiners' results are industry standards which help to ensure reliability and testability of the expert opinion." United States v. Monteiro, 407 F. Supp. 2d 351, 369 (D.Mass 2006).

The Plaintiff's experts have not produced any materials relative to how the Mitek program operates. We do not know and cannot verify what information the Plaintiff's expert imputed into the computer program, or conversely left out of the computer program. The Plaintiff's experts have produced no information regarding how MiTek recommends the analysis be used. The Plaintiff's experts have produced no literature or

programming materials indicating that the MiTek program is appropriate for failure analysis.

**General Acceptance With The Relevant Community**

"In Daubert and Kumho Tire, the Supreme Court affirmed the continued relevance of whether the technique at issue is generally accepted within the scientific community. 509 U.S. at 594. Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism." United States v. Monteiro, 407 F. Supp. 2d 351, 369 (D.Mass 2006).

The Plaintiff's experts have proffered no evidence that the MiTek program is accepted within the engineering community as an appropriate tool for failure analysis in trusses, other than their unsubstantiated opinion. The Plaintiffs have identified no authoritative articles, treatises, or publications recognized within the industry, demonstrating that the MiTek program is appropriate for truss failure analysis. The Plaintiff's expert has admitted that there is no literature which discusses the use of the MiTek program for failure analysis. (Exhibit "G", Grafe Deposition, P.119, L14 – P.120, L15)

**Peer Review & Publication**

"Daubert counsels that "publication in a peer reviewed journal [is] a relevant, though not dispositive, consideration in assessing the validity of a particular technique or methodology on which an opinion is premised." Daubert, 509 U.S. at 594. The First Circuit has elaborated, noting that publication and peer review "serve as independent indicia of the reliability of the …technique" and "demonstrate a measure of acceptance of

the methodology within the scientific community." (Citations Omitted) United States v. Monteiro, 407 F. Supp. 2d 351, 369 (D.Mass 2006).

The Plaintiff's experts have produced no peer review literature or product software which discusses the use of the MiTek program for failure analysis. Therefore, this factor weighs against the plaintiff's expert's proposed testimony based upon the MiTek program.

**Weight of Error and General Acceptance**

The plaintiff has produced no information regarding the known or potential rate of error for the MiTek program in failure analysis, or their methodology.

Alawa was asked:

Q. Are you familiar with the Mitek website?

A. I believe so.

Q. They've got this whole list of bugs in their site?

A. Yes.

Q. So Mitek makes a mistake once in a while?

A. They do, but they're improving quite a bit over the years.

(Exhibit "C", P.178, L2-8)

Therefore, this factor weighs against the plaintiff's expert's proposed testimony.

**Prior Judicial Analysis of Admissibility of the Methodology**

There has been no showing that the MiTek program has been used to assess a truss failure in any reported cases.

**Experience and Education**

MiTek has a certification process and a training program with respect to the use of its program. Alawa is not certified by MiTek for use of its program nor did he receive any formal training on how to properly operate the MiTek program.

Both Bogle and Alawa have admitted that **by law** Alawa can not attest to the validity of MiTek's analysis. In Rhode Island, as well as in Massachusetts only a registered professional engineer can review the analysis, certify its accuracy, and seal the analysis. (Exhibit "C", P.185) Concomitantly, only a professional engineer can represent to the appropriate building inspector that the MiTek analysis is appropriate. (Exhibit "C", P.186, L16-22) Alawa concedes that he is not a professional engineer and that, **by law**, he can not certify the MiTek analysis, and represent its accuracy to a building inspector. (Exhibit "C", P.187, L23-24) [5]

Alawa has never published any articles on wood trusses or the use of the MiTek program.

Alawa has never given any lectures on failure analysis of wood structures.

Alawa has never testified in court as an expert on wood trusses or failure analysis.

Alawa has never used the MiTek program to analyze a truss failure.

Alawa has never actually installed a truss.

Prior to 2001 Alawa never had any involvement with trusses, (Exhibit "C", P.182, L17-19)

Alawa never had any formal study of wood trusses. (Exhibit "C", P.182, L23-24)

---

[5] While not binding on this Court the State of Rhode Island Engineering Commission has barred an individual from testifying as an engineering expert where that person although trained as an engineer was not licensed in the State as an engineer. See, In Re: Steven M. Clarke, Complaint no. 94-16 attached hereto.

The court vacated the summary judgment finding in favor of the insurer and remanded the matter to the superior court for further proceedings consistent with its holdings, presumably to determine the cause of the collapse.

While the reasoning underlying the court's decision is not readily apparent, the Rhode Island Supreme Court implied that you do not need a "total collapse". However, the decision does not provide any guidance as to what constitutes a "collapse" short of a total failure which is not the case here. "The fact remains that determining whether a collapse has occurred rests largely on the degree of damage."[6] (Couch On Insurance 2d, 48:178 at 185) See, Dreiblatt, et al. v. St. Paul Fire & Marine Insurance Company, 264 F.3d 126 (1st Cir. 2001).

*/s/ Ronald Langlois*
Ronald Langlois, Esq. #2891
Smith & Brink, P.C.
One State Street, Suite 400
Providence, RI 02908
Tel: (401) 351-9970
Fax: (401) 274-6218

**CERTIFICATION**

I hereby certify that I hand delivered a true copy of the within to **Steven Orabone,** Esquire, 20 Ridgevale Court, Cranston, RI 02921 on the 7th day of November, 2006.

*/s/ Ronald Langlois*

[6] Even if one was to accept collapse to mean the threat of imminent collapse, it should be noted that no action has been taken with respect to approximately 96 units. Furthermore, the plaintiff has come forth with no admissible evidence identifying what units were in imminent danger of collapsing. Nor has it produced any evidence of damage caused by a collapse.