**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., A/K/A EAGLE NEST CONDOMINIUM ASSOC.**

**V.** **C.A.NO: 04-436ML**

**NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY**

**DEFENDANTS, NEW LONDON COUNTY MUTUAL INSURANCE COMPANY AND NLC INSURANCE COMPANIES, INC.'S MOTION FOR SUMMARY JUDGMENT**

Now come the Defendants, The New London County Mutual Insurance Company and NLC Insurance Companies, Inc. (hereinafter "NLC"), and hereby moves this Honorable Court for Summary Judgment in the above-captioned matter. Defendant further relies on its reasons set forth in its Memorandum of Law appended hereto.

Respectfully submitted,
Defendant, "NLC"
By its attorneys,

*/s/ Ronald Langlois*
Ronald Langlois, # 2891
Smith & Brink, P.C.
One State Street, Suite 400
Providence, RI 02908
Tel: (401) 351-9970
Fax: (401) 274-6218

**CERTIFICATION**

To: Steven Orabone, Esq.
20 Ridgevale Court
Cranston, RI 02921

I hereby certify that I hand delivered a true copy of the within to the above listed attorney(s) on the 7th day of November, 2006.

*/s/ Ronald Langlois*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**EAGLE'S NEST CONDOMINIUM**
**ASSOCIATION, INC., A/K/A**
**EAGLE NEST CONDOMINIUM ASSOC.**

**V.** **C.A.NO: 04-436ML**

**NEW LONDON COUNTY MUTUAL**
**INSURANCE COMPANY, NLC INSURANCE**
**COMPANIES, INC., DOES I THROUGH V**
**AND NLC INSURANCE COMPANIES,**
**ALIAS JOHN DOE COMPANY**

# DEFENDANT, NEW LONDON COUNTY MUTUAL INSURANCE COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## I. Introduction

This is a declaratory judgment action to determine whether the defendant (hereinafter "NLC") should provide insurance coverage for repairs made to defectively constructed floor trusses at the Eagle's Nest Condominium complex. The Eagle's Nest Condominium complex consists of 120 dwelling units divided among 48 distinct multifamily buildings that are physically separated from one another. There are six different styles of buildings: Jefferson, Georgian, Madison, Presidential, Elmhurst, and Garrison. Some of the buildings contain four units per building, and some two.

The item in question, floor trusses, is not susceptible to visible inspection. They are enclosed between the floor of the top unit and the ceiling of the bottom unit. The only way to discern whether there is a problem with the unit is to remove the ceiling.

The floor trusses consist of a top chord, a series of triangular webs, and a bottom chord. The truss components are held together by a series of metal connector plates.

Floor trusses are designed to hold both live load and dead load. Dead load consists of the building components, i.e., the trusses, ceiling, rugs, and building fixtures, such as kitchen cabinets, toilets, vanities, etc. Live load consists of movable items such as persons, furniture and appliances. The total load bearing capacity of the truss is derived from a multitude of factors. Some of these factors include, but are not limited to, the depth of the truss, the quality of the wood, the moisture content of the wood, the strength and type of the metal connecter plates.

Since there are several styles of units, constructed at different times, there is no way to know, without ripping down the ceilings, whether the floor trusses in Unit A are the same as the trusses in Unit B. Likewise, it is unknown whether the trusses in one unit were installed in the same manner as the trusses in another unit. One cannot infer therefore that a problem with a truss in one unit means that there are problems with trusses in other units.

Construction on the condominiums commenced prior to 1983 and proceeded in phases over several years. Some of the individuals associated with the problematic units are original owners since 1983. In other effected units there have been multiple owners.

## II. <u>Insurance</u>

NLC insured Eagle's Nest Condominium Association pursuant to a commercial policy commencing on or about December 20, 2000 and continuing through December 22, 2004, with separate consecutive policy periods. Eagle's Nest did not notify NLC of any problems until March 15, 2004.

## III. <u>Loss</u>

On June 28, 2002, Joan Zeller, an association member who lived at 15C Eagles

Run, reported to Eagle's Nest's property manager that approximately one week earlier, she had run into another unit owner who reported that their dining room ceiling was sagging. Ms. Zeller wrote:

> ***"This came as no surprise as my living and dining room floors have been sinking for over a decade.*** *Every time I hear a loud cracking noise I break out in a cold sweat. My first concern of course is the correction of the structural stress before we have a catastrophe...The gentleman from your staff thought he'd have an answer by this coming Monday, July 1, 2002, after researching the blue prints from town hall to determined (sic) where the center beam was."* (Emphasis Supplied) (Exhibit A - Zeller Letter 6/28/02)

Shortly thereafter, Eagle's Nest retained an engineer to assess the problem in building 15. It was reported that there was a five (5) inch deflection in unit 15A. The engineer subsequently inspected condominium units in other buildings and found deflections of various degrees ranging from an inch and a half, to three inches. (Exhibit B – Bogle Report) He has since testified that the problem was due to the quality of materials used in making the trusses, which existed from the day they were installed some nineteen to twenty years earlier.

Through counsel, Eagle's Nest immediately began exploring its legal options. However, Eagle's Nest did not notify NLC of any problems and continued to renew its policies.

By February 10, 2003, Eagle's Nest had consulted with Sydney Smith, its insurance agent, who had nearly forty years of insurance experience. He reviewed the engineering report and determined that NLC's policy did not provide coverage for the loss.

With respect to placing NLC on notice, Eagle's Nest's insurance agent testified:

> *"I don't know if I would have used the term, pluses and minuses. But you can put a carrier on notice of a potential claim and the carrier has the*

> *right to investigate to determine a lot of the facts about the situation and then look at their policy to determine if they feel that there's coverage, that's not a position that I would be in. However, being a knowledgeable insurance person…I would recognize that this type of situation could be a very serious underwriting consideration of not only NLC, but any other carrier looking at the acceptability of the risk."* (Exhibit C, Deposition of Sidney Smith, P. 57, L22-P. 58, L9)

Mr. Smith was further asked:

Q. Did you discuss… [with Eagle's Nest's property manager] any potential pitfalls of putting NLC on notice of this loss?

A. I don't recall that specifically. But if by pitfalls you mean what could be some of the consequences of doing it, of putting NLC on notice, I can clearly understand why an insurance company would not want to stay on the risk or a new carrier to go on the risk. There's a lot of coverages under this type of policy besides collapse. But this could have an impact on the general liability. (Exhibit C, P. 58, L10-20)

Despite the insurance agent's position, Eagle's Nest's property manager recommended submitting the claim to its insurance carrier [NLC] and obtaining a denial letter. The Eagle's Nest Association rejected the advice and did not notify NLC of the problem. (Exhibit D, Deposition of Barbara Perino, P. 47, L21-25) Eagle's Nest then repaired four units without giving NLC the opportunity to inspect the conditions, verify their measurements or assess the cost. (Exhibit B)

In May of 2003, the Eagle's Nest Condominium Association discussed "insurance lawsuit updates" with their counsel. After discussing "insurance lawsuit updates" with their attorney, but prior to providing NLC with any notice, they repaired an additional eight units. (Exhibit B)

On or about March 15, 2004, twenty-one months after Eagle's Nest was undisputedly aware of a problem, thirteen months after they had consulted with their insurance agent, and ten months after they discussed "insurance lawsuit updates" with

their attorney, Eagle's Nest notified NLC of the problem. (Exhibit E – Aube Letter 3/15/04) By then, fourteen more units had been repaired without NLC having had the opportunity to assess the claim. (Exhibit B)

On June 30, 2004, one hundred and seven (107) days later, Eagle's Nest filed a lawsuit against NLC in the Kent County Superior Court. However, Eagle's Nest did not serve NLC with the complaint, nor did they provide NLC with a copy of the lawsuit.

On August 12, 2004, NLC, through its counsel, requested Eagle's Nest to produce various documents relating to the history of the property, the problem and various association meetings. (Exhibit F – Request 8/12/04) Eagle's Nest did not respond to this request.

On September 27, 2004, Eagle's Nest served the insurance commissioner with the complaint. Subsequently, the matter was removed to Federal Court.

On January 14, 2005, following the Court's mandatory conference, NLC served Eagle's Nest interrogatories and request for production of documents. Eagle's Nest responded to the discovery requests on or about August 1, 2005. It is at this point in time that NLC first learned about the June 28, 2002 Zeller letter. Additionally, the plaintiff provided the following response to Interrogatory 17:

For each unit you claim had defective trusses, please identify:

a. the unit number;
b. the unit owner;
c. the date the owner purchased the unit;
d. the date the problem was reported;
e. who determined the problem;
f. how the problem was determined;
g. what the problem was;
h. all repairs performed;
i. who performed the repair work;
j. the cost.

