**LIST OF EXHIBITS**

A. Zeller Letter 6/28/02

B. Bogle Report

C. Deposition of S. Smith

D. Deposition of B. Perino

E. Aube Letter

F. Request 8/12/04

G. Executive Minutes 12/9/03

H. Deposition of Broussard

I. Perrino report June of 2002

J. Executive Minutes 11/18/02

K. 6/30/04 Letter

L. Deposition of Bogle 7/6/06

M. Deposition of Alawa

N. Bogle Letter 10/7/04

O. Bogle Letter 1/2/04

P. Deposition of Bogle 9/16/05

Joan M. Zeller
15c Eagle Run
East Greenwich, RI 02818
401-885-1133

DEFENDANT'S EXHIBIT A, J. D. 9/16/05

DEFENDANT'S EXHIBIT A 12/20/05 SLR

June 28, 2002

Barbara Perrino
Perrino & Associates, Inc.
100 Jefferson Blvd.
Suite 205
Warwick, RI 02888

Dear Barbara,

Just a memo to recap a recent event at Eagle's Nest, 15c Eagle Run. About a week ago I had the occasion to catch up with Al Jackvony, son of Mrs. Jackvony in 15a, as I wanted to pass on the name of the individual that painted our decks in case he was interested.

At the time he expressed concern about his mother's dining room ceiling and the fact it was sagging. This came as no surprise as my living and dining room floors have been sinking for over a decade. Now there is a perceivable lean to all my furniture and you can feel the floor sloping as you walk across it. It was frightening to learn it had sagged enough to caused Mrs. Jackvony's ceiling to sag too. Every time I hear a loud cracking noise I break out in a cold sweat.

My first concern of course is the correction of the structural stress before we have a catastrophe but just as important is the time frame in which this will be done. As you are well aware, the state law of seller disclosure for the sale of real estate will make this property worthless.

I have spent the last few months of free time redoing my condo unit. I had it repainted top to bottom and wallpapered one bathroom. A new tile floor was installed for the second time in the kitchen that cost twice the normal price because a new sub flooring had to be put down before the tiles could be laid. The condition of the soft cement and the fact the floor was slanted and spongy underscored the reason why the first tiles installed all cracked and the fact there is structural stress in this unit!! The deck work was completed last weekend adding to the uphill climb and expense to whip this place into shape.

EXHIBIT

EXHIBIT A

23-ii

I have all new blinds and had new electrical switch plates and outlets installed. My next step was to purchase new furniture and install a fireplace mantle, but....needless to say I'm scared to death to spend another dime. My unit looks like I just moved in with no pictures on the wall and things stuffed under the couch and behind doors because I don't know if I am coming or going, and I can't live like this much longer.

Needless to say, I would like to see this thing resolved ASAP and look forward to hearing the planned solution and time-frame for action to be taken, as soon as possible. The gentleman from your staff thought he'd have an answer by this coming Monday, July 1, 2002, after researching the blue prints from town hall to determined where the center beam was. I await your comments and solution.

Sincerely,

Joan M. Zeller

Joan M. Zeller
Unit 15c @ Eagle's Nest
cc: M. Broussard, Pres.

5 < xxxvi

| # | OWNER | BSMT(Y/N) | DEFLECTION | COMMENTS | ACTION | REPAIRED |
|---|---|---|---|---|---|---|
| A | TAUBER, CARL | N | 1" | cted 9/24/03 | Reinspect 4/04 | |
| 01B | SILVER, EVA | N | 1/2" | Inspected 7/22/03 | Reinspect 2/04 | |
| 02A | NEWTON, MORTIMER/MCGANN, MARY | N | 1/2" | Inspected 5/3/03 | Reinspect 1/04 = 3/4-1" | |
| 02B | GALLANT, EUGENE | N | 3/4" | Inspected 9/23/03 | Reinspect 4/04 | |
| 03A | CORCORAN, DOROTHY | Y | 0" | Inspected 4/5/03 | Reinspect 4/04 | |
| 03B | WASSICH, DR. SOPHIE | Y | 1/2" | Inspected 6/12/03 | Reinspect 1/04 | |
| 03C | POLASKI, BARNEY & NORMA | Y | 0" | Some small cracks in 2 spots | Reinspect 1/04 = 3/4" | |
| 03D | O'CONNOR, LAWRENCE & MARINA | Y | 0" | Repaired Beam (by staff, per engineer direction) | Reinspect 1/04 = 3/4" | 11/13/02 |
| 04A | FORGUE, DONALD & SANTA | N | 3/4" | Inspected 7/11/03 | Reinspect 1/04 = 1" | |
| 04B | EARNEY, GEORGE | N | 1/2" | Inspected 7/23/03 | Reinspect 1/04 = 1 1/4" | |
| 05A | LARKIN, JENNIFER | Y | 0" | Inspected 7/11/03 | Reinspect 7/04 | |
| 05B | MCCONNELL, DIANE | Y | 0" | Inspected 7/11/03 | Reinspect 2/04=1/2" | |
| 05C | DEMAIO, VINCENT & MARGARET | Y | 0" | Inspected 7/11/03 | Reinspect 7/04 | |
| 05D | MARION, MATHEW | Y | 0" | Inspected 7/11/03 | Reinspect 7/04 | |
| 06A | MCKINNON, JUNE | N | 1/4" | Inspected 7/21/03 | Reinspect 7/04 | |
| 06B | BOYLAN, JOAN | N | 1/2" | Inspected 7/21/03 | Reinspect 1/04 | |
| 07A | DETROIA, CYNTHIA | N | 7/8" | Inspected 7/22/03; Reinspected/Geisser 10/03 | Reinspect 10/04 | |
| 07B | BENZ, ROBERT & PATRICIA | N | 1 1/2" | Geisser Inspect 7/22/03: repair list after #38 | **Repair scheduled 3/8/04** | |
| 08A | LEPORE, LEONARD & CAROL | N | 1/2" | Inspected 7/16/03 | Reinspect 2/04 | |
| 08B | RUZZO, RICHARD & PAULETTE | N | 3/4" | Inspected 7/16/03 | Reinspect 1/04 = 3/4" | |
| 09A | HAIKEN, ROBERT & MARLENE | Y | 0" | Inspected 5/16/03; Truss repaired, support added | Reinspect 5/04 | 5/16/03 |
| 09B | FLYNN, BEATRICE | Y | 0" | Inspected 5/16/03 | Reinspect 5/04 | |
| 09C | GIUSTI, JEAN | Y | 1/2" | Inspected 4/29/03; 1 truss crack; repaired | Reinspect 1/04 = 1-1 1/4" | 5/7/03 |
| 09D | CLOUD, NANCY | Y | 1/2" | Inspected 4/29/03; 3truss cracks, repaired | Reinspect 5/04 | 5/7/03 |
| 10A | MCMAHON, ROBERTA | N | 1/2" | Inspected 8/7/03 | Reinspect 2/04 | |
| 10B | CAHIR, THOMAS & LUCY | N | 3/4" | Inspected 7/16/03 | Reinspect 2/04 | |
| 11A | KAPLAN, DR. IRWIN | N | 3/4" | Inspected 8/8/03 | Reinspect 2/04 | |
| 11B | FONTAINE, RUSSELL & ROSE | N | 1/2" | Inspected 8/7/03 | Reinspect 2/04 | |

2/27/20 Structu[...]air List

EXHIBIT B

EXHIBIT J

tabbies

| | | | | | | |
|---|---|---|---|---|---|---|
| [illegible]2B | DIFILLIPPO, MICHAEL | N | 3/4" | In[illegible]cted 7/22/03 | Reinspect 2/04 | |
| 14A | ROY, DONALD & RUTH | N | 7/8-1.5" | Geisser 7/22/03; Geisser inspect 10/03 | **Repair 2004** | |
| 14B | ALLSOP, PHYLLIS & DONALD | N | 7/8-1.5" | Geisser 7/22/03; Geisser inspect 10/03 | **Repair 2004** | |
| 15A | JACKVONY, BERNARD & ALFRED | Y | 5" prior | Prior repair; new cracks noted by owner<br>Geisser reinspect 10/21/03; plaster shrinkage | Reinspect 11/04 | 1/03 |
| 15B | ASCHETTINO, ELEANOR | Y | 5" prior | | Reinspect 11/04 | 1/03 |
| 15C | ZELLER, JOAN | Y | 5/8" (5" prior) | Prior was 5" deflection; Geisser reinspect 12/03 | Reinspect 11/04 | 11/02 |
| 15D | DOWNING, CLAIRE | Y | 0" | With above - | Reinspect 11/04 | 11/02 |
| 16A | WORTHINGTON, JOHN & MARJORIE | N | 1 1/2" | Geisser inspected 9/20/03 | **Repair 2004** | |
| 16B | DELACK, CAROL | N | 1/2" | Inspected 7/22/03 | Reinspect 1/04 = 3/4"-1 1/2" | |
| 17A | HALLM MURIEL | N | 2" | Geisser inspected 8/26/03;10/04 | **Repair 2004 (after 7B)** | |
| 17B | MCCANN, WILLIAM | N | 2" | Geisser inspected 8/26/03;10/04 | **Repair 2004 (after 7B)** | |
| 17C | PARNESS, CHARLES | N | 0" | Inspected 8/8/03 | Reinspect 8/04 | |
| 17D | CONSIDINE, BRIDGET | N | 0" | Inspected 8/8/03 | Reinspect 8/04 | |
| 18A | COOPER, DAVID | N | 3/4" | Inspected 8/8/03 | Reinspect 2/04 | |
| 18B | MCDERMOTT, RICHARD & GEORGIANA | N | 1 1/2" | Geisser inspected 8/12/03; 10/03-Monitor 3 mos. | **Repair 2004 (after 17)** | |
| 19A | MANNI, ADOLPH & LUCILLE | N | 1 1/2-1 5/8" | Geisser inspected 10/3/03; monitor 3 mos. | **Repair 2004** | |
| 19B | PALUMBO, JEANINE | N | 1/2" | Inspected 10/8/03 | Reinspect 3/04 | |
| 20A | PICCOLI, PATRICIA | N | 1 1/2" | Geisser inspect 10/21/03 - Monitor 3 mos. | **Repair 2004** | |
| 20B | CLANCY, SARAH | N | 1 1/2" | Geisser inspect 10/21/03 - Monitor 3 mos. | **Repair 2004** | |
| 20C | PAULSON, BETHANY | N | 1/2" | Inspected 9/3/03 | Reinspect 3/04 | |
| 20D | MCNIFF, ANN | N | 0" | Inspected 9/3/03 | Reinspect 9/04 | |
| 21A | AMATO, ANN MARIE | N | 3/4" | Inspected 8/12/03 | Reinspect 2/04 | |
| 21B | VEALY, BRUCE & ELAINE | N | 3/4" | Inspected 8/12/03 | Reinspect 2/04 | |
| 22A | MADDALENA, AMELIA | N | 3" prior | Repaired | Reinspect 2/04 | 2/03 |
| 22B | BELIVEAU, ROBERT & BECKY | N | 3" prior | Repaired | Reinspect 2/04 | 2/03 |
| 22C | BOWEN, LISA | N | 0" | Inspected 1/13/03 | Reinspect 1/04 | |
| 22D | WYNNE, ANNE | N | 0" | Inspected 1/13/03 | Reinspect 1/04=0" | |
| [illegible]# | OWNER | BSMT(Y/N) | DEFLECTION | COMMENTS | ACTION | St REP |
| | ARCHIBALD, GORDON | N | 1/2" | In[illegible]ed 8/23/03 | Reinspect 2/04 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 24A | AUBE, CHARLES & MARY | N | 1.75" | Geisser inspected 10/03; monitor 3 mos. | Repair 2004 (after 18B) | |
| 24B | NERI, RENEE | N | 1 1/4" | Geisser inspected 8/26/03 | Reinspect 1/04 = 1" | |
| 25A | CIARAMELLO, EDWIN & MARY | N | 1/2-1 5/8" | Geisser inspected 8/26/03;10/03; monitor 6 mos. | Reinspect 4/04 | |
| 25B | ROY, THERESA | N | 3/4" | Inspected 8/8/03 | Reinspect 4/04 | |
| 26A | KUPERSMITH, KAREN | N | 1/2" | Inspected 8/14/03 | Reinspect 2/04 | |
| 26B | COOPER, MARY | N | 0" | Inspected 8/14/03 | Reinspect 8/04 | |
| 27A | TIBBETTS, DOROTHY | N | 3/4" | Inspected 8/14/03 | Reinspect 2/04 | |
| 27B | HAAS, LINDA | N | 1/2" | Inspected 8/29/03 | Reinspect 2/04 | |
| 28A | LYNCH, KRISTEN | N | 1/2" | Inspected 9/3/03 | Reinspect 3/04 | |
| 28B | HONDA, KENJI & KEIKO | N | 3/4" | Inspected 9/3/03 | Reinspect 3/04 | |
| 29A | FUNKQUIST, MARIA | N | 1/2" | Inspected 8/23/03 | Reinspect 3/04 | |
| 29B | DANDURAND, MICHELE | N | 3/4" | Inspected 6/19/03 | Reinspect 1/04 | |
| 29C | HECKART, CYNTHIA | N | 1/2" | Inspected 9/5/03 | Reinspect 3/04 | |
| 29D | SILVIA, DIANNE | N | 3/4" | Inspected 8/26/03 | Reinspect 2/04 | |
| 30A | ATKINSON, CATHERINE | N | 3/4" | Inspected 8/12/03 | Reinspect 2/04 | |
| 30B | REYNOLDS, JOYCE | N | 3/4" | Inspected 8/22/03 | Reinspect 2/04 | |
| 31A | BOWEN, JOHN & ARLEEN | N | 1/4" | Inspected 6/12/03 | Reinspect 6/04 | |
| 31B | WLASSICH, DR. SOPHIE | N | 1/4" | Inspected 6/12/03 | Reinspect 6/04 | |
| 32A | ROQUE, ROBERT & HELEN | N | 1 1/4" | Geisser inspect 8/23/03; 10/03-monitor 6 mos. | Reinspect 4/04 | |
| 32B | CONNOR, CHRISTINE | N | 3/4" | Inspected 8/30/03 | Reinspect 4/04 | |
| 33A | NEWMAN, THOMAS | N | 3/4" | Inspected 9/26/03 | Reinspect 3/04 | |
| 33B | TASSIA, PETER | N | 3/4" | Inspected 8/26/03 | Reinspect 2/04 | |
| 34A | DOERZBACHER, FRED & TWILA | N | 1 3/4" prior | ACC completed 7/03 | Reinspect 7/04 | 7/03 |
| 34B | FLAMAND, RICHARD & ROSEANNE | N | 1 3/4" prior | ACC completed 7/03 | Reinspect 7/04 | 7/03 |
| 34C | JOHNSON, PATRICIA | N | 0" | Inspected 7/31/03 | Reinspect 7/04 | |
| 34D | LAUTIERI, MICHAEL & COLLEEN | N | 0" | Inspected 7/31/03 | Reinspect 7/04 | |
| **UNIT #** | **OWNER** | **BSMT(Y/N)** | **DEFLECTION** | **COMMENTS** | **ACTION** | **REPAIRED** |
| 35A | GALLANT, PETER | N | 1/8" | Insnected 10/8/03 | Reinspect 10/04 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| .A | DEFUSCO, JEAN | N | 1/2" | I[illegible]ted 8/30/03 | Reinspect 2/04 | |
| 36B | GRISLIS, SUSAN | N | 1/2" | Inspected 8/30/03 | Reinspect 2/04 | |
| 37A | AUGENSTEIN, SUZANNE | Y | 0" | Inspected 8/03 | Reinspect 8/04 | |
| 37B | MCGINNIS, NANCY | Y | 1/2" | 1 Cracked truss, 1 poor lower chord; repaired by BH | Reinspect 6/04 | 6/25/03 |
| 37C | ROTENBERG, LINDA | Y | 3/4" | 2 trusses, 1 cracked vert., 1 bottom chord Repaired by BH | Reinspect 1/04 = 1/2" | 6/26/03 |
| 37D | DEIGNAN, CAROL | Y | 1/2" | Inspected 9/11/03 | Reinspect 3/04 | |
| 38A | LAKEWAY, FREDERICK & CAROLE | N | 1" (both floors) prior | Inspected 7/31/03; repaired by ACC | Reinspect 1/04 = 1/2" | 10/03 |
| 38B | BJERKE, CYNTHIA | N | 1" (both floors) prior | Inspected 7/31/03; repaired by ACC | Reinspect 10/04 | 10/03 |
| 38C | BENTFIELD, JOYCELYN | Y | 0" | Inspected 7/31/03 | Reinspect 7/04 | |
| 38D | PIFF, DAVID | Y | 0" | Inspected 7/31/03 | Reinspect 7/04 | |
| 39A | SAOBENTO GLORIA | N | 1 3/4" prior | ACC completed 8/03 | Reinspect 8/04 | 8/03 |
| 39B | FALCO, ALBERT & HELENE | N | 1 3/4" prior | ACC completed 8/03 | Reinspect 8/04 | 8/03 |
| 39C | CUSHMAN, WARREN & IRENE | N | 0" | Inspected 5/16/03 | Reinspect 5/04 | |
| 39D | HEALEY, ELIZABETH | N | 0" | Inspected 5/16/03 | Reinspect 5/04 | |
| 40A | DAILEY, WILLIAM & PHYLLIS | Y | 2" prior | ACC completed | Reinspect 4/04 | 4/03 |
| 40B | VITO, FRANCES | Y | 2" prior | ACC completed | Reinspect 4/04 | 4/03 |
| 40C | CAPPALLI, WNEDY & JIM | N | 0" | Inspected 3/4/03 | Reinspect 3/04 | |
| 40D | DILAURO, ANTHONY & HELEN | N | 0" | Inspected 3/4/03 | Reinspect 3/04 | |
| 41A | KUTZ, FRANK | N | 3/4-1" | Inspect 9/5/03 | Reinspect 3/04 | |
| 41B | RICHMOND, FRANCES | N | 1/2" | Inspected 9/11/03 | Reinspect 3/04 | |
| 42A | CALORE, DANIEL | N | 1 3/4" | Geisser Inspected 10/03; monitor 3 mos. | **Repair 2004** | |
| 42B | RAFFERTY, EILEEN | N | 3/4" | Inspected 9/12/03 | Reinspect 1/04 = 3/4" | |
| 43A | SOARES, LINDA | N | 1/2" | Inspected 9/11/03 | Reinspect 3/04 | |
| 43B | DAWKINS, SALLY | N | 1/2" | Inspected 8/30/03 | Reinspect 2/04 | |
| 44A | BOUNTEMPO, IDLE | N | 1/4" | Inspected 8/23/03 | Reinspect 8/04 | |
| 44B | BROUSSARD, MARILYN | N | 3/4" | At entrance to deck-need support pole; repaired BH | Reinspect 8/04 | 8/11/03 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 45B | CANETA, JOE & MARIANNE | N | 1" prior | ACC completed 9/03 | Reinspect 9/04 | 9/03 |
| 46A | WALSH, PATRICIA | Y | 3/4" | Inspected 9/3/03 | Reinspect 1/04 = 3/4-1" | |
| 46B | VERRECCHIA, MICHELLE | Y | 1/2" | Inspected 9/3/03 | Reinspect 3/04 | |
| 46C | ROSENTHAL, SYLVIA | Y | 1/4" | Inspected 9/4/03 | Reinspect 9/04 | |
| 46D | LACKS, SAMUEL | Y | 1 1/4" | No cracks or breaks;add support for load Repaired by BH | Reinspect 5/04 | 5/21/03 |
| 47A | SWALLOW, JANET | N | 1/2" | Inspected 8/26/03 | Reinspect 1/04 | |
| 47B | TEEVEN, PAUL | N | 1/2" | Inspected 9/3/03 | Reinspect 1/04 = 3/4 - 1" | |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., ALSO KNOWN AS EAGLE NEST CONDOMINIUM ASSOC. :

VS. : C.A. No.04-436ML

NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V, AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY, et als :

DEPOSITION of SIDNEY M. SMITH, JR., a WITNESS in the above-entitled cause, taken on behalf of the PLAINTIFF, pursuant to notice, before Denise A. Webb, a Notary Public in and for the State of Rhode Island, at the offices of Allied Court Reporters, 115 Phenix Avenue, Cranston, Rhode Island, on January 6, 2006, at 2:00 p.m.

APPEARANCES:

FOR THE PLAINTIFF...... ORABONE & GREENE
BY: STEVEN H. ORABONE, ESQUIRE
FOR THE DEFENDANT...... SMITH & BRINK, P.C.
BY: RONALD LANGLOIS, ESQUIRE

FOR THE WITNESS........ VAN TIENHOVEN & COTTER
BY: KEVIN S. COTTER, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500
www.alliedcourtreporters.com

A. Okay. If the -- if it was -- if the engineering report was correct, that the lumber was wrong, the wrong type lumber, then either the contractor used the wrong lumber. That should have been in the architect's specifications, in which case the contractor may have been liable.

Or if the architect specified in the plans what type of lumber should be used and the architect specified the wrong type of lumber, then they would want to go against the architect.

If a third-party, some third-party building supply dealer built the trusses, then you would have to look to whoever built the trusses to see who gave the -- that builder the specifications that would have included the size, the dimensions, the type of lumber, and everything else.

So my recommendation was since the trusses were failing and the engineer report said, because of the type of lumber -- and I'm not positive it was the word type, but it was the grade, the type, the size, something with that lumber was wrong. But if that's the case, then that's where she should have been looking for coverage.

they should be looking to the contractor and/or the architect policies for coverage.

Q. Did you ever advise Barbara Perino not to report this matter to NLC?

A. I don't think I would have made that statement that she should not report it. No.

Q. Did you ever advise her that if she did report it to NLC that NLC would probably drop Eagle's Nest as an insured?

A. I don't recall making that statement, but it certainly would be a possibility.

Q. Did you ever advise Barbara Perino that if she did report this matter to NLC that Eagle's Nest would then become uninsurable?

A. I don't recall making that statement either. But, again, it's -- it is a possibility that that could have been the case based on the problem of the trusses.

Q. Did you ever discuss with Barbara Perino the pluses and minuses of reporting this claim to NLC?

A. I don't know if I would have used that term, pluses and minuses. But you can put a carrier on notice of a potential claim and the carrier has the right to investigate to determine a lot of

the facts about the situation and then look at their policy to determine if they feel that there's coverage, that's not a position that I would be in. However, being a knowledgeable insurance person, in quotation marks, I would recognize that this type of situation could be a very serious underwriting consideration of not only NLC but any other carrier looking at the acceptability of the risk.

Q. Did you discuss with Barbara Perino any potential pitfalls of putting NLC on notice of this loss?

A. I don't recall that specifically. But if by pitfalls you mean what could be some of the consequences of doing it, of putting NLC on notice, I can clearly understand why an insurance company would not want to stay on the risk or a new carrier to go on the risk. There's a lot of coverages under this type of policy besides collapse. But this could have an impact on the general liability.

If you're talking collapse, meaning sagging floors or could it go beyond that eventually to what I would define as a collapse, and by that I mean suddenly this thing falling to the ground, that could affect many coverages under that

engineering report, is that correct?

THE WITNESS: An engineering report having to do with failure of the trusses for Eagle's Nest, is that the question?

MR. LANGLOIS: Yes.

A Yes.

Q And you reviewed that report?

A Yes.

Q And based upon the accuracy of that report, you told her you did not believe the NLC policy provided coverage for that loss; is that correct?

MR. ORABONE: Objection.

A If the engineering report was correct, my feeling was generally you would not find that kind of coverage under a policy such as NLC's, which is a first party property policy.

Q Are there formal ways for reporting a claim to an insurance carrier?

A Yes.

Q What are they, sir?

A The insured can report it directly.

Q When you say directly, I apologize?

A Directly to the carrier. Many carriers have 800 numbers these days that the claim can be reported on. The claim can also be reported to the agency,

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM
ASSOCIATION, INC., A/K/A
EAGLE NEST CONDOMINIUM ASSOC.

VS. C.A. NO.: 04-436ML

NEW LONDON COUNTY MUTUAL
INSURANCE COMPANY, NLC
INSURANCE COMPANIES, INC.,
DOES I THROUGH V AND
NLC INSURANCE COMPANIES,
ALIAS JOHN DOE COMPANY

COPY

DEPOSITION OF **BARBARA PERRINO**, taken on behalf of the Defendants, Friday, January 6, 2006 at 10:00 a.m. pursuant to the Rhode Island Rules of Civil Procedure at the offices of Smith & Brink, P.C., One State Street, Suite 400, Providence, Rhode Island before Linda F. Oakley, RPR, Inc., Notary Public.

APPEARANCES:

STEVEN ORABONE, ESQ.
Counsel for the Plaintiff

FRANK LOMBARDI, ESQ.
Counsel for the Deponent

SMITH & BRINK, P.C.
BY: RONALD LANGLOIS, ESQ.
Counsel for the Defendants

REPORTING ASSOCIATES
10 Dorrance Street, Suite 617
Providence, RI 02903

EXHIBIT D

during the construction of these condominiums, that everyplace there was an upstairs toilet the plumber had cut through, cut through the trusses? Do you recall that at all?
A Yes. I do recall that there were some substandard plumbing work that was done, whereby trusses or some trusses were found to have been cut for piping. I don't believe it was in all units. There were some that were discovered during this process.
Q What's your best memory of what Mr. Bogle told you about the problems with the trusses?
A The problems with the trusses, my understanding was that they were designed for a Number 1 pine, which had a twenty-four foot span. And what was actually used was Number 2 pine, which is appropriate for a twelve-foot span.
Q And they were defective in design from the date of construction of the units?
A Yes.
Q And was it your understanding that the trusses began sagging over a period of years?
A Yes.
Q Do you know how long a period of years they had been sagging?
MR. ORABONE: Well, I know I'm moving

A Yes.
Q There's a suggestion, there's evidence that counsel sought to discuss this matter with another person, who may be knowledgeable about insurance issues?
A Yes.
Q In 2003, and, by the way, this consultation may have occurred in March of 2003, correct?
A Yes.
Q After that during the year of 2003, from January 1st, 2003 till December 31st of 2003, did the Association, to your knowledge, put any insurance carrier on notice of the problem at the condominiums relating to the trusses?
A No.
Q They never did?
A No.
Q And did you recommend to them that they do that?
MR. ORABONE: Objection. You can answer.
MR. LANGLOIS: Let me rephrase the question.
Q Did you recommend as early as February 2003 that they get a denial letter from the insurance carrier?
A Yes.
Q And they never followed your advice, did they?
A No.

RICHARD F. AUBE
LOSS CONSULTANT/ADJUSTER

PO Box 1273
West Warwick, RI 02893

Telephone 401-827-0459
Fax 401-827-5023

March 15, 2004

CERTIFIED MAIL
RETURN RECEIPT

Shailer & Greene
942 Warwick Avenue
Warwick, RI 02888

RE:
Policy: ORC34922-1
Insured: Eagle Nest Condominium Association
Eagle Run
Warwick, RI

To Whom it May Concern:

Please be advised that this office represents the insured, Eagle Nest Condominium Association, with regard to damages sustained to property as the result of collapse.

As agent for the above, please process notification to the New London County Mutual Insurance Company.

As representative of the Eagle Nest Condominium Association, please refer all contact regarding this matter to this office.

Sincerely,

Richard F. Aube
Adjuster

CC: Roberta McMahon
Association President

EXHIBIT

EXHIBIT E

13-1

SMITH & BRINK, P.C.
ATTORNEYS AT LAW
A PROFESSIONAL CORPORATION
ONE STATE STREET
SUITE 400
PROVIDENCE, RI 02908
TELEPHONE: (401) 351-9970
FAX: (401) 274-6218
www.SmithBrink.com

Ronald Langlois*♦
rlanglois@smithbrink.com

* Admitted in Rhode Island
♦ Admitted in Massachusetts

QUINCY OFFICE
122 QUINCY SHORE DRIVE
SECOND FLOOR
QUINCY, MA 02171
TELEPHONE: (617) 770-2214
FAX: (617) 774-1714

DANVERS OFFICE
99 ROSEWOOD DRIVE
UNIT 240
DANVERS, MA 01923
TELEPHONE: (978) 646-9114
FAX: (978) 646-9264

SPRINGFIELD OFFICE
191 CHESTNUT STREET
SUITE 3D
SPRINGFIELD, MA 01103
TELEPHONE: (413) 746-8122
FAX: (413) 781-6290

August 12, 2004

Richard F. Aube
P.O. Box 1273
West Warwick, Rhode Island 02893

RE: Insured: Eagle's Nest Condominium
Date of Loss: 7/02
Type of Loss: Physical Damage to Property – Truss Damage

Dear Mr. Aube:

Please be advised that I have been retained to provide legal advice and counsel to NLC with respect to the above matter. This letter is intended to respond to your correspondence of July 21, 2004. As you report, "The Eagle's Nest Condominium Complex discovered damage to floor trusses in July, 2002". It appears from the review of the correspondence that the Eagle's Nest Condominium Association retained Geisser Engineering of Riverside, Rhode Island to assess the problem. Geisser appears to have inspected the property as early as October 25, 2002. They commenced with certain repairs on the property beginning as early as December, 2002. In your correspondence of June 3, 2004, you submit full payment entitled "Eagle's Nest Unit Structural Repair Expense for 2002 and 2003". Eagle's Nest's broker was not advised of this loss until March 15, 2004. Eagle's Nest's policy provides in pertinent part:

**DUTIES IN THE EVENT OF LOSS OR DAMAGE**

**a.** You must see that the following are done in the event of loss or damage to covered property:

(2) Give us prompt notice of the loss or damage, include a description of the property involved.

(3) As soon as possible, give us a description of how and where the loss or damage occurred.

The evidence demonstrates that Eagle's Nest Condominium Association did not comply with this requirement. NLC never had an opportunity to inspect the units where the losses purportedly occurred. They never had an opportunity to evaluate the repairs performed. Finally, at the present time NLC has insufficient information to either confirm or deny your request for payments. As part of its investigation, NLC is requesting that you provide us with the following information:

EXHIBIT

EXHIBIT F

1. Minutes of all Condominium Association meetings from January 1, 1998 to the present.
2. A list identifying the owners of the unit for which you are seeking payment.
3. A list of all units sold at the Eagle's Nest Condominiums between January 1, 1998 and the present.
4. Any and all reports prepared by Geisser Engineering Corporation.
5. Any and all reports prepared by Hardpine, Inc.
6. Any and all documents, notes, or memoranda referring to any repairs or maintenance performed on the condominium units from date of their construction to the present.
7. Any and all documents evidencing any of the entities who constructed the condominium units.
8. Any and all documents evidencing the name of the truss manufacturer or entity who constructed the trusses at the condominium units.
9. Any documents, correspondence, memorandums and notes submitted by any unit owner to any board member of the Condominium Association, any other governing board of the Condominium Association relating to any cracks or damage to their units.
10. Any and all documents evidencing when the Eagle's Nest Condominiums were constructed.
11. Any and all documents from any governmental agency relating to the inspection of the condominium units from date of their construction to the present.
12. Any and all documents evidencing any assessment on a unit owner's for the cost of any repairs to the trusses at any point in time.

Given the late notice in which NLC was presented with this claim to insufficient information which has been provided, NLC is not in a position to indicate when payments, if any, will be made.

Please be advised that the New London County Mutual Insurance Company will not waive any terms or conditions of the subject policy or their rights or defenses thereunder or at law as it continues in its investigation and adjustment of the subject loss. The New London County Mutual Insurance Company will continue its investigation into this matter and into claims asserted. However, this investigation into the cause and origin of this report of loss and review of coverage remains ongoing and incomplete. The New London County Mutual Insurance Company will conduct its investigation pursuant to a full and complete reservation of rights, and New London County Mutual Insurance Company reserves its right to disclaim any and all liability under the above referenced policy of insurance should this investigation demonstrate that the coverage afforded by the policy is inapplicable for this matter. Nothing contained herein, nor any continued investigation by the insurer or its representatives or compliance by insured with any of the policy terms and conditions is intended be, nor shall it be construed as, a waiver by the insurer of any of the terms and/or conditions of the policy of insurance, nor of any rights or defense as the insurers has or may have, whether based upon

facts known or become known in the future, whether legal or equitable in nature nor as admission of liability by the insurer with any person, or entity whatsoever.

If you have any questions in this matter, please do not hesitate to contact me.

Very truly yours,

Ronald Langlois, Esq.

RL/sal

***Sent via Fax & Regular Mail***

24B explains nobody will be selling with fees of $340.00/month.

.3B in real estate explains there is no condo development in MLS listings with fees higher than $200.00

46A asked about difficulties with basements, the drop ceiling in her basement was not lifted and checked with the rest o the unit. Others exclaimed the same concern with basements.

9D has concerns that each unit may not have been properly inspected. She feels raising the fees is not good. If Brett defines heavy deflection and is not an engineer how is he qualified to inspect. Steve explains the checking does not tal an engineer. An invasive, in-depth inspection would require an engineer and would be costly.

3C states that 2 years ago she reported a deflection in her basement. Nothing was done so her husband braced it. Called for an inspection by an engineer, but has not happened.

3D said Brett did look at this unit, said no mistake there are broken trusses. Steve expresses he needs to look at 3C &

??someone asked if all units have been inspected. Barbara Perrino and Marilyn Broussard answer, Yes to our knowledge.

5D asked if Brett did the measurements in every unit?

46A and 47A say that they have not been inspected. Barbara tells everyone to come up after the meeting give name ar unit number to request inspection.

30A asked if at some point in time will all units need repair the numbers are growing? Steve answers hard to say but sa to assume yes.

Cyndee explains the $140.00 increase in the fee is not addressing the structural problems. Long term resolution would a line of credit for 350K and 10 years of financing.

??someone states every unit should be professionally inspected.

Frank Lombardi states that condominium issues are being minimized. He will need signatures on a petition and support when he goes before the Warwick City Council.

??someone asked what if we have the wrong figures. How do we settle for an unknown figure? Frank explains this will be a long process that could take several years, there will be time to amend the figures.

??someone asked if agreement can be made between unit owner and Board that fees are a loan and will be reimbursec in the future. Frank will explore with regards to a loan and marketability assessment.

10A feels the Board is rushing the unit owners. It would be foolish to rush decisions, feel more meeting are necessary.

16A asked what is the balance of the reserve fund. Marilyn asks that this be held off until David Nunes can review. 16A asked structural is not included in reserve. Marilyn and Barbara explain the reserve is roofs, roads, sewer, pumpin station, siding, lighting, underground utilities, the infrastructure. Funds were available until structural issues were discovered. The reserve has to be kept up since some of the work on the infrastructure has to be accelerated, ie. phasi in the roofs.

Going back to the presentation, Cyndee explains, in the past not enough was put into reserve from the initial reserve study. Noblin was an aggressive plan. Perrino went around Noblin plan directly to vendors to review life of infrastructur items. We had to take out of reserve for the first couple of units, then had to replace the funds.

7B wants the base condo fee separated out as a separate line item. Explains the increase is a hardship on everyone.

Too many questions and comments the presentation is stopped at 8:40pm. David Nunes presents the approved budge and analysis of the reserve fund.

??someone asked, what is the problem with financing. Won't it take care of the items now and down the road. David [illegible]

EXHIBIT

EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., A/K/A EAGLE NEST CONDOMINIUM ASSOC.

Vs. C.A. NO. 04-436ML

NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY

COPY

**DEPOSITION OF MARILYN FRANCES BROUSSARD**, taken on behalf of the Defendants, on December 20, 2005, at the law offices of Smith & Brink, P.C., One State Street, Suite 400, Providence, Rhode Island, before Susan J. LeBlanc-Rockcliffe, RPR, convening at 8:54 a.m.

**APPEARANCES:**

**STEVEN H. ORABONE, ESQUIRE**
Counsel for the Plaintiffs

**SMITH & BRINK, PC**
BY: Ronald Langlois, Esquire
Counsel for the Defendants

REPORTING ASSOCIATES
Suite 617 - 10 Dorrance Street
Providence, Rhode Island 02903

EXHIBIT H

A Yes.

Q And in June, Miss Perrino reported in June of 2002, "Indications are there is insufficient central beam support as floors are bowing, correct?

A Yes.

Q That information was known to Eagle's Nest in June of 2002?

A It was known when Joan wrote the letter because I believe her floor was bowing by like five or six inches, if I recall right. She had a huge deflection.

Q That was in June of 2002, correct?

A Yeah. We didn't know anything until she wrote this letter. When she wrote this letter, we had Geisser go out right away because we were concerned that the floor was going to fall on Mrs. Jackvony. Because Claire lived upstairs and Miss Jackvony lived downstairs, and she said, the Jackvonys said Mrs. Jackvony's floor was sagging. So we felt it was a safety issue, so we got guys in there right away to look at it.

MR. LANGLOIS: Mark this as Exhibit D.

(WHEREUPON A ONE-PAGE LETTER DATED 7/15/02 FROM CLAIRE DOWNING TO PERRINO & ASSOCIATES, INC., WAS RECEIVED AND MARKED AS

OPERATIONS

Issues in June included mailing the financial audit and annual reports package to owners who did not attend the May meeting. Also, a memo reminding owners about the dog regulation was sent. Pet registration requests were received from 7B and 16A, and approved by the Board.

Notice was sent to #1A, Carl Tauber, regarding the condition of his screened porch and items in front of the garage. No response was received but the items in front of the garage were removed. If the screened porch is not taken care of in a timely manner, Attorney Lombardi advised that Mr. Tauber be sent a notice to attend a hearing with the Board. Attorney Lombardi would facilitate that if requested.

A copy of the legal opinion letter regarding the tennis court was sent to Frank Kutz. Note: We also recently met with the contractor referred to us by Karen Kupersmith and Frank Kutz to discuss repair, replacement and/or removal. This contractor (Keith Alexander) did not in fact install tennis courts but, rather, does tile installations. Further, he said would have subcontracted work on the tennis court, he stated that a repair would be in the $6,000-8,000 range, he confirmed our previous position that no contractor would guarantee any repair, and stated that replacement would cost about $50,000. He also noted that the tennis court was bound to have problems due to its location in a low lying area with related drainage. Frank Kutz has now dropped the issue. We will pursue removal quotes from qualified contractors for the Board's planning purposes.

Paint color change requests were approved by the Board and we communicated these to Ann Marie Amato for follow up. Painting by Brizard Painting is scheduled to begin by the end of July.

4A, Don Forgue, submitted a request to install a patio in place of his deck and this was approved by the Board. The approval notice was sent along with a Unit Maintenance Agreement.

Yardstick's front entrance design at $1,864.50 was approved by the Board and will be done in July. Several tree limbs overhanging porches and drives throughout the complex were recently removed by Yardstick.

Other maintenance issues this month included revisited gutter cleaning by Sonny's Carpentry and staff. These were at units 43B, 26A, 27A, 29A, 46CD, 18B, 34C, 39C, 31A, 41B. Gutter/downspout repairs were also done on 18B and 46CD, and flashing repair was done on 39C's chimney cap. Prepainting repairs were underway this month.

Note: A structural problem in building 15 is under review with Geisser Engineering. This appears to be a serious problem and we will forward information as soon as possible. This quadplex apparently was the first quadplex constructed during development. Indications are that there is insufficient central beam support as floors are bowing. All other quadplexes don't appear to have problems but these are also being reviewed by Geisser.

EXHIBIT

EXHIBIT I

Building 15:

First regarding legal avenues the Board may pursue regarding the structural issues, there seems to be some confusion as to the limitation imposed by law. The question is – can action be taken from date of discovery or date of completion? Do we have a case or don't we? Can we go ahead and pursue legal action against appropriate parties? Do we have a case or not? It was requested of Frank Lombardi to provide specifics and outline chances of success. The Board is eager to move on the issue.

Regarding the Jackvony unit, Mr. Jackvony is demanding settlement for work to be done on his unit. He is requesting $3100 to care for his Mother at his brother's home while work is being done as well as new carpet. Mr. Jackvony has refused to allow work to be done on his unit until a settlement is agreed upon. Mr. Lombardi will handle all communication with Mr. Jackvony and the Board has authorized Mr. Lombardi was asked to proceed quickly in getting this matter resolved.

Work will start on the B and D side of the building. Additional costs will likely be incurred because of the necessity of a new "start up" by the contractor when work starts on the A and C side of the unit.

Garage Doors:

After additional vendors are approved, communication will go to the Unit owners. Overhead Doors has submitted information on their product and priced it at $571 with additional discounts being given for several new doors being installed at the same time (aka group rate). Perrino to request a picture fro Overhead Door,

Sewer Covers:

Brent has inspected these with special attention being given to the covers outside Building 47. Cesario will do the necessary repair soon as weather permits.

Budget for 2003: This as been approved by the Board with amendment to the Landscaping portion as described above.

The next meeting will be the annual meeting for Unit Owners as well as election of officers at Evelyn's Restaurant. December 5, 2002 was chosen and had been communicated to owners.

Post Script: Because of Snow, the annual meeting was postponed to 16 January 2003 at Evelyn's Restaurant.

Respectfully Submitted,

Cynthia Bjerke

Cynthia Bjerke

EXHIBIT 163

EXHIBIT J

RICHARD F. AUBE
LOSS CONSULTANT/ADJUSTER

PO Box 1273
West Warwick, RI 02893

Telephone 401-827-0459
Fax 401-827-5023

June 30, 2004

James Heaney
R.J. Margetta Adjustment
82 Granite Street
Fall River, MA 02720

RE:
Your File: M04-18383-COL
Co Claim: B41979
Policy: ORC34922-1
Insured: Eagle Nest Condominium Association
Eagle Run
Warwick, RI

Dear Mr. Heaney:

Please be advised that on this date, and pursuant to the terms of the Commercial Policy Conditions, the insured, Eagle Nest Condominium Association has filed a legal action against New London County Mutual Insurance Company for damages sustained to property as the result of collapse.

Our records indicate, as we have advised your office, that the date of loss is July 2002 and not the referenced date of loss of 11/29/02 as it appears in your letter of 5/28/04 to the insured and thus the two year anniversary is approaching.

This action was necessary in order to reserve the rights of the insured. We understand and appreciate the ongoing investigation into the cause and origin of this matter.

The insured wishes to continue the dialogue that has occurred in an effort to settle this matter in a fair and equitable manner. I remain the point of contact and representative of the insured and look forward to a resolution to this referenced claim.

Sincerely,

Richard F. Aube
Adjuster

000487

EXHIBIT

EXHIBIT K

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM
ASSOCIATION, INC., ALSO KNOWN AS
EAGLE NEST CONDOMINIUM ASSOC.

vs. C.A. No. 04-436ML

NEW LONDON COUNTY MUTUAL
INSURANCE COMPANY, NLC INSURANCE
COMPANIES, INC., DOES I THROUGH
V, AND NLC INSURANCE COMPANIES,
ALIAS JOHN DOE COMPANY, et al.

DEPOSITION OF STEVEN BOGLE, P.E., a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Allied Court Reporters, Inc., 115 Phenix Avenue, Cranston, Rhode Island on July 6, 2006 at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFFS......LAW OFFICE OF STEVEN ORABONE
BY: STEVEN H. ORABONE, ESQUIRE

FOR THE DEFENDANTS......SMITH & BRINK, P.C.
BY: RONALD LANGLOIS, ESQUIRE

ALSO PRESENT: Mike Grafe

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

Q. And those findings are contained in these reports?
A. Yes.
Q. That's a fair and accurate statement of the findings?
A. Yes.
MR. ORABONE: Off the record.
(OFF THE RECORD)
MR. ORABONE: Mark this as Exhibit 2, please.
(PLAINTIFFS' EXHIBIT 2 MARKED FOR IDENTIFICATION)
Q. Can you identify that, please, Exhibit 2?
A. This is the physical properties of southern yellow pine, a table that provides you with physical properties of different sized members in southern yellow pine lumber.
Q. Who produces that report?
A. The Southern Pine Inspection Bureau.
Q. And what are they?
A. They're basically a grading -- it's a board or a group of people that determine the quality and the grading rules for southern yellow pines.
Q. Do engineers make use of this information?
A. Yes.
Q. In what manner?

Q. Was that unit repaired?
A. It has since been repaired because it had about a half inch of deflection when it was unoccupied. When we went back to measure it when people were in it, it was up to an inch and a half.
Q. How do you know people were in it, were people actually in the room when you took the deflection?
A. No. They were occupying the apartment at the time.
Q. You don't know whether anyone was actually in the unit?
A. At the time that I measured, no, I couldn't say they were there. Again, it would be an assumption there was furniture there, they moved in and they were occupying the unit.
Q. At any point in time to determine what amount of deflection was due to dead load and what amount of deflection was due to live load, did you conduct any type of test to make that conclusion, actual test?
A. No.
Q. If you wanted to, what would you have done to test that conclusion?
A. I would have had -- let's say it was in 15 or

17, I would have that clear span area completely cleaned out of all furniture and just down to the finish floor and nothing else in place. At that time, then take deflection measurements, because that would give me the actual dead load.

Q. That would give you actual dead load. Then what would you do to determine what effect live load would have on that?

A. I could do a typical old-fashioned load test where I could bring in sandbags and equate a certain amount of live load by applying sandbags to the floor and then take the deflection reading and then add more and continue on.

Q. And that was something you could have done, correct?

A. Sure.

Q. And you never did do that?

A. No.

Q. Had you done that, then you could confirm what deflection was due to live load and what deflection was due to dead load, correct?

A. Correct.

Q. You could have tested the conclusions?

A. Correct.

Q. The conclusions that have been drawn have never

indication of excessive deflection.
Q. Closer to the partitions?
A. Yes.
Q. Did you photograph the cracks?
A. I should -- yes, I think I did take some photographs.
Q. Whatever photographs you have, you've produced and they're attached, correct?
A. Everything that I've taken.
Q. Now, the code actually uses L over 240 for a combined deflection reading, correct?
A. True. Yes.
Q. Did you calculate what the acceptable deflection readings would be if it was L over 240?
THE WITNESS: Did I calculate that?
MR. LANGLOIS: Yes.
A. I may have done that back when I started doing this, but again, I did know that the floors that we had been looking at were not fully loaded, so I didn't think we had a full combined load, so I didn't use L over 240 for the criteria. I wanted to hold it to a little higher standard.
Q. Without getting into the specific mathematics, if you used L over 240, which is prescribed in the building code for total weight, that's dead load

and live load, you would have a greater allowable deflection, correct?

A. That's true.

Q. So that some of these units would have all been within acceptable readings, correct?

A. The readings based on that formula, they would be acceptable, yes.

Q. Now, using the L/240 formula, did you test to find out whether in certain units they were occupied with people in them they were within allowable deflections?

A. I didn't use the L over 240 formula so, no, I didn't.

Q. But you could have used the L/240 formula, prescribe by the building code for total weight combined, dead and live load, and then put people and things in it and determined whether or not --

A. I could have done an actual load test and loaded the floor up.

Q. So we -- you could have used the L/240 deflection reading, which is dead and live load, and then load the floor up and see whether it was in -- to test if it fell within?

A. To test to see if it fell within that criteria.

A. I think that's Mr. Orabone's.
MR. ORABONE: I did those.
Q. Is this a photograph that you took?
A. Yes, it is.
Q. Do you see with respect to this particular truss there appear to be two boards attached to it?
A. Yes.
Q. Was that the condition you observed when you took the ceiling down?
A. That's what I observed after they removed the ceiling, yes.
Q. Why did you take that photograph?
A. I took the photograph because I saw the crack in the bottom chord of the truss. Primarily, if the crack was there, regardless of what else was there, I would have taken the photo, but it also shows some form of field repair was performed during construction.
Q. Does this photograph show that it appears there was a crack in the bottom chord of the truss in Unit 45B which occurred during construction?
A. I would say it indicates that, yes.
Q. And that someone attempted a repair on that truss during construction?
A. Yes.

materials, correct?
A. They certainly appear to be made with inferior material, yes.
Q. The quality of the construction that you observed, how would you describe it for these condominiums?
A. Subpar.
Q. And that was from the day they were constructed?
A. Yes.
Q. So, the fact is, all of those photographs that you had the cracks and the knots, they could have been existing from since the day of construction and they just didn't feel like repairing them, that's that's a possible, correct?
A. I guess I would say it is a possibility, yes.
Q. Take a look at the photograph Exhibit C3 of Unit 9A, is that a photograph that you took?
A. Yes.
Q. Do you see where there's two boards on that truss?
A. Yes.
Q. Did that second board -- did someone repair that during construction?
A. I'm going to say I'm quite positive if we checked the record that 9A is the gentleman, Bob Haiken, he's the owner of this particular unit, and that was repaired when he was living in the

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., ALSO KNOWN AS EAGLE NEST CONDOMINIUM ASSOC.

vs. C.A. No. 04-436ML

NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V, AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY, et al.

DEPOSITION OF AIMAN ALAWA, Ph.D., a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Allied Court Reporters, Inc., 115 Phenix Avenue, Cranston, Rhode Island on July 7, 2006 at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFFS......LAW OFFICE OF STEVEN ORABONE
BY: STEVEN H. ORABONE, ESQUIRE

FOR THE DEFENDANTS......SMITH & BRINK, P.C.
BY: RONALD LANGLOIS, ESQUIRE

ALSO PRESENT: Mike Grafe

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

I N D E X

Q. So that if the condominiums were constructed in 1984, and somebody moved in on January 1st, 1985, the failure would have occurred in 1985; is that correct?

THE WITNESS: After the live loads -- should I say yes or no first?

MR. LANGLOIS: No, that's okay.

A. I can explain. After -- usually people move gradually. They don't move in with full-blown scale, right. So it's after people moved in, the structural status of these trusses was that the bottom chord was overstressed. Overstressed will constitute a failure.

Q. When the people completely moved in, they moved all their couches, their TV and they were living there?

A. Right.

Q. In 1985 -- assume that all occurred in 1985, the failure would have occurred in 1985, correct?

A. Right.

Q. Let's just talk for a while, okay. What is design analysis?

THE WITNESS: Design analysis?

MR. LANGLOIS: Yes.

THE WITNESS: Are you talking about

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., ALSO KNOWN AS EAGLE NEST CONDOMINIUM ASSOC.

vs. C.A. No. 04-436ML

NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V, AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY, et al.

VOLUME II

DEPOSITION OF AMAN ALAWA, Ph.D. a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Smith & Brink, PC, One State Street, Providence, Rhode Island on September 18, 2006 at 1:15 P.M.

APPEARANCES:

FOR THE PLAINTIFFS......LAW OFFICE OF STEVEN ORABONE
BY: STEVEN H. ORABONE, ESQUIRE

FOR THE DEFENDANTS......SMITH & BRINK, P.C.
BY: RONALD LANGLOIS, ESQUIRE

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

you look at the bottom chords, you have all the cracks in the bottom chords. This is tensile. It means the analysis is going exactly hand-in-hand with what is happening on the site, which means you have now the issue which is the stresses, overstresses, and you have now cracks.

Q. Can another engineer take your data that is in your report and your analysis and run his own analysis?

A. Feel free to do so, please. He will come up with the same results.

Q. Would that constitute testing your analysis?

MR. LANGLOIS: Objection.

Q. Or testing your results?

MR. LANGLOIS: Objection.

A. He can do that or run his own analysis and come up with the same values, and I can see that.

MR. ORABONE: Nothing further.

FURTHER EXAMINATION BY MR. LANGLOIS

Q. You testified last time you would expect the failure would have occurred when the live load was applied, correct?

A. When the capacity is reached.

Q. You testified that would have been when the people were moving in in 1985, correct?

A. Right.
Q. That's when the failure, occurred in 1985, correct?
A. Not necessarily. Not necessarily. We don't know. The bottom line is, we don't know when that failure happened.
Q. You've done an analysis and said these trusses can only hold a certain amount. If you exceed that amount, what are we going to see instantly?
A. What will happen is that the wood is organic material, it does not fail overnight. It takes time. So the failure will develop in the members. We don't know, I will not be able to be positive on when that failure happened. I cannot say for that.
Q. You don't know?
A. Yes. Because it's an organic material, it's not like steel that will fail or concrete that will fail on the spot. It takes time.
Q. But would you expect a certain amount of deflection to occur at a point in time?
A. You would expect, but the wood is not like steel.
Q. But would you -- if you had a certain dead load that you recorded and you put in a certain live

GEORGE J. GEISSER, JR., P.E.
GEORGE J. GEISSER, III, P.E.
NORMAN K. PAQUETTE, P.E.
1951-1985

Geisser Engineering Corp
Consulting Engineers
227 Wampanoag Trail
Riverside, R.I. 02915
(401) 436-7711
Fax # (401) 436-0251

October 7, 2004

NE Moves Mortgage
100 Jefferson Boulevard
Suite 300
Warwick, RI 02888

RE: Floor Truss Deflection
Unit 37B
Eagle's Nest Condominiums
Geisser Job#: K-395

To Whom It May Concern:

We are sending you this letter to address the concern of the second floor truss system. Our office has been involved with reviewing and reinforcing floor truss systems at the above referenced condominium complex. We determine which units require reinforcing by measuring the deflection of the floor truss system. Based on the most recent measurements, taken in the above referenced unit, there is currently no need to perform any structural modifications to the floor system. Although we cannot guarantee the floor system in this particular unit, will continue to operate satisfactorily, the relatively small amount of deflection recently measured, indicates that the floor system is working quite well and shows no sign of needing any structural repairs in the short term future.

Sincerely,
Geisser Engineering Corporation

Steven A. Bogle, P.E.
Senior Project Engineer
SAB
S:\Lily Documents\Steve's Documents\General\K395 37B.doc



EXHIBIT

EXHIBIT N

18-xi

Corporati

GEORGE J. GEISSER, JR., P.E.
GEORGE J. GEISSER, III, P.E.
NORMAN R. PAQUETTE, P.E.
1921-1985

Consulting Engineers
227 Wampanoag Trail
Riverside, R.I. 02915
(401) 438-7711
Fax # (401) 438-0281

January 2, 2004

Ms. Barbara Perrino
Perrino Associates
100 Jefferson Boulevard
Warwick, RI 02888

**RE: Unit 15A Deflection Measurement**
**Eagle's Nest Condominiums**
**Warwick, RI**
**Geisser Job#: R-395**

Dear Barbara:

On Tuesday, December 16, 2003, the undersigned, accompanied by Dennis Higgins, Marcel Dutwin and Brett (Perrino Associates), visited the above referenced unit. The purpose of our visit was to determine if the floor trusses have undergone additional deflection, following reinforcing installation and shoring removal. To measure the existing deflection, a dry line was strung along the length of the trusses. The dry line was held equidistant from the ceiling at each end and a measurement was taken at the lowest point of the ceiling. Based on our field measurement on this date, the trusses have deflected approximately 5/8". According to Dennis Higgins, this is the same amount of deflection he measured when the shoring was initially removed. It is the opinion of this office that the reinforced trusses are structurally sound and are performing quite well.

If you have any questions, or should you require any additional information, please do not hesitate to contact our office.

Sincerely,
*Geisser Engineering Corporation*

*Steven A. Bogle, P.E.*
*Senior Project Engineer*
SAB
*S:\My Documents\Steve's Documents\General\R-395(15AReinspect).doc*

EXHIBIT

5-XXXV

EXHIBIT O

# In The Matter Of:

*Re: Claimants: Clara Goncalves, Tracy Mendes, Jaquilina Pereira and Emilio Varela*

---

*Steven A. Bogle, P.E.*
*September 16, 2005*

---

*Reporting Associates*
*10 Dorrance Street*
*Westminster Square Building Suite 617*
*Providence, RI 02903*
*(401) 351-1660*

*Original File BOGLELFO.TXT, 111 Pages*
*Min-U-Script® File ID: 3755293195*

**Word Index included with this Min-U-Script®**

EXHIBIT P

Page 19

MR. ORABONE: Objection.
A: I don't know how long.
Q: Prior to the time you got there?
A: Yeah. That's why they called me out.
Q: It wasn't an overnight situation?
A: I don't think so, no.
Q: It wasn't within a day or two?
A: No, I don't think it was within a day or two, no.
Q: Did you meet, do you recall what unit you went to look at?
A: 15A is the lower unit, if I remember correctly. And that's where we went first. That was Jagolinzer, the owner.
Q: Is it Jagolinzer or Jackvony?
A: Oh, Jackvony. As I said, I've seen.
Q: Okay.
A: Jackvony. Matter of fact, yeah. 'Cause the son was a attorney. What is he? Lieutenant governor at one point?
Q: Yes.
A: So we went to that apartment first. That's where the mother lived. And then we went upstairs. 'Cause looking at it from downstairs, it was visibly noticeable, but to be upstairs on it was much more telling.

Page 20

Q: And when it was visibly noticeable downstairs, and, once again, you didn't have to be an engineer to figure it out?
A: That there was a problem?
Q: Yes.
A: No.
Q: And the problem had predated your arrival to the location, is that correct?
A: Yes.
Q: Did you meet the tenant?
A: Yes, we did. She was home.
Q: Did you have any conversations with her about the situation?
A: A little bit. She was, she's an elderly woman. There wasn't extensive conversation with her.
Q: Do you recall anything about that?
A: No. I'd, I would say I had more conversation with the woman upstairs.
Q: Okay. Do you know the number of the unit downstairs?
A: As I say, I think it was 15A.
Q: Okay. And I think you're correct. But —
A: They went A, B, C, D, so.
Q: And the unit upstairs that you went in, —
A: I think that's 15C.
Q: — do you know who the tenant there is?

Page 21

A: I don't remember her name, no.
Q: Did you have any discussion with the woman upstairs?
A: Yes.
Q: What do you recall about that?
A: Well, she was just describing to us the condition, the fact that if she put anything, like I say, a round pen on her dining room table, it would just roll right off. How she noticed, you know, how she was concerned about the condition of her floor.
Q: Do you recall this woman being named Joan Zeller?
A: I, I can't say that I, that name rings a bell.
Q: Okay. And the problem in 15A and the problem in 15C, were they associated?
A: Well, they shared the floor. The ceiling of 15A is the floor of 15C, so they are associated.
Q: And subsequently you made a more detailed inspection of that property, correct?
A: Correct.
Q: And what did you determine that problem to be?
A: Well, at first, at that point I said we need to get the ceiling taken down, so we can see the structure.
Q: When you were there on that day, sir, did you take any photographs?
A: On the day that the ceiling was down?
Q: Going back, that first day when you were with, is it

Page 22

correct?
A: On the first day —
Q: Tell me everything you did.
A: — I don't recall taking photographs because there was not much to see. I mean, there was some cracking in the ceiling, but no definitive information that would be helpful to my, you know, for what I needed to do. So I don't remember taking photographs at that time.
Q: Any measurements?
A: Brett had taken measurements 'cause we had the level. He just was using just a, I think a four- or six-foot level and just measuring from the ceiling down.
Q: What do you recall about that?
A: He was measuring it to three inches.
Q: That it was off?
A: Yes.
Q: And that's on your first visit there?
A: Yes.
Q: Anything else you recall about during your visit the first time to 15A, the downstairs unit?
A: No. We looked around the rest of the unit to see if we saw any similar conditions and didn't really see anything that looked anything like what was in the living-dining room area. And that's when I said,

Page 55

Q: Was it beyond your expertise, and that's why you called HardPine?
A: I wouldn't say beyond my expertise, but I thought it was better to use somebody that was more versed and also had the software to analyze. The specialized software makes life a lot easier. For an engineer to just model a truss out takes much more time, and it costs more money. I thought it would be much quicker, and to me it turned out to be much quicker. He's able to, he has software specific to this particular structural element. And that's what we did or I did.
Q: How did you pick this particular truss manufacturer?
A: I was familiar with HardPine. I had been to their office on other projects just to request the design. So I just picked him out. There were quite a few truss companies around we could have called, but, and we would have. If they didn't want to do it, I would have called them. But they said no problem, and so that's who we went with.
MR. LANGLOIS: Can we mark this as the next exhibit, please.
THE DEPONENT: Sure.
Q: Is it all together, Steve? Everything, and when I say all together, everything that's paper clipped

Page 56

belongs together?
A: Yes. I think we've got two sets of fax here, actually, but, so this may actually be two copies of the same thing, but.
(PHOTOSTATIC COPIES OF TEN PAGES OF DOCUMENTS, INCLUDING HARDPINE INC. REPORT ON FLOOR TRUSSES CONDITION, WARWICK CONDOS, R.I. WERE MARKED DEFENDANT'S EXHIBIT R, IDENTIFICATION)
Q: And for the record, sir, would you identify what Exhibit Number R is?
A: Exhibit Number R is a copy of the report from HardPine, which analyzed the existing trusses.
Q: And did you have an opportunity to review that report?
A: Yes.
Q: And did you agree with the conclusions reached in that report?
A: I had no reason to disagree.
Q: But do you presently agree with the conclusions reached?
A: Yes.
Q: And do you have, is it the same copy?
A: I think I have the exact same copy here. Yup. Yes. This is the photocopy of that.
Q: Okay. And is page 2 at the bottom, page 5 of 5 on

Page 57

the photocopy.
A: Okay.
Q: Do you see the conclusion?
A: Yes.
Q: And when it says based — and the report says: Based on field observations and structural calculations, the above mentioned trusses do not meet the minimum design criteria or codes and might collapse under normal loads. Did I read that correctly?
A: Yes.
Q: And do you agree with that conclusion?
A: Yes.
Q: And was that for all the trusses that were involved?
A: That was for the trusses of unit 22.
Q: Does this, does that conclusion apply to the trusses in unit 15?
A: They were the same style. So, yes, that would, that would apply to the trusses of the quadplex units.
Q: Was there a different finding with respect to the trusses of the other units?
A: We didn't have them run an analysis on all the other layouts.
Q: Did you make a conclusion as to what the problems with the trusses were on the other units?
A: What the trusses were?

Page 5

Q: What the problems were, the cause of the problems.
A: We presumed that the problem was continuous throughout, even though the spans or the layouts may have been different. The construction or the material used in the, in the trusses was the same.
Q: So the problem with the trusses was the — specifically, what was the problems with the trusses, in your opinion?
A: Well, as he states here, the spacing, based on the construction of the trusses, the spacing should have been closer together.
Q: Less than twenty-four?
A: Typically. Typically, yeah. Typically for trusses like that aren't done at twelve inches on center. You could go to twenty-four inches on center and build them to that, to meet that requirement. So the next statement or the next problem would be the fact that they used a lower grade lumber to construct the trusses for the spacing and depth that they were constructed at.
Q: These trusses, the materials and the way they were structured, may have been acceptable if they were twenty—- twelve inches on center; that's a possibility?
A: Yes.

Page 59

Q: But they were positioned twenty-four inches on center?
A: Correct.
Q: All of the trusses?
A: Yes.
Q: In all of the units they had problems?
A: (Deponent nods head in the affirmative)
**MR. ORABONE:** Don't nod your head. Say "yes" or "no."
A: I'm sorry. Yes, sir.
Q: Okay. Therefore, assuming that the trusses were designed to be placed twenty-four inches on center, the materials used in the trusses when they were originally constructed was of insufficient quality?
A: Yes.
Q: And that was causing the problem?
A: Yes.
Q: In all the units?
A: That's our conclusion, yes.
Q: And they couldn't meet normal load requirements, correct?
A: Correct.
Q: And that problem, that problem was with the insufficient materials making the trusses existing from the day they were installed, correct?

Page 60

A: Yeah.
Q: Twenty years earlier in nineteen, whatever it may be, correct?
A: Correct.
Q: The problem with all the trusses was as a result of defective materials used in the original construction of the condominiums, correct?
**MR. ORABONE:** Objection.
A: Not defective material, but — the material itself wasn't defective. It was just not of the quality.
Q: The problem that existed in all of the trusses was the fact that the trusses were constructed of inappropriate materials?
A: Lower grade lumber. That's what I would say.
Q: Okay.
A: For the spacing that they were placed at.
Q: From the date they were installed eighteen, nineteen years ago, correct?
A: Correct.
Q: And that's what was causing the deflection, correct?
A: Yes.
Q: On the normal loads?
A: Right.
Q: Now, it was recommended that certain units be repaired and other units not be repaired, is that

Page 61

correct?
A: Yes.
Q: Who made that determination?
A: It basically fell on my shoulders to. And, again, it became a monetary issue, so I had to choose, when we tried to base it on the deflection that was measured in the floors.
Q: Which units, did you measure the deflection in 15A?
A: Yes, we did.
Q: You.
A: Well, it was measured originally by Brett.
Q: Okay.
A: But I'm pretty sure when we did go out for that first visit, he did show me how we measured it and what we had recorded.
Q: Is there any way, sir, in looking at Exhibit D, from Ms. McMahon's deposition earlier today, we know that from your testimony, that the truss, there are certain units where the truss was causing problems to two units, the same truss, correct?
A: Correct.
Q: So on 15A and 15B we know it was the same truss causing the problem, correct?
A: Yes.
Q: 22A and 22B is the same truss causing the problem?

Page 62

A: Yes.
Q: 38C and 38D, do you know?
A: They are not a quadplex. So I think those would be separate floors.
Q: 39A and 39B?
A: Same thing. They're, I don't think those, they were in quadplex units, were placed in those areas where those were built, so, no.
Q: 40A and 40B?
A: That I don't recall. I don't think that was a quadplex, either.
Q: 42A and 45A? I apologize. 45A and 45B?
A: That, I also don't think that that's a quadplex. Those are separate units. If I can interject.
Q: Go ahead.
A: I'm pretty sure that the 20A was. And they may have just focused on 20A, but that would have included two units. But I could be mistaken.
Q: Is there a situation where, clearly, the deflection you told us about in 15A and 15B was significant and noticeable?
A: Yes.
Q: Such that it was affecting the unit up above?
A: Correct.
Q: Were there, to your knowledge, and I know you didn't

Page 63

do the repairs, were there specific repai—- I don't know whether the trusses in 15 were so far out of whack that you had to bring the walls up, and it cracked all the walls? Do you know?
A: They were located in an area with no walls above. So they were able to be pushed back into, jacked as close to level as he could get them and then repaired.
Q: Okay. I didn't know whether because 15 was so far erect, and when they were bringing up the trusses in 15 to level, it was causing some type of — and cosmetic's not the word I'm looking. But something that had to be fixed, whether painted, the floors had to be redone in 15B, and that perhaps in other units it wasn't causing problems to the upper unit. Do you know what I'm saying?
A: Well, if the deflection wasn't as significant as 15, people may not notice as much, depending on the person. Some people can notice more than others, but.
Q: You used a certain cutoff for deflections that you indicated needed repairs and others that didn't?
A: Yes.
Q: What was the cutoff that you chose?
A: We, using L over 360, which is a standard, which is

Page 64

the length of the span, in this case twenty-six feet. You divide it by twelve to get into inches and then divide it by 360. And that gives you a, actually a live load deflection, so deflection under just the live load. So I think it came out to about seven eighths of an inch was kind of what was used for a allowable.
Q: In determining deflection, sometimes even in the construction, sometimes things are just plain crooked, correct?
A: Yes.
THE REPORTER: They're what, please?
MR. LANGLOIS: Crooked.
Q: They're plain crooked.
A: Right.
Q: Is there a certain error that, you know, you can measure it? Have something that doesn't have any problems; and it can be, you know, from floor to ceiling twelve feet over here, and floor to ceiling twelve and a half over there?
A: Yes.
Q: And that could be acceptable, correct?
A: It's not something you like, but, you know, there's certain amount of tolerances that we allow without —
Q: Did you allow a certain amount of tolerance?

Page 6

A: Well, we did. And, again, seven eighths was sort of a cutoff point. If we got significantly higher than that, it became an issue. And with that we started to, you know, we'd look more closely at the, at that particular unit. Typically, when they were measuring them, they were under dead load only. Most of the time there were no people upstairs. There was just furniture.
Q: Okay.
A: So if it was deflecting without even significant live loads on the floor.
Q: So when these meetings were being taken, step back. We're going to set up a foundation. There are building codes, such as BOCA, that control the construction of buildings, such as the condominiums at Eagle's Nest, correct?
A: Correct.
Q: And these building codes also control the trusses that are installed in such units, correct?
A: They set the standard or reference a standard.
Q: And these building codes set what these trusses should be able to carry, what weight they should be able to carry, correct?
A: Correct.
Q: For the record, is it — what is a live load?

Page 6

A: A live load is a load of anything that actually can move around on a floor. Furniture can be a live load, people. That's the typical live loads. The dead loads are structure itself. We're probably on a concrete floor right now, so the weight of the flooring system is the dead load.
Q: And the building code requirements for trusses, such as the one that we're talking about at Eagle's Nest, they're regulated by BOCA, correct?
A: Back then?
Q: Back then, today.
A: In the eighties, I would say the building code was a version of BOCA.
Q: Yes.
A: So the load requirements were definitely set forth in Rhode Island State Building Code, which was a version of BOCA.
Q: I don't know twenty years ago, but I know within the last five or ten years Rhode Island Building Code incorporates BOCA?
A: Now it's the International Building Code. BOCA is not the code now, sir.
Q: But at one point on the Rhode Island Building Code, when we're talking about this period —
A: When I'm thinking about the eighties, it was BOCA.

Page 67

Q: Right. Rhode Island Building Code incorporated BOCA, correct?
A: Yes.
Q: And BOCA sets the standards as to how much weight a truss should be able to hold?
A: How much weight the floor for a condominium unit should carry, yes.
Q: And those trusses are supposed to meet the BOCA requirements, correct?
A: Correct.
Q: As a matter of fact, the local building department is supposed to certify that those trusses are in compliance with BOCA, correct?
A: They are supposed to receive a stamped set.
Q: Yes.
A: That they can review and make sure that they meet BOCA or meet the code, yes.
Q: For example, and for internal trusses is the number universal, consistent?
A: Well, for, again, even —
Q: Residential.
A: Even in this unit, on the quadplexes because the lower, the upper floor is a separate unit all together, it would have to be forty pounds per square foot. But in the units that have, there are

Page 68

two-story units, and the second story would be considered sleeping area, you're allowed to drop down to thirty pounds per square foot for sleeping areas. So there is a difference from that standpoint. But those numbers are universal.
Q: Exactly. And in this particular case, the trusses when installed had to meet either the forty or the thirty pound per square foot requirement, correct?
A: Yes.
Q: And that requirement anticipates that there will be people and refrigerators and stoves on top of it, correct?
A: Correct.
Q: Those are just normal loads?
A: Correct.
Q: And in this particular case, according to your opinion and HardPine's, the trusses were not capable of meeting those requirements, correct?
A: Correct.
Q: From day they were installed?
A: Correct.
Q: It wasn't excessive load that was causing the problem; these trusses couldn't hold the regular loads, correct?
A: Correct.

Page 69

MR. LANGLOIS: Off the record.
(Discussion off the record)
MR. LANGLOIS: Okay.
Q: You set the standard of seven eighths of an inch for deflection, correct?
A: Yes.
Q: Was there anything over seven eighths it was your opinion that needed to be replaced, reinforced?
A: What we decided to do was first we kind of got a collection of different units and got the measurements. And we had some much higher than others, closing in on two-inch deflection. Some had over two inch of deflection. And so they were chosen to be repaired because of the amount of deflection. I think anything, I think we went up to an inch and a quarter would be monitored because money was not available to just go wholehearted, fix everything at once. And what we were doing was anything inch and a quarter and up, I think we were doing every three months doing the monitoring. If they were inch and a quarter down to seven eighths, in that range, every six months. And seven eighths it would just be on an annual basis we check it just to make sure it hadn't increased. And that's basically where it was.
Q: How do you take the measurements?

Page 70

A: At that time they were less sophisticated. They were, Brett was using his level and just measuring. Basically, he would, basically, hold the level out to where he saw a dip in the floor, bring it up to the, near a wall and just measure from the ceiling down, where the — we knew, of course, near the wall it was at the height it should be, and he was getting a measurement that way. It was the best he had at the time. Since then they've actually done laser shots out there.
Q: Is there — you weren't taking the measurements?
A: No.
Q: Brett was taking the measurements?
A: Brett would take the measurements.
Q: Okay.
A: On some of them we'd work together, yes, but.
Q: And some of them, and the measurements were, the early measurements were imprecise?
A: I would say they may not have been the most accurate. It probably would have been better to run a string even with a laser, setting it up a, on an even, you know, some of the floors were uneven, so you wouldn't get proper measurements that way. I think the best way would be run a dry line that's at a fixed height above the floor and then measure along that. And we

Page 71

should be able to get a much better, more accurate readings. But the original measurements were taken using the level off the ceiling.

**Q:** And you don't know what Brett's background is?

**A:** Not really, no.

**Q:** You don't know whether he's an engineer or —

**A:** I know he's not an engineer. I know that.

**Q:** He's a handyman?

**A:** That's the best I know him is a handyman.

**Q:** Was he providing you with the measurements? Like, for example, we're looking at unit 9. And I don't know what those, what are those —

**A:** Approximately an inch to one and a half inches.

**Q:** Is that his measurement?

**A:** He had the level. I think on some of those I was running, you know, I would put the tape up to it to measure it.

**Q:** Okay. And, for example, I don't see — that's why I was going to ask. This document, and you don't have to accept it. But for purposes, this document was prepared on March 5.

**A:** Okay.

**Q:** And it indicates the units that have been repaired, still March 5. And unit number 9 is not listed.

Page 72

**A:** Correct. It's slated for August, this last month it was slated for repairing, yes.

**Q:** So, basically, nothing would have happened to that unit between that time period?

**A:** No repairs would have been done, no. Like I said, they tried to prioritize, and you can see 22 at three inches plus, so. That's why that one was —

**MR. LANGLOIS:** Steve, can we go off the record for a second?

**MR. ORABONE:** Sure.

(Discussion off the record)

**Q:** In looking at the lists that were prepared, do you know which — certain trusses were, for lack of a better word, hidden because of the ceiling, correct?

**A:** Correct.

**Q:** Other trusses, the ones were exposed because they were in the basement?

**A:** In unfinished basements, yes.

**Q:** Can you tell, do you know which ones were in the basement and which ones weren't?

**A:** Well, I know that, I know the quadplexes like 15 did not have basements.

**Q:** Okay.

**A:** But the majority of the other homes do have basements because they were multilevel units.

Page 73

**Q:** Well, what happened next, sir? And you can look at your records to see.

**A:** What happened next. And what time frame are we coming off of?

**Q:** Well, I think — okay.

**A:** From the time we determined that the repairs needed to be done.

**Q:** The last thing we were looking at Exhibit Q and some point in time September 16th to October 9th of 2002. What's the next series of events?

**A:** I think we did some additional inspections in the — actually, this was another day. Other units were done. 40A, 39B, 34B were done. He had different mileage down, so different time. But that, there was just a continuation of inspections and trying to put together a prioritized list of which units would need to be repaired.

**Q:** So the record's clear, Exhibit Q is a two-page document, correct?

**A:** Correct.

**Q:** And on the front page of Exhibit Q it says 9/16/02?

**A:** Correct.

**Q:** You have some mileage listed down there in some units that were inspected?

**A:** Correct.

Page 74

**Q:** The second page there are units, of Exhibit Q, there's unit 40A, 39B, and 34B, correct?

**A:** Correct.

**Q:** You believe this was done on the second day because you have different mileage?

**A:** Correct.

**Q:** And your time records will reflect to that effect?

**A:** Yes.

**Q:** What's the next thing to look for?

**A:** Well, I think by that time they had gone to bid with the contractors, and finally chosen a contractor to start repairs on 15, which would have been ACC. And so that, that repair, that repair work started. And then I started to look at other units for possible repairs.

**Q:** Okay. Is there anything in your documents to reflect the next thing that you did?

**A:** Okay. The records from December, December of '02 is when repairs on 15 were being performed.

**Q:** And were you present that day?

**A:** Well, I — what happened, two things happened. One, the presence of wires and other obstructions were, would make it impossible for them to put the plywood in exactly the way we described because they could not do full length. So I, on December 16th, I was