UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM
ASSOCIATION, INC., A/K/A
EAGLE NEST CONDOMINIUM ASSOC.

V. C.A.NO: 04-436ML

NEW LONDON COUNTY MUTUAL
INSURANCE COMPANY, NLC INSURANCE
COMPANIES, INC., DOES I THROUGH V
AND NLC INSURANCE COMPANIES,
ALIAS JOHN DOE COMPANY

## LIST OF EXHIBITS

A. Report of Steven Bogle

B. Steven Bogle Deposition (7/6/06)

C. Dr. Aiman Alawa Deposition (07/07/06) and Volume II

D. Steven Bogle Deposition (09/16/05)

E. Report of Michael Grafe

F. MiTek Literature

G. Michael Grafe Deposition

| # | OWNER | BSMT(Y/N) | DEFLECTION | COMMENTS | ACTION | REPAIRED |
|---|---|---|---|---|---|---|
| A | TAUBER, CARL | N | 1 | ...cted 9/24/03 | Reinspect 4/04 | |
| 01B | SILVER, EVA | N | 1/2" | Inspected 7/22/03 | Reinspect 2/04 | |
| 02A | NEWTON, MORTIMER/MCGANN, MARY | N | 1/2" | Inspected 5/3/03 | Reinspect 1/04 = 3/4-1" | |
| 02B | GALLANT, EUGENE | N | 3/4" | Inspected 9/23/03 | Reinspect 4/04 | |
| 03A | CORCORAN, DOROTHY | Y | 0" | Inspected 4/5/03 | Reinspect 4/04 | |
| 03B | WASSICH, DR. SOPHIE | Y | 1/2" | Inspected 6/12/03 | Reinspect 1/04 | |
| 03C | POLASKI, BARNEY & NORMA | Y | 0" | Some small cracks in 2 spots | Reinspect 1/04 = 3/4" | |
| 03D | O'CONNOR, LAWRENCE & MARINA | Y | 0" | Repaired Beam (by staff, per engineer direction) | Reinspect 1/04 = 3/4" | 11/13/02 |
| 04A | FORGUE, DONALD & SANTA | N | 3/4" | Inspected 7/11/03 | Reinspect 1/04 = 1" | |
| 04B | EARNEY, GEORGE | N | 1/2" | Inspected 7/23/03 | Reinspect 1/04 = 1 1/4" | |
| 05A | LARKIN, JENNIFER | Y | 0" | Inspected 7/11/03 | Reinspect 7/04 | |
| 05B | MCCONNELL, DIANE | Y | 0" | Inspected 7/11/03 | Reinspect 2/04=1/2" | |
| 05C | DEMAIO, VINCENT & MARGARET | Y | 0" | Inspected 7/11/03 | Reinspect 7/04 | |
| 05D | MARION, MATHEW | Y | 0" | Inspected 7/11/03 | Reinspect 7/04 | |
| 06A | MCKINNON, JUNE | N | 1/4" | Inspected 7/21/03 | Reinspect 7/04 | |
| 06B | BOYLAN, JOAN | N | 1/2" | Inspected 7/21/03 | Reinspect 1/04 | |
| 07A | DETROIA, CYNTHIA | N | 7/8" | Inspected 7/22/03; Reinspected/Geisser 10/03 | Reinspect 10/04 | |
| 07B | BENZ, ROBERT & PATRICIA | N | 1 1/2" | Geisser Inspect 7/22/03: repair list after #38 | **Repair scheduled 3/8/04** | |
| 08A | LEPORE, LEONARD & CAROL | N | 1/2" | Inspected 7/16/03 | Reinspect 2/04 | |
| 08B | RUZZO, RICHARD & PAULETTE | N | 3/4" | Inspected 7/16/03 | Reinspect 1/04 = 3/4" | |
| 09A | HAIKEN, ROBERT & MARLENE | Y | 0" | Inspected 5/16/03; Truss repaired, support added | Reinspect 5/04 | 5/16/03 |
| 09B | FLYNN, BEATRICE | Y | 0" | Inspected 5/16/03 | Reinspect 5/04 | |
| 09C | GIUSTI, JEAN | Y | 1/2" | Inspected 4/29/03; 1 truss crack; repaired | Reinspect 1/04 = 1-1 1/4" | 5/7/03 |
| 09D | CLOUD, NANCY | Y | 1/2" | Inspected 4/29/03; 3truss cracks, repaired | Reinspect 5/04 | 5/7/03 |
| 10A | MCMAHON, ROBERTA | N | 1/2" | Inspected 8/7/03 | Reinspect 2/04 | |
| 10B | CAHIR, THOMAS & LUCY | N | 3/4" | Inspected 7/16/03 | Reinspect 2/04 | |
| 11A | KAPLAN, DR. IRWIN | N | 3/4" | Inspected 8/8/03 | Reinspect 2/04 | |
| 11B | FONTAINE, RUSSELL & ROSE | N | 1/2" | Inspected 8/7/03 | Reinspect 2/04 | |



tabbies

EXHIBIT A

5-xxxvi

| | | | | | | |
|---|---|---|---|---|---|---|
| 12B | DIFILLIPPO, MICHAEL | N | 3/4" | In...cted 7/22/03 | Reinspect 2/04 | |
| 14A | ROY, DONALD & RUTH | N | 7/8-1.5" | Geisser 7/22/03; Geisser inspect 10/03 | **Repair 2004** | |
| 14B | ALLSOP, PHYLLIS & DONALD | N | 7/8-1.5" | Geisser 7/22/03; Geisser inspect 10/03 | **Repair 2004** | |
| 15A | JACKVONY, BERNARD & ALFRED | Y | 5" prior | Prior repair; new cracks noted by owner<br>Geisser reinspect 10/21/03; plaster shrinkage | Reinspect 11/04 | **1/03** |
| 15B | ASCHETTINO, ELEANOR | Y | 5" prior | | Reinspect 11/04 | **1/03** |
| 15C | ZELLER, JOAN | Y | 5/8" (5" prior) | Prior was 5" deflection; Geisser reinspect 12/03 | Reinspect 11/04 | **11/02** |
| 15D | DOWNING, CLAIRE | Y | 0" | With above | Reinspect 11/04 | **11/02** |
| 16A | WORTHINGTON, JOHN & MARJORIE | N | 1 1/2" | Geisser inspected 9/20/03 | **Repair 2004** | |
| 16B | DELACK, CAROL | N | 1/2" | Inspected 7/22/03 | Reinspect 1/04 = 3/4"-1 1/2" | |
| 17A | HALLM MURIEL | N | 2" | Geisser inspected 8/26/03;10/04 | **Repair 2004 (after 7B)** | |
| 17B | MCCANN, WILLIAM | N | 2" | Geisser inspected 8/26/03;10/04 | **Repair 2004 (after 7B)** | |
| 17C | PARNESS, CHARLES | N | 0" | Inspected 8/8/03 | Reinspect 8/04 | |
| 17D | CONSIDINE, BRIDGET | N | 0" | Inspected 8/8/03 | Reinspect 8/04 | |
| 18A | COOPER, DAVID | N | 3/4" | Inspected 8/8/03 | Reinspect 2/04 | |
| 18B | MCDERMOTT, RICHARD & GEORGIANA | N | 1 1/2" | Geisser inspected 8/12/03; 10/03-Monitor 3 mos. | **Repair 2004 (after 17)** | |
| 19A | MANNI, ADOLPH & LUCILLE | N | 1 1/2-1 5/8" | Geisser inspected 10/3/03; monitor 3 mos. | **Repair 2004** | |
| 19B | PALUMBO, JEANINE | N | 1/2" | Inspected 10/8/03 | Reinspect 3/04 | |
| 20A | PICCOLI, PATRICIA | N | 1 1/2" | Geisser inspect 10/21/03 - Monitor 3 mos. | **Repair 2004** | |
| 20B | CLANCY, SARAH | N | 1 1/2" | Geisser inspect 10/21/03 - Monitor 3 mos. | **Repair 2004** | |
| 20C | PAULSON, BETHANY | N | 1/2" | Inspected 9/3/03 | Reinspect 3/04 | |
| 20D | MCNIFF, ANN | N | 0" | Inspected 9/3/03 | Reinspect 9/04 | |
| 21A | AMATO, ANN MARIE | N | 3/4" | Inspected 8/12/03 | Reinspect 2/04 | |
| 21B | VEALY, BRUCE & ELAINE | N | 3/4" | Inspected 8/12/03 | Reinspect 2/04 | |
| 22A | MADDALENA, AMELIA | N | 3" prior | Repaired | Reinspect 2/04 | 2/03 |
| 22B | BELIVEAU, ROBERT & BECKY | N | 3" prior | Repaired | Reinspect 2/04 | 2/03 |
| 22C | BOWEN, LISA | N | 0" | Inspected 1/13/03 | Reinspect 1/04 | |
| 22D | WYNNE, ANNE | N | 0" | Inspected 1/13/03 | Reinspect 1/04=0" | |
| ...# | OWNER | BSMT(Y/N) | DEFLECTION | COMMENTS | ACTION | REP |
| | ARCHIBALD, GORDON | N | 1/2" | In...ed 8/23/03 | Reinspect 2/04 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 24A | AUBE, CHARLES & MARY | N | 1.75" | Geisser inspected 10/03; monitor 3 mos. | **Repair 2004 (after 18B)** | |
| 24B | NERI, RENEE | N | 1 1/4" | Geisser inspected 8/26/03 | Reinspect 1/04 = 1" | |
| 25A | CIARAMELLO, EDWIN & MARY | N | 1/2-1 5/8" | Geisser inspected 8/26/03;10/03; monitor 6 mos. | Reinspect 4/04 | |
| 25B | ROY, THERESA | N | 3/4" | Inspected 8/8/03 | Reinspect 4/04 | |
| 26A | KUPERSMITH, KAREN | N | 1/2" | Inspected 8/14/03 | Reinspect 2/04 | |
| 26B | COOPER, MARY | N | 0" | Inspected 8/14/03 | Reinspect 8/04 | |
| 27A | TIBBETTS, DOROTHY | N | 3/4" | Inspected 8/14/03 | Reinspect 2/04 | |
| 27B | HAAS, LINDA | N | 1/2" | Inspected 8/29/03 | Reinspect 2/04 | |
| 28A | LYNCH, KRISTEN | N | 1/2" | Inspected 9/3/03 | Reinspect 3/04 | |
| 28B | HONDA, KENJI & KEIKO | N | 3/4" | Inspected 9/3/03 | Reinspect 3/04 | |
| 29A | FUNKQUIST, MARIA | N | 1/2" | Inspected 8/23/03 | Reinspect 3/04 | |
| 29B | DANDURAND, MICHELE | N | 3/4" | Inspected 6/19/03 | Reinspect 1/04 | |
| 29C | HECKART, CYNTHIA | N | 1/2" | Inspected 9/5/03 | Reinspect 3/04 | |
| 29D | SILVIA, DIANNE | N | 3/4" | Inspected 8/26/03 | Reinspect 2/04 | |
| 30A | ATKINSON, CATHERINE | N | 3/4" | Inspected 8/12/03 | Reinspect 2/04 | |
| 30B | REYNOLDS, JOYCE | N | 3/4" | Inspected 8/22/03 | Reinspect 2/04 | |
| 31A | BOWEN, JOHN & ARLEEN | N | 1/4" | Inspected 6/12/03 | Reinspect 6/04 | |
| 31B | WLASSICH, DR. SOPHIE | N | 1/4" | Inspected 6/12/03 | Reinspect 6/04 | |
| 32A | ROQUE, ROBERT & HELEN | N | 1 1/4" | Geisser inspect 8/23/03; 10/03-monitor 6 mos. | Reinspect 4/04 | |
| 32B | CONNOR, CHRISTINE | N | 3/4" | Inspected 8/30/03 | Reinspect 4/04 | |
| 33A | NEWMAN, THOMAS | N | 3/4" | Inspected 9/26/03 | Reinspect 3/04 | |
| 33B | TASSIA, PETER | N | 3/4" | Inspected 8/26/03 | Reinspect 2/04 | |
| 34A | DOERZBACHER, FRED & TWILA | N | 1 3/4" prior | ACC completed 7/03 | Reinspect 7/04 | 7/03 |
| 34B | FLAMAND, RICHARD & ROSEANNE | N | 1 3/4" prior | ACC completed 7/03 | Reinspect 7/04 | 7/03 |
| 34C | JOHNSON, PATRICIA | N | 0" | Inspected 7/31/03 | Reinspect 7/04 | |
| 34D | LAUTIERI, MICHAEL & COLLEEN | N | 0" | Inspected 7/31/03 | Reinspect 7/04 | |
| **UNIT #** | **OWNER** | **BSMT(Y/N)** | **DEFLECTION** | **COMMENTS** | **ACTION** | **REPAIRED** |
| 35A | GALLANT, PETER | N | 1/8" | Inspected 10/8/03 | Reinspect 10/04 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| .A | DEFUSCO, JEAN | N | 1/2" | I. :ted 8/30/03 | Reinspect 2/04 | |
| 36B | GRISLIS, SUSAN | N | 1/2" | Inspected 8/30/03 | Reinspect 2/04 | |
| 37A | AUGENSTEIN, SUZANNE | Y | 0" | Inspected 8/03 | Reinspect 8/04 | |
| 37B | MCGINNIS, NANCY | Y | 1/2" | 1 Cracked truss, 1 poor lower chord; repaired by BH | Reinspect 6/04 | 6/25/03 |
| 37C | ROTENBERG, LINDA | Y | 3/4" | 2 trusses, 1 cracked vert., 1 bottom chord Repaired by BH | Reinspect 1/04 = 1/2" | 6/26/03 |
| 37D | DEIGNAN, CAROL | Y | 1/2" | Inspected 9/11/03 | Reinspect 3/04 | |
| 38A | LAKEWAY, FREDERICK & CAROLE | N | 1" (both floors) prior | Inspected 7/31/03; repaired by ACC | Reinspect 1/04 = 1/2" | 10/03 |
| 38B | BJERKE, CYNTHIA | N | 1" (both floors) prior | Inspected 7/31/03; repaired by ACC | Reinspect 10/04 | 10/03 |
| 38C | BENTFIELD, JOYCELYN | Y | 0" | Inspected 7/31/03 | Reinspect 7/04 | |
| 38D | PIFF, DAVID | Y | 0" | Inspected 7/31/03 | Reinspect 7/04 | |
| 39A | SAOBENTO GLORIA | N | 1 3/4" prior | ACC completed 8/03 | Reinspect 8/04 | 8/03 |
| 39B | FALCO, ALBERT & HELENE | N | 1 3/4" prior | ACC completed 8/03 | Reinspect 8/04 | 8/03 |
| 39C | CUSHMAN, WARREN & IRENE | N | 0" | Inspected 5/16/03 | Reinspect 5/04 | |
| 39D | HEALEY, ELIZABETH | N | 0" | Inspected 5/16/03 | Reinspect 5/04 | |
| 40A | DAILEY, WILLIAM & PHYLLIS | Y | 2" prior | ACC completed | Reinspect 4/04 | 4/03 |
| 40B | VITO, FRANCES | Y | 2" prior | ACC completed | Reinspect 4/04 | 4/03 |
| 40C | CAPPALLI, WNEDY & JIM | N | 0" | Inspected 3/4/03 | Reinspect 3/04 | |
| 40D | DILAURO, ANTHONY & HELEN | N | 0" | Inspected 3/4/03 | Reinspect 3/04 | |
| 41A | KUTZ, FRANK | N | 3/4-1" | Inspect 9/5/03 | Reinspect 3/04 | |
| 41B | RICHMOND, FRANCES | N | 1/2" | Inspected 9/11/03 | Reinspect 3/04 | |
| 42A | CALORE, DANIEL | N | 1 3/4" | Geisser Inspected 10/03; monitor 3 mos. | **Repair 2004** | |
| 42B | RAFFERTY, EILEEN | N | 3/4" | Inspected 9/12/03 | Reinspect 1/04 = 3/4" | |
| 43A | SOARES, LINDA | N | 1/2" | Inspected 9/11/03 | Reinspect 3/04 | |
| 43B | DAWKINS, SALLY | N | 1/2" | Inspected 8/30/03 | Reinspect 2/04 | |
| 44A | BOUNTEMPO, IDLE | N | 1/4" | Inspected 8/23/03 | Reinspect 8/04 | |
| 44B | BROUSSARD, MARILYN | N | 3/4" | At entrance to deck-need support pole; repaired BH | Reinspect 8/04 | 8/11/03 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 45B | CANETA, JOE & MARIANNE | N | 1" prior | ACC completed 9/03 | Reinspect 9/04 | 9/03 |
| 46A | WALSH, PATRICIA | Y | 3/4" | Inspected 9/3/03 | Reinspect 1/04 = 3/4-1" | |
| 46B | VERRECCHIA, MICHELLE | Y | 1/2" | Inspected 9/3/03 | Reinspect 3/04 | |
| 46C | ROSENTHAL, SYLVIA | Y | 1/4" | Inspected 9/4/03 | Reinspect 9/04 | |
| 46D | LACKS, SAMUEL | Y | 1 1/4" | No cracks or breaks;add support for load<br>Repaired by BH | Reinspect 5/04 | 5/21/03 |
| 47A | SWALLOW, JANET | N | 1/2" | Inspected 8/26/03 | Reinspect 1/04 | |
| 47B | TEEVEN, PAUL | N | 1/2" | Inspected 9/3/03 | Reinspect 1/04 = 3/4 - 1" | |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., ALSO KNOWN AS EAGLE NEST CONDOMINIUM ASSOC.

vs. C.A. No. 04-436ML

NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V, AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY, et al.

DEPOSITION OF STEVEN BOGLE, P.E., a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Allied Court Reporters, Inc., 115 Phenix Avenue, Cranston, Rhode Island on July 6, 2006 at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFFS......LAW OFFICE OF STEVEN ORABONE
BY: STEVEN H. ORABONE, ESQUIRE

FOR THE DEFENDANTS......SMITH & BRINK, P.C.
BY: RONALD LANGLOIS, ESQUIRE

ALSO PRESENT: Mike Grafe

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

# I N D E X


| WITNESS | PAGE |
|---|---|
| STEVEN BOGLE | |
| EXAMINATION BY MR. ORABONE | 3 |
| EXAMINATION BY MR. LANGLOIS | 48 |
| FURTHER EXAMINATION BY MR. ORABONE | 189 |
| FURTHER EXAMINATION BY MR. LANGLOIS | 190 |


## E X H I B I T S


(PLAINTIFFS')

| NO. | PAGE |
|---|---|
| 1 | 3 |
| 2 | 45 |

(DEFENDANTS')

| | |
|---|---|
| A | 57 |
| B & C | 169 |
| D & E | 172 |
| F | 185 |
| G | 186 |
| H | 188 |


REPORTER'S NOTE: EXHIBITS RETAINED BY MR. ORABONE.

agree with that?
A. Yes.
Q. Tell me in actuality how much live load was in Unit 14A?
THE WITNESS: In actuality?
MR. LANGLOIS: Yes, sir.
A. I couldn't tell you exactly how much was up there.
Q. Did you ever measure it?
A. No.
Q. How about Unit 14B, how much live load was present in Unit 14B?
A. I can honestly say I didn't measure how much live load was present in any of the units at the time.
Q. You don't know from your deflection readings whether you were measuring just deflection being caused by the dead load or the live load, correct?
A. Well, I would have to -- if I was measuring dead load only, I would have to assume that there was absolutely no furniture upstairs and the units that I measured were occupied. So, again, I would assume that there is some percentage of live load up on the floor.
Q. But you don't know?

Q. Was that unit repaired?

A. It has since been repaired because it had about a half inch of deflection when it was unoccupied. When we went back to measure it when people were in it, it was up to an inch and a half.

Q. How do you know people were in it, were people actually in the room when you took the deflection?

A. No. They were occupying the apartment at the time.

Q. You don't know whether anyone was actually in the unit?

A. At the time that I measured, no, I couldn't say they were there. Again, it would be an assumption there was furniture there, they moved in and they were occupying the unit.

Q. At any point in time to determine what amount of deflection was due to dead load and what amount of deflection was due to live load, did you conduct any type of test to make that conclusion, actual test?

A. No.

Q. If you wanted to, what would you have done to test that conclusion?

A. I would have had -- let's say it was in 15 or

been tested in the actual field, correct?
A. Correct.
Q. Unit 15, as I recall, was the first unit you looked at?
A. Correct.
Q. That's the Jackvony unit?
A. Yes.
Q. Did you go in again and look at it when the ceiling was pulled down and trusses were exposed?
A. Yes.
Q. Did you make a determination to look and see whether there was any stamping on anything, any of the trusses to determine who manufactured the truss?
A. I did look for stamps. I didn't find anything that would indicate who the manufacturer was.
Q. I want to step back for a second so my question is proper. A truss can be -- a truss is an engineered structural member, correct?
A. Correct.
Q. Not so much today, but in older times when I was younger contractors would make their own trusses on the job, correct?
A. I am aware of that type of process.

Q. On those trusses that we've identified where they had the cracks corresponding to the knots, do you have photographs showing whether that was stamped as southern yellow pine Number 2 or southern yellow pine Number 3?

A. Unless they show up in the photographs here, I would not have a photograph, so I didn't notice -- there is a stamp there, it does say Southern Pine Inspection Bureau. I would have to get onto the computer to see if I could bring it up to see what the grade is. I can just see the SPIB, that's it.

Q. So you don't know what grade it is -- strike that. In any of the trusses that you inspected that had the cracks next to the knots, you don't know what the grade of the lumber is, is that fair to say?

A. I would say that I did not write down or record for the record what the grade of lumber was.

Q. And in terms of economics, southern yellow pine Number 2 would be more expensive than southern yellow pine Number 3?

A. Yes.

Q. So, a less than scrupulous truss manufacturer could be using southern yellow pine Number 3 to

save money?
A. Yes.
Q. That's a possibility?
A. Unfortunately, it's a strong possibility.
Q. And we don't know that as we sit here today?
A. As far as the grading, right. I mean, if we had somebody from the Southern Pine Inspection Bureau come out and look at the trusses, he might say I would never grade this a Number 2, I don't know.
Q. When a truss manufacturer prepares a truss design, they're supposed to submit some type of design drawings, correct?
A. Correct.
Q. Have you seen any design drawings for the trusses at Eagle's Nest?
A. I have not.
Q. Have you looked for any?
A. I personally haven't looked for any. It's my understanding that representatives from Perrino Associates at the time were trying to find any records that would be available.
Q. Does anyone know, is there any on file with the City of Warwick?
A. From what anybody that's done any

investigation with them to date, there has been no evidence of design calculations or framing plans from the truss manufacturer.

Q. Now, with respect to the trusses that you inspected in Unit 15, can you tell me when they were built?

A. When they were built? Again, I don't know if -- where are those pictures that I took? I don't think anything on the trusses would indicate -- let's see, I would say no, I don't know when they were fabricated.

Q. Do you know when Unit 15 was built?

A. To the best of my knowledge, it was built some time around 1984.

Q. At this particular complex, there are actually 120 units, correct?

MR. ORABONE: Yes, that's correct.

Q. And they were built over a number of years; would you agree with that?

A. Yes.

Q. With respect to any of the units that you examined, can you tell me if those units, the date when any of the trusses were manufactured?

A. I couldn't tell you when they were manufactured, no. There may be some indication on

a plate, but I don't know if that's --

Q. As you're sitting here today, you don't know whether they were manufactured all within a month of each other or five years from each other, correct?

A. That is correct.

Q. You don't know if they were manufactured by the same person or same entity, correct?

A. Correct.

Q. You don't know if it has the same materials in any of the trusses? When I say materials, I'm referring specifically to the grade, species and type of plates.

A. Again, from what I remember looking at all the different units, even if I didn't write it down, the grade stamps from what I recall were pretty consistent as far as the grade of lumber and species of lumber. The plates, I never took a lot of notice of the plates, so, no, I can't say that every single truss has the exact same manufacturer of plates.

MR. LANGLOIS: Off the record.

(OFF THE RECORD)

(LUNCH RECESS 12:53 TO 1:47)

Q. In the photographs that we just looked at which

the capacity that they give you in the tables has some factor of safety built in as well.
Q. When you're doing failure analysis, you're dealing with actual conditions, correct?
A. Correct.
Q. So you can run a test on the specific wood to determine whether or not -- what the strength capabilities of that wood is, correct?
A. Correct.
Q. Because the actual strength capabilities may be different than the assigned average values, correct?
A. Correct.
Q. In this particular case, no one tested the actual wood to determine what the strength capabilities were, correct?
A. Correct.
Q. Without knowing the actual strength capabilities of the wood, you can't accurately predict how much load it can carry, correct?
A. Yes. I guess you would say it's estimated based on the tabular, not the actual of what's been done.
Q. You would agree with that, in a failure analysis as opposed to a design analysis, in a failure

analysis you don't know what the actual strength of the wood is; you cannot accurately state how much load that wood can carry, correct?
A. I would agree with that, yes.
Q. At any point in time, did you analyze the moisture content in any of the trusses?
A. No.
Q. Does moisture content affect strength?
A. Yes. A higher moisture content can lower the strength qualities of the lumber.
Q. Have you ever used the MiTek system?
A. I have not.
Q. In this particular case do you know what version of the MiTek system was used?
A. I would have to look at the calculations to see if it's called out on the printout, that's the only way I would know which version, if it does stipulate that.
Q. It lists MiTek 2020?
A. Here it lists 6.2, I don't know if that's a version.
Q. When you're saying here, Steve, you're referring to the analysis that was done on Sunday, June 25?
A. Correct, 2006.
Q. Have you ever seen the MiTek software program?

THE WITNESS: Sure.
Q. And he assigns, and we'll accept this number as being accurate, 2.3 per square foot for three quarter plywood estimated and he assigns the Gypcrete specimen as 10.04 per square foot. Would you add that up.
(WITNESS PERFORMING CALCULATION)
A. 13.59.
Q. That 13.59 -- you've added up those figures that he sets forth on Page 12?
A. Yes.
Q. And that's the figure he uses on Page 13 to analyze the maximum carrying capacities of the trusses, correct?
A. Correct.
Q. Now, you earlier calculated for me the self weight for a 32-foot truss, correct?
A. Correct.
Q. What did you come up with for a number?
A. 2.94.
Q. He's wrong, isn't he?
A. I would have to say I disagree with the weight that he came up with.
Q. In the units that you examined over the years that you went over there, how many upstairs units did

you see that just had Gypcrete but no rugs on top of them?
A. None.
Q. Did you see where he included anything for the carpeting?
A. He lists here carpeting is assumed at 2 pounds per square foot, where applicable.
Q. Every unit had carpet, so he didn't include the carpeting, correct?
A. He did leave that out in his calculations.
Q. So his analysis is wrong again, correct?
A. There is a number that's off, absolutely.
Q. Now, on the MiTek, for the 32-foot truss which was done on June 25, there is five pounds per square foot for the bottom chord dead load, correct?
A. Correct.
Q. That should have been added in also, correct?
A. It's in his analysis, I would think it would have been in his -- kind of his synopsis, his findings, it should have included he carried 5 pounds per square foot for the ceiling.
Q. So he's wrong again?
A. He's mistaken in his synopsis, correct.
Q. If we add up the correct numbers, what does it come to?

A. If it had a Gypcrete floor, 20.55.
Q. Did you add the carpeting in, too?
Yes, five would make it 18.59, and then the two pounds for the carpeting, would make it 20.55 -- I didn't include the additional self weight, I'm sorry. And then another --
MR. ORABONE: Don't mumble to yourself. You have to speak out loud so the stenographer can hear you -- I ended up with a total of 22.28 pounds per square foot, if my math is correct. Is that what you came up with?
Q. So, he was basically more than nine pounds per square foot off on his calculations, correct?
A. Well, on the 32-foot truss, if he's stating that he applied the -- well, it does say where applicable on the Gypcrete. 32-foot trusses were on the two story units that didn't have Gypcrete, so, there's sort of a possibly --
Q. He was nine pounds -- more than nine pounds?
A. On the 32-foot truss, he shouldn't have been carrying Gypcrete because there wasn't any, but on the 26 and the 28, there was, so I would say he's off on his dead load for the two shorter trusses, but on the 32 length, I would subtract ten from this, and that would give me 12.28, so he's

actually conservative.
Q. Let's go back. He's assuming the Gypcrete is on the 32, correct? He's using 13.59?
A. If he's using 13.59 and his calculations, including the Gypcrete, this analysis is assuming the Gypcrete is there.
Q. So he's off by 9 pounds per square foot on the 32-foot trusses, correct?
A. Yes.
Q. He's off on all of his calculations, correct? What we'd have to do is adjust -- what we would have to do is recalculate the self weight for the 26-foot and the 28-foot trusses, correct?
A. Correct.
Q. But irrespective of that, he's off on all of his calculations, substantially off?
A. Appears to be missing some of the dead load.
Q. A lot of the dead load?
MR. ORABONE: Objection.
Q. We can do the math. What percentage of the dead load is he wrong on the 32-foot truss?
A. If you want me to use the calculator.
(WITNESS PERFORMING CALCULATIONS)
A. I get approximately 64 percent under. He's 64 percent under based on a 32-foot truss.

Q. That's a substantial error, wouldn't you agree?
A. I would say that that's a fairly substantial error, yes.
Q. Were you relying on his analysis to come up with your analysis?
A. I was relying on the analysis that was performed to render my opinion, yes, at least to bolster my opinion.
Q. But you didn't do any independent calculations, correct?
A. Correct.
Q. You didn't test any of your opinions, correct?
A. Did not field test any of them, no.
Q. He didn't field test any of his opinions either, correct?
A. Correct.
Q. In any of the units you went into and examined, could you detect by eye an inch deflection?
A. Just to look at it and say that's an inch, no. You could visually see the deflection had taken place, but I wouldn't say I could tell you exactly how much it was.
Q. Do you think anyone could tell a deflection standing outside looking up at a two story roof to determine whether or not there was a two-inch

correct?
A. Yes, they're underestimated, the dead load.
Q. Why was it your preliminary opinion that the trusses may have been fabricated on site?
A. A little bit of input from people that had supposedly seen the construction, somebody was trying to say that they thought they saw trusses being fabricated and then the other situation that made me think that was possible was the fact that I was seeing such a variety in the actual construction of trusses in the same exact floor system, which made me think there was a lack of quality control, which I thought could happen on a site a lot better than it could happen in warehouse conditions.
Q. When you say variety of conditions --
A. Depths. I think I mentioned in the report that I measured a fairly significant difference in depth of trusses right next to one another. Also, in some cases, one truss would have a single bottom chords, two web members and a single top chord, next one to it would have an additional bottom chord plate added and then the rest of it looking like the other truss. I found it strange there was this variety in the trusses. So that

correct?
A. Correct.
Q. So his measurements could have been off?
A. There could have been some error in the measurements, sure.
Q. And with respect to the second group, there was a guy on the board of trustees?
A. On the condo association board, I think he was -- I think he was working with the new condo management company and with people from their office shooting -- they actually set up grids on the floors and shot elevations.
Q. Do you know if this person knew anything about how to take measurements?
A. Honestly, no. I don't know what their background was at all.
Q. Did you ever see this person taking measurements?
A. No.
Q. You don't know if they were reliable or not; is that correct?
A. That's correct.
Q. Did you use some of the measurements of this unknown person was taking to determine which trusses had excessive deflections?
A. Yes.

A. No. Just getting older. So I guess I'm getting a little wiser.

Q. Any information provided since then?

A. The only other -- well, the additional information would be the additional analyses and then, of course, the reports or photographs provided by the contractor on some of the units that he's repaired, and the fact that I finally got to see actual plans of the buildings, which I never saw before.

Q. If we sent you back tomorrow to do an actual analysis, on the capabilities of the floor truss, what would you do today that you haven't done in the past?

THE WITNESS: If we wanted to do an in-place analysis?

MR. LANGLOIS: Yes. A proper scientific analysis that can be tested and verified, what would you do.

A. I would want a unit -- I would probably choose a unit that has an upstairs/downstairs, two different units above one another and want them both cleared out, and I would want the ceiling removed from the lower unit, and then I would establish a datum or existing condition of the

deflection of the trusses, and then I would want to perform -- I would do a load test where you actually load the trusses systematically approaching the prescribed live load of the building code and taking measurements throughout.

Q. And that wasn't done -- that hasn't been done yet, correct?

A. That's never been done.

Q. That would give you an actual reading?

A. Correct.

Q. Currently, how many units are there at Eagle's Nest, to your understanding, that do not have any excessive deflection as you have defined that term?

A. Can I refer back to that table? If I can find my report -- I'd have to read from the tables here to let you know.

Q. We're just giving an estimate. We went off the record for a minute, correct, sir?

A. I agree.

Q. Attorney Orabone, and I'm going to accept his math, I'm not really accepting it, but for hypothetical purposes, there are 120 condominium units at Eagle's Nest, correct?

A. I agree that's the number.

(PAUSE)

A. Okay. So as far as -- there was a truss beneath a wall above that appeared to deflect and cause the doors to misalign that were inside that wall. I also -- this is concerning that configuration we were just talking about of the stairways, where we have sort of a piggybacked toenailed beam section support, the trusses coming in at the stairway. And that particular member is deflecting and causing the trusses to drop, but it doesn't pertain to the trusses themselves but what they're being supported by.

Q. Was there reference to a saw-hole cut?

A. Yes. A plumbing -- another area of plumbing damage done to a truss somewhere near midspan.

Q. I should ask the question easier, that's what I usually do. Did you write back on March 17, 2005, "Our representative located himself in the basement below the wall described above. He then moved the drop ceiling tile and discovered a truss with a significant portion of its top chord removed by a hole-saw used to install a plumbing drain line"?

A. Yes.

Q. "This damage weakened the truss considerably,

and analysis for our records.

MR. ORABONE: Nothing further.

FURTHER EXAMINATION BY MR. LANGLOIS

Q. Sir, this was not a truss design, though, was it?

A. Truss analysis. An in-place truss analysis.

Q. It was a failure analysis, correct?

A. They were determining if it would fail, and then at that point an analysis to determine what would make it fail based on what they had for information.

Q. And we know from your review that his analysis is incorrect, correct?

A. Yes. The dead load in his analysis is incorrect.

Q. Substantially incorrect?

A. Over 50 percent is pretty substantial.

Q. Knowing it's over 50 percent wrong, would you still rely on it?

A. I would want it to be redone, I would say.

Q. As it sits now with the errors in it, would you rely upon it?

A. No.

MR. LANGLOIS: No further questions.

(DEPOSITION ADJOURNED AT 4:25 P.M.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM
ASSOCIATION, INC., ALSO KNOWN AS
EAGLE NEST CONDOMINIUM ASSOC.

vs. C.A. No. 04-436ML

NEW LONDON COUNTY MUTUAL
INSURANCE COMPANY, NLC INSURANCE
COMPANIES, INC., DOES I THROUGH
V, AND NLC INSURANCE COMPANIES,
ALIAS JOHN DOE COMPANY, et al.

DEPOSITION OF AIMAN ALAWA, Ph.D., a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Allied Court Reporters, Inc., 115 Phenix Avenue, Cranston, Rhode Island on July 7, 2006 at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFFS......LAW OFFICE OF STEVEN ORABONE
BY: STEVEN H. ORABONE, ESQUIRE

FOR THE DEFENDANTS......SMITH & BRINK, P.C.
BY: RONALD LANGLOIS, ESQUIRE

ALSO PRESENT: Mike Grafe

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

I N D E X

WITNESS PAGE

AIMAN ALAWA

EXAMINATION BY MR. ORABONE................3

EXAMINATION BY MR. LANGLOIS..............72


E X H I B I T S

(PLAINTIFFS')


| NO. | PAGE |
|---|---|
| 1 | 3 |
| 2 | 6 |
| 3 | 15 |
| 4 | 24 |
| 4A - C | 32 |
| 4D - G | 33 |
| 4H - J | 34 |
| 5A - D | 40 |
| 6A - D | 40 |
| 7A - F | 40 |
| 8 | 40 |
| (DEFENDANTS') | |
| A | 82 |
| B & C | 86 |
| D | 189 |
| E | 195 |


REPORTER'S NOTE: EXHIBITS RETAINED BY MR. ORABONE.

you have a specific topic that you want to have a copy of, I will definitely call -- I can call myself the company and ask them for a copyright permission first, then I can print you that particular issue that you're looking for.

Q. Number 1 asks for a complete and accurate copy of all truss design software programs used with the full explanation of all design formulas and variance; did I read that correctly?

A. Yes, you did.

Q. You did not bring that with you, correct?

A. Correct, I did not bring it, and the reason why is it's a proprietary program that exists only for manufacturers, which I work for, for example.

Q. How do we know that -- how can we check whether you did your program analysis properly, if we don't know what the program is?

A. You can question that, definitely. You have all the right to question that.

Q. I do have the right to question that, you agree?

A. Definitely. Definitely. Actually, as a researcher, I don't take any software for granted. What I did -- when I joined Hard Pine, the first year, actually, I got soft -- I was working with MiTek, and I started working, familiarizing myself

A. In the computer.
Q. What do you have on your computer at home relating to this matter?
A. The hours that I tracked and the files that were produced and gave these printouts on the trusses.
Q. What file?
A. Analysis.
Q. Is that not here? Are there analysis -- something on a computer that's not here?
A. No. The analysis results and all the analysis data are in this file.
Q. Now did you use a software program at home?
A. I can gain remote access from home to my computer at work.
Q. Without us seeing the software program, how am I supposed to verify what you did?
A. The results.
Q. But I don't know what the program -- let's put it this way, the program requires that you input certain information, correct?
A. Yup.
Q. There are different drop down screens on the program?
A. Yes.

Q. GIGO, have you ever heard that acronym before?
A. I don't know it.
Q. Have you dealt with computers before?
A. Yes, I have.
Q. Have you done research on finite element analysis?
A. Yes.
Q. Have you ever seen the term GIGO in any of the research?
A. Up to now I haven't seen that.
Q. Have you ever heard the term garbage in, garbage out?
A. I heard about that.
Q. What is garbage in, garbage out?
A. Garbage in, garbage out, computers are not intelligent entities. If you put garbage in, you get garbage out. If that's what you're talking about, GIGO, now I understand it.
Q. Does that GIGO -- we use GIGO, garbage in, garbage out apply to MiTek analysis?
A. If you have the wrong person, you would produce wrong analysis and wrong designs.
Q. If you put in the wrong data, you get erroneous results, correct?
A. It is.
Q. We can agree on that point?

A. I did not use it.
Q. You chose a different number?
A. I chose just the default.
Q. Okay. Now that's the default in the MiTek program?
A. Right.
Q. Getting back to that, that means we don't know what you put in and what you didn't put in, correct?
A. I can show you what I put in and what I did not put in.
Q. But when we don't know what the MiTek program says, we don't know whether you're using default analyses; is that correct?
A. It is correct, yes.
Q. So we can't verify your results, can we?
A. You cannot. I can.
Q. So we're relying on you, the person who brought your whole file with you, the person who used 1.25, the person who was retained and paid by the other side, we're relying upon you to tell us the truth?
A. Yes.
Q. Without verifying it, correct?
A. You are asking -- yes.

Q. And that's what you reflected in your report, correct?
A. Yes. In part of my report, it's not the whole part.
Q. On Page 13 of your report?
A. On Page 13 -- yes, it is incorrect. This one here, yes, it is correctly written here but --
Q. Let's stop. You knew that Exhibit 2 was going to be used for litigation purposes, correct?
A. Yes.
Q. You knew the issue in the litigation is to attribute as much problem to the live load as possible?
A. Yes, I know that. Yes, I know.
Q. So, in coming up with a percentages, you used the number of 13.59, correct?
A. Yes.
Q. All right. Now, are you aware of any units at the condominium that have Gypcrete but no carpet on top?
A. I haven't been to these units. The units that have the Gypcrete, I wasn't in that unit, and I did not take measurements on those Gypcrete, I relied on the field report that Steven Bogle gave.
Q. Wouldn't good scientific investigation require you

to check that fact out?
A. To answer your question, yes, it is, but there are many limitations also because many of the trusses were already covered, they were repaired, and they were covered and we didn't -- I didn't know exactly what existed on top of them.
Q. What information would you like to have had that you did not have?
A. As far as now, as far as now, if we want the -- what I was trying to establish is the maximum capacity, that is my main purpose.
Q. What information would you like to have that you didn't have?
A. Okay. We have the vanity weight, for example.
Q. You didn't have that?
A. We did not have that.
Q. And that should have been included in the calculation?
A. Usually common practice is that you included it in your 10 PSF, by the way.
Q. But you didn't use 10 PSF?
A. I did not use 10. I went for the extreme cases.
Q. Let's talk -- we're not talking about designing

something, we're talking about something that actually exists out at the Eagle's Nest.
A. Okay.
Q. You didn't include the bathroom vanities?
A. I used them in this report here.
Q. Let's go back. Exhibit A is the report you ran this morning?
A. This morning.
Q. That I just received at some time about 1:30, quarter of two, today?
A. Okay.
Q. Is that correct?
A. Yes.
Q. Exhibit 2 which is your report which I believe was prepared at the end of June of this year, correct?
A. Yes.
Q. You didn't include anything for the vanities, correct?
A. No, I did not include that.
Q. And that would have increased the dead load?
A. Would have.
Q. Didn't you think there were vanities in the bathrooms at the condominiums?
A. When you take -- usually you -- the standard of the industry is to go with minimum -- not

minimum, by some certain amount of dead loads or live loads. That's what I used in the beginning.

Q. But we're talking about actual conditions here?

A. Actual conditions, yes.

Q. Did you think there were vanities at the Eagle's Nest condominium?

A. I know that there were, definitely.

Q. You didn't include that in the data?

A. I did not include that.

Q. Did you include the toilet fixtures into the dead load calculations?

THE WITNESS: Fixtures as of?

MR. LANGLOIS: The toilet.

A. A toilet, yes. I took the worst-case scenario and studied it. I did not include it, to answer your question, except in this report.

Q. Let's go to your report, the one that you submitted for litigation purposes, the one that you prepared before you found out all the problems with it. You had 13.59, correct?

A. Yes.

Q. That 13.59 was the Gypcrete, correct?

A. Yes.

Q. 10.04, correct?

A. Yes.

Q. 2.3 for plywood, correct?
A. Right.
Q. And the 1.25 for the self weight, correct?
A. Right.
Q. Now we know the self weight number is wrong, correct?
A. Based on Steve's report, yes. You asked me. Yes.
Q. Now you keep saying based on Steve's report. The 1.25 is wrong based upon accepted engineering principles, correct?
A. Okay, yes. I'll say yes.
Q. It's true.
A. It is true.
Q. You used an assumption, he did the actual calculation, correct?
A. Yes.
Q. And that's where you came up with the 13.59, correct?
A. Yes.
Q. So you didn't include the vanities that were actually at the site, correct?
A. Right.
Q. You didn't include the toilet fixtures?
A. Right.

Q. You didn't include the bathroom tubs or whatever, correct?
A. Right.
Q. You didn't include all the partitions?
A. In part of my report, yes, I did.
Q. You used one partition?
A. Right.
Q. Aren't there several bedrooms, kitchens and bathrooms up above those floor trusses?
A. There are.
Q. More than one partition, correct?
A. There are. And there are some sections that will have only one partition, that's the case that I took.
Q. Now, but you didn't include all the partitions, correct?
A. In this report, no. It was not done intentionally.
Q. I'm not saying it was. I'm going to let someone else make that decision. But the fact was, it was a significant omission, correct?
A. Okay. Yes.
Q. A significant omission that affects your opinion as reflected in Exhibit 2, correct?
A. Yes.

Q. Now, you didn't include the rugs, correct?
A. Correct.
Q. Which you assigned a number of 2, correct?
A. Yes.
Q. Do you think the Gypcrete was just sitting up on all these floors bare in these condominiums?
A. I was studying two cases, one is --
Q. What was my question?
A. Yes.
Q. You thought -- did you think that there were rugs on top of the Gypcrete?
A. Maybe it passed my attention.
Q. So there is another mistake?
A. It's a mistake, yes.
Q. With that 13.59 did you include the bottom chord dead load of 5?
A. Yes. I included it.
Q. Where is that in the 13.59?
A. It is in here, actually. This is my analysis.

MR. ORABONE: If he's going to say here for the record, for the stenographer, use the exhibit number.

A. I elaborated here in the report on the top chord, loading only, I did not elaborate on the

Q. Now, if there were 17 inches, which was an actual condition and not 18 inches, would that affect the analysis?
A. It will. This analysis is not for the 18-inch trusses for -- for the 17-inch trusses, these are only for the 18-and the 24-inch trusses.
Q. You don't know how many trusses existed at Eagle's Nest that was 17, correct?
A. I don't know.
Q. And that would affect your analysis?
A. It wouldn't have affected it, because I'm taking only -- no.
Q. Let's put it this way, there has been testimony that some of the trusses may have been 17 inches in depth, correct?
A. Okay.
Q. The analysis that you performed would not apply to those trusses that were 17 inches in depth?
A. Correct.
Q. You only saw two units, correct?
A. I saw two units only.
Q. These were not the --
A. A third unit I saw it was only for excessive deflection, but that's it, yes.
Q. The trusses were not exposed?

A. No, I did not.
Q. Did you see any photographs of trusses that had double bottom chords?
A. These are not called bottom chords, double bottom chords. What I heard from Steven is that there were some repairs that were carried out.
Q. When did you hear that?
A. During the course of this investigation.
Q. How many times have you spoken to Mr. Bogle?
A. During that time that we went for the inspection.
Q. On June 6 of 2006?
A. Yes.
Q. Did he tell you some of these trusses were repaired during construction?
A. Not the ones that we were looking at. He told me there were some, yes.
Q. He told you that on June 6, 2006?
A. Yes. But he did not tell me during construction or otherwise. He told me there were some trusses that were repaired by somebody else other than themselves, which is -- you know, versus plywood.
Q. Did you see any evidence of that in any of the photographs that you looked at?

A. Yes.
Q. Are you familiar with the MiTek website?
A. I believe so.
Q. They've got this whole list of bugs in their site?
A. Yes.
Q. So MiTek makes a mistake once in awhile?
A. They do, but they're improving quite a bit over the years.
Q. One of the good things is because you know MiTek makes mistakes, you should test -- isn't it good engineering practice -- in fact, isn't there an engineering article out there that you should, where possible, you should test the computer results, correct?
A. Yes, and I did that on a different occasion that was not related to this job.
Q. Was it relating to floor trusses?
A. It was related to floor truss, yes.
Q. Which location?
A. In Hard Pine.
Q. Not here?
A. Not on this one, no.
Q. But you asked about verification and that's what I'm saying. Show me in the MiTek analysis -- strike that. When you go back and you did this

not going to present them as evidence obviously.
Q. Did you print materials off from the STAAD program?
A. I did not, no. I can kept them as files.
Q. You have them someplace?
A. Yes, I have them.
Q. You didn't bring those today?
A. I can. If you want me to drive back and forth.
Q. I thought the question I asked was you didn't bring those today?
A. No, I did not, because it was an incomplete study and it did not finish, because of a request done -- that it was not allowed.
Q. When did you start working at Hard Pine?
A. 2001.
Q. Prior to 2001, what involvement did you have with wood trusses?
A. Wood trusses, I didn't have any involvement.
Q. Prior to 2001 had you had any training in wood trusses?
A. No, I did not.
Q. Any study of wood trusses?
A. No, I did not.
Q. You worked at Hard Pine from 2001 until when, sir?

will take the sizes the depths that you have already expected, do the analysis, and after they do the analysis, it goes into the design process.

Q. And then they print out something like Exhibit 7E?

A. Yes.

Q. That something like 7E or 7A then goes back --

A. To MiTek. It will go back to MiTek.

Q. Hold on a second. When it's completed at Hard Pine, did Hard Pine have a professional engineer --

A. No, we did not. We did not.

Q. -- who sealed their drawings?

A. They sealed them in MiTek.

Q. Someone has to certify the analysis, correct?

A. Yes.

Q. Someone has to certify the MiTek analysis?

A. They will look over the analysis, yes, and check and seal.

Q. Seal the analysis?

A. Yes.

Q. The sealed analysis at some point in time gets back to the builder?

A. Yes.

Q. The builder then takes that sealed analysis and gives it to the building department, correct?

A. Not necessarily at the beginning. When it's done --
Q. At the end?
A. When they need it.
Q. When it's done, the building inspector --
A. In many instances they need that stamp.
Q. When it is done, the building inspector in the appropriate community has to have a sealed set of drawings --
A. Right.
Q. -- relating to the trusses, correct?
A. Right.
Q. Without those sealed drawings, those trusses cannot be installed, correct?
A. Right.
Q. Only a professional engineer can seal those drawings?
A. Sealwise, yes.
Q. Only a professional engineer can represent to the government building inspector that this analysis is proper?
A. Right.
Q. You couldn't do that?
A. I am not a P.E., not yet.
Q. When you were at Hard Pine, you were not permitted

to seal the drawings to determine that they were accurate, correct?

A. Nor Hard Pine wanted to have a P.E. on their team, so they would have some other issues.

Q. Was that the question I asked?

A. Yes; you are correct.

Q. When you were at Hard Pine, you could not certify the MiTek analysis?

A. No, I did not.

Q. You couldn't?

A. I couldn't.

Q. By law you couldn't?

A. I couldn't.

Q. Correct?

A. Yes.

Q. As a matter of fact, by law, you cannot, to this day, as we're sitting here today, certify the MiTek drawings, correct?

A. Right.

Q. You're not certified in the MiTek program, correct?

A. No.

Q. Is that correct?

A. No, I'm not certified.

Q. Have you ever written any articles on wood

the field issues.

Q. We're talking about truss failures.

A. Failures, I wasn't on the failure problem there.

Q. Truss failures anywhere, not problems, identify specific sites of truss failures.

A. Except for this project, none.

Q. Have you ever manufactured a truss?

A. Manufactured a truss? In Hard Pine -- no, did not press the truss. In Hard Pine I was the design manager there and I was designing and just next door they were manufacturing.

Q. Have you ever physically installed a truss?

A. Installed a truss, no.

MR. LANGLOIS: Do you want to stop here?

(DEPOSITION ADJOURNED AT 4:05 P.M.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., ALSO KNOWN AS EAGLE NEST CONDOMINIUM ASSOC.

vs. C.A. No. 04-436ML

NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V, AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY, et al.

VOLUME II

DEPOSITION OF AMAN ALAWA, Ph.D. a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Smith & Brink, PC, One State Street, Providence, Rhode Island on September 18, 2006 at 1:15 P.M.

APPEARANCES:

FOR THE PLAINTIFFS......LAW OFFICE OF STEVEN ORABONE
BY: STEVEN H. ORABONE, ESQUIRE

FOR THE DEFENDANTS......SMITH & BRINK, P.C.
BY: RONALD LANGLOIS, ESQUIRE

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500

# I N D E X


| WITNESS | PAGE |
|---|---|
| AMAN ALAWA | |
| FURTHER EXAMINATION BY MR. LANGLOIS | 3 |
| FURTHER EXAMINATION BY MR. ORABONE | 123 |
| FURTHER EXAMINATION BY MR. LANGLOIS | 143 |
| FURTHER EXAMINATION BY MR. ORABONE | 152 |
| FURTHER EXAMINATION BY MR. LANGLOIS | 153 |
| FURTHER EXAMINATION BY MR. ORABONE | 157 |


## E X H I B I T S

(DEFENDANTS')


| NO. | PAGE |
|---|---|
| F | 41 |
| B-1 | 68 |
| 7E-1 | 87 |
| G & H | 158 |


REPORTER'S NOTE: Exhibits retained by the parties.

A. Yes, we do, right here.
Q. And if we look at the geometry, exhibit on 7E that would correspond to your handwritten notes on Exhibit B-1?
A. Right.
Q. And there are metal plates that hold the webbing in, correct?
A. Right.
Q. There are metal plates that splice the joints also?
A. Right.
Q. That have certain strength capabilities, right?
A. Right.
Q. And on this particular one it said plates mil 20, grip 249/190, correct?
A. Right.
Q. Did you input that information into the computer?
A. No, I did not.
Q. Where did that information come from?
A. It's a recommendation by MiTek.
Q. So MiTek recommended that plate --
A. Yes.
Q. -- for this design?
A. Yes.
Q. With those plates, this design would have the

strength capabilities as reflected in Exhibit 7E?
A. Right.
Q. If you changed the plates, the strength capabilities could change, correct?
A. The plates are elements that would hold joints in place. It will hold member ends in place and also they will restrain rotation of these elements; that's what they are.
Q. Okay. Did you run an analysis using a different plate?
A. No, I did not.
Q. Did you ever try to run an analysis using a different plate?
A. No, I did not.
Q. Why not?
A. Because we are talking now about analysis, not about design. What our objective was was the analysis. The analysis will not take plates sizes into account. What the analysis will do is that it will give you -- let's say you have a joint and when you run the analysis, the program will assume that there is a certain rotation at that joint and you want either to restrict it or make it free, and the plates do not come into the play at that point; we're running analysis, not design.

# In The Matter Of:

*Re: Claimants: Clara Goncalves, Tracy Mendes, Jaquilina Pereira and Emilio Varela*

---

*Steven A. Bogle, P.E.*

*September 16, 2005*

---

*Reporting Associates*
*10 Dorrance Street*
*Westminster Square Building Suite 617*
*Providence, RI 02903*
*(401) 351-1660*

*Original File BOGLELFO.TXT, 111 Pages*
*Min-U-Script® File ID: 3755293195*

**Word Index included with this Min-U-Script®**

EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., a/k/a EAGLE'S NEST CONDOMINIUM ASSOC.

VS. C.A. NO. 04-436ML

NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY

DEPOSITION OF STEVEN A. BOGLE, P.E., taken on behalf of the Defendant, Friday, September 16, 2005 at 1:16 p.m. pursuant to the Federal Rules of Civil Procedure at the offices of Smith & Brink, P.C., One State Street, Suite 400, Providence, Rhode Island before Linda F. Oakley, RPR, Inc., Notary Public.

APPEARANCES:

STEVEN ORABONE, ESQ.
Counsel for the Plaintiff

SMITH & BRINK, P.C.
BY: RONALD LANGLOIS, ESQ.
Counsel for the Defendant

REPORTING ASSOCIATES
Westminster Square Building
10 Dorrance Street, Suite 617
Providence, RI 02903

INDEX


| DEPONENT | PAGE NO. |
|---|---|
| Examination by Mr. Langlois | 3 |


DEFENDANT'S


| EXHIBITS | DESCRIPTION | PAGE NO. |
|---|---|---|
| A, I.D. | Photostatic copies of fifty pages of correspondence and related material regarding floor trusses | 6 |
| B, I.D. | Six color laser copies of photographs paper clipped together | 6 |
| C, I.D. | Five color laser copies of photographs paper clipped together | 6 |
| D, I.D. | Three color laser copies of photographs paper clipped together | 6 |
| E, I.D. | Eleven color laser copies of photographs paper clipped together | 6 |
| E-1, I.D. | Six color laser copies of photographs paper clipped together | 6-7 |
| F, I.D. | Five color laser copies of photographs paper clipped together | 7 |
| G, I.D. | Three color laser copies of photographs paper clipped together | 7 |
| H, I.D. | Color laser copy of photograph | |
| I, I.D. | Color laser copy of photograph | 7 |


INDEX

DEFENDANT'S


| EXHIBITS | DESCRIPTION | PAGE NO. |
|---|---|---|
| J, I.D. | Color laser copy of photograph | 7 |
| K, I.D. | CD remains in possession of Mr. Langlois | 7 |
| L, I.D. | Photostatic copy of one-page document of Geisser Engineering Corporation titled Letter of Transmittal dated July 29, 2002 | 14 |
| M, I.D. | Photostatic copy of Request For a New Job Number | 17 |
| N, I.D. | Drawing No. S-1 of Floor Truss Reinforcement, Quadplex 15, Unit 15C, Eagle Run, East Greenwich, Rhode Island | 31 |
| O, I.D. | Photostatic copy of diagram with attached Summary Report of Basic Geometric Properties | 38 |
| P, I.D. | Photostatic copies of eight pages of preliminary architectural drawings of Eagle's Nest Four Family Unit | 45 |
| Q, I.D. | Two pages of handwritten notes on white lined paper | 51 |
| R, I.D. | Photostatic copies of ten pages of documents, including HardPine Inc. Report on Floor Trusses Condition, Warwick Condos, R.I. | 55-56 |
| S, I.D. | Photostatic copy of one-page memorandum to Unit Owners - Quadplexes from Barbara Perrino dated September 19, 2002 | 75 |

Page 75

able to give them a, I gave them a letter stating it was okay to stop the plywood from the ends of the trusses approximately five feet. And then, also, we came up with a extra reinforcing using quarter inch steel plates at the broken sections of the trusses. So they just have letters to document that that was an acceptable repair.

**MR. LANGLOIS:** Can I have this marked as the next document.

**(PHOTOSTATIC COPY OF ONE-PAGE MEMORANDUM TO UNIT OWNERS - QUADPLEXES FROM BARBARA PERRINO** DATED SEPTEMBER 19, 2002 WAS MARKED DEFENDANT'S EXHIBIT S, IDENTIFICATION)

**Q:** Go ahead.

**A:** On the 16th we also have, December 16th, 2002 I have a letter regarding 38C and D, which was a, that's a multistory unit. But we had some pretty —

**Q:** Go ahead. When you say multistory, is that a quadplex or —

**A:** No. Multistory meaning that the individual owned more than one floor —

**Q:** Okay.

**A:** — in the unit.

**Q:** Okay.

**A:** They had some significant damage to the trusses,

Page 76

which were not involving a break, but literally plumber's damage, if you know what I mean. The plumber went ahead and drove right through the truss.

**Q:** That's not an uncommon —

**A:** No. Unfortunately, it's not. So I was recommending that unit be moved up the list because of the damage that had occurred. Let's see. The next that I have a letter here from August 16th, '02.

**Q:** Can I just go back? What unit is that?

**A:** The December?

**Q:** The unit that the plumber drove through.

**A:** That would be 38.

**Q:** C? D?

**A:** C and D.

**Q:** Okay.

**A:** 38C is where I found the major damage.

**Q:** The damage to the trusses there that needed repair, that was due to defective construction work by the plumber?

**A:** Yes. That's what, you know, that's —

**Q:** It's not uncommon, not to pick on a trade, for plumbers.

**A:** It's not even uncommon in this whole complex. I mean, in some of the units we — matter of fact, in unit 22, which is where HardPine inspected, the

Page 77

trusses, one of the trusses he was looking at was broken. You know, the bottom chord was broken. But in another area of the same unit a portion of the truss was near a wall, so it had some support from the wall. But the plumber had drove right through. I mean, the truss guy saw that and almost fell over, but, ha-ha, ha-ha.

**Q:** Let's step back a second. In terms of construction, and we'll talk about these particular units, in general, the trusses, both the ceiling level and the floor levels, go in before the plumbing and the electrical, correct?

**A:** Correct.

**Q:** The trusses are designed to provide a certain amount of structural integrity, correct?

**A:** Correct.

**Q:** Which, and we talked about that with BOCA; they're designed to hold a certain amount of weight —

**A:** Yes.

**Q:** — by code?

**A:** Yes.

**Q:** The design and the materials used in these trusses, theoretically speaking, are supposed to support that when everything is put together properly, correct?

**A:** Correct.

Page 78

**Q:** Sometimes certain building trades, primarily plumbers, when they come in after the trusses have been installed, cut holes through these trusses so they can run their pipes, correct?

**A:** Correct.

**Q:** And some of the pipes that they're installing, whether if they're coming, are substantial in width, correct?

**A:** Correct. I mean, typically, the size of the pipe isn't the problem when it comes to a truss. It's the location that's the problem.

**Q:** The location. And these plumbers are cutting the trusses and, therefore, destroying the structural integrity, reducing the structural integrity of the truss, correct?

**A:** Correct.

**Q:** And with respect to unit 38C and 38D, what was observed there was the plumber did something, cut through the trusses to run a pipe, is that correct?

**A:** Yes.

**Q:** And that affected the structural integrity?

**A:** Correct.

**Q:** Did that cause the problem with the deflection in that unit or contributed to it?

**A:** I would say contributed to the deflection 'cause the

Page 79

truss was damaged.
Q: And that was from the date of construction, whatever it may have been, 1982, 1983, whenever the unit was constructed?
A: Correct.
Q: Okay. With respect to units 22A and 22B, on those trusses, was it 22A or twenty— I apologize. Was that one unit? One truss?
A: Well, let's see. Potentially, we're referring back to when the HardPine representative was there. He listed the unit 22A.
Q: And what was the problem with 22A?
A: Well, where we saw plumbing damage was really more to the back of the unit, nowhere near where the trusses. We had a twisted truss and had one truss with a broken chord that were separate completely. So that, plumbing damage did not affect —
Q: That one?
A: — the deflection on those two trusses.
Q: But the plumber did cut through the truss?
A: But he did cut through a truss further into the building, yes.
Q: Anyplace else, sir?
A: Other units that had the configuration of 38C did have, it was almost a given. I could walk to the

Page 80

same location 'cause what it was was there was a bathroom up on the second floor. And when they cut for the pipe for the, I'm pretty sure it's for the toilet or the tub in the same location and units of the same configuration, it was almost a given that you could see damage.
Q: Okay. And —
A: Normally, that was found after we had stripped the ceilings due to deflection found in other parts of the room, but we'd also see that damage there. So there was that there.
Q: How many, can you, looking at Exhibit D from earlier at Ms. McMahon's deposition, can you tell which one had damage to the trusses caused by the plumber cutting?
A: Again, I remember 38C 'cause that was the first one that I saw. I would have to find out 'cause I don't remember by numbers which units had the same layout as 38. They were buildings built similar to 38 that had that problem.
Q: So whatever 38C may have been, let's go back. 15, unit 15 was this fourplex?
A: Quadplex.
Q: Quadplex. How would you describe unit 38?
A: More like a duplex. There would be two single-family

Page 81

units side by side with two floors and a full basement.
Q: And in all of those units that you observed, the plumber had cut?
A: I wouldn't say all, but in quite a few of the ones of that construction type, the plumber to some degree hit a truss because it landed in the same area. So there was a pattern that followed.
Q: And that affected the structural integrity of the trusses?
A: Of that truss, of that particular truss that he hit, it most certainly did.
Q: Which contributed to the deflection of the building?
A: It could contribute. It contributed to the deflection of the floor in that area, yeah.
Q: And that was from the date of original construction?
A: Correct. Or from the date that the plumber did his work.
Q: Yes. Would you take a look at Exhibit S, please.
MR. LANGLOIS: Will you mark this, please.
(PHOTOSTATIC COPY OF TWO-PAGE LETTER FROM GEISSER ENGINEERING CORPORATION TO PERRINO & ASSOCIATES DATED NOVEMBER 29, 2002 WAS MARKED DEFENDANT'S EXHIBIT T, IDENTIFICATION)

Page 82

Q: And would you take a look at Exhibit T. Do you have Exhibit T in your package?
A: It should be here, but I'm not —
Q: I know you had it.
A: I know I had it.
Q: Have you had an opportunity to review Exhibit T?
A: Yes.
Q: And is that a document you prepared in the regular course of your business?
A: Yes.
Q: And it was kept in the regular course of your business?
A: Yes.
Q: And that document's dated November 29th, 2002?
A: Yes.
Q: Now, having looked at that document, are you able to identify which ones were quadplex units similar to 15?
A: Well, they're listed, 22, —
Q: Yes.
A: — 34, 39, and 40.
(Discussion off the record)
Q: So 15 was a quadplex, 15A and B?
A: Yes. 22.
Q: A and B.

C. A. PRETZER ASSOCIATES, INC. 50 Freeway Drive, Cranston, RI 02920
STRUCTURAL ENGINEERS
DESIGN, CONSULTATION, INVESTIGATION
(401) 785-2690 FAX (401) 461-9360
email: mail@capretzer.com

C. ANDREW PRETZER, PhD., P.E.
MICHAEL J. GRAFE, P.E.
THOMAS P. GRAFE, P.E.
DAVID GRANDPRÉ, P.E.
PETER W. GRAFE
DAVID B. O'NEILL, P.E.

September 26, 2006

Mr. Ronald Langlois, Esq.
Smith & Brink, P.C.
One State Street, Suite 400
Providence, RI 02908

Re: Eagle Nest Condominium Association, Inc.
CAPA File No. 204493.70

Dear Mr. Langlois:

You have asked C. A. Pretzer Associates, Inc. to review the findings of Mr. Steven A. Bogle, P.E., Mr. Aiman Alawa, Ph.D., and Mr. Domingos Medeiros, with regard to the floor trusses at the above referenced project.

You have provided us with their reports, affidavits, and deposition transcripts for our review. I visited the site on June 6, 2006, to review the trusses in Unit 16A. Mr. David Grandpré, P.E., and Ms. Jennifer Greene, from our office, reviewed the trusses in Units 17A and 19A on May 14, 2004.

It was determined early in Mr. Bogle's investigation that some floor trusses had cracked and sagged as much as 5 inches. The cracks typically occurred in the bottom chord at knots or other imperfections in the wood grain. The bottom chord is in constant tension, and the imperfections create a weak spot that broke, in some cases. This is an indication that a poor grade of lumber was used in the bottom chords.

It was also determined by Mr. Alawa's analysis that the trusses were under-designed for the dead load plus a code-required live load of 40 psf. Even though we found several problems with Mr. Alawa's analysis, we do agree that the trusses were under-designed. Under-designed trusses are trusses that theoretically are not adequate to support established design load criteria.

Because of the broken members, large sags, and under-designing, the owners decided to reinforce the trusses with plywood nailed to both sides. We agree that the trusses should have been reinforced, but we were not asked to analyze the design of the reinforcing.

Although we agree with the fundamental assessment that the trusses were inadequate and needed to be reinforced, we found several problems with the investigation technique, terminology, methodology, computer analysis, mathematics, and subsequent opinions expressed by Mr. Bogle, Mr. Alawa, and Mr. Medeiros. The following is a list of discrepancies we found:

EXHIBIT E

1. The term "failure", as defined in the Dictionary of Architecture and Construction by Cyril M. Harris, Professor of Architecture at Columbia University, is *"In structural engineering, that condition of a structural element (or its material components) which renders it incapable of continuing the load-carrying function for which it was designed; may be caused by fracture or by excessive and permanent plastic deformation."* By this definition, only the trusses that had cracked members and trusses with excessive deformation would be considered structural failures. Stating that a truss has "failed" because the theoretical wood stresses determined by calculation exceed the allowable design stresses, as stated in Mr. Bogle's and Mr. Alawa's reports, is incorrect. Allowable stresses have a safety factor against failure. Mr. Bogle and Mr. Alawa misused the term "failed." They should have said the trusses did not meet the established design criteria of the code. Failure to meet design criteria does not, in itself, mean that the truss has failed.

   The term "excessive and permanent plastic deformation" is difficult to define, but a conservative guideline would be L/240 based on the deflection limits given in Section 1604.3 of the 2003 International Building Code deflection. L/240 is the length, in inches, divided by 240. For the 26'-0", 28'-4", and 32'-0" trusses, L/240 is 1.3, 1.4, and 1.6 inches, respectively.

2. The methods used by Mr. Bogle and representatives from Perrino & Associates, in taking deflection measurements may have been inaccurate and incomplete. Many of the units had ceilings in them when the measurements were taken, so the deflections of the trusses themselves were not actually measured. The deflections recorded were at the low point of the ceiling, so only one or two trusses out of ten or more in the unit may have deflected at the recorded deflection. A 6-foot level was used to measure deflections by holding one end of the level against a wall, which was presumed to have no deflection, and the other end at a low point in the room. This would give a general sense of the deflection but would not be very accurate.

3. The determination of actual dead load on the trusses was incorrect and incomplete, and no determination of live load was made. Based on Mr. Alawa's analysis, the dead load on the trusses was self-weight plus 13.6 psf on the top chord and 5 psf on the bottom chord. Using the weights on page 12 of 25 in his report, the top chord dead load with gypcrete fireproofing should have been 2.3 psf for the plywood subfloor, plus 10.04 psf for the gypcrete, plus 2 psf for carpeting and padding, for a total of 14.34 psf, not 13.6 psf. There were also no loads taken for partitions, cabinetry, plumbing fixtures, and other built-in dead load on the floor above. The bottom chord ceiling dead load of 5 psf did not include plumbing lines, electrical lines, or ductwork. In addition, we found that some roof load was being transferred through the second floor partitions, onto the floor trusses in Unit 16A. There was no determination or estimation of the actual live load on the trusses shown in any of the reports.

4. The type of computer analysis used was not well suited for trusses fabricated in the 1980's with broken members. The Mitek program used in the analysis is an excellent design tool for new construction but has limitations when it comes to failure analysis, based on the output that I saw.

We were not provided with a copy of the software to review, but we question whether or not the program is capable of incorporating defective or broken members, correct allowable wood stresses at the time the trusses were fabricated, or the same type of metal plates as used by the original fabricator.

We also noted that the plate sizes and splice locations in the bottom chord used in the analysis did not match those that I measured in the field in Unit 16A. We do not know if the program is flexible enough to use the actual plate sizes, or that the correct sizes were not input into the program. The actual measured depth of trusses in a given unit varied by at least a 1/2 inch, according to Mr. Bogle. The analysis did not reflect variations in depth. We also saw no bending stresses calculated between panel points in the top or bottom chord, nor did we see any provisions for creep deflection due to dead load in the output provided. These deficiencies in the truss models and limitations in the program make the analysis inaccurate for determining the failure load. An accurate failure analysis would model the actual truss components, condition, applied loads, and be able to replicate the actual observed field conditions of deflection and cracked members.

5. The most accurate way to determine the load-carrying capacity of a wooden truss is to test it. No field load tests were performed to check the deflection of the trusses under a known load. This type of test would have been easy to do and would have provided an accurate check on the theoretical computer analysis.

6. Mathematical mistakes in Mr. Alawa's report make the results of his analysis incorrect and misleading. As previously established, the dead load used in the analysis was incorrect and incomplete. However, the charts on sheet 13 of 25 do not even use the dead loads that Mr. Alawa calculated. They use much smaller dead loads, which enhance his subsequent opinion that live load caused the failure. The dead load used to calculate the percentages in the tables is 13.59 psf. The dead load calculated by Mr. Alawa on the 26-foot truss, for example, should have been: self-weight, 2.65 psf + plywood, 2.3 psf + carpeting, 2.0 psf + gypcrete, 10 psf + ceiling 5 psf, for a total of 21.95 psf. This mathematical error makes the results shown in the tables erroneous, and misleads the reader.

## CONCLUSIONS

We agree that the trusses were under-designed, but the number of trusses that actually failed due to broken members or excessive deflection was very limited.

Some of the field measurements of deflection taken by Mr. Bogle and the owners' representatives could not be done accurately with ceilings in place.

The calculated dead load did not include partitions, cabinetry, plumbing fixtures, nor other built-in items that would have substantially added to the dead load used in the analysis. No actual applied live load was ever determined or estimated. The live load, which is said to have caused overstress, was never shown to exist. Mr. Bogle and Mr. Alawa assumed that the live load

existed and that the trusses were overstressed by it, but never showed how much was actually on the trusses.

The computer analysis was done using a design program that was not well suited to a proper failure analysis of the actual conditions. No load tests were done in the field to substantiate the results of the analysis.

Therefore, we conclude that the opinions of Mr. Bogle and Mr. Alawa that the dead load alone did not cause the trusses to fail, but live load of the occupants and their possessions did cause failure is unsubstantiated by the work that they did.

Based on the information provided in Mr. Bogle's and Mr. Alawa's reports and what we saw in the field, there is significant evidence that trusses could have failed from dead load alone. We concluded from photo Exhibit C-14 in Mr. Bogle's report that at least one truss in Unit 45B had a broken bottom chord and was most likely repaired during construction, before the ceiling was installed. The poor lumber used in the bottom chord greatly reduced the load-carrying capacity, and the bottom chords could have broken due to dead load alone.

Mr. Bogle, Mr. Alawa, and Mr. Medeiros did not determine when the trusses broke. They did no failure analysis to determine when the trusses may have broken or under what load they broke. They broke due to defects in the wood, which could have been due to dead load alone.

The shallow depth of the trusses in relationship to their span and the extra weight of gypcrete made them susceptible to large dead load deflections. The deflection due to dead load increased over time due to "creep," which is the relaxing of the wood fibers under constant stress. "Creep" deflection due to dead load was not considered in the analysis done by Mr. Alawa and could have been the cause of the excessive deflections.

Without the correct dead load and with no dead load deflection calculation or creep analysis of that deflection, it cannot be said with any certainty that the excessive deflection was caused by people and property.

Please contact me if you have any questions.

Sincerely,

C. A. PRETZER ASSOCIATES, INC.

Michael J. Grafe, P.E.
President

MJG/sjm

# *Length/Deflection Ratio Settings for MiTek 20/20 Software*

MiTek recommends using the deflection limits listed below, unless more stringent criteria are specified by the project engineer/architect. The settings for deflection limits may be altered for specific job requirements.

Floor trusses should use the following settings:







Roof trusses should use the following settings:







EXHIBIT F

Deflection due to wind load is not often a governing condition, however, there are certain instances where it may control. Long overhangs/cantilevers and tall end verticals exposed to wind can be limited by deflection.







Attic trusses should have the BC Panel limit changed to 360 for live load and 240 for total load. This setting is not automatically applied when the truss type is changed to "attic". Even if the overall truss deflection is changed to 360 live and 240 total, the attic room panel may not pass unless the panel deflections are changed correspondingly

In some cases, the deflection on cantilevers and overhangs may fail to meet the specified ratio. However, if it is less than 0.5", the software will report this as acceptable. This was programmed intentionally to prevent reasonable overhang lengths from failing in deflection in certain instances.

Please note that the settings for cantilever and overhangs are half that of the main span. The panel settings may be increased if desired. Also note that, although the deflection ratio may allow for much higher deflections based on the truss span, it is recommended that the absolute deflection be kept under 1". Higher deflections, while meeting the building code minimum deflection ratio, may potentially produce aesthetic issues. Sealed designs from MiTek may have a note added calling attention to this issue.

Generally, floors are designed with the live load deflection set to 360 and the total load set to 240. If a stiffer floor system is desired, architects and engineers often specify the live load deflection criteria should meet L/480. In this situation, it is highly recommended that the total load deflection be increased to 360 in order to achieve a corresponding increase in overall stiffness. This applies to other common settings for live and total load deflections, such as 600/480 or 720/600.

# TRUSS DEFLECTION MAY BE KEY TO SATISFYING YOUR CUSTOMERS

Truss deflection may be something you do not give much thought to when designing trusses. The code requirements are general in nature and in most cases don't control the design. However, paying attention to deflection may be the key to whether your customer is satisfied with you as a supplier and continues to buy your product. Regardless of what the codes say, most people regard large levels of deflection (usually referred to as sag in this context) as a sign of structural deficiency.

Truss design software will cut you off when code limits for deflection are exceeded, but may not prevent you from designing trusses with large deflections. For roof trusses, the deflection in inches due to live load cannot exceed the span in inches divided by 240 (L/240). For floor trusses, the deflection in inches due to live load cannot exceed the span in inches divided by 360 (L/360).

Based on these design code deflection criteria, let's calculate some allowable deflections.

For a 40'-0" roof truss with 20psf live load and 20psf dead load, the allowable deflection due to live load would be:

$$(40x12) / 240 = 2"$$

The allowable total load deflection would be twice this amount or 4", since the live load and dead loads are each 20 psf.

For a 28'-0" floor truss with 40 psf live load and 15 psf dead load, the allowable deflection due to live load would be:

$$(28x12) / 360 = 0.93"$$

The allowable total load deflection would be:

$$(55/40) \times 0.93 = 1.28"$$

As you can see from the two examples, the larger the dead load is as a percentage of the total load, the greater the increase in allowable total load deflection over allowable (live load) deflection.

Trusses are frequently cambered for the dead load portion of the deflection. In theory, once the dead loads are applied, the truss deflects downward to a flat bottom chord position giving a level ceiling line. Cambering for design dead loads that exceed actual dead loads results in a non flat or arched ceiling line that may be undesirable. For this reason, many truss manufacturers build in no camber at all. There are also many truss configurations that are impractical to camber. Trusses with no camber show deflection from all loads both dead and live.

In addition to this immediate load induced deflection, wood trusses will also experience what is called creep. Creep is a property of wood that causes trusses under a sustained long-term load (dead load) to deflect more and more with time. This can increase the calculated immediate dead load deflection one-and-one-half to two times.

Looking at our 40'-0" roof truss example, let's recalculate the expected long-term deflection considering creep.

| | | |
|---|---|---|
| Allowable deflection due to live load | = | 2.00" (L/240) |
| Allowable deflection due to dead load | = | 2.00" |
| Deflection due to creep .5(2.00) | = | 1.00" |
| Total Deflection | = | 5.00" |

Live loads tend to be conservative and in most cases the truss only sees a small

Case 1:04-cv-00436-ML-LDA Document 83 Filed 11/08/2006 Page 66 of 85

percentage of this load for a short period of time, but dead loads often exist at their full design load levels. On our 40'-0" example, considering no live load, the long-term deflection could easily be 3". With live load present, it would be greater than 3".

Three inches in forty feet is most likely noticeable and could be the source for complaints about your product. By closer control in deflection sensitive applications, you may prevent some undesirable situations from occurring.

Differential deflection can also be a problem. Differential deflection is when one point moves with respect to another. For example, if you have a flat bottom chord truss next to a scissor truss, the flat bottom chord truss may only deflect a small amount while the less stiff scissor truss deflects much more. This differential in deflection may result in a noticeable "sag" at the peak as you sight down the ridge line.

Horizontal deflection of scissor trusses may also cause problems if not carefully monitored. The Truss Plate Institute's *Design Specification* says the following about horizontal movement:

> *"In lieu of specific provisions for lateral movement of trusses and supports, total horizontal deflection at the reactions for the design of trusses shall be limited to 1.25" due to total load and 0.75" due to live load. The building designer shall design the supporting structure and truss to wall connection accordingly.*

Again, in certain deflection sensitive applications, you may need to allow less horizontal movement or at least make it clear to your customer that this can occur.

Structurally adequate, code-conforming truss designs may not always satisfy your client. You may want to consider more conservative deflection limits for certain applications. Your truss design software will provide you with the magnitude of deflection, and more conservative span to deflection ratios can be met when necessary. By staying aware of truss deflection magnitudes and of how they relate to the end of the structure, you will be better able to satisfy the needs of your clients.

This page last modified on 3/14/2003

# WorkFlow™

**Automate Your Information Flow**

## LOADING

- Check that all appropriate load cases are turned on.
  - UBC 10 psf bottom chord live load when using UBC code.
  - IRC requires some kind of bottom chord live load.
  - BOCA 42" access load when using BOCA code for residential trusses.
  - Carolina 6'-0" access load may be used in NC.
  - Unbalanced snow load for IBC.
  - IRC with roof snow load requires unbalanced snow loads.
  - Most of the time IRC will have ground snow load for a roof live load and ther unbalanced loads are required instead of unbalanced snow loads.
  - If IRC with Top chord live load greater than 70 psf, live load should be set to
  - Wind loading is required on all roof trusses.
  - FBC bottom chord live load requirements are the same as the I codes.
- Verify that all panels on truss are loaded properly - DO NOT remove all load on pa minimal load is required to cover the weight of the truss itself.
- Watch for plate sizes below the top chord as an indicator that the member is being web rather than a top chord and would therefore not be loaded with top chord loadi
- Truss program will not calculate the weight of the truss material and add it to the d for the design. Keep this in mind when running a truss at very large or small spacir
- Note: Snow load > 80 psf recommend 1.0 load duration increase on both lumk unless structural specs say otherwise.
- Minimum 16 psf top chord live load
- Minimum 4 psf top chord dead load
- Minimum 1 psf bottom chord dead load (may need to be increased for spacing les
- Affects of Changing Design Parameters on Girders – It is possible for girder loads one or more load cases if a user makes design parameter changes after loading a changing design parameters on a girder truss, users should either reset all load ca and reapply the girder loads, or examine all the load cases to ensure the loads hav expected. MiTek's Engineers recommend always resetting the girder loads whene is changed that may affect the girder loads. The program will automatically do this "Yes" when presented the dialog box when making this change. If auto loading fron all of the carried trusses must be reanalyzed along with the girder trusses. For a co description of this important issue, download the document "Affects of Changing Gi Parameters" in Adobe PDF format from the MiTek website at: http://www.mii.com/u Click on "Software Support" and then "Areas of Consideration". This can be seen i ways; either there will be no girder loading on what is obviously a girder truss or the on the drawing stating that "load # missing from load case #.... Sometimes this no to drawings because the carried truss was designed for both C&C and MWFRS an only designed for MWFRS and therefore the number of load cases does not match two trusses has an "overhang load case", etc. Note that the .LDG file that contains layout information does not come to us when trusses are sent for seals.
- Loading Webs - Extreme care needs to be taken when applying loads to webs. Al load has been applied as expected by reviewing the loads on the output.
- If there is an uplift load on a truss verify that a load case was created with and witt

# The New TPI 2002 Code: What Does it Mean for the Truss Manufacturer?

## Background

In 1995 the Truss Plate Institute (TPI) published the "National Design Standard for Metal Plate Connected Wood Truss Construction". Also called ANSI/TPI 1-1995, this code or standard has been the technical basis for truss design for almost 7 years. Literally millions of trusses have been built in accordance with this code and preceding TPI codes and these products have had an exceptional record of performance. However, in order to incorporate the latest technology all codes are typically required to go through a revision cycle and it was time for an update.

Over the last several years, this code has been revised and updated by a broad group of industry experts making up the ANSI/TPI 1-2002 Project Committee. This committee followed the American National Standards Institute (ANSI) process whereby an accredited project committee, under the auspices of TPI, developed what is called a consensus standard. Consensus is achieved when "substantial agreement has been reached by directly and materially affected interests". ANSI formally approved the new TPI 2002 standard on March 25th of this year.

The project committee was comprised of engineers from truss manufacturers, plate companies and hanger manufacturers, consulting engineers, academia and industry association representatives. Several public reviews took place where any interested party had an opportunity to comment on the standard and have his voice heard. The result of this process is a document that is based on the collective experience and engineering knowledge and best data available upon attaining evidence of consensus.

What does this all mean? When is this all going to happen? How does it affect the truss manufacturer? How are truss designs going to change? We don't have the complete story yet, but we will try to answer these questions as best we can for you in this article.

## New Code Timing

The code will make (made) its debut at this year's BCMC Show in Columbus, Ohio in October. Copies will be (were) available for purchase by interested parties. MiTek has had the standard since April and we have been busy developing specifications and doing the programming so the new provisions will be in the next software release. **The official implementation date of ANSI/TPI-1 2002 is May 1st, 2003.** This will approximately coincide with the introduction of the 2003 International Codes in which the new TPI code will be a referenced standard. We are expecting implementation timing to be highly dependent on your market conditions and how quickly the various building departments adopt/require the new standard. **Our aim is to have the new version of MiTek 20/20 with the new code option in your hands in the first quarter 2003** giving you ample time to prepare for conversion to the new code.

Old ANSI/TPI 1-1995 code selections will be maintained in the new version for ongoing jobs or for those that are required to comply with the old standard for one reason or another. **MiTek strongly recommends that building departments adopt or allow this new design standard to be used on the May 2003 effective date.** This represents the state of the art in metal plate connected wood truss design based on the latest data and engineering knowledge available. We have no concrete plan as to a phase out date for the current standard, but at some point we will support only the new standard. Truss designs will clearly state which design standard has been applied.

## Impact on Truss Manufacturer

There are many changes in the new standard that may cause truss designs to differ from the previous code. Most changes involve quality control, truss loading, plate/lumber allowable values, truss design procedures and connector plate design. These things can be handled in the design process and will be built in to our software. We will review some of the more meaningful changes, but you can be confident that this is all being done more or less automatically in the software and that MiTek designs have properly considered these

new provisions.

### Quality Control

**The largest single change is in the area of quality control,** more specifically the section in the code outlining the quality standard for the manufacturing process of metal plate connected wood trusses. WTCA originally suggested, and TPI agreed, that the current quality standard in ANSI/TPI 1-1995 does not reflect the real world issues facing truss manufacturers. Too much time is being spent inspecting trusses and there is a strong need to expedite the QC process and to make compliance more straightforward. It was determined that what was needed was a quality control procedure that was written with the inspector in mind, making it quick to inspect trusses and easy to implement and understand. This new procedure helps ensure that the trusses produced are consistent with the assumptions made in the design process.

This blending of design and manufacturing recognizes realistic tolerances and makes allowances for wood defects by reducing tooth-holding strength. There is now a new method of inspection called the Plate Placement Method (PPM) that resolves the aforementioned issues. Refer to the separate QC section for a more detailed explanation.

### Truss Loading

A requirement for partial span load cases on floor trusses with chase openings will cause more load cases to be checked. These load case checks should be transparent to the user but could result in slightly higher stress levels on some trusses.

Dead load requirements for wind are now set at .6 times the nominal design dead load which is an ASCE 7-98 requirement. This requirement is actually in some earlier versions of the software that support ASCE 7-98 and could cause uplifts to be higher.

### Plate and Lumber Changes

The Quality Control Factor Cq, reduces connector plate design values and could increase plate sizes. Refer to the separate QC section for a more detailed explanation.

Lumber tensile and compression allowable strength properties are increased by 10 percent for chord members when roof sheathing, flooring, gypsum or other load distributing elements are attached directly to the chords and there are 3 or more trusses spaced not more than 24 inches on center. Lumber bending allowable strength properties are increased by 15 percent for chord members if structural wood sheathing is attached and by 10 percent if other load sharing elements are attached. You will have to be more specific in the program relative to indicating chord sheathing materials in order to properly adjust these properties. With the additional increases on tension and compression that were not applied in the previous code, trusses should span slightly farther or lower lumber grades and/or sizes may work where they did not before.

Structural finger-jointed materials are now expressly permitted to be used interchangeably with solid sawn members of the same grade and species.

### Truss Design Procedures

The TPI simplified method of design (Truss in MI 20/20) has been removed from the code and placed in a non-mandatory appendix. The more exact matrix method is now the approach of choice in the standard and will be automatically invoked in MiTek software.

There are a few changes to compression element buckling lengths for both webs and chords that could cause slight changes. Webs with a single brace for example will now utilize the .8 buckling factor and may carry more compression load than before for like size and grade material.

3x2 floor truss top chord bearing reaction limits are now outlined in the standard.

Floor truss total load deflection limits are now set to L/360 for ceramic tile floors.

Total load deflection calculations will now consider time dependent deformation or creep.

### Connector Plate Design

The previously discussed QC changes will impact connector plate design, and a requirement to consider a plus or minus 10 degree plate rotation must also be considered. These changes could increase plate sizes slightly.

The current code requires all plate connections to be sized for a minimum of 375 pounds of force. The new code applies this requirement only for trusses over 16 feet in span. This could cause plate sizes to decrease slightly on short spans.

Other new requirements address the design of connector plates for moment and methods to determine effective steel sections to resist tensile forces. These changes could impact connector plate sizes/design.

## Conclusion

The changes discussed in this article are intended to provide an overview of the new TPI 2002 standard only. In general, the standard will produce truss designs that are not too different from what you are accustomed to seeing. There will be some small changes in the areas discussed. How the changes impact your specific truss designs will be best established by using the new TPI 2002 version of the software when it is available. For those readers interested in more specific details, you can reference the new standard directly.

We can assure you that MiTek will do all it can to provide you with powerful design tools that will produce structurally sound, competitive and code complying truss designs. After all, we have been around since this industry's inception and have proudly provided truss designs to our great customers since the first TPI standard came out some 40 years ago. We sincerely appreciate your business and look forward to helping you succeed and grow in the future.

## Quality Control Changes

Plate Placement Method (PPM) for new and improved QC.

The Plate Placement Method has built in a tolerance for lumber defects and ineffective teeth due to flattening. This was accomplished by reducing plate tooth holding values by 20% for roof trusses and 10% for floor trusses. These reductions are built into the tooth lateral resistance values and a quality control factor Cq can be used to adjust the values.

PPM provides a fast and easy way to effectively monitor truss joint quality. Only critical joints are checked where the joint stress index (jsi) exceeds .8. For these critical joints, the software, upon request, will produce a QC detail. This detail will be a graphical representation of the joint that shows position tolerances as calculated by the software. These position tolerances will be in the form of what we are calling a tolerance polygon. This is the shape in which the center of the plate must stay in order for the joint to be okay with the specified plate. This shape can be different or unique for every joint. The plate location tolerance figure from ANSI/TPI 1-1995 will no longer be used because an exact tolerance is now calculated and shown with the tolerance polygon.

An example illustrates this better.

*5x6 MII 20 As specified by the software with center of plate on joint center.*



*5x6 MII 20 Plate misplaced slightly but OK.*



*Plate not OK*



The diamond shaped polygon on this joint represents how much the plate center can move up, down, left or right and still be okay. If the center of the plate is outside of the tolerance polygon (diamond shape in this example) the plate does not work.

The software will, upon request, produce a joint QC detail on an 8 1/2" x 11" sheet of vellum or paper and will contain:

> Lines that allow the inspector to align the QC detail on the joint. These will generally be the lumber edges.
> The tolerance polygon that shows plate-positioning boundaries.
> Angle reference lines that define the maximum allowable rotation of the plate.
> An area representation of the allowable defect area permitted.

The basic positioning requirements are met and the joint is acceptable if the center of the plate falls within the tolerance polygon, has been rotated less than or equal to the reference line shown and the defects are less than the graphic representation shows.

Tooth Count Method (TCM)

There is a second or alternative joint inspection method called the Tooth Count Method. This is essentially the same general method we have used for some time and is available

as necessary. Any time the quality control factor Cq is set above 1.0 for typical roof trusses and 1.11 for floor trusses (flat orientation lumber) the TCM is utilized. This method may also be used if a joint is difficult to plate and can't be plated with the reduced values built in to the PPM. The software will clearly state which method has been assumed and if any particular joints are exceptions, it will also be stated.

The graph below shows the inverse relationship between Cq and tooth holding reductions. Since the reductions are now built in to the values, Cq is used to increase them to previous levels if necessary.




*Tooth Holding Factor Relationship to Quality Control Factor Cq*

MiTek software will default to the PPM method and our recommendation is that this approach be used. Financial impact studies have shown that due to plating for handling and other factors the increase in overall truss cost due to using the PPM method is less than 2/10ths of one percent for a representative group of trusses. In our view the benefits considerably exceed the costs, which are negligible.

## Joint Wood-to-Wood Gaps

Gaps are now measured at plate edges. Gap criteria is simple and consistent. A maximum of 1/8" is allowed for most conditions with the exception of floor truss chord splices where the maximum gap is 1/16". Fig. 3.7-3 from the TPI 2002 Standard, shown below, shows typical joints with wood-to-wood member gap tolerances.




This page last modified on 3/14/2003

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EAGLE'S NEST CONDOMINIUM ASSOCIATION, INC., ALSO KNOWN AS EAGLE NEST CONDOMINIUM ASSOC.

vs. C.A. No. 04-436ML

NEW LONDON COUNTY MUTUAL INSURANCE COMPANY, NLC INSURANCE COMPANIES, INC., DOES I THROUGH V, AND NLC INSURANCE COMPANIES, ALIAS JOHN DOE COMPANY, et al.

DEPOSITION OF MICHAEL GRAFE, P.E., a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Allied Court Reporters, Inc., 115 Phenix Avenue, Cranston, Rhode Island on October 25, 2006 at 10:00 A.M.

APPEARANCES:

FOR THE PLAINTIFFS......LAW OFFICE OF STEVEN ORABONE
BY: STEVEN H. ORABONE, ESQUIRE

FOR THE DEFENDANTS......SMITH & BRINK, P.C.
BY: RONALD LANGLOIS, ESQUIRE

ALSO PRESENT: Dr. Alawa

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500



EXHIBIT G

# I N D E X

| WITNESS | PAGE |
|---|---|
| MICHAEL GRAFE | |
| EXAMINATION BY MR. ORABONE | 3 |

## E X H I B I T S
## (PLAINTIFFS')

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | STRUCTURAL ANALYSIS & DESIGN, BY S.D. RAJAN PAGE 138 | 96 |
| 2 | CODE OF ETHICS FOR ENGINEERS | 96 |
| 3 | MATERIALS FOR CIVIL AND CONSTRUCTION ENGINEERS | 119 |

here?

A. I'm not familiar with that exact number, no.

Q. Do you agree with this -- they seem to be illustrating six modes of failure here, correct?

A. Crushing -- yes, I agree there. They're illustrating some modes of failure. Yes.

Q. Six of them?

A. Six of them.

MR. ORABONE: Let's mark that Exhibit 3, and I think I'll be done.

(PLAINTIFFS' EXHIBIT 3 MARKED FOR IDENTIFICATION)

MR. ORABONE: I'm done.

MR. LANGLOIS: I just want to say one thing. All we want to say, Mr. Alawa testified back at the first time in July of 2006, and essentially, it was one of the things was asked was about producing literature, and Mr. Alawa produced a list of websites, and we discussed this when he was deposed again on September 18, 2006. And what we asked, I think it was on the record, but we talked about it.

MR. ORABONE: I think it was on the record.

MR. LANGLOIS: Basically identifying

any literature where the MiTek program was discussed doing a failure analysis of trusses. At that point in time Mr. Alawa couldn't identify any specific ones, and we said that he -- if he found some, he would identify them for me. I think I sent an E-mail to you recently, Steve --

MR. ORABONE: Yes.

MR. LANGLOIS: -- saying I don't have any yet. It's my understanding from speaking with Dr. Alawa today that he's not found any where the MiTek analysis was specifically referenced with respect to doing failure analysis in trusses; is that correct?

DR. ALAWA: Yes. Failure and MiTek as two words is not under any research.

MR. LANGLOIS: Thank you very much. That's all.

(DEPOSITION CLOSED AT 1:07 P.M.)

# STATE OF RHODE ISLAND
# BEFORE THE RHODE ISLAND ETHICS COMMISSION

## In Re: Steven M. Clarke Complaint No. 94-16

## DECISION AND ORDER

Pursuant to the Rhode Island Code of Ethics R.I.G.L. §36-14-1, et seq. and Regulation 1017, the Rhode Island Ethics Commission held adjudicative hearings in open session on the above-entitled matter on April 17, June 19, June 20, and June 21, 1996. Written closing arguments were then submitted. The Commission deliberated on July 11, 1996 and on July 26, 1996 completed its deliberations and voted as to all findings in this Decision and Order. A stenotypist was present on April 3, April 17, June 19, June 20, and June 21, 1996 to record the proceedings. The following Commissioners were present for the taking of all testimony and participated in this Decision and Order:

Richard Morsilli, Chair Richard Connor

John J. O'Brien, Vice Chair Henry A. Belin, III

Kathie Chadwick

Martin F. Healey, Executive Director and Chief Prosecutor, presented the case to the Commission. The Respondent was represented during the adjudicative proceedings by Attorneys Francis Gaschen and Patrick Quinlan. The Respondent was present during all adjudicative proceedings. Gary Yesser attended all proceedings as Counsel to the Commission.

### TRAVEL

On February 25, 1994 the Rhode Island Ethics Commission received a complaint filed by Roger Anthony of North Kingstown, Rhode Island (sometimes hereinafter the "Complainant"). The complaint was filed against Steven M. Clarke in connection with Mr. Clarke's actions as a member of the Rhode Island Board of Registration for Professional Engineers (sometimes hereinafter the "Board"). The complaint included allegations of improper conduct by Mr. Clarke for the period from March, 1993 to June, 1993. In the complaint, Mr. Anthony alleged that Mr. Clarke, as a Board member, participated in disciplinary matters involving the complainant at a time when Mr. Clarke simultaneously had private business interests in conflict with those of Mr. Anthony. On March 16, 1994, the Respondent filed an Answer denying any improper conduct.

On April 25, 1994, the Commission made an initial determination that the facts, as alleged, may constitute violations of the Code of Ethics. As a result, the Commission authorized the Executive Director to investigate the matter. The matter proceeded to investigation and was subject to two 60-day extensions, each granted by the Commission upon request by the prosecutor, and for good cause shown. The investigation concluded on December 21, 1994. On December 28, 1994, the Executive Director filed his report including a Motion to Amend the Complaint, at which time the Respondent was sent a notice of hearing regarding the probable cause determination and motion.

The Respondent was first represented by Attorney Paul L. Foster in these proceedings. Based upon Mr. Foster's service and responsibilities as legal counsel to the Rhode Island Board of Registration for Professional Engineers, the Prosecutor filed a motion to disqualify Mr. Foster as counsel for the Respondent in these proceedings. That motion was granted by order of December 13, 1994. Attorneys Gaschen and Quinlan subsequently entered their appearance and represented the Respondent at all times subsequent.

On March 29, 1995, a hearing was held pursuant to R.I.G.L. §36-14-12(c)(4) and Commission Regulation 1006. After argument, the Commission entered an Order and Finding of Probable Cause as to the following allegations:

1. The Respondent, as a Member of the Rhode Island Board of Registration for Professional Engineers, had an interest which was in substantial conflict with the proper discharge of his duties and employment in the public interest and of his responsibilities as prescribed in the laws of this state, to wit, his participation in investigative and enforcement actions involving James Salem, from approximately December, 1992, to the filing date of the complaint, all in violation of R.I.G.L. §§36-14-5(a) and 36-14-7(a); and,

2. The Respondent, as a Member of the Rhode Island Board of Registration for Professional Engineers, used his public office to obtain financial gain, other than that provided by law, for himself and his company, Commonwealth Engineering, by his participation in investigative and enforcement actions involving James Salem, from approximately December, 1992, to the filing date of the complaint, all in violation of R.I.G.L. §36-14-5(d).

3. The Respondent, as a Member of the Rhode Island Board of Registration for Professional Engineers, had an interest which was in substantial conflict with the proper discharge of his duties and employment in the public interest and of his responsibilities as prescribed in the laws of the state, to wit, his participation in investigative and enforcement actions involving Roger Anthony and Land Use, from approximately February, 1993, to the filing date of the complaint, all in violation of R.I.G.L. §§36-14-5 (a) and 36-14-7(a);

On April 18, 1995, a notice was forwarded to counsel setting adjudication for June 28, 1995. On June 28, 1995, by agreement, the matter was continued. Ultimately, the matter was set for adjudication to begin on April 3, 1996.

On April 3, 1996, immediately prior to the scheduled start of the adjudicative proceedings, the Respondent filed and argued several motions with the Commission. First, the Respondent filed a Motion to Dismiss based upon the Prosecutor's failure to file an amended complaint after the Motion to Amend was granted. After deliberations, the Commission denied the Motion based upon a finding that the Order and Finding of Probable Cause represented an amended complaint, and satisfied any requirements due Respondent as to notice relating to the amended allegations. Respondent's counsel also filed and argued a Motion to Exclude based upon the Prosecutor's failure to produce materials requested during discovery. After deliberations, the Commission denied the motion as a Motion to Exclude, but, treating it as a Motion to Continue, granted the Motion and continued the hearing to April 17, 1996, specifically permitting the Respondent's counsel to view any materials properly discoverable between April 4 and April 17, 1996. On April 3, 1996, Respondent also filed and argued a Motion to Dismiss based upon a lack of timeliness in the completion of the investigation and in connection with the request for extensions of time to complete the investigation. After deliberations, the Commission denied that motion finding that the completion of the investigation and the requests for extensions were timely and proper.

Immediately prior to the April 17, 1996 adjudicative hearings, the Respondent sought Interlocutory Judicial Review in the Supreme Court seeking dismissal of the complaint, and a stay of the adjudicative proceedings. At noon on April 17, 1996, the duty Justice of the Supreme Court denied the Respondent's Petition for Writ of Certiorari and Request for Stay, as premature, and, the adjudicative proceedings before the Commission began later on that date.

## SUMMARY OF ADJUDICATIVE PROCEEDINGS

On April 17, 1996, after opening statements, the Commission first heard testimony from Agnes Smith, Secretary for the Rhode Island Board of Registration for Professional Engineers. Numerous exhibits were identified and introduced through Ms. Smith. At the conclusion of Ms. Smith's testimony, the Commission next heard testimony from Richard Kirby, Assistant Solicitor for the Town of Cumberland, Rhode Island, and counsel to the Zoning Board for the municipality. Exhibits relating to the minutes of the Cumberland Zoning Board of Review and transcripts from its proceedings on April 14, 1993 were identified and introduced through Mr. Kirby. At the conclusion of Mr. Kirby's testimony, the adjudication recessed until June 19, 1996.

On June 19, 1996, the prosecution case continued with testimony by Deidre Paiva. Ms. Paiva identified herself as an employee of the engineering firm in which the Respondent has an ownership interest, and, she testified as to her work involving a certain traffic study in Cumberland, Rhode Island in 1993. Exhibits including billings for services rendered by Respondent's firm in connection with that traffic study were identified and introduced through Ms. Paiva. At the conclusion of Ms. Paiva's testimony, the Commission heard testimony from Raymond Marshall. Mr. Marshall identified himself as a member of the Rhode Island Board of Registration for Professional Engineers, who served with Mr. Clarke on that Board . At the conclusion of Mr. Marshall's testimony, the proceedings recessed until June 20, 1996.

The prosecution's case continued on June 20, 1996 with the testimony of Karen Beck. Ms. Beck identified herself as a landscape architect employed by the Respondent's engineering firm, and she also testified as to the Cumberland traffic study. On that same date, the Commission heard testimony from James Salem. Mr. Salem identified himself as a Traffic Consultant, and, he testified as to certain investigations and enforcement actions taken against him by the Rhode Island Board of Registration for Professional Engineers for the period from 1990 through 1994 and to the present. Exhibits were identified and introduced through Mr. Salem relating to those actions.

Roger Anthony, the complainant in this matter also testified on June 20, 1996. Mr. Anthony testified as to his company, Land Use Specialists, Inc., its work in connection with a project known as the "Black Point" project, and an investigation of his company in which the Respondent's Board was involved. Exhibits were identified and introduced through Mr. Anthony relating to actions involving his company and the Rhode Island Board of Registration for Professional Engineers for the period from January to May, 1993. At the conclusion of Mr. Anthony's and Mr. Salem's testimony on June 20, 1996, the prosecution rested. The Defense then made an oral motion to dismiss the complaint, which was denied after deliberations.

On June 21, 1996, the defense began with testimony of Thomas Andolfo. Mr. Andolfo identified himself as the appraiser and expert who was engaged by the State of Rhode Island in connection with the matter known as the Black Point Project and, that his firm engaged the Respondent's firm to perform engineering services relating to that project. A written document relating to his engagement was identified and introduced as an exhibit through Mr. Andolfo. At the conclusion of Mr. Andolfo's testimony, the Respondent then testified on his own behalf. Exhibits were also identified and admitted through the Respondent. The Respondent then rested.

The proceedings concluded on June 21, 1996. At the request of the Commission, the prosecution and Respondent each subsequently submitted written closing arguments. The Commission deliberated the matter on July 11, 1996.

## SUMMARY OF PERTINENT TESTIMONY AND EVIDENCE

Steven M. Clarke, after completing all necessary educational and professional requirements, has been engaged as a professional engineer in the State of Rhode Island for approximately 15 years. Mr. Clarke is the co-owner of an engineering firm known as Commonwealth Engineers and Consultants, Inc. In 1992, Mr. Clarke was appointed by the then Governor Sundlun to serve as a Member of the Rhode Island Board of Registration for Professional Engineers. In 1993 he was elected by his colleagues on the Board to serve as its Vice Chair and, since 1994, he has served as its Chair.

The statutory obligations of the Board include the establishment of rules and regulations for the examination of applicants, the registration of professional engineers, the setting of requirements for continuing education, and the conducting of disciplinary proceedings, including investigating complaints relating to the practice of engineering.

### Salem Matter

Much testimony was introduced as to the Board's responsibilities and actions relating to the investigation of those persons who lack the proper credentials to operate as professional engineers in this state. One of the individuals investigated by the Board was James M. Salem, a resident of Barrington, Rhode Island. The investigation of Mr. Salem began on or about 1990, at which time Mr. Salem received an inquiry from the Secretary of the Board relating to his use of the word "Engineer" when testifying as to traffic matters before zoning boards and planning boards throughout the State of Rhode Island. Mr. Salem was advised that since he was not a registered professional engineer, the use of the word "Engineer" in his practice and testimony was improper and forbidden under the law. Mr. Salem responded, and advised the Board that he held a Master of Science Degree from an engineering college and that in connection with his testimony, whenever necessary, he would have his work first reviewed and approved by a licensed and registered professional engineer. Mr. Salem also indicated that since his particular specialty in transportation did not extend to other fields of engineering, he did not intend to sit for the qualifying Rhode Island examination.

The communications between Mr. Salem and the Rhode Island Board of Registration for Professional Engineers continued after 1990. Mr. Salem testified that before his investigation by the Board, his income from testifying as a traffic consultant before cities and towns throughout Rhode Island earned him in excess of "six figures" annually, and that as of the present time, it is less than 10% of those amounts.

By 1991 and 1992, the Board had advised Mr. Salem on numerous occasions that he could not testify as an "Engineer" or "Expert" under any circumstances, that he must affirmatively disclose in writing to every client that he was not licensed in the state as an engineer, and also that he must affirmatively disclose to any Board, Panel, Commission or other forum that he was not so licensed prior to his giving testimony. It was also required that Mr. Salem notify the Board every six months as to his appearances and before whom he had testified. All communication from the Board to Mr. Salem advising him as to the conditions for his continued work were from Paul L. Foster, Legal Counsel to the Board.

In December of 1992, Mr. Salem was engaged to perform a traffic flow analysis in connection with a project in Cumberland, Rhode Island, known as the Chelo's Health Club. Specifically, on December 11, 1992, the superintendent for field operations for the construction manager on the job engaged Mr. Salem

to complete the traffic flow analysis and advised Mr. Salem that the report should be started immediately.

As of December, 1992, the Respondent's engineering firm, Commonwealth Engineering and Consultants, Inc., was also engaged by the construction manager on the Chelo's project to perform services. As of that time, those services did not include the traffic study. However, on February 15, 1993, the Respondent's employee, Deidre Paiva, advised the construction manager that Commonwealth Engineering and Consultants, Inc. would be performing the traffic study for the Chelo's Health Club project. Two days after that notification, on February 17, 1993, Karen A. Beck, RLA, another of the Respondent's employees, advised Mr. Salem in a telephone conversation that the traffic analysis which he prepared was inadequate, and that employees of Commonwealth Engineering and Consultants would be performing the traffic report services and would be appearing before the municipality. In response, Mr. Salem advised Ms. Beck that his reports had previously been accepted by the Rhode Island Department of Transportation, the Town of Cumberland, and numerous other municipalities within Rhode Island. Ms. Beck advised Mr. Salem that, regardless of the acceptance of previous reports, the traffic study for the Chelo's project would be done by in-house personnel at Commonwealth Engineering and Consultants. Immediately after that telephone conversation, Ms. Beck made a written log of that conversation, advised the Respondent that no traffic study would be forthcoming from Mr. Salem, and advised Respondent that "a 16-hour traffic count would need to be done" by Commonwealth Engineering.

Mr. Salem did not heed the advice of Ms. Beck. In fact, on March 10, 1993, he completed and was prepared to testify and present the Chelo's traffic study before the Cumberland Zoning Board of Review. On that same date, the Rhode Island Board of Registration for Professional Engineers met. The Respondent was in attendance. The minutes of that meeting indicate that "this Board sent a letter of clarification to an individual who is not registered in the state and is appearing as a traffic engineer." On that same date, Paul L. Foster, legal counsel, sent a letter to the Town Solicitor for the Town of Cumberland specifically advising the municipality that Mr. Salem was not a registered engineer and therefore could not present or testify as an expert in connection with traffic engineering studies or evaluations. The letter specifically indicated that in the Board's opinion, any presentation by Mr. Salem should not be used as a traffic engineering study or evaluation. Copies of that correspondence were provided to the Respondent in his capacity as Vice Chair. Two days later a letter was sent from Mr. Foster to Mr. Salem advising as to possible further action including injunctive relief in the Superior Court, all "to protect the general public" .

Richard Kirby, an Assistant Solicitor for the Town of Cumberland, testified that during 1993 he served as counsel to the Zoning Board. His offices had reviewed Mr. Foster's March 10, 1993 correspondence, and, based upon that letter advised the Zoning Board that Mr. Salem was not qualified to testify in connection with the traffic study. Ultimately, the Chelo's presentation for the traffic study was presented to the Cumberland Zoning Board by Deidre Paiva on April 14, 1993. Ms. Paiva is identified in the minutes of the Cumberland Zoning Board meeting as "a traffic and transportation engineer with Commonwealth Engineers". Ms. Paiva testified that although she was not a professional engineer, she prepared her traffic study under the supervision of the Respondent.

On May 1, 1993, Mr. Salem billed the contractor the sum of $950 for the traffic studies in connection with the Chelo's project. On May 20, 1993, Mr. Salem was advised by the contractor that since he was not a "registered engineer", the project was "put in a position where it had to hastily get a registered engineer". As a result, Mr. Salem was not paid since his study was not utilized. The Respondent's firm was paid approximately $2,000 for the study.

**Land Use/Black Point Matter**

During 1992, the Rhode Island Board of Registration for Professional Engineers began review of a complaint against Gerald Narkiewicz, a Registered Professional Engineer. The matter was settled, and on January 23, 1993, a consent order was forwarded to Mr. Narkiewicz's attorney relating to the matter. That consent order provided for a voluntary suspension from the practice of engineering by Mr. Narkiewicz for the period from February 1, 1993 through April 30, 1993. The consent order was agreed to by Mr. Narkiewicz on February 1, 1993.

It subsequently came to the attention of the Rhode Island Board of Registration for Professional Engineers that Mr. Narkiewicz might have violated the consent order suspension by practicing professional engineering during the period between February 1, 1993 and April 30, 1993. That matter resulted in a hearing, and was resolved by Decision and Order of the Board dated May 11, 1993, which provided for additional sanctions.

During the time of action by the Board involving Mr. Narkiewicz, the Board was also taking action against an entity known as Land Use Specialists, Inc., of North Kingstown, Rhode Island. That entity is owned by Roger W. Anthony, the Complainant, who is a registered land surveyor. The Board advised Mr. Anthony that his organization could not engage in "Engineering", unless it had a professional licensed engineer in charge of those activities. Mr. Anthony responded to the Board through correspondence and an application proposing that the engineer in responsible charge for that entity was Gerald Narkiewicz. On March 26, 1996, the Board advised Land Use that Mr. Narkiewicz was under suspension and therefore could not serve in a capacity as an "engineer in responsible charge".

In early 1993, Land Use Specialists, Inc. was engaged by William McGovern, owner of an appraisal company named Northeast Investment Company, to provide services for the State of Rhode Island, relating to litigation concerning Black Point, an area of land in Narragansett, Rhode Island. During that time, the State was involved in proceedings before the Superior Court relating to that property. Land Use Specialists, Inc. completed its work for the Black Point job and billed Mr. McGovern's company for that work on April 2, 1993. Although Land Use Specialists, Inc. expected to do additional work for the Black Point job, it was understood that any further engagement would be through Mr. McGovern's offices.

In late April, 1993, the lawyers who were representing the interests of the state in the Black Point case decided to engage Thomas Andolfo to serve as its expert witness appraiser for the Black Point litigation. Mr. Andolfo, rather than Mr. McGovern, ultimately testified on behalf of the State as its expert witness appraiser.

In May of 1993, shortly after his engagement, Mr. Andolfo chose the Respondent's engineering firm to serve as its expert engineer for the Black Point project. The Respondent testified that prior to being hired by Mr. Andolfo, he had no knowledge that Mr. Andolfo's company had performed any tasks in connection with the Black Point project, or that Land Use Specialists, Inc. had any expectation that it would continue to perform services involving Black Point.

## DISCUSSION

The Respondent stands before the Ethics Commission charged with three violations of the Code of Ethics. We shall first discuss the "Salem" matter, and follow with the "Land Use/Black Point" matter.

In connection with the matter involving James Salem, the Respondent is charged with having an interest in substantial conflict with the proper discharge of his duties and employment in the public interest, and of his responsibilities as prescribed in the laws of this state, in violation of R.I.G.L. §36-14-5(a), as

defined in R.I.G.L. §36-14-7(a). In addition, the Respondent is charged with using his public office to obtain financial gain, other than that provided by law, for himself and his company, Commonwealth Engineering, in violation of R.I.G.L. §36-14-5(d).

The Commission heard many witnesses and reviewed numerous documents regarding the propriety of Mr. Salem identifying himself as "engineer", "expert", "consultant", and the like. The Respondent argued forcefully that he had a professional duty as a member of the Rhode Island Board of Registration for Professional Engineers to take steps to protect the public by insuring that individuals such as Mr. Salem who were not registered professional engineers did not hold themselves out as such, or participate or testify in matters for which only a registered professional engineer was qualified. The prosecutor argued with equal force that the limitations applied to Mr. Salem were not applied to the Respondent's own employees, and that such double standard, represents a violation of the ethics law.

However, irrespective of whether the actions of the Board involving Mr. Salem were or were not proper, certain facts are not subject to dispute. First, Mr. Clarke's business was performing certain engineering services for the Chelo's project, and those services excluded the traffic study which was to be handled by Mr. Salem. Secondly, Mr. Clarke participated in actions in his official capacity which resulted in Mr. Salem's disqualification from the Chelo's project. Lastly, the individual and company who benefited from that disqualification was the Respondent and his business, since that office completed the traffic study and was paid for the traffic study.

In this case, it is not the conduct of Mr. Clarke relating to Mr. Salem, in and of itself, that results in violations of the Code of Ethics. It is that Mr. Clarke and his company had an expectation to benefit and did benefit as a result of Mr. Clarke's official actions.

The Respondent here had a choice. If he chose to actively be involved in the investigation and enforcement action by the Board against Mr. Salem, he should have declined any business for himself or his firm relating to the traffic study for the Chelo's project. Alternatively, if he chose to address his personal business interests, he should have recused as to all matters before the Board involving Mr. Salem and Chelo's during the time he and his company were performing services for that job. He did neither. He chose to participate as a public official, and, to simultaneously receive a private benefit for himself and his company. This he cannot do under the Code of Ethics.

On the "Land Use/Black Point" matter, the circumstances are significantly different. In that case, it appears that the Respondent's conduct as a member of the Board in connection with matters concerning Gerald Narkiewicz and Land Use was without any reasonable expectation of benefit for Respondent or his company. The evidence presented in that matter indicates that the active investigation and enforcement actions involving Mr. Narkiewicz, and the review of the Land Use Specialists, Inc. application process, all occurred between January and April, 1993, prior to engagement of the Respondent's firm in May of 1993 to serve as an expert engineer for the Black Point project. The evidence fails to show that the Respondent expected, or had reason to expect, any benefit for him or his business as a result of his official action

We believe that in order to avoid any appearances of impropriety, the Respondent should have recused in all matters before the Board concerning Mr. Narkiewicz and Land Use Specialists, Inc. once he became involved in the Black Point project on and after May, 1993. However, we nevertheless conclude that since no evidence exists providing any improper nexus between the official action of the Respondent, and the subsequent engagement of his business, we find no violation of the Code of Ethics as to the "Land Use" matter.

## FINDINGS OF FACT

Based upon our review of all evidence, we make the following findings of fact:

1. The Respondent Steven Clarke was appointed by Governor Sundlun to serve as a member of the Rhode Island Board of Registration for Professional Engineers in 1992, and he has continued to serve in such capacity to the present time.

2. The Respondent is a one-half owner in a company known as Commonwealth Engineers and Consultants, Inc. In May of 1992, that company was hired to perform engineering services in connection with the Chelo's project.

3. In December, 1992, an individual known as James Salem was engaged to perform a traffic study for a project known as the Chelo's project in Cumberland, Rhode Island.

4. During various periods between February, 1993, and April, 1993, the Respondent participated in or took official actions in his capacity as a member of the Rhode Island Board of Registration for Professional Engineers involving James Salem, which resulted in Mr. Salem's inability to perform the Chelo's traffic study.

5. As a result of the Respondent's official actions as a member of the Board, the traffic study for the Chelo's project was subsequently performed by the Respondent's company and the Respondent was the engineer in charge of the traffic study. The Respondent's firm was paid for that study in the amount of approximately $2,000.

6. During the period between January, 1993 and April, 1993, the Rhode Island Board of Registration for Professional Engineers took certain actions involving Land Use Specialists, Inc., and a professional engineer known as Gerald Narkiewicz.

7. Land Use Specialists, Inc. had performed certain services on behalf of an appraiser engaged by the State of Rhode Island, in connection with a certain matter known as Black Point, Narragansett, Rhode Island.

8. In May of 1993, a subsequent appraiser was engaged by the state for the Black Point project. That appraiser, Thomas Andolfo, engaged the Respondent's firm to serve as its expert engineer for the Black Point case in late May 1993.

9. At the time the Respondent took official action involving Land Use Specialists, Inc. he had no knowledge of any business relationship between Land Use Specialists, Inc. and the Black Point project, and he had no expectation or reason to expect that he or his business might benefit as a result of that action.

## CONCLUSIONS OF LAW

On the basis of the evidence and our factual findings, we hold and conclude as follows:

1. We find that the Respondent, as a member of the Rhode Island Board of Registration for Professional Engineers, had an interest which was in substantial conflict with the proper discharge of his duties and employment in the public interest and of his responsibilities as prescribed by the laws of this state, by his participation in investigative and enforcement actions involving James Salem, from approximately

December, 1992 forward, in violation of R.I.G.L. §36-14-5(a) as defined by R.I.G.L. §36-14-7(a); and,

2. We find that the Respondent, as a Member of the Rhode Island Board of Registration for Professional Engineers, used his public office to obtain financial gain, other than that provided by law, for himself and his company, Commonwealth Engineering, by his participation in investigative and enforcement actions involving James Salem, from approximately December, 1992 forward, in violation of R.I.G.L. §36-14-5(d).

We find the charges against the Respondent relating to his participation in investigative and enforcement actions involving Roger Anthony and Land Use Specialists, Inc. do not represent violations of the Code of Ethics, and they are therefore DENIED and DISMISSED.

## PENALTY

As to the Salem matter, the Respondent is ordered to pay a civil penalty in the amount of $4,000.00 representing, $2,000.00 for violations of R.I.G.L. §36-14-5(a), and $2,000.00 for violations of R.I.G.L. §36-14-5(d). Payment must be made within 30 days of this decision.

## VOTE

The vote on the Decision and Order was UNANIMOUS.

Richard W. Morsilli, Chair

July , 1996

NOTICE

PURSUANT TO R.I. GEN. LAWS, § 36-14-15 ANY ACTION BY THE COMMISSION SHALL BE SUBJECT TO APPEAL AND REVIEW PURSUANT TO THE ADMINISTRATIVE PROCEDURES ACT.