Plaintiff's Response to Interrogatory 17.:

> Plaintiff objects to answering this interrogatory as posed. Plaintiff has not kept a separate record that summarizes the requested information. Said information is irrelevant, and the question is not reasonably calculated to lead to the discovery of admissible evidence. What is more, it would be unduly burdensome, unduly expensive, and unduly oppressive to require Eagle's Nest Condominium Association, Inc. to attempt to answer this interrogatory as posed. Plaintiff could attempt to answer this interrogatory by reviewing the documents Plaintiffs produced in response to Defendant's production request. Defendant's however, are equally capable of doing so. Since it is Defendant's that seek such information, it should be Defendant's burden to do so. Without waiving this objection, Plaintiff incorporates as its answer to this interrogatory the various documents Plaintiffs have produced in response to Defendant's production requests. Plaintiff answers, further, that in approximately August of 2002, Steven Bogle orally informed the board of the problems with the trusses. Mr. Bogle followed this up in November 2002 with a written report of the truss problems. As further answer to this interrogatory, see Plaintiff's answer to interrogatory 4, which is incorporated by reference.

Presently, there are multiple coverage issues which are ripe for summary judgment determination.

## A. <u>THE PLAINTIFF FAILED TO FILE ITS COMPLAINT WITHIN THE POLICY'S TWO YEAR SUIT PROVISION</u>

The policy in issue provides in pertinent part:

*Legal Action against us*

*No one may bring a legal action against us under this coverage part unless:*

***

*2. The action is brought within two years after the date on which a direct physical loss or damage occurred.*

Rhode Island has long adhered to the validity of limitation periods in insurance contracts. <u>DiIorio v. Abington Mutual Fire Insurance Co</u>., 121 R.I. 689, 694; 402 A.2d 745, 747 (1979); <u>Hay, et al v. Pawtucket Mutual Ins. Co</u>, 824 A.2d 458, 460 (R.I. 2003).

Indeed the specific two year provision in issue was held valid in the matter of Maywood Corporation and Admiral Condominium Association v. NLC Insurance Company, 754 A.2d 109 (R.I. 2000).

The limitation period in an insurance contract runs from the date of the loss. DiIorio v. Abington Mutual Fire Insurance Co., 121 R.I. 689, 695; 402 A.2d 745, 748 (1979); Hay, et al v. Pawtucket Mutual Ins. Co, 824 A.2d 458, 460 (R.I. 2003). When, as here, the facts relevant to the issue of statute of limitations are not in dispute, resolution of the question becomes a matter of law and summary judgment is appropriate. Id.

In the instant matter, it is uncontroverted that prior to June 28, 2002, the plaintiff was aware there were substantial structural problems with the trusses. On that date Ms. Zeller wrote to Eagle's Nest property manager:

> *"About a week ago I had the occasion to catch up with Al Jackvony, son of Mrs. Jackvony in 15A.*
>
> ***
>
> *At the time he expressed concern about his mother's dining room ceiling and the fact it was sagging. This came as no surprise as my living and dining room floors have been sinking for over a decade. Now there is perceivable lean to all my furniture and you can feel the floor sloping as you walk across it. It was frightening to learn it had sagged enough to caused (sic) Mrs. Jackvony's ceiling to sag too. Every time I hear a loud cracking noise I break out in a cold sweat...My first concern of course is the correction of the structural stress before we have a catastrophe but just as important is the time frame in which this will be done.*
>
> ***
>
> *Needless to say, I would like to see this thing resolved ASAP and look forward to hearing the planned solution and time-frame for action to be taken, as soon as possible. The gentleman from your staff thought he'd have an answer by this coming Monday, July 1, 2002, after researching the blue prints from town hall to determine where the center beam was.* (Exhibit A)

Ms. Zeller's description of the defect is "sufficiently significant to alert [the

plaintiff] to the possibility of a defect". See Lee v. Morin, 469 A.2d 358, 360 (R.I. 1983)

In Lee v. Morin, supra, the Rhode Island Supreme Court held that with respect to improvements to real property, the statute of limitations begins to run when the evidence of injury to property is sufficiently significant to alert the injured party to the possibility of a defect. Id. See Lally v. Allstate Ins. Co., 724 F. Supp. 760, 761-63 (S.D. Cal. 1989) aff'd 930 F. 2d 28 (9th Cir. 1991) (reasonable person on notice of loss when damage is reasonably observable not after geologist report identifying cause).

In addition, and consistent with Ms. Zeller's observation that the structural problem had existed for a substantial period of time prior to June 2002, the owner of unit 3C reported at the owners' meeting of December 9, 2003 that, " two years ago she reported a deflection in her basement. Nothing was done so her husband braced it. Called for an inspection by an engineer, but has not happened." (Exhibit G- 12/9/03 Executive Minutes)

Ms. Broussard, a former president of Eagle's Nest Condominium Association, testified that Eagle's Nest knew in June 2002 that "indications are there is insufficient central beam support as floors are bowing." (Exhibit H, Deposition of Ms. Broussard, P. 26)

In her June 2002 report, Barbara Perrino, Eagle's Nest's property manager, wrote:

> *A structural problem in building 15 is under review with Geisser Engineering. This appears to be a serious problem and we will forward information as soon as possible. This quadplex apparently was the first quadplex constructed during development. Indications are that there is insufficient central beam support as floors are bowing.* (Exhibit I – Perrino Report 6/2002*)*

The November 18, 2002, Eagle's Nest Condominium Association's board meeting minutes state:

> *"Building 15: First regarding legal avenues the board may pursue regarding the structural issues, there seems to be some confusion as to the limitations imposed by law. The question is- can action be taken from date of discovery or date of completion? Do we have a case or don't we? Can we go ahead and pursue legal action against the appropriate parties? Do we have a case or not? It was requested of [counsel for Eagle's Nest] to provide specifics and outline chances of success. The board is eager to move on the issue."* (Exhibit J – 11/18/02 Executive Minutes)

On June 30, 2004[1], Eagle's Nest Condominium Association's adjuster wrote to James Hainey at RJ Marguetta Adjustment, NLC's independent adjuster, stating:

> *"Please be advised that on this date, and pursuant to the terms of the Commercial Policy Conditions, the insured, Eagle Nest Condominium Association has filed a legal action against New London County Mutual Insurance Company for damages sustained to property as a result of collapse.*
> *Our records indicate... that the date of loss is July 2002 and not the referenced date of loss of 11/29/02 as it appears in you letter of 5/28/04 to the insured and thus the two year anniversary is approaching."*
> (Exhibit K – 6/30/04 Letter)

This correspondence from Eagle's Nest's insurance adjuster demonstrates that "the plaintiff was not lulled by the insurer into a reasonable belief that [her] claim would be settled without suit, but instead felt compelled to bring suit against the insurer to enforce [her] claim" DiIorio v. Abington Mutual Fire Insurance Co., 121 R.I. 689, 695; 402 A.2d 745 (1979).

Ms. Zeller's correspondence of June 28, 2002 conclusively establishes that at a minimum, the loss occurred at least one week before June 28, 2002. Thus, the filing of the Complaint on June 30, 2004 was, as a matter of law, not within the two year suit provision.

## B. THE PLAINTIFF'S DELIBERATE FAILURE TO PROVIDE NLC WITH PROMPT NOTICE PRECLUDES COVERAGE

[1] Eagle's Nest Condominium Association filed an action against "NLC' in the Kent County Superior Court on June 30, 2004.

Like all liability policies, NLC's policies required Eagle's Nest to provide them with prompt notice of the loss.

The pertinent portion of the insurance policies provides:

DUTIES IN THE EVENT OF LOSS OR DAMAGE

> a. You must see that the following are done in the event of loss or damage to covered property:
>
> ***
>
> (2) Give us prompt notice of the loss or damage, include a description of the property involved;
> (3) As soon as possible, give us a description of how and where the loss or damage occurred.

"The purpose of a policy provision requiring the insured to give the company prompt notice... of a claim is to give the insurer an opportunity to make a timely and adequate investigation of all the circumstances. An adequate investigation often cannot be made where notice is long delayed because of the possible removal or lapse of memory on the part of witnesses, the loss of opportunity for examination of the physical surroundings...Such a requirement [for timely notice] tends to protect the insurer against... invalid claims made in good faith." 8 Appleman, Insurance Law and Practice § 4734 (2nd Ed); 13 G. Couch, Cyclopedia of Insurance Law §49.39-49.48 (2nd Ed).

Stated more succinctly, the notification serves to facilitate the timely investigation of claims by bringing an event to the attention of an insurer that allows an inquiry "before the scent of factual investigation grows cold". Textron, Inc. v. Liberty Mutual Ins. Co., 639 A.2d 1358, 1364 (R.I. 1994)

"In determining whether notice was given within a reasonable time, the following circumstances, among others, have been considered to be relevant: the length of delay in

giving the notice, the reasons for the delay, and the probable effect of the delay on the insurer." 8 Appleman, Insurance Law and Practice, § 4734 at 29. Consideration of the effect of the delayed notice involves the extent of any prejudice suffered by an insurer given it was not notified of a loss or claim within a reasonable time. Pickering v. American Employers Ins. Co., 109 R.I. 143, 158 (1971).

The uncontroverted chronology of events conclusively demonstrates that Eagle's Nest made a conscious decision not to promptly notify NLC, thus depriving NLC of the opportunity to examine critical evidence.

In June of 2002, Eagle's Nest knew that they had a substantial structural problem. By July 2002, they had an engineering report and an attorney. By February 10, 2003, they consulted with their insurance agent, who had more than forty years of experience. More importantly, as of February 10, 2003, they rejected their property manager's recommendation to submit the claim to the carrier to obtain a denial letter. Eagle's Nest then waited an additional thirteen months to put NLC on notice of the claim. During that thirteen month period, Eagle's Nest repaired thirteen units, depriving NLC of the ability to verify the conditions and assess the repairs, or gather critical evidence to determine whether the loss commenced during its policy periods.

It must be remembered that in June of 2002, NLC had only insured the property for eighteen months. We know that Ms. Zeller stated that the problem had existed for ten years. We also know the owners of Unit 3C stated that they had reported the problem two years earlier. They have since moved to Florida.

The plaintiff's expert states that the defect causing the problem existed from the date of construction, some eighteen to nineteen years earlier. The plaintiff's expert

testified that the condition had existed for a while, but he could not estimate as to how long.

According to the reports made by the plaintiffs, the units that were repaired before NLC was put on notice, had the most significant problems. Units such as 15A and 15B had five inches of deflection; Units 22A and 22B had three inches deflection; Units 40A and 40B had two inches of deflection. (Exhibit B) An examination of the condition in these units would have revealed the best evidence as to how long the problem existed. All of these units were repaired before NLC had notice of the claim. Some of the owners of the affected units, including Unit 3C, have since moved. Even for the witnesses who are still available it would be unreasonable to expect them to fully recall events which occurred years before.

There is nothing to suggest that plaintiff's engineer or anyone else had any interest in determining when the damage occurred when they did the initial inspection. See Carl v. Oregon Auto. Ins. Company/North Pac. Ins. Co., 141 Ore. App. 515 (1996) (insured failed to give timely notice where it removed evidence without regard for when loss occurred even though it took photos).

The plaintiff's failure to provide timely notice was compounded by its lack of cooperation after notice was given. On August 12, 2004, Eagle's Nest was asked to provide a series of documents so that NLC could investigate this loss. (Exhibit F) The documents requested in this letter were not produced until August 1, 2005, when the plaintiff responded to NLC's discovery requests.

The Rhode Island Supreme Court has held that sufficient prejudice is shown when an insurer is denied the opportunity to investigate the cause and nature of the claim or

occurrence while the facts are still fresh in the minds of the parties and while the physical evidence is still fresh. Textron, Inc. v. Liberty Mut. Ins. Co., 639 A.2d 1358 (R.I. 1994); Avco Corp. v. Aetna Cas. & Sur. Co., et al, 679 A.2d 323, 329 (R.I. 1996); Eastern Products Corp. v. Cont'l Cas. Co., 58 Mass. App. Ct. 16 (Mass. 2003). This is precisely what has occurred in this matter.

The Rhode Island Supreme Court has consistently held that the issue of prejudice is not a mechanical rule to apply without analysis of the underlying facts. Textron, Inc., supra,; Avco Corp., supra,; Donahugh v. Hartford Ins. Co., 110 R.I. 603, 605, 295 A.2d 693, 694 (1972). In Avco, the Rhode Island Supreme Court stated, "Avco is presumed to have more sophistication in managing its affairs than the average consumer and thus should be able to recognize and adhere to notice provisions in contracts of insurance that require it to contact its carrier 'as soon as practicable' in the event of an occurrence." Id.

Here, the evidence conclusively demonstrates that Eagle's Nest had the sophistication to understand the importance of providing notice. After June of 2002, they had retained an engineer and were aware of the circumstances surrounding the problem. They had an attorney exploring the possibility of legal action. They had their insurance agent, who had at least forty years of experience, review the report. They did not follow their property manager's suggestion to submit the claim and obtain a denial letter.

The plaintiff's deliberate delay in notifying NLC should not inure to their benefit where critical evidence has been lost. The plaintiff's 21 month delay in notifying NLC during which time they lost critical evidence, precludes coverage as a matter of law.

## C. THE PLAINTIFF BEARS THE BURDEN OF PROVING THAT THE COLLAPSE OCCURRED DURING NLC'S POLICY PERIOD

The NLC policy only covers:

*Loss or damage commencing:*

*a. During the policy period shown in the Declarations*

As a matter of law, the insured seeking to establish coverage bears the burden of proving a prima facie case, including but not limited to the existence and validity of a policy, the loss as within the policy coverage, and the insurer's refusal to make payments as required by the terms of the policy. General Accident Ins. Co. v. American Nat'l Fireproofing, 716 A.2d 751, 757 (R.I. 1998). Consistent with this burden, it is Eagle's Nest's responsibility to demonstrate that the loss occurred during NLC's policy period, and not prior or subsequent thereto. Davidson v. United Fire & Casualty Co., 576 So. 2d. 586, 590 (La. 1991).

In Davidson, the court held, "the burden is on the insured to prove that the collapse occurred during a particular carrier's policy period". Id. at 590. There, the insured's home sustained a "collapse" due to termite infestation which occurred over a number of years. The insured testified that she was unaware of property damage prior to one of the policy periods. Two experts testified that there was no way to determine when the damage occurred or over how long a period of time it occurred. Id. The Court, finding for the insurers, held that the fact that a disputed issue was difficult to prove did not lessen the insured's burden in this regard. Id.

Like the insured in Davidson, the uncontroverted evidence demonstrates that Eagle's Nest cannot meet its burden of demonstrating that this loss commenced during NLC's policy period and not prior thereto.

Bogle, one of the plaintiff's experts, is of the opinion that when live loads were brought into the building, the units exhibited excessive deflection and went into a "state

of failure". (Exhibit L, Deposition of Bogle 7/6/06, P.47) This would have been some time after the initial construction of Eagle's Nest in the 1980s, and at a minimum of fifteen years before NLC ever insured the premises.

Alawa, the plaintiff's other expert, was essentially of the same opinion. (Exhibit M, Deposition of Alawa, P. 73)

Alawa was asked:

Q. So that if the condominiums were constructed in 1984, and sombody moved in on January 1, 1985, the failure would have occurred in 1985; is that correct?

A. I can explain. After – usually people move gradually. They do not move in with full-blown scale, right. So it's after people moved in, the structural status of these trusses was that the bottom chord was overstressed. Overstressed will constitute a failure.

Q. When the people completely moved in, they moved all their couches, their tv, and they were living there?

A. Right.

(Exhibit M, P 73 L 1-20)
Q. In 1985 – assume that all occurred in 1985, the failure would have occurred in 1985, correct?

A. Right.

Later, at his continued deposition, Alawa testified:

Q. You testified last time you would expect the failure would have occurred when the live load was applied, correct?

A. When the capacity is reached.

Q. You testified that would have been when the people were moving in in 1985, correct?

A. Right.

Q. That's when the failure, occurred in 1985, correct?

A. Not necessarily. Not necessarily. We don't know. The bottom line is we don't know when that failure happened.

Q. You've done an analysis and said these trusses can only hold a certain amount. If you exceed that amount, what are we going to see instantly?

A. **What will happen is that wood is organic material, it does not fail overnight. It takes time. So the failure will develop in the members. We don't know. I will not be able to be positive on when that failure happened. I cannot say for that. (Emphasis Supplied) (Exhibit M, Vol. II, P.153, L20 –P.154, L15)**

**Cracked Trusses**

With respect to those trusses which had cracks, Bogle agreed that it was possible they could have existed since the day of construction. Bogle was asked:

Q. So, the fact is, all of those photographs that you had the cracks and the knots, they could have been existing from since the day of construction and they just didn't feel like repairing them, that's...a possible, correct?

A. I guess I would say it is a possibility, yes.

(Exhibit L, P.175, L9-14)

Based upon Bogle's photographs, we know that there was a crack in the bottom chord of the truss in Unit 45B which occurred during construction, and was repaired during construction. (Exhibit L, P.173, L19-25) We also know there was a crack in the truss at Unit 9A which was repaired prior to Bogle's involvement. He believes it was repaired prior to 2000.

Additionally, at least two unit owners reported that the problem had been in existence for a substantial period of time prior to June 2002. Ms. Perrino also testified that it was her understanding that the trusses began sagging over a period of years. (Exhibit D, P. 53, L17-22)

Thus, the plaintiff can not sustain its burden of proving that a loss occurred during NLC's policy period.

## D. THE PLAINTIFF CAN NOT SUSTAIN ITS BURDEN OF PROVING THAT THERE WAS A COLLAPSE CAUSED BY A COVERED PERIL

The condominium association coverage form provides in pertinent part:

*A. COVERAGE*

*We will pay for direct physical loss of or damage to Covered Property caused by or resulting from any Covered Cause of Loss.*

*D. ADDITIONAL COVERAGE-COLLAPSE*

*The term Covered Cause of Loss includes the Additional Coverage-Collapse as described and limited in D.1 through D.5 below.*

*1. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following:*

***

*d. Weight of people or personal property;*

***

*f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in D.1 through D.1e., we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.*

Here, the policy "does not provide coverage for collapse unless the collapse result[ed] from one or more of the … enumerated causes". State Farm Fire & Cas. Co. v. Shady Grove Baptist Church, 838 So. 2d 1039, 1043 (Ala. 2002). "It is not [NLC's] position … that the collapse was excluded from coverage; rather, [NLC] asserts that the collapse was not covered under the policy. Therefore, this is not a case in which [Eagle's Nest] has to prove that a collapse, as defined within the policy, has occurred and [NLC] then has to prove that a certain exclusion within the policy removed the collapse from the scope of its coverage.(Citations Omitted) Rather, in resisting [NLC's] motion for [summary] judgment …, [Eagle's Nest] must … [submit] substantial evidence showing that the collapse fit[s] within the definition of that term in the policy and that it was

covered under the policy by virtue of its being caused by at least one of the ...enumerated causes provided in the policy." Id. See also Paula B. Tarr et al., Insurance Coverage for Collapse Claims: Evolving Standards and Legal Theories, 34 Tort & Ins. L.J. 57, 59 (1999) ("Collapse is not a peril but rather a result of other perils" the policy provide[s] collapse coverage only if the cause or causes of the collapse were among those listed.)

To sustain its burden, the plaintiff must produce competent evidence that for each unit there was a collapse attributable to one of the covered causes, here, "weight of people or personal property". Bohanan v. Farmer's Ins. Of Columbus, Inc., No. 03-CAE12066, 2004 Ohio App. LEXIS at P29; Fernandes v. Allstate Ins. Co., 305 A.2d 1065 (2003); State Farm Fire and Casualty Co. v. Shady Grove Baptist Church, 838 So.2d 1039, 1043 (Ala. 2002). The law is clear that the causal connection between an event and an incident must be established by competent proof and cannot be based upon conjecture or speculation. Hernandez v. Fernandez, 697 A.2d 1101, 1103 (R.I. 1997) quoting Fondedile, S.A. v. C.E. Maguire, Inc., 610 A.2d 87, 95 (R.I. 1992). "Speculation cannot fill the void left by a lack of proof." Moore v. Chesapeake & O.R. Company, 340 U.S. 573, 577 (1951).

"When, as here, the issue of causation is presented in a context which is not a matter of common knowledge, such a reasonable probability can only be proven by the testimony of a competent expert witness." Money et al. v. Manville Corp. Asbestos Disease Compensation Trust Fund, et al., 596 A.2d 1372, 1377 (Del. 1991); W. Keeton Prosser & Keeton on the Law of Torts, 269 (5th Ed. 1984). Neely v. St. Paul Fire and Marine Ins. Co., 584 F.2d 341 (9th Cir. 1978) (affirming grant of summary judgment where plaintiff's affidavits did not provide sufficient evidence from which to infer that

one explanation of the cause of injury was more likely true than another). See Goffredo v. Mercedes-Benz Truck Company, 520 N.E. 2d 1315, 1319 (Mass. 1988) ("Without the testimony of an expert as to the amount of force necessary to cause the door to open, the evidence was insufficient to establish that the design of the door was defective." ).

Plaintiff can not sustain its burden of proof, for reasons set forth in NLC's memorandum of law to strike the plaintiff's experts. Simply stated, the plaintiff can not identify a specific point in time and state to a reasonable degree of engineering probability when a "collapse" occurred, including one caused by the "weight of persons or property".

**The Facts Do Not Support a Finding of Collapse**

Ignoring for the moment the fact that the plaintiff has not shown via admissible evidence that the problem is due to a covered peril, the plaintiff has not even shown that there is a collapse.

In 2003 Hardpine, Inc. inspected the trusses on behalf of the Eagle's Nest Condominium Association and reported that "based on field observations and structural calculations, the ...trusses do not meet the minimum design criteria or codes and might collapse under normal loads". (Plaintiff's Response to Admissions)

To date no unit has ever sustained an actual collapse. No ceiling has ever fallen down at the complex. Nor has any unit sustained direct physical loss or damage as a result of a collapse. No one at the complex vacated their premises except when repairs were being performed.

The action taken to reinforce certain trusses were precautionary measures, undertaken to respond to a perceived condition which "might" cause a condition at some

undefined point in the future. According to the plaintiff's engineering report of January 27, 2003, they used "an inch and one half deflection as indicative that a truss posed a problem and needed to be reinforced".[2] Many units have no reported deflections[3] more than 20 years after construction,[4] while other units reported acceptable deflection limits as established by the plaintiff's engineer.[5] (Exhibit B). As a matter of law the Plaintiffs cannot recover for any problems that did not manifest itself during NLC's policy period.

As evidence that these units are structurally sound, the plaintiff's engineer wrote with respect to Unit 37B, "based on the most recent measurements taken in the above referenced unit there is currently no need to perform any structural modifications to the floor system. Although we cannot guarantee the floor system in this particular unit, will continue to operate satisfactorily, the relatively small amount of deflection recently measured indicates that the floor system is working quite well and shows no sign of needing any structural repairs in the short term future". (Exhibit N - October 7, 2004 Bogle Letter) Notably, there was a five eighths inch deflection in one of the units that had been repaired, which the plaintiff's engineer deemed to be structurally sound. (Exhibit O - January 2, 2004 Bogle Letter)

**The Deflection Readings**

---

[2] In addition to the previously referenced units, according to the plaintiff's report, the following units did not need to be reinenforced: 1A, 24B, 38A, 38B, 45B, and 46D.

[3] A "deflection reading" indicates the amount of sag in a structure.

[4] Units with no deflection: 3A, 3C, 5A, 5B, 5C, 5D, 9A, 9B, 15D, 17C, 17D, 20D, 22C, 22D, 26B, 24C, 34D, 38C, 38D, 39C, 39D, 40C, 40D

[5] Units with acceptable deflection: 1B, 2A, 2B, 3B, 4A, 4B, 6A, 6B, 7A, 9C, 9D, 10A, 10B, 11A, 11B, 12A, 12B, 16A, 16B, 18A, 19B, 20C, 21A, 21B, 25B, 26A, 27A, 27B, 28A, 28B, 29A, 29B, 29C, 29D, 30A, 30B, 31A, 31B, 32B, 33A, 33B, 35A, 35B, 36A, 36B, 37B, 37C, 37D, 41A, 41B, 42B, 43A, 43B, 44A, 44B, 46A, 46B, 46C, 47A, and 47B. It is now 50 months since Mrs. Zeller wrote her letter, and 22 months since NLC did not renew the policy, and no action has been taken with respect to approximately 68-70 units. Plaintiff's counsel represents that due to the configuration of the units, there are only 106 units which can be affected.

Both Bogle and Alawa agree that the deflection readings taken at the subject premises are not reliable. The deflection readings were not performed by an engineer, but rather by the property manager's maintenance person. Additionally, the deflection readings were taken while the ceilings were in place. (Exhibit L, P. 70, L19- P. 71, L4) Plaintiffs' experts further admit that their methodology for taking measurements in this case is not reliable due to the imperfection in construction and the fact that things are frequently built crooked. Thus, the readings could possibly be off by as much as a half inch. (Exhibit L, P.74 L2-24)

Mr. Bogle testified:

Q. How do you take the measurements?

A. At that time they were less sophisticated. They were, Brett [the handyman] was using his level and just measuring.

(Exhibit P, Deposition of Bogle 9/16/05, P. 69, L25- P. 70, L2)

***

Q. And some of them, and the measurements were, the early measurements were imprecise?

A. I would say they may not have been the most accurate. It probably would have been better to run a string even with a laser, setting it up a, on an even, you know, some of the floors were uneven, so you wouldn't get proper measurements that way. I think the best way would be run a dry line that's at a fixed height above the floor and then measure along that. And we should be able to get a much better, more accurate readings. But the original measurements were taken using the level off the ceiling. (Exhibit P, P70 L17; P71 L3)

**Creep**

Bogle did not consider the issue of "creep". Creep has been defined as, "a property of wood that causes trusses under a sustained long-term (dead load) to deflect more and more with time. This can increase the calculated immediate dead load

deflection one-and-one half to two times." (MiTek Literature) With respect to creep, MiTek's literature states, "regardless of what the codes say, most people regard large levels of deflection (usually referred to as sag in this context) as a sign of structural deficiency."

Accordingly, the plaintiff's proposed experts cannot opine that a truss is in a "state of failure" because of an excessive deflection, when they admit that the deflection readings are unreliable. To compound this problem, Bogle took the admittedly unreliable deflection readings, and applied them to an inappropriate formula.

The building code sets forth two formulas, L/240 and L/360, for determining excessive deflection. L/240 is the length of the trusses in inches divided by 240. L/360 is the length of trusses in inches divided by 360.

The code requires the L/240 formula to be used to determine the combined total deflection which includes live load. Bogle admits that the L/240 formula permits a greater allowable deflection. (Exhibit L, P.126 L23; P127 L3) In determining whether the trusses were exhibiting excessive deflection, Bogle used the L/360 formula which does not account for any live load. Bogle, in his report states, "at the time the deflection measurements were taken, the trusses were supporting total dead load plus a small percentage of the required live load, **that is why I held the deflection criteria to a more stringent level**". (Emphasis supplied). Bogle states that he used the L/360 formula as a matter of precaution for repairs. Bogle has admitted that had he used the L/240 formula, many of the trusses would have been deemed to have acceptable deflection limits.

The fact of the matter is that there was live load in the units, which could have been determined. At no point in time did the plaintiff conduct a test to determine what

amount of deflection was due to just dead load. (Exhibit L, P.90 L17-22) The test to determine dead load could have been easily done by removing all of the furniture in the room and then taking a deflection readings in an appropriate fashion. (Exhibit L, P.90 L23; P91 L18) The furnishings removed could then be weighed, and the number of persons residing in the unit taken into account, in order to approximate live load. However, at no point in time did the plaintiff determine the total amount of live load in any unit. Bogle simply does not know what furniture or people were in place when the deflection readings were being taken, much less whether these loads exceeded the live load guidelines. Accordingly, his opinion is unreliable. Thus the Plaintiff cannot sustain its burden of proving a collapse due to an enumerated peril.

The decision in Campbell, et al. v. Norfolk & Dedham Mutual Fire Insurance Company, 682 A.2d 933 (R.I. 1996) is inapplicable to this matter. In Norfolk & Dedham the Rhode Island Supreme Court interpreted the meaning of a "collapse" provision in a substantively different factual context, and with substantially different policy terms.

The insurer in Norfolk & Dedham denied the claim on the basis of an exclusion which is not in issue in this matter. Moreover, the cases are factually distinguishable, which renders the application of Norfolk & Dedham to this matter inappropriate.

In Norfolk & Dedham the insureds had a homeowner's policy for a single-family dwelling. A nineteen-foot section of the thirty-two foot foundation wall to their home "collapsed and crumbled into rubble in the basement". Id. at 934 As a result of the collapse, the floors of the home became unleveled and continued to shift rendering the home "uninhabitable". The insurer denied the claim "on the basis of the exclusion for loss caused by earth movement or ground water." An engineer retained by the insured

reported "that water had no part in the collapse", but was due to "hidden decay". The policy provided in pertinent part:

> Collapse. We insure for direct physical loss to covered property **involving collapse** of a building or any part of a building caused only by one or more of the following:
>
> b. hidden decay
>
> Loss to ..., foundation, *** is not included under items b, c, d, e, and f unless the loss is a direct result of the collapse of a building. Id. at 935.

The insured asserted that this provision was ambiguous because it covers collapse of a building or any part of a building that is due to hidden decay, but it then excludes coverage for loss to the homeowner's foundation except when the loss is caused by the collapse of a building. The Supreme Court defined the issue to be:

> *[W]hether it is reasonable for the purchaser of an insurance contract to believe that the collapse of a nineteen-foot section of thirty-two foot basement wall that eventually renders his home uninhabitable constitutes a "collapse of a building". Id. at 936.*

The Court observed:

> *In construing insurance clauses similar to the one here, many courts have found that the use of the word collapse in an insurance policy does not require the total destruction of a building because to require a party to await complete destruction before losses will be covered frustrates an insured's understanding of the insurance agreement and subverts his or her duty to mitigate damages and to avoid economic waste. (Citations omitted). Id.*
>
> ***
>
> *In effect, to require that any loss to a foundation be recoverable only if it results from the complete collapse of a building would render illusory as applied to the foundation the earlier policy provision purporting to insure against the risk of 'collapse of a building or any part of a building.' Id.*

The court therefore vacated the summary judgment finding in favor of the insurer and remanded the matter to the superior court for further proceedings consistent with its holdings, presumably to determine the cause of the collapse.

The decision in Norfolk v. Dedham does not provide any guidance as to what constitutes a "collapse" short of a total failure, which never occured here. "The fact remains that determining whether a collapse has occurred rests largely on the degree of damage." (Couch On Insurance 2d, 48:178 at 185) See Dreiblatt, et al. v. St. Paul Fire & Marine Insurance Company, 264 F.3d 126 (1st Cir. 2001).

Factually, this matter is closely analogous to the situation presented in Dreiblatt, et al. v. St. Paul Fire & Marine Insurance Company, 264 F.3d 126 (1st Cir. 2001). There, the insured, a condominium complex, noticed problems with its roofs after a snowstorm. The condominium buildings had flat roofs constructed of wood trusses supported by wood and metal webs covered with plywood sheathing and a rubber membrane. The ceiling of the top unit in each apartment building was made of plaster attached directly to the roof structure.

Following the snowstorm, a unit owner discovered that his living room ceiling was hanging down several inches. The ceiling was repaired and St. Paul paid for the damage. The Condominium Association subsequently hired an engineer who determined that several of the metal trusses failed and were severely corroded and that the problem extended to roof supports in many of the other units. The building inspector determined that at least some parts of the roof systems had rusted and deteriorated, and issued a citation warning the owners that the ceilings needed to be repaired. There, as here, the

Association conducted "deflection readings" of all of the units. It was determined that a number of the deflection readings exceeded that allowable under the Massachusetts Building Code but none of the measurements showed deflection of greater than one inch. Based on these deflection readings, the Condominium Association's expert testified that there had been a complete collapse of the plywood deck resulting from the snowstorm. The insurer's engineering firm was of the opinion that there had been differing amounts of corrosion within the roof and some deflection of the roof system, but due to load redistribution and the associated deflections, it did not "collapse".

St. Paul's policy covered against the risk of direct physical loss or damage involving collapse of a building or any part of the building due to causes including the weight of ice and snow or sleet. There as here, the policy did not define collapse, but did note that "collapse does not include settling, cracking, bulging, shrinking or expansion. The policy also denied coverage for loss caused or exacerbated by wear and tear, or deterioration, mold, wet or dry rock, rust or corrosion. St. Paul therefore denied the claim reasoning that there was no collapse and litigation ensued.

The First Circuit deferred a collapse to encompass three elements: suddenness, a perceptible change in appearance, and completeness. Applying this standard, the District Court found that the problems with the roof and ceiling did not constitute a collapse. In finding for St. Paul, the District Court held that the roof still performed its basic functions:

> *[A collapse] must result in some significant primary ... element of the structure becoming disengaged or falling down so that it no longer is performing its characteristic function in the building. The requirements of a "collapse" cannot be satisfied by mere 'flaking' or "bending," nor may it be satisfied by compression, shifting, sagging, or 'deflection' of a few inches.* ***The breakdown of subsidiary elements such as several metal webs is not in itself sufficient to constitute a collapse.*** *(Emphasis*

*Supplied)* *Id.* *at 129.*

The insured appealed this decision to the First Circuit arguing that a "loss of structural integrity coupled with some movement or alteration of the appearance of a portion of the building could indeed be collapse. It further argued that under this revised definition, they introduced sufficient facts to survive summary judgment: (i) that structural elements within the...roof failed and in some instances became detached; (ii) that ceilings sagged perceptibly; (iii) that there were measurable deflection readings; and (iv) that there was "ponding" on roof surfaces. Id. at 130.

The First Circuit rejected this argument, noting that other than one roof, there was no evidence that the ceilings sagged perceptibly to the naked eye. Additionally, the Court noted, "although the roof deflection was measurable using a specialized apparatus called a "story pole," and was significant enough in some cases to violate the Massachusetts building code, the insured had not suggested that a deflection of less than one inch could be perceived without engineering knowledge and equipment. The Court then held that as a matter of law, a deflection of less than one inch is insufficient to create a noticeably altered physical appearance in the building. The policy's exclusion of settling, cracking, bulging, shrinking or expansion from the definition of a collapse further supported the determination that *de minimus* deflection does not meet the legal definition of collapse. Id. at 131.

The First Circuit Court of Appeals held that:

> *Appellants [the insureds] have not introduced sufficient evidence to satisfy that aspect of the definition with which they agree, nor have they placed any material facts at issue sufficiently require a trial.* *Id.* *at 131.*

A similar result was reached by the Court in Hilton Head Resort Four Seasons

Ctr. Horizontal Prop. Regime Council of Co-Owners, Inc. v. General Star Indemnity Co., 357 F.Supp. 2d 885 (D.S.C. 2005) In Hilton Head, the insured had two mansard roofs which suffered damage and were reportedly in imminent danger of collapse, but the roofs had not physically fallen off the buildings or been replaced. It was undisputed that none of the roofs suffered "an actual collapse" or direct physical loss or damage as a result of a collapse. Id. at 888 Rather, the insured had roofs with deteriorated wood that were "in imminent danger of collapse". Id. The insured relied upon a previous South Carolina case, Ocean Winds Council of Co-Owners, Inc. v. Auto-Owner Ins. Co., 350 S.C. 268, 565 S.E.2d 306. The court in Ocean Winds held:

> *To construe the phrase "risks of direct physical loss involving collapse" as requiring actual collapse is too narrow an interpretation. This phrase is more expansive than the word collapse and appears to cover even the threat or loss from collapse. We find a requirement of imminent collapse is the most reasonable construction of the policy language covering risks of direct physical loss involving collapse. We define imminent collapse to mean collapse is likely to happen without delay... Ocean Winds Council of Co-Owners, Inc. v. Auto-Owner Ins. Co., 350 S.C. 268, 565 S.E.2d 306 at 308 (2002).*

The Federal District Court in Hilton Head, held that the reasoning in Ocean Winds, was not applicable because of the different wording in the policies. In ruling for the insurer, the court held:

> *It is undisputed that none of the [roofs] or any part of them, suffered an actual collapse during the applicable policy period, or indeed have collapsed to this date. Moreover, the Plaintiff has demonstrated nothing to indicate any direct physical loss or damage as a direct result of a collapse of the mansard roofs. At most, the Plaintiff has mansard roofs with deteriorated wood, in "imminent danger of collapse" for over three years, which have not caused any direct loss or damage to any covered property. General Star [the insurer] had no duty under the insurance contract to provide coverage. Id. at 888.*

Eagle's Nest has advanced even less evidence than the insureds in Dreiblatt and

Hilton Head; accordingly, NLC is entitled to summary judgment.

In this particular case, it is undisputed that the trusses were defective due to the use of defective materials and methods in construction, which is not covered by the policy. It does state however, "if the collapse occurs after construction…is complete and is caused in part by a cause of loss…[weight of people or personal property], we will pay for the loss or damage even if use of defective materials or methods in construction contributed to the collapse".

Here, it is undisputed that the trusses should have been designed, constructed and installed so as to hold the requirements prescribed by the building code. It is undisputed that because of defective materials and construction, the trusses cannot carry the normal design loads required by the building code.

Specifically, Steven Bogle of Geisser Engineering testified that the materials used in the trusses were of insufficient quality when they were originally constructed. (Exhibit P, P59 L11-19) He further testified that excessive loads were not causing the problem, since the trusses could not hold the regular loads. (Exhibit P, P68 L10-25)

However, plaintiff nonetheless asserts that this clause affords coverage if "any weight, people or personal property, contributes to the failure of a truss", an absurd reading of the policy that renders the construction defect provision and the building code provisions a nullity. If the plaintiff's argument is accurate, there would be no problem with the trusses if they were designed, constructed and installed properly. Accordingly, the sole proximate cause of the problem are the trusses, not the weight of persons or property.

By law, however, the applicable building codes set the standard for what weight a

truss must be able to support. The building code requirements anticipate that there will be people, fixtures, furniture, and appliances on top of the truss – these are "normal loads". Plaintiff's expert concedes that the trusses at Eagle's Nest were not capable of meeting these requirements from the day they were installed, and did not meet building code requirements. (Exhibit P, P68 L16-L22)

Where plaintiff's own expert conceded that the minimum requirements prescribed by the building code were not met at the time of construction, any argument that the damage at issue in this suit should be covered as caused by "weight of persons or property" because the initial defect visibly and inevitably manifested itself is absurd. The conditions causing the defects complained of are clearly due to the initial use of inadequate materials during the performance of inadequate construction; this is an excluded cause.

Further, plaintiff's own insurance agent testified that he read the policy consistently with NLC's position. Mr. Smith, who has forty years of experience in the insurance industry,[6] testified that he was presented with the engineering report in this

[6] After graduating from college, Mr. Smith entered a training program at Travelers Insurance Company where he became an underwriter, dealing with the acceptability or non-acceptability of a risk. He has taken courses in charter property and casualty underwriting and has a designation as an associate in risk management. This is a professional designation that addresses legal issues of transfer of legal liability or risk. He had continuing education to maintain his producer's license, which includes fifteen credits an hour. He attended many seminars on insurance and CPCU meetings. He was employed by Travelers for 12 ½ years, where he also worked as a commercial lines underwriter. While at Travelers, he was an assistant manager in commercial lines for the underwriting of major accounts and major agencies. He was also involved in managing the commercial lines department and training the underwriters staff. After leaving Travelers he became a manager at Frank B. Hall, an international insurance brokerage firm. At Frank B. Hall, he was responsible for administration of commercial and personal lines and training. In that position, he was involved with questions regarding interpretations of insurance policies. While at Frank B. Hall, he wrote insurance and was the only producer of certain bank industries such as National Bank, Citizens Financial and Old Stone. In that position, he assessed potential risks an entity may have and the types of policies that would cover those risks He subsequently worked for an entity called Davis, Bateman & Nugent which dealt with commercial accounts where he assumed the post of vice president of marketing. When he left this entity in 1995, he was vice president of financial institutions and vice president of the company. In 1995, he opened his own insurance agency, Smith, Mack & Associates, Inc., where he writes commercial accounts and accounts for condominiums. (Ex C, P. 60- P. 72)

matter relative to the defectively constructed trusses. He testified, "if the engineering report was correct, my feeling was generally you would not find that kind of coverage under a policy such as NLC's, which is a first party property policy". (Exhibit C, P. 74)

Mr. Smith also testified as follows:

> *A. ...If the engineering report was correct, that the lumber was wrong, the wrong type lumber, then either the contractor used the wrong lumber. That should have been in the architect's specifications, in which case the contractor may have been liable.*
>
> ***
>
> *If a third-party, some third-party building supply dealer built the trusses, then you would have to look to whoever built the trusses to see who gave the –that builder the specifications that would have included the size, the dimensions, the type of lumber, and everything else.*
>
> *So my recommendation was since the trusses were failing and the engineer report said, because of the type of lumber – and I'm not positive it was the word type, but it was the grade, the type, the size, something with that lumber was wrong. But if that's the case, then that's where she should have been looking for coverage.* (Exhibit C, P. 20, L1-25)

It would be an absurd result to conclude that the cause of the problem is a "covered peril," of "weight of persons or property" where the plaintiff's engineer concedes that the cause was defective methods and materials used during the construction of the building.

In examining the pertinent policy provisions, the Court must be mindful that a policy of insurance is a contract between the insurer and the insured and should be construed in the same way. See Amica Mut. Ins. Co. v. Streicker, 583 A. 2d 550, 551 (RI 1990). The Court should not try to stretch its imagination in order to read ambiguity into a policy where none is present; rather, effect should be given to the plain, ordinary meaning of the language employed. Mullins v. Federal Dairy Co., 568 A.2d 759, 762 (RI 1990).

Consistent with these principles: "The Court should not construe policy language to achieve an absurd result inconsistent with what the ordinary reader and purchaser would have understood the language to mean". Textron, Inc. v. Century Indem. Co., C.A. 87-3497; 2005 R.I. Super. LEXIS 113.

Here, as in Hilton Head, the policy terms afford coverage for direct physical loss for actual collapses not caused by construction defects, rather than for the "risk" of "collapse," as was at issue in Norfolk & Dedham. Accordingly, the definition of collapse articulated in Dreiblatt as requiring actual collapse, and not just mere bowing, as here, controls for the purposed of determining whether there is a covered event. Here, there has been no actual collapse, and all work undertaken by plaintiff has been strictly precautionary. However, even if the definition of collapse was read congruently with Norfolk & Dedham, the admissions of plaintiffs' experts, coupled with their failure to make any assessment of the actual live loads (i.e., the "weight of persons or property") at issue prior to making repairs or filing suit, prevent Eagles' Nest from making any showing that the weight did contribute to a collapse.

Reading NLC's policy to afford coverage to trusses incapable of bearing live load at the time of construction once they inevitably began to "creep," would be an absurd result, since it would nullify the clear disclaimer in the policy of coverage for construction defects. This disclaimer is plain and unambiguous. Further, since plaintiff's own insurance agent read the policy (and the engineering report) in NLC's suggested manner, plaintiff will be unable to show that coverage nonetheless exists for a condition that can only be shown to be the result of a construction defect, rather than the "weight" that was not measured by plaintiffs, not taken into consideration in its' experts' reports,

and clearly excluded from coverage.

## IV. Conclusion

For the reasons set forth herein, defendant NLC respectfully requests that this Court grant it's Motion for Summary Judgment, and enter judgment in favor of NLC and against plaintiff, Eagle's Nest Condominium Association, Inc.

Defendant, NLC

By its attorneys,

*/s/ Ronald Langlois*
Ronald Langlois, Esq. #2891
Smith & Brink, P.C.
One State Street, Suite 400
Providence, RI 02908
Tel: (401) 351-9970
Fax: (401) 274-6218

**CERTIFICATION**

I hereby certify that I hand delivered a true copy of the within to **Steven Orabone,** Esquire, 20 Ridgevale Court, Cranston, RI 02921 on the 7TH day of November, 2006.

*/r/ Ronald Langlois*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**EAGLE'S NEST CONDOMINIUM**
**ASSOCIATION, INC., A/K/A**
**EAGLE NEST CONDOMINIUM ASSOC.**

**V.** **C.A.NO: 04-436ML**

**NEW LONDON COUNTY MUTUAL**
**INSURANCE COMPANY, NLC INSURANCE**
**COMPANIES, INC., DOES I THROUGH V**
**AND NLC INSURANCE COMPANIES,**
**ALIAS JOHN DOE COMPANY**

## CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS

## I. Background

### A. History of Eagle's Nest Condominium Association

1. The Eagles Nest Condominium Association (herein after Eagles Nest) consists of approximately 120 condominium units.

2. The 120 Condominium units are divided up among 48 buildings.

3. There are approximately six (6) styles of buildings

4. The buildings were constructed in various phases.

5. The earlier condominium buildings were constructed in 1983.

### B. Problem With Trusses

6. On June 28, 2002, Joan Zeller, an association member who lived at 15C Eagles Run, reported to Barbara Perrino, Eagle's Nest's property manager that approximately one week earlier, she had run into another unit owner who reported that their dining room ceiling was sagging. Ms. Zeller wrote:

> "This came as no surprise as my living and dining room floors have been sinking for over a decade. Every time I hear a loud cracking noise I break out in a cold sweat. My first concern of course is the correction of the structural stress before we have a catastrophe…The gentleman from your staff thought he'd have an answer by this coming Monday, July 1, 2002, after researching the blue prints from town hall to determined (sic) where the center beam was." (Exhibit A- Zeller June 28, 2002 letter)

7. Independent of the letter, Joan Zeller told Barbara Perrino, (Property Manager) that the "problem" existed for over a decade. (Exhibit D - Deposition of Barbara Perrino, P. 29)

8. Joan Zeller has lived in her unit since 1983.

9. Barbara Perrino, Eagle's Nest's property manager, wrote in her June 2002 report: A structural problem in building 15 is under review with Geisser Engineering. This appears to be a serious problems and we will forward information as soon as possible. This quadplex apparently was the first quadplex constructed during development. Indications are that there is insufficient central beam support as floors are bowing. All other quadplexes don't appear to have problems but these are also being reviewed by Geisser. (Exhibit I - June 2002 Report)

10. In June 2002 Eagle's Nest knew "Indications are there is insufficient central beam support as floors are bowing". (Exhibit H - Deposition of Ms. Broussard, P. 26)

11. On February 21, 2003, the Eagle's Nest Condominium Association's property manager reported, "At this time, the structural problems are considered a design flaw and the Association's insurance policy does not cover the expenses for structural design flaws. However, there may be other issues involved here which is why a truss expert has been engaged. Be assured that we have been proactively working with Attorney Frank Lombardi to pursue whatever legal means possible to alleviate the financial impact this will have on the Association." (2/21/03 Report)

12. On December 9, 2003, the owner of Unit 3C reported at the annual unit owners' meeting, "two years ago she reported a deflection in her basement. Nothing was done so her husband braced it. Called for an inspection by an engineer, but has not happened". (Exhibit G – 12/9/03 Executive Minutes)

C. <u>Eagle's Nest Investigation</u>

13. Geisser Engineering was retained by the Eagle's Nest Condominium Association to inspect the units. (Plaintiff's Response to Admissions)

14. Hardpine, Inc. inspected the trusses on behalf of the Eagle's Nest Condominium Association. (Plaintiff's Response to Admissions)

15. Hardpine, Inc. reported that based on field observations and structural calculations, the above mentioned trusses do not meet the minimum design criteria or codes and might collapse under normal loads. (Plaintiff's Response to Admissions)

16. Hardpine took field measurements of certain trusses, recorded the chord and web layout of the trusses, and recorded lumber grades of the truss parts. Hardpine reported that it found number 2 southern yellow pine had been used for the top and bottom chords

of the trusses and that number 3 southern yellow pine had been used for the webs of the trusses. Hardpine also reported that it found certain items missing from the truss installation, that certain trusses had metal plates improperly pressed in certain chords, that they found holes cut in certain chords, they found that certain trusses had failed and that in a number of areas trusses were not properly spaced and clipped at partitions. Hardpine used their field measurements and performed a structural analysis (a mathematical evaluation) to calculate the ability of the structure as constructed to support live and dead loads. Based on these facts and grounds, they concluded that the trusses do not meet minimum design criteria or codes and might collapse under normal loads, and that immediate repair or replacement was strongly recommended. They concluded, further, that had these trusses been spaced 12 inches on center they would have passed the code requirements. (Plaintiff's Answers to Interrogatories No. 4.)

17. Steven Bogle of Geisser Engineering testified that the problem predated his arrival to the location. (Exhibit P - Deposition of Steven Bogle, P. 20)

18. Steven Bogle of Geisser Engineering testified that the problem in Unit 15 was visibly noticeable and "you didn't have to be an engineer to figure it out". (Exhibit P, P. 20)

19. Steven Bogle of Geisser Engineering stated that he agreed with Hardpine's report which states: Based on field observations and structural calculations, the above mentioned trusses do not meet the minimum design criteria or codes and might collapse under normal loads. (Exhibit P, P. 57)

20. Steven Bogle of Geisser Engineering testified that the materials used in the trusses were of insufficient quality when they were originally constructed. (Exhibit P, P. 59)

21. Steven Bogle of Geisser Engineering testified that the trusses could not meet normal load requirements. (Exhibit P, P. 59)

22. Steven Bogle of Geisser Engineering testified that the problem with the trusses existed from the day they were installed nineteen or twenty years earlier. (Exhibit P, P. 59-60)

23. Steven Bogle of Geisser Engineering testified that those problems were causing the deflection under normal loads. (Exhibit P, P.60)

24. Steven Bogle of Geisser Engineering testified that it was not excessive load that was causing the problem; the trusses could not hold the regular loads. (Exhibit P, P.68)

25. The plaintiff's expert, Steven Bogle of Geisser Engineering testified, without qualification, that the materials used in the trusses when they were originally constructed were of insufficient quality which was what was causing the problem in all of the units. (Exhibit P, P. 59)

26. The building code states in pertinent part:

> **301.1 Design**. Buildings and structures, and all parts thereof, shall be constructed to support safely all loads, including dead loads.
> **301.2 Climatic and geographic design criteria.** Buildings shall be constructed in accordance with the provisions of this code using the design criteria set forth in Tables 301.2a and 301.2b.
> **301.3 Dead load.** The actual weights of materials and construction shall be used for determining dead load with consideration for the dead load of fixed service equipment.
> **301.4 Live load**. The minimum uniformly distributed live load shall be as provided in Table 301.4.
> **301.6 Deflection**. The allowable deflection of any structural member under the live load listed in Sections 301.4 and 301.5 shall not exceed the values in Table 301.6. (Building Codes)

27. Steve Bogle of Geisser Engineering testified that the trusses were not capable of meeting those requirements from the day they were installed. (Exhibit P, P. 68)

28. The applicable building codes set the standard for what weight a truss should support. (Exhibit P, P. 65, L20)

29. The trusses are installed to meet building code requirements. (Exhibit P, P. 67, L4-P.68, L9)

30. The building code requirements anticipate that there will be people, refrigerators, and stoves on top of the truss – these are "normal loads". (Exhibit P, P. 68, L10)

D. <u>Notice of the Loss</u>

31. The November 18, 2002, Eagle's Nest Condominium Association's board meeting minutes state:

> "Building 15: First regarding legal avenues the board may pursue regarding the structural issues, there seems to be some confusion as to the limitations imposed by law. The question is- can action be taken from date of discovery or date of completion? Do we have a case or don't we? Can we go ahead and pursue legal action against the appropriate parties? Do we have a case or not? It was requested of [counsel for Eagle's Nest] to provide specifics and outline chances of success. The board is eager to move on the issue." (Exhibit J – 11/18/02 Executive Minutes)

32. On March 22, 2003, Barbara Perrino reported, "the Board of Directors, through Attorney Lombardi, is actively pursing legal recovery against all parties responsible for this situation". (Memo from Barbara Perrino to Unit owners/Eagle's Nest Condominium Association, March 22, 2003, Special Assessment)

33. On May 15, 2003, Eagle's Nest's Condominium Association's executive board discussed, "insurance lawsuit updates with attorney". (Executive Board Minutes May 15, 2003)

34. On or about March 15, 2004, Eagle's Nest Condominium Association, through its loss consultant adjuster, Richard Aube, notified NLC's insurance agent that "Eagle's Nest Condominium Association has damage to property as a result of a collapse". (Exhibit E - Aube Letter)

35. On June 30, 2004[1], Eagle's Nest Condominium Association's adjuster wrote to James Hainey at RJ Marguetta adjustment, NLC's independent adjuster, stating:

> "Please be advised that on this date, and pursuant to the terms of the Commercial Policy Conditions, the insured, Eagle Nest Condominium Association has filed a legal action against New London County Mutual Insurance Company for damages sustained to property as a result of collapse.
>
> Our records indicate... that the date of loss is July 2002 and not the referenced date of loss of 11/29/02 as it appears in you letter of 5/28/04 to the insured and thus the two year anniversary is approaching." (Exhibit K – 6/30/04 Letter)

36. Prior to notifying NLC of this claim, "Eagle's Nest" repaired and or replaced the trusses in approximately 14 condominium units.

37. NLC did not have an opportunity to inspect, evaluate or appraise the alleged damage and/or repairs performed by "Eagle's Nest" in approximately 14 condominium units.

E. <u>Insurance</u>

38. NLC insured the Eagle's Nest Condominium Association's property pursuant to a commercial package policy, policy no. ORC34922-1, commencing on or about December 20, 2000 and continuing through December 22, 2004.

39. The pertinent portion of the insurance policies provide:

> ***CONDOMINIUM ASSOCIATION COVERAGE FORM***
>
> *A. COVERAGE*

[1] Eagle's Nest Condominium Association filed an action against "NLC' in the Kent county Superior Court on June 30, 2004.

*We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.*

*D. ADDITIONAL COVERAGE - COLLAPSE*

*The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in D.1. through D.5. below.*

*1. We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following:*

*a. The "specified causes of loss" or breakage of building glass, all only as insured against in this Coverage Part;*

*b. Hidden decay;*

*c. Hidden insect or vermin damage;*

*d. Weight of people or personal property;*

*e. Weight of rain that collects on a roof;*

*f. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in D.1.a. through D.1.e., we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.*

*4. Collapse does not include settling, cracking, shrinkage, bulging or expansion*

40. ***COMMERCIAL PROPERTY CONDITIONS***

*H. POLICY PERIOD, COVERAGE TERRITORY*

*Under this Coverage Part:*

*1. We cover loss or damage commencing:*

*a. During the policy period shown in the Declarations*

***COMMERCIAL PROPERTY CONDITIONS***

***D. LEGAL ACTION AGAINST US***

*No one may bring a legal action against us under this coverage part unless:*

***

2. *The action is brought within two years after the date on which a direct physical loss or damage occurred.*

41. DUTIES IN THE EVENT OF LOSS OR DAMAGE

a. You must see that the following are done in the event of loss or damage to covered property:

(2) Give us prompt notice of the loss or damage, include a description of the property involved;

(3) As soon as possible, give us a description of how and where the loss or damage occurred.

F. <u>Sidney Smith</u>

42. Sydney Smith was Eagles Nest's Insurance Agent.

43. Sydney Smith has approximately forty (40) years of experience in the insurance industry.

44. On February 10, 2003, Eagle's Nest's insurance agent, Sidney Smith, "is citing a design flaw (as reiterated by Geisser) and therefore will not cover costs of repair". (2/10/03 Executive Minutes)

45. Sydney Smith told Eagles Nest that based on the engineering report the "collapse" would not generally be covered under NLC's policies. (Exhibit C, P. 13)

46. Sydney Smith was not an agent of NLC (Exhibit C, P.50, L5)

47. No ceiling has ever fallen down at the premises.

48. No one at the complex vacated their premises except when repairs were being performed.

49. To date no unit has ever sustained an "actual collapse".

50. The Rhode Island building code sets forth two formulas for determining excessive deflection.

51. The formulas are L/240 and L/360. L/240 is the length of the trusses in inches divided by 240. L/360 is the length of trusses in inches divided by 360.

52. The code requires the L/240 formula to be used to determine the combined total deflection, which includes live loads.

53. Bogle admits that the L/240 formula permits a greater allowable deflection.

54. In determining whether the trusses were exhibiting excessive deflection, Bogle used the L/360 formula which does not account for any live load.

55. Bogle, in his June 27, 2006 report states, "at the time the deflection measurements were taken, the trusses were supporting total dead load plus a small percentage of the required live load, that is why I held the deflection criteria to a more stringent level.

56. Bogle states that he used the L360 formula as a matter of precaution for repairs.

57. Bogle has admitted that he had used the L/240 formula, many of the trusses would have been deemed to have acceptable deflection limits.

58. At no point in time did the Plaintiff conduct a test to determine what amount of deflection was due just to dead load.

59. At no point in time did the plaintiff determine what the amount of live load was in any unit.

Defendant
By its attorneys,

*/r/Ronald Langlois*
Ronald Langlois, Esq. #2891
Smith & Brink, P.C.
One State Street, Suite 400
Providence, RI 02908
Tel: (401) 351-9970
Fax: (401) 274-6218

**CERTIFICATION**

I hereby certify that I hand delivered a true copy of the within to **Steven Orabone,** Esquire, 20 Ridgevale Court, Cranston, RI 02921 on the 7th day of November, 2006.

*/s/ Ronald Langlois